## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARQUIS JACKSON, | |
| Plaintiff, | Case No. _____ |
| v. | |
| CITY OF NEW HAVEN; and LEROY DEASE, PETISIA ADGER, DARYLE BRELAND, and JAMES STEPHENSON, in their individual capacities. | **COMPLAINT AND JURY DEMAND** |
| | MARCH 13, 2019 |
| Defendants. | |

Plaintiff Marquis Jackson, by and through his undersigned attorneys, states as follows:

### INTRODUCTION

1.      Beginning in early 1999, Plaintiff Marquis Jackson, then a 19-year-old resident of New Haven, was wrongfully arrested, imprisoned, prosecuted and convicted for a murder he did not commit. Simultaneously therewith, Vernon Horn, another resident of New Haven and long-time acquaintance of Marquis, was likewise wrongfully arrested, imprisoned, prosecuted and convicted for the same crime, currently the subject of a pending action before this Court against the same defendants named herein. *Vernon Horn v. City of New Haven, et al.*, Civ. No. 3:18-cv-1502 (JAM). Although no physical or forensic evidence ever connected Marquis to the crime, he was charged and convicted as a result of the defendants' creation of false and misleading evidence and suppression of exculpatory evidence, as part of a pervasive and long-standing

1

custom, policy, pattern and practice of "closing" high profile criminal cases at all costs, in knowing and recklessly indifferent disregard of the constitutional rights of Plaintiff and similarly situated persons.

**2.**     As a result of defendants' actions as pled herein, Marquis was wrongfully incarcerated for nineteen years – critical years between age 19 and age 38.  During that time, he missed many of life's most precious moments, separated from his family and unable to begin and enjoy a family of his own, and was caused to suffer severe mental anguish, emotional distress, loss of income, loss of past and future earning capacity, humiliation, indignities, injury to reputation, and restrictions on all forms of personal freedom, including, but not limited to, diet, sleep, personal contact, educational opportunity, gainful employment, sexual activity, personal fulfillment, and loss of life's enjoyment in numerous other respects.

## **PARTIES**

**3.**     Plaintiff Marquis Jackson is a 39-year-old man who is a citizen of the United States.  At the time of his wrongful arrest in March 1999, he resided in New Haven, Connecticut.  Mr. Jackson was finally released from prison more than 19 years later, after the State itself acknowledged that his conviction lacked integrity, and the Connecticut Superior Court vacated his conviction and dismissed all charges.

**4.**     Defendant City of New Haven (the "City") is a municipal corporation organized under the laws of the State of Connecticut. The New Haven Police Department (the "NHPD") is an agency of the City.

**5.**     Defendant Leroy Dease was formerly a Detective in the NHPD.  He is now retired from

the NHPD. At all relevant times, he was acting within the scope of his employment with the NHPD and under color of state law.  He is sued in his individual capacity.

6.      Defendant Petisia Adger was formerly a Detective in the NHPD.  She was later promoted to Assistant Police Chief. She is now retired from the NHPD. At all relevant times, she was acting within the scope of her employment with the NHPD and under color of state law.  She is sued in her individual capacity.

7.      Defendant Daryle Breland was formerly a Detective in the NHPD. He is now retired from the NHPD. At all relevant times, he was acting within the scope of his employment with the NHPD and under color of state law.  He is sued in his individual capacity.

8.      Defendant James Stephenson is a firearms examiner who was formerly employed by the Connecticut State Police Forensic Science Laboratory. At all relevant times, he was acting within the scope of his employment with the State of Connecticut and under color of state law. On information and belief, he is now retired from government employment and runs a consulting business.

## JURISDICTION AND VENUE

9.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Mr. Jackson's rights as secured by the United States Constitution. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

10.     This Court has supplemental jurisdiction over Mr. Jackson's state law claims pursuant to 28 U.S.C. § 1367(a).

**11.**     Venue is proper in the District of Connecticut under 28 U.S.C. § 1391(b), in that this is the District in which the claims arose.

**JURY DEMAND**

**12.**     Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Federal Rule of Civil Procedure 38(b).

**FACTUAL ALLEGATIONS**

*The January 24, 1999 Murder of Caprice Hardy*

**13.**     On January 24, 1999, shortly after 3:26 am, three armed, masked men barged into an all-night delicatessen located at the corner of Dixwell Ave. and Bassett St., in New Haven, CT.  One of the men immediately opened fire, killing Caprice Hardy, a customer standing at the counter.

**14.**     In short order thereafter, two of the three men entered a rear room of the Deli, rummaging around for money and taking a cell phone and pager belonging to one of the store employees.

**15.**     After returning to the front of the store, in addition to taking money from several persons present at the time, the men attempted to open the store cash register, but were scared off by the sound of sirens, upon which the three of them all fled the Deli.

**16.**     While all of this happened, Marquis was at an apartment at 249 County Street in New Haven, in the company of Tesha Smith, with whom he spent the night and the following morning; and Vernon Horn was in a rooming house with Zaneta Berryman at 235 W. Ivy Street, likewise in New Haven.  Neither Marquis nor Vernon was among the three men who robbed the

4

Deli and killed Caprice Hardy.  Marquis and Vernon had nothing whatsoever to do with the crime.

***The Investigation Immediately Focuses on Vernon Horn and Marquis Jackson***

17.    Around the time of the Deli robbery, Ms. Berryman, while in the company of Horn at the rooming house, received a page from Marcus Pearson, a close friend, and arranged to meet him in the vicinity of the Deli, which was located half way between the rooming house and Pearson's apartment.  She asked Vernon to accompany her in walking to meet Pearson.

18.    As Ms. Berryman and Horn approached the Deli, at approximately 3:35 am, with police already on the scene, they learned that a shooting had occurred.

19.    Beginning at or around 4 a.m., after waiting on the sidewalk outside the Deli as instructed, Horn was interviewed by an NHPD officer on the scene.

20.    Detective Dease was the lead NHPD detective assigned to the case. This was his last homicide investigation. Dease had already put in his retirement papers when the murder happened.  His retirement was scheduled to take effect in April 1999.

21.    Detective Adger was also heavily involved in every step of the investigation. She had recently been promoted, and this was her first homicide case. On information and belief, Adger was paired with Dease so that he could show her the ropes.

22.    Detective Breland worked closely with Dease and Adger and interviewed critical witnesses during the investigation.

23.    Dease had a working theory that people who committed homicides often returned to the scene shortly afterwards. This theory has little basis in fact. However, the investigation focused

on Vernon almost immediately as a result. The investigation also quickly focused on Marquis

Jackson because he and Horn had been together earlier in the night.

24.     In the days following the murder, following the investigations' precipitous focus on Horn

and Marquis, the detectives proceeded to procure purported eyewitnesses photo identifications of

them as the supposed perpetrators of the crime, under questionable circumstances.  None of the

identifications was reliable.

25.     The first identification was by Regina Wolfinger, a woman who had been seated in a car

outside the Deli 50 feet away while a friend, Howard Roberts went into the deli during the

robbery. Wolfinger was a crack addict who had been drinking and using drugs heavily that night.

26.     Wolfinger told police that she saw two unmasked men walk out of the Deli and

supposedly spend a couple of minutes standing outside before leaving. She described the men as

light-skinned.

27.     In fact, as all other witnesses agreed, there were three robbers, not two; the men were

masked, not unmasked; and they fled hastily after hearing sirens, rather than hanging outside the

scene of a murder.  And both Marquis and Horn were dark-skinned, not light-skinned.

28.     Nevertheless, in order to bolster his precipitous case closure, Detective Dease showed

Wolfinger a set of eight photos that included Horn and seven other men. Wolfinger picked out

Horn as one of the light- skinned men she saw outside the Deli.

29.     When asked whether she was "pretty positive" she had seen Horn outside the Deli, she

said "possibly, yes, he looks pretty familiar."

6

**30.**     Within days thereafter, Detectives Dease, Adger, and Breland showed Kendall

Thompson, who had walked into the Deli while the robbery was in progress, two sets of photos.

Both contained photos of Horn and Marquis.

**31.**     Thompson explained that he could not identify the robbers' faces because they were

wearing masks the entire time.

**32.**     Nonetheless, he said that Horn's eyes and mouth looked like the eyes and mouth of one

of the robbers—through a face mask. Thompson also picked out a photo of Marquis as

resembling the general appearance of one of the other masked robbers.

**33.**     The NHPD conducted interviews of Marquis and Horn during the first week of the

investigation. Each of them provided a consistent account of their whereabouts on the night of

the murder: going to the Alley Cat club, driving to the Athenian Diner, picking up Zaneta

Berryman, dropping off Horn and Berryman at the West Ivy Street rooming house, and

numerous other details with readily available corroboration from other witnesses.

**34.**     The NHPD did not seek to arrest Horn or Marquis at this point in the investigation.

Dease, Adger, and Breland knew that Wolfinger and Thompson's unreliable, incomplete

identifications were not enough to form the basis for an arrest.

**35.**     They also knew that there was critical evidence still outstanding. The police had lifted

latent fingerprints from the scene, including from a cigar box in the back room of the Deli that

the robbers had rummaged through. They did not yet have any fingerprint matches.

**36.**     The police had also sought the records of the cell phone that was stolen from the Deli. If

the robbers had used the phone after stealing it, the records would lead right to the perpetrators.

***The Stolen Cell Phone Records Point to Robbers in Bridgeport, Not New Haven***

37.     On February 1, 1999, a week after the murder, the NHPD obtained the records of the owner's stolen cell phone.

38.     The phone had made five calls between the time it was stolen from the Deli and the time the owner contacted the phone company to cut off service. The records of these calls would play a crucial role in the case against Marquis and Horn—and its unraveling.

39.     The first and fifth calls were both to the same number, registered to a Bridgeport man named Willie Sadler. The first call occurred at 4:14 a.m., just 45 minutes after the perpetrators were observed fleeing the scene of the Deli robbery-murder (and just minutes after the police interview with Horn had concluded).

40.     The NHPD repeatedly interviewed Sadler in February and early March of 1999, but he was uncooperative and said he did not remember who called him.

41.     The second call, made on the evening of January 24, was to a young woman who lived in Stratford, named Adrienne Younger.

42.     The third call, at 10:40 AM on January 25, was placed to a woman named Tamika Fuller at her house in Bridgeport.  Fuller told Detectives Dease, Adger, and Breland that she did not know who called her.  However, she also noted that her boyfriend Marlo Macklin might have been at her house at that time. Macklin told Dease, Adger, and Breland that he was not Tamika Fuller's boyfriend and was not at her house, and that Tamika Fuller was a drug-dealing associate of Willie Sadler (the individual who had received the first and fifth calls from the phone).

43.     The fourth call from the stolen cell phone came 27 minutes after the third.

8

**44.**     The call was made to a house in West Haven where a woman named Crystal Sykes worked as a live-in nurse's aide for an incapacitated elderly couple.

**45.**     This fourth call from the stolen cell phone would prove to be perhaps the single most important detail in the case against Marquis and Horn. Without the fourth call, there would have been no way to reconcile Marquis and Horn's supposed involvement with the objective evidence.

**46.**     But the story that the State and its witnesses would tell to tie Marquis and Horn to the fourth phone call was a fabrication, conjured up by the NHPD detectives.

**47.**     Having committed to that fiction, the detectives would take increasingly drastic measures to preserve it, even as it became more and more outlandish.

**48.**     In fact, when the NHPD identified one of the three actual robbers with a fingerprint, the detectives would feed him a fabricated nonsense story to implicate Marquis and Vernon. Later, the detectives obtained phone records making plain that Marquis and Horn had nothing to do with the fourth phone call.  They hid them from prosecutors and buried them in a basement.

**49.**     The NHPD's misconduct in investigating the Deli robbery- murder was enabled by, and was a product of, its troubling practice of coercing scripted witness statements in off-the-record "pre-interviews."

***The NHPD's Practice of Coercing Scripted Witness Statements in Off-the-Record "Pre-Interviews"***

**50.**     At the time of the investigation of the Dixwell Deli robbery-murder, the NHPD had a policy and custom of conducting lengthy, unrecorded, undocumented "pre- interviews" with witnesses.  After the "pre-interview" coaching session, the officer or detective conducting the

interview would turn on an audio tape recorder and record a brief formal interview with the witness, in which the witness would be required to parrot back the statement the detectives had coached and coerced the witness to provide.

**51.**     The NHPD also had a policy and custom of not maintaining any notes from the "pre-interviews," and of "losing" or destroying the audio recordings of the formal interviews if they were unhelpful.

**52.**     Connecticut courts have exhaustively documented this practice.[1]

**53.**     NHPD officers used this witness interview procedure to coerce witnesses into producing fabricated testimony. These coercive practices were pervasive throughout the NHPD during the 1990s.

**54.**     For instance, a witness in the investigation of the 1990 murder of Terrance Gamble testified that two NHPD detectives coerced her into providing a statement, stopping the tape several times to feed her details. At the time of the murder trial, one of the detectives was a defendant in three pending federal civil rights cases involving alleged coercion and intimidation of witnesses.

---

[1] *See, e.g., State v. Williamson*, 212 Conn. 6, 7 (1989) ("This case presents us with no less than our sixth occasion since 1981 to consider whether the New Haven police department's destruction or loss of a witness' statements requires striking the witness' testimony in an ensuing criminal trial."); *State v. Myers*, 193 Conn. 457, 467-68 (1984) ("[A] statement of the state's principal witness was deliberately destroyed according to a long- standing policy of the New Haven police department . . . ."); *State v. Jones*, 29 Conn. App. 304, 310 (1992); *State v. Reddick*, 36 Conn. App. 774 (1995); *State v. Woodard*, 27 Conn. App. 786 (1992).

55.     In August 1991, Eric Ham brought a federal civil rights action against NHPD Detectives Joseph Greene and Michael Sweeney claiming false arrest and malicious prosecution. Mr. Ham, who had been arrested on February 13, 1991 for a January 20, 1991 murder, alleged that Greene and Sweeney knowingly made misleading statements on and omitted material information from their affidavit in order to obtain the arrest warrant. In particular, Greene and Sweeney failed to disclose that a key witness mentioned throughout the affidavit made two prior statements in which he did not identify Mr. Ham as the assailant. A jury returned a verdict in favor of Mr. Ham, awarding nearly $1,000,000 in damages. *See Ham v. Greene*, 248 Conn. 508, 729 A.2d 740 (1999).

56.     In 1994, two witnesses at the trial of Daryl Valentine, accused of murder at a New Haven diner, testified that they had been coerced and bribed by the same NHPD detectives into making false inculpatory statements against Valentine. The witnesses testified that they made clear they had no relevant knowledge, but that the detectives had threatened them with jail time if they did not inculpate Valentine.

57.     In 1996, two New Haven detectives, including Chief of Detectives Brian Sullivan, destroyed a tape recording of an interview in a murder investigation, apparently for the purpose of protecting a drug dealer in the City.

58.     At the time of the Dixwell Deli investigation, Sullivan was still in charge of NHPD detectives. His conduct was under investigation by the City and by a grand jury at the time. Sullivan was later charged with felony evidence tampering.

11

**59.**     In 1999, on the advice of the City's Corporation Counsel, the Mayor of New Haven requested that the NHPD reopen its investigation into a murder for which a man named Scott Lewis had been convicted several years earlier.[2] The Mayor made this request after receiving the findings of an FBI investigation into the NHPD detective in charge of the case.

**60.**     The FBI investigation had found that the NHPD detective, Vincent Raucci, had coerced and improperly coached multiple witnesses into providing false statements implicating Lewis, all of whom subsequently recanted their statements and described the pattern of repeated NHPD misconduct used in procuring them. During the unrecorded pre-interviews, Raucci, in the presence of fellow NHPD detectives, had browbeaten witnesses into falsely implicating Lewis by threatening to bring false charges against them. Raucci had also fed the witnesses specific details that they could not otherwise have known. Then, after turning the recording on, he had coaxed carefully scripted statements inculpating Lewis from the witnesses.

**61.**     In addition, FBI lab findings demonstrated that the NHPD detectives had repeatedly stopped and restarted the tape in the case of at least one of the witnesses, to further coax and coerce him, as the witness himself testified at the criminal trial, and as Detective Raucci had falsely denied under oath.

**62.**     Notwithstanding the Mayor's request, in 1999, the NHPD refused to reopen the Lewis investigation.

---

[2] Lewis was later exonerated.  His complaint in his § 1983 action in this Court sets forth Raucci's misconduct in detail.  See Dkt. #1, *Lewis v. City of New Haven*, No. 3:16-CV-1382 (D. Conn. Aug. 15, 2016).

**63.**     The NHPD continued these practices for years. In 2005, two witnesses against murder defendant J'Veil Outing recanted their taped statements, testifying that NHPD detectives had coerced their statements during off-the-record sessions beforehand.

**64.**     Multiple witnesses were also coerced to provide testimony the police wanted in off-the-record pre-interviews during the 2006 investigation and arrest of Bobby Johnson. Johnson was later convicted of murder.  He has since been exonerated.[3]

**65.**     All of these troubling NHPD practices—coerced witness statements, spoon-feeding witnesses false information during off-record pre-interviews for repetition in official statements, missing tapes—infected the investigation of Marquis Jackson and Vernon Horn and its aftermath.

***The Detectives Invent a Phone Call from Marcus Pearson to Crystal Sykes***

**66.**     On February 2, 1999, just over a week after the murder at the Dixwell Deli, Detectives Dease, Adger, and Breland had just gotten the records of the stolen cell phone. They went to the house in West Haven that received the fourth phone call. Crystal Sykes, the live-in nurse's aide, answered the door.

**67.**     The police showed Sykes photos of people who had been seen around the Dixwell Deli on the night of the robbery-murder and asked if she recognized any of them.

---

[3] Johnson's § 1983 action, *Johnson v. City of New Haven*, No. 3:17-CV-1479 (D. Conn.), is currently pending in this Court.

**68.**     As it so happened, she did recognize one of them: Marcus Pearson, who Zaneta

Berryman was going to meet at the Deli when she and Vernon Horn returned there shortly after

3:30 AM.  Coincidentally, Pearson was Sykes's marijuana dealer.

**69.**     Sykes did not want to talk to police at the house but agreed to come to the police station.

There, she spoke with Detectives Dease, Adger, and Breland.

**70.**     It is unknown exactly what was discussed in Sykes's "pre-interview." The detectives

apparently destroyed their notes. The NHPD also claims to have lost Sykes's tape-recorded

interview. The typed statement, however, includes the following exchange between Sykes and

Detective Dease concerning the fourth call from the stolen cell phone:[4]

> Q.     Ms. Sykes I'm gonna refer you back to January [25th, 1999]. Was you
> working at 59 West Ivy Street in West Haven?
> A.     Yes.
> Q.     Ms. Sykes, do you recall receiving a telephone call at that location?
> A.     No I don't recall taking or receiving a phone call from Marcus [Pearson] but
> the paper said that he called. Like I explained to them if I was sleeping, knowing
> that I'm up all through the hours of the night. I get wake up calls in the morning, I
> don't recall a man calling me or whoever called me at that particular time. I don't
> know even from yesterday who called me so . . .
> Q.     Ms. Sykes, so you're telling me that it's a good possibility that Marcus
> Pearson may have called you around [11:00] on 1/25/99?
> A.     Yes.

**71.**     But that "it's a good possibility that Marcus Pearson may have called" was not what

Crystal Sykes had told Detective Dease at all. In fact, as she specifically stated, Sykes had no

recollection of receiving a call from Pearson. She was confused about the time of the call the

---

[4] Punctuation edited for clarity.

detectives were referring to. She told Detective Dease during the same interview that she did not usually answer the phone during the day because the elderly woman she cared for, who was paralyzed but mentally competent, would usually do so.

72.     The detectives showed Sykes the record of the stolen cell phone and, falsely, told her that it showed Pearson had called her on January 25. (That is what Sykes meant when she said, "the paper said that he called.") In fact, the detectives had invented that Pearson was the caller and that she was the recipient: all they knew was that the stolen cell phone had made a call to the house where Sykes worked.

73.     Even though she was (a) coached in the unrecorded "pre-interview" and (b) falsely told that there was documentary evidence that Pearson had called her, Sykes was still unwilling to say that such a call had happened. She only acknowledged that it "may" have been "possible" when Detective Dease pressed her to say so.

74.     In fact, when asked in her written statement why she was at the police station, Sykes responded: "*I was told* I had a phone call, right, phone call stating that I was talking to—*say his name*— Marcus Pearson."[5]

75.     Even in her official statement, after being coached off the record, Sykes had to ask her interrogators to "say his name"—that is, to tell her that Pearson was the person she was supposed to be talking about.

---

[5] Punctuation edited for clarity, and emphasis added.

***The Detectives Coerce Marcus Pearson Into Saying that He Made the Fourth Phone Call***

**76.**     Having extracted only a vague answer about the fourth phone call from Sykes, the detectives tried to coerce Marcus Pearson to confirm it.

**77.**     Pearson had already been once interviewed by police two days after the murder.  During that initial interview, he told Detective Breland that Vernon Horn had come over to his house in New Haven on January 25—the day of the pivotal fourth call from the stolen cell phone.

**78.**     No one made any phone calls during this visit on Pearson's porch. Vernon was not in possession of the stolen cell phone and did not lend it to Pearson.  Pearson did not need to borrow a phone anyway—he had a cordless phone in the house. As a result, during his initial interview with police, Pearson never said anything about a phone call.

**79.**     After speaking with Crystal Sykes, however, the NHPD repeatedly pressured Pearson to admit that he had placed the fourth call from the stolen cell phone from his porch to Sykes on January 25.

**80.**     Detectives came to see Pearson again on multiple occasions. He told them to leave, but they came back.

**81.**     Pearson was on probation at the time, and his probation officer threatened to charge him with violating his probation because he had become a suspect in a murder investigation.  His probation officer told him that his children would be taken away from him.

**82.**     On February 3, Detectives Dease and Breland interviewed Pearson. They falsely told Pearson that phone records showed he had called Crystal Sykes from the stolen cell phone on the

morning of January 25. They told Pearson that he must have either gotten the stolen phone from Vernon Horn or taken it from the Deli himself.

**83.**     Detectives Dease and Breland told Pearson that he had a choice: he could either say that he had used the phone, or face charges for participating in the robbery-murder himself. Detectives Dease and Breland threatened to take away Pearson's children.

**84.**     Afraid of being found to have violated his probation, losing his children, and being charged with murder, Pearson gave in to Dease and Breland. At their direction, Pearson falsely told them what they told him to say: that Vernon Horn had lent him a cell phone while they were on his porch on the morning of January 25, and that he had used it to call Crystal Sykes.

**85.**     Even after Pearson made this statement, the NHPD continued to pressure him. Apparently unsatisfied that Pearson would stick to their fabricated story, Detectives Dease and Breland interviewed Pearson again on February 5, and yet again on February 9.

**86.**     The detectives again told Pearson either to confirm that Horn lent him the stolen cell phone on January 25 or to face charges himself. Pearson continued to believe he had no choice and again told the detectives that he had borrowed the phone from Horn.

**87.**     Even after fabricating a connection between Vernon Horn and the stolen cell phone, the detectives did not arrest Vernon Horn or Marquis Jackson.

**88.**     They still had only two suspects in a three-man crime. They still did not have a fingerprint match. And they still needed to figure out who had called Willie Sadler from the stolen phone 45 minutes after the robbery. That person would be a prime suspect if they could find him.

17

*Willie Sadler and William Newkirk Give Up Steve Brown*

**89.**     Crystal Sykes's boyfriend was a man named William Newkirk. Newkirk was the leader

of a Bridgeport gang.  He and Willie Sadler, the recipient of the first and fifth calls from the

stolen cell phone, were close friends and dealt drugs together.

**90.**     Newkirk worked an overnight shift at a beverage distributor and often spent time with

Crystal Sykes at the house in West Haven, where Crystal worked, during the day. He often made

and received calls on the land line phone at that West Haven house—the land line that got the

fourth call from the phone stolen from the Dixwell Deli.

**91.**     The NHPD became aware that Newkirk might have information relevant to the case in

February 1999. NHPD reports are oddly vague about Newkirk, stating only that his name

"surfaced" "during the course of the investigation."

**92.**     The likeliest explanation is that Sykes told detectives on February 2 that Newkirk was her

boyfriend and often spent time with her at the West Haven house. On information and belief, that

is what happened.

**93.**     In February 1999, the police repeatedly contacted Willie Sadler. He refused to tell them

who had called him from the stolen cell phone. On information and belief, they also contacted

Newkirk.

**94.**     At some point, Sadler and Newkirk got frustrated with the attention they were drawing

from the NHPD. To get the police off their back, Newkirk told Sadler to give up the name of the

actual person who called him after the Dixwell Deli robbery.

**95.**     On March 4, Detectives Dease and Adger met with Sadler and Newkirk in Bridgeport. Sadler told the detectives that the person who called him was named Steve. Sadler said that he did not know Steve's last name, but that Steve was Marlo Macklin's brother-in-law.

**96.**     Sadler also told the police that Steve was good friends with Tamika Fuller, the woman who received the third phone call from the stolen phone.

**97.**     The detectives then went to see Macklin, who identified Steve as Steve Brown.

**98.**     The next day, the NHPD got Steve Brown's fingerprints from the Bridgeport Police Department. Brown's prints matched a latent print lifted from the cigar box in the back office of the Deli.

**99.**     On March 9, Dease got a warrant for Brown's arrest. Brown was arrested at his house in Bridgeport the next day.

***Detectives Dease and Adger Fabricate an Identification of Marquis Jackson and Vernon Horn by Steve Brown***

**100.**     When Steve Brown was arrested, Detectives Dease, Adger, and Breland knew that Brown, who lived and sold drugs in Bridgeport, had participated in the robbery-murder at the Dixwell Deli. They also knew four additional pieces of information that strongly indicated Sadler and Newkirk's involvement in the crime:

   **a.**   They knew that, 45 minutes after the crime, Brown called Sadler, another Bridgeport drug dealer, on the phone stolen from the Deli.

**b.** They knew that Brown was good friends with Tamika Fuller, the woman who got the third phone call from the stolen cell phone, and that Fuller knew Sadler and his associates.

**c.** They knew that William Newkirk, a close associate of Sadler's, often spent time at the West Haven house that got the fourth call from the stolen phone call 27 minutes after Fuller got the third.

**d.** Finally, they knew that Brown had called Sadler from the stolen phone again later that day.

**101.** In short, the available evidence strongly suggested that Brown was one of the killers, and his confederates were likely associated with his Bridgeport drug crew: William Newkirk, Willie Sadler, and Marlo Macklin. All of these people were tied to the stolen cell phone.

**102.** Neither Marquis Jackson nor Vernon Horn had anything to do with Brown or his Bridgeport crew.

**103.** The truth was beginning to emerge. But rather than pursue the truth, the detectives doubled down on a lie.

**104.** After his March 10 arrest, Brown agreed to speak with Dease and Adger and confessed to participating in the robbery at the Dixwell Deli.

**105.** Brown had never met Marquis Jackson or Vernon Horn, let alone robbed the Dixwell Deli with them. Brown did not know them at all. Brown did not know what they looked like. Neither did Sadler, Newkirk, Macklin, or any of Brown's other Bridgeport associates.

20

**106.**    At the time of Brown's interview with police, Marquis and Vernon had not been publicly identified as suspects in the case. On information and belief, their photographs had not been published in any newspaper or on any posters.

**107.**    Yet, somehow, when Dease and Adger gave Brown a set of eight photos on March 10, Brown picked out Marquis Jackson and Vernon Horn as the other two men who robbed the Dixwell Deli—the two men Dease and Adger had already tunneled in on as the supposed perpetrators.

**108.**    There is only one way this could have happened: Detectives Dease and Adger told Brown which photos to pick. They told Brown to say that Marquis Jackson and Vernon Horn robbed the Dixwell Deli with him, even though this was not true—and they knew it was not true.

**109.**    Had Brown been randomly guessing, the chances that he would have picked out both Marquis and Vernon would have been less than four percent.

**110.**    Brown also somehow managed to lie about the stolen cell phone in a way that matched the detectives' fabricated account of the fourth phone call to the West Haven house. Brown told Detectives Dease and Adger that he and Horn rode around in Bridgeport until the next morning, and then Horn took the phone back and left. That did not happen. (Brown later changed his story on this point.)

**111.**    Brown spent an hour and a half talking to Dease and Adger in the unrecorded "pre-interview" between the time he signed a Miranda waiver and the time he gave his formal statement.

**112.**   Detectives Dease and Adger either did not take notes of this coaching session or, more likely, destroyed the notes.

**113.**   During this hour-and-a-half interaction, Detectives Dease and Adger fed Brown the false story he needed to tell to get favorable treatment for himself and let them close out their investigation. Brown repeated this false story back to the detectives in his official statement.

**114.**   On March 12, 1999, based on Brown's fabricated photo identification and his statement implicating Marquis and Vernon, Adger prepared identically-worded arrest warrant applications to arrest Marquis and Vernon on charges of murder.

**115.**   On March 24, 1999, Marquis was arrested and held on bail.

***Shaquan Pallet Lies to Implicate Marquis and Secure Favorable Treatment for Himself***

**116.**   During the week that Marquis was arrested, Shaquan Pallet, the person who had accompanied Caprice Hardy in the cab ride from his place of employment in Hamden to the Dixwell Deli preceding the shooting, was arrested by the NHPD for a string of unrelated armed robberies.

**117.**   Pallet confessed to the unrelated robberies. Detective Dease was informed that Pallet was at the police station and came to speak with him about the Dixwell Deli robbery-murder. Assistant State's Attorney Gary Nicholson, who would be the lead prosecutor on the case, also participated in that interview.[6]

---

[6] Detectives later claimed to have met with Pallet once beforehand three weeks earlier, during which Pallet viewed a set of photos and set Vernon and Marquis's photos to one side, implicitly identifying them as the perpetrators. But there is no contemporaneous documentation of the

118.    Pallet claimed that he got out of the taxi with Caprice Hardy at the Dixwell Deli. He saw

three men on the side of the Deli smoking "wet," or marijuana soaked in embalming fluid. He

went into the store with Caprice Hardy. After Hardy bought cigarettes, he gave some of them to

Pallet.  Pallet then said good night to Hardy and walked out of the Deli.

119.    Pallet claimed that, as he walked out, two of the three men he had seen smoking "wet"

were outside the door pulling masks down on to their faces. Pallet then got back in the taxi and

left.

120.    During his March 23 interview, Pallet identified photos of Marquis and Vernon as two of

the three men smoking "wet" outside the Deli.

121.    This entire story was false. Pallet never left the taxi on the night of the murder, never

entered the Deli, never saw anyone standing alongside it, and never passed by anyone putting on

a mask.

122.    In May 1999, Pallet told his robbery co-defendant that his story was a lie, designed to get

favorable treatment in his robbery case.

123.    Pallet's gambit worked. He faced the possibility of a 180-year sentence for the armed

robberies he committed. As a result of his cooperation against Marquis and Vernon, he received

a two-year sentence with the possibility of parole.

---

earlier meeting and no official record of Pallet's purported photo identification there.  On
information and belief, the earlier meeting did not happen.

### *The State's Ballistics Expert Manipulates Results and Hides Exculpatory Evidence*

**124.**     Steve Brown was one of the killers and a key prosecution witness against Vernon Horn and Marquis. When the NHPD interviewed Brown in March 1999, Brown said the murder weapon fired by Horn was a Beretta.

**125.**     Shortly after the robbery, the NHPD sent shell casings and bullet fragments recovered from the Dixwell Deli to the State Police Forensic Science Laboratory.

**126.**     By statute, the role of the State Police Forensic Science Laboratory was to provide "technical assistance to law enforcement agencies in the various area of scientific investigation." Conn. Gen. Stat. § 29-7b (1999). The Laboratory was authorized to investigate physical evidence upon request of state or local law enforcement agencies, *see id.*, and is and was staffed by law enforcement investigators, including former detectives of the NHPD.[7]

**127.**     According to the Laboratory, its "primary function" was to "examine physical evidence for the purpose of determining, for example: (1) [t]hat a crime was committed [or] (2) [t]hat the crime is connected to the victim or perpetrator(s)."

**128.**     At all times pertinent herein, the Laboratory served as the forensics arm of the NHPD, which routinely utilized the Laboratory, not the NHPD Bureau of Identification, to conduct ballistics examinations in connection with NHPD investigations of criminal cases.

---

[7] Thus, for example, Forensic Examiner Stephenson had been a detective with the NHPD immediately prior to his employment as a forensic Examiner at the State Police Forensic Science Laboratory, and NHPD Sergeant Pleckaitis – the NHPD investigator to whom Stephenson addressed his February 1999 ballistics report, *see* ¶ 129, *infra* -- himself moved shortly thereafter from the NHPD to become a forensic examiner with the State Laboratory, performing investigative functions for the NHPD and other Connecticut law enforcement agencies.

**129.**     On February 4, 1999 -- prior to the NHPD procurement of the Steven Brown police statement naming Marquis Jackson and Vernon Horn as his supposed accomplices, including Brown's claim that the murder weapon had been a Beretta -- Forensic Examiner James Stephenson produced a two-page report on his examination of the shell casings and bullet fragments from the Dixwell Deli robbery-murder. The report was addressed to Sergeant John Pleckaitis of the NHPD.

**130.**     The report said: "The bullets and bullet fragments are consistent with being 9mm caliber. They may have been fired from but not limited to a self-loading pistol manufactured by Calico, FEG, Browning, Heckler & Koch, Hungarian, Kassnar, Norinco, or Walther."

**131.**     This two-page written report was disclosed to Marquis's lawyer.

**132.**     The basis for Stephenson's written conclusion was a more detailed "General Rifling Characteristics" Report that he generated on February 3, 1999, likewise prior to the Steve Brown police statement that became the centerpiece of the NHPD case against Marquis and Vernon and that stated the murder weapon was a Beretta. This February 3 General Rifling Characteristics report listed various gun models that could match the characteristics of the shell casings and bullet fragments recovered from the scene.

**133.**     All of the manufacturers in Stephenson's written report were listed on the General Rifling Characteristics Report.  Beretta – the weapon used to murder Hardy, according to Steve Brown's statement implicating Marquis and Vernon as his supposed accomplices – was not among them. The margin of error on the February 1999 General Rifling Characteristics Report was +/- 2.

134.    The February 1999 Rifling Characteristics Report was not disclosed to the defense.  Nor, on information and belief, did Stephenson give it to the State's Attorney's Office.

135.    At a later stage in the investigation, subsequent to Brown's police statement implicating Marquis and Vernon and identifying the murder weapon as a Beretta, Forensic Examiner Stephenson generated a new General Rifling Characteristics Report, this time manipulating the report to increase the margin of error to +/- 4.

136.    This time, the new General Rifling Characteristics Report listed multiple Beretta models as a potential match for the shell casings and bullet fragments recovered from the Deli.

137.    The new General Rifling Characteristics Report was likewise never disclosed to the defense. On information and belief, Stephenson never provided the new report to the State's Attorney's Office either.

138.    At the criminal trial leading to the conviction of Marquis and Vernon -- exploiting the suppression, and demonstrating the materiality, of the aforesaid General Rifling Characteristics reports and the exculpatory information concerning margin-of-error manipulation contained therein -- Stephenson testified that he had concluded the murder weapon could have been a Beretta.

139.    At trial, Marquis and Vernon never knew how or why Stephenson changed his conclusion because, on information and belief, Stephenson withheld the General Rifling Characteristics Reports from the State's Attorney's Office.

140.    Marquis and Vernon did not discover either of the General Rifling Characteristics Reports until they were produced in response to a subpoena in 2018—more than 18 years later.

26

*The State Proceeds to Trial on a Nonsense Theory*

**141.**    Marquis Jackson and Vernon Horn were tried together.

**142.**    Marquis and Vernon were each charged with ten counts and, if convicted, each faced mandatory minimum sentences of 25 years and a maximum sentence of life.

**143.**    Steve Brown pleaded guilty to manslaughter and testified against Marquis and Vernon. His sentence exposure was capped at 25 years, the prosecution agreed to recommend 18 years, and he ultimately received a 10-year sentence.

**144.**    The case against Marquis and Vernon never made sense.  The State's theory was:

    **a.**    On the night of January 23, 1999, Vernon and Marquis met Steve Brown at the White Eagle Club in Bridgeport—a private Polish social club with no black members. (All three men are black.) Vernon and Marquis never gave their real names, but introduced themselves as "Sun" and "Trae."

    **b.**    After hanging out at the club for some time, they all drove up to New Haven in the early morning of January 24. They went to the Dixwell Deli. Without any prior discussion or agreement, Horn and Jackson handed Brown a gun and a red bandana to cover his face. They all ran into the Deli and committed the robbery.

    **c.**    After fleeing the Deli, Steve Brown and Marquis retreated to a car around the corner. But Vernon stayed outside the Deli, waiting to have a chat with the police about the murder he just committed.

    **d.**    After the police interviewed Vernon, Vernon, Marquis, and Brown drove back to Bridgeport. On I-95 on the way back to Bridgeport, Brown made the first call from

the stolen cell phone.  He did not want Marquis and Vernon to know where he lived, so he called Willie Sadler and asked Sadler to pick him up at a central location in Bridgeport.

e. The next day, Vernon for some reason went back to Bridgeport to retrieve the cell phone from Steve Brown. At 10:40 AM on January 25, Steve Brown used the phone to make the third call to his drug-dealing associate Tamika Fuller. He then met up with Vernon and gave him the phone.

f. Vernon proceeded immediately to Marcus Pearson's house in New Haven. There, just 27 minutes after Steve Brown used the stolen phone to make the third call in Bridgeport, Pearson borrowed the stolen phone from Vernon and used it to call Crystal Sykes.

g. Vernon then took the phone back to Bridgeport so that Brown had it in time to make the fifth call, placed to Willie Sadler (reflected on the phone records the NHPD had obtained) later that day.

145.   The logical flaws in this story are obvious. How would Brown have met Marquis and Horn at a private, Polish, all-white social club? Why would Brown go to New Haven with two virtual strangers and rob a store without even discussing it first? Why, rather than fleeing, would one of three perpetrators stay at the scene for police to interview him? How did Vernon find Brown to get the phone back? How could the phone get from Brown's hands in Bridgeport to Pearson's porch in New Haven within 27 minutes? If the phone was so important to Vernon, why did he lend it to Pearson?  And, perhaps most important, why would anyone go to such

lengths to ferry any phone back and forth between Bridgeport and New Haven—much less a phone that was evidence of murder?

**146.**    Years later, Detective Dease would testify under oath that he chose not to scrutinize the details of this story too carefully because he knew the whole case might fall apart:

> Q.    Were you concerned that if you pushed Mr. Brown he might back away from some of these statements and your case would unravel?

> A.    *I believe so*.

**147.**    The State's other evidence also had serious flaws.  For example:

    **a.**  Regina Wolfinger, the crack addict, identified Vernon as one of two unmasked men lingering outside the Deli, while everyone else saw three masked men flee in haste.

    **b.**  Shaquan Pallet claimed that he got out of the taxi with Caprice Hardy and bummed some cigarettes from the pack that Hardy bought. But the taxi driver testified that only one person got out of the taxi, and crime scene photos show Hardy's pack of Newports was sitting unopened on the counter, seal intact, when he was shot.

    **c.**  The prosecution emphasized that Vernon was a regular customer and that the robbers were clearly familiar with the Deli because they knew to "Get the nigga in the back." But Abby Yousif, the co-owner of the Deli, who was behind the counter at the time, was very familiar with Marquis and Vernon's appearance, voice and mannerisms.  He "stated with certainty" that neither had been in the Deli during his shift that night.

148.    Notwithstanding the serious deficiencies in the State's case, the jury convicted Marquis and Vernon. Years later, a juror explained: "the evidence of . . .  the cell phone was pretty convincing."

149.    At his sentencing, Marquis asserted his innocence, stating, after expressing his sympathy for the victim's family, that he had nothing to do with what happened, had never met or heard of Steve Brown, and "did not commit this crime."

150.    Nonetheless, the trial judge sentenced Marquis to 45 years in prison for what he called a "savage crime," by virtue of which he and Horn had "forfeited [their]rights to remain in civilized society for a long period of time.".

151.    In the same sentencing hearing, following their joint trial on the same evidence, Horn was sentenced to 70 years in prison.  Horn also professed his innocence at sentencing,

### *After Nineteen Years of Wrongful Incarceration, Marquis is Finally Exonerated*

152.    Throughout his years in prison, Marquis consistently maintained his innocence, as did Vernon Horn.

153.    Following their sentencing in 2000, both Marquis and Vernon pursued numerus post-conviction proceedings seeking to set aside their convictions.

154.    Finally, in 2018, it was discovered that, in addition to the fabrication and suppression of evidence described above, there had been 137 pages of phone records and related documents in the possession of the NHPD since 1999, well before the trial at which Marquis and Vernon were convicted, but never turned over to the State's Attorney's Office, and, as a result, never disclosed by the State to Marquis or Vernon or any of their attorneys.

155.    Upon information and belief, those records were included in a "binder" of documents relating to the NHPD investigation of the Dixwell Deli case that had been given to Detective Adger by Detective Dease at the time of the latter's retirement in or about April 1999, but never disclosed.

156.    Upon further information and belief, the contents of the hidden records are exculpatory and astonishing. They contradict the already dubious idea that Marquis or Vernon had any connection to the fourth call from the stolen cell phone to the house in West Haven.

157.    Upon further information and belief, the hidden records reveal that, two minutes before receiving the fourth phone call from the stolen cell phone, the land line at the West Haven house called a Bridgeport pager, and that the West Haven land line called that pager very often in the weeks surrounding the robbery-murder at the Dixwell Deli. The West Haven land line called the pager twice on January 3, once on January 4, once on January 8, once on January 25, twice on January 26, and twice on January 28.

158.    The hidden records strongly suggest that these calls were made by William Newkirk. Newkirk was the Bridgeport gang leader and drug dealer who dated Crystal Sykes, the nurse's aide who lived at the West Haven house, and often spent time at the house

159.    Upon further information and belief, the hidden records also show that Willie Sadler, who received Steve Brown's first and fifth calls from the stolen cell phone, also called the same pager seven times in January and February 1999.

160.    In short, two minutes before the fourth phone call from the stolen cell phone, the recipient of the call paged a Bridgeport pager closely associated with the Bridgeport drug crew

31

of Newkirk, Sadler, and Brown. This critical fact was never disclosed to the State's Attorney's Office or to Marquis Jackson or Vernon Horn.

161.    The obvious inference from the hidden phone records is that Marcus Pearson did not make the fourth call on the stolen cell phone to Crystal Sykes from his porch in New Haven. The fourth call was to William Newkirk from one of his Bridgeport drug-dealing associates, in response to his page.

162.    More generally, upon further information and belief, the phone records document a dense web of connections among Brown, Sadler, Newkirk, and Marlo Macklin (Brown's brother-in-law). Sadler called phone numbers associated with Newkirk 96 times between January 17 and February 16, 1999. He called Macklin 30 times during the same period.

163.    Upon further information and belief, the 137 pages of phone records also include records of phones associated with Marquis, Vernon Horn, and Marcus Pearson, and none of those phones *ever* called Brown, Sadler, Macklin, Newkirk, or anyone else associated with their Bridgeport crew.

164.    Detectives Dease, Adger, and Breland understood the significance of the 137 pages of phone records at the time of the investigation and prosecution of Marquis Jackson and Vernon Horn.  Upon information and belief, they reviewed the records carefully, as the records contain highlighting and detailed marginal notes about certain calls, and even made a chart of all of Willie Sadler's calls to New Haven County from January 21 through February 5, 1999.

165.    Despite their understanding of the records' importance, and their knowledge that the records pointed to the Bridgeport crew as the perpetrators of the Dixwell Deli robbery-murder,

Detectives Dease, Adger, and Breland *did not disclose* the exculpatory records to the State's Attorney's Office.  Instead, they hid them.

**166.**    Upon information and belief, the records had been obtained pursuant to two search warrants in February and March 1999. As a matter of common practice, the fact that a search warrant has been issued and the fact that a return has been received are contemporaneously docketed in the New Haven Clerk's Office.

**167.**    These two warrants, however, were not docketed until *September 2014*.

**168.**    Evidence obtained pursuant to a search warrant (or in any other fashion) is supposed to be logged into the NHPD evidence file.

**169.**    But the NHPD has no record of these 137 pages of hidden phone records ever being logged.

**170.**     In other words, for 15 years, the NHPD mysteriously failed to record search warrants that generated striking exculpatory evidence, and failed to disclose the exculpatory evidence as it was required to do, and as Plaintiff's constitutional rights entitled him to.

**171.**    In addition, again in 2018, it was revealed that the NHPD-invented account of the supposed involvement of Marcus Pearson to place the January 25, 1999 11:07 a.m. stolen cell phone call (the "fourth" call), from a location in New Haven, when Pearson was in the presence of Vernon Horn in that City, was physically impossible.

**172.**    Cell-site data pertaining to that call conclusively established that the call originated from Bridgeport, not New Haven. Steve Brown, or another of his Bridgeport drug-dealing associates,

called William Newkirk at the West Haven house in response to Newkirk's page two minutes earlier.

173.   The cell-site data also shows that Steve Brown could not have been on I- 95 on the way back to Bridgeport, as he claimed, when he made the first phone call to Willie Sadler shortly after the robbery. That call originated from cell sector 61923, which is *in* Bridgeport, north of I-95.

174.   Steve Brown was already back in Bridgeport by the time he made the first phone call. That means that he could not have possibly driven back to Bridgeport with Vernon Horn and Marquis Jackson: there was not enough time. Horn was speaking with the police outside the Deli around 4:00 a.m. It would have been impossible for Brown and Jackson to wait while Horn remained at the Dixwell Deli to be interviewed by police, and thereafter supposedly get Brown all the way to Bridgeport by 4:14 a.m.

175.   The call record of the stolen cell phone was a critical document—perhaps *the* critical document—in the investigation of the murder-robbery at the Dixwell Deli. Detectives Dease, Adger, and Breland must have looked at it dozens, if not hundreds, of times. They also showed it to multiple witnesses

176.   Dease, Adger, and Breland surely noticed the "ORIG" column on those call records. And, on information and belief, they must have known or at least inferred the obvious: that "ORIG" meant "origin."

**177.**   At any time after they got the records of the stolen cell phone on February 1, 1999,

Detectives Dease, Adger, and Breland could have gotten the cell-site information by simply

asking (or subpoenaing) the carrier for it.

**178.**   At this point, it is unknown whether Dease, Adger, and Breland did not bother to get the

cell-site information, or whether they got it but failed to act on it, log it into evidence, or disclose

it to the State's Attorney's Office.

**179.**   What is clear is that Detectives Dease, Adger, and Breland allowed Marquis Jackson and

Vernon Horn to be wrongfully arrested, tried, convicted, and imprisoned for nearly two decades

while failing to disclose evidence that they knew to be critical, that was readily available to them,

and that would ultimately prove the innocence of both men.

**180.**   As a result of the foregoing, following a motion filed by the New Haven State's

Attorney's Office to vacate his conviction in the interest of justice, Marquis was produced in

Superior Court in New Haven, for a hearing at which the State's motion to vacate was granted,

the case dismissed with prejudice, and -- after 19 years of imprisonment -- Marquis walked out

of the courthouse a free man.

**181.**   Following a similar procedure the preceding week, Vernon Horn's conviction had also

been vacated, and he had also been released from prison.

## DAMAGES

**182.** The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the Defendants caused Plaintiff Marquis Jackson to be falsely arrested and imprisoned, wrongfully convicted, and forced to serve more than 19 years in jail and prison for a brutal crime he did not commit.

**183.** As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Plaintiff sustained injuries and damages, including loss of his freedom for more than nineteen years, pain and suffering, severe mental anguish, emotional distress, indignities and embarrassment, degradation, restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

**184.** As a further result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Marquis was also deprived of his familial relationships.

**185.** As a further result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Marquis sustained economic injuries and damages, including loss of income and loss of career opportunities.

**186.** As a further result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Marquis sustained physical injuries and damages, including physical pain and suffering, personal injuries, physical illness, and inadequate medical

care, for which he is entitled to monetary relief.

## FIRST CAUSE OF ACTION

42 U.S.C. § 1983 – *Brady* – Withholding Material Exculpatory
Evidence (Against Defendants Dease, Adger, and Breland)

**187.** Plaintiff realleges the above paragraphs as if they were fully set forth here.

**188.** The 137 pages of phone records were and are material exculpatory evidence. Had they been disclosed to Plaintiff, there would have been at least a reasonable probability of a different outcome at his trial.

**189.** Dease, Adger, and Breland were all aware of the records, reviewed them, and understood their contents. All three of them had a duty to give material exculpatory evidence to the prosecutor so it could be disclosed to the defense.

**190.** Dease, Adger, and Breland did not provide the phone records to the State's Attorney's Office. Instead, they concealed the records, including by not logging them into evidence and not ensuring that the search warrant returns were docketed.

**191.** On information and belief, Dease, Adger, and Breland failed to disclose other *Brady* material to the State's Attorney's Office as well.

**192.** Dease, Adger and Breland acted under pretense and color of state law.

**193.** Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.  They acted with the specific intent to deprive Plaintiff of his constitutional rights.

**194.** As a direct and proximate result of their misconduct and abuse of authority, Plaintiff suffered the damages alleged herein.

### SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 – Denial of Due Process – Fabrication of Evidence
### (Against Defendants Dease, Adger, and Breland)

195. Plaintiff realleges the above paragraphs as if they were fully set forth here.

196. Dease, Adger, and Breland caused the initiation of criminal proceedings against Plaintiff.

197. As set forth above, Dease, Adger, and Breland created false information and fabricated evidence likely to influence the jury, including:

    **a.** Steve Brown's photo identification of Plaintiff, his statement implicating Plaintiff in the robbery-murder at the Dixwell Deli, and his statements relating to possession by Plaintiff's co-defendant, Vernon Horn, of the cell phone stolen from the Deli;

    **b.** Crystal Sykes's statement that she may have received the fourth phone call from the stolen cell phone from Marcus Pearson;

    **c.** Marcus Pearson's statement that he borrowed the stolen cell phone from Plaintiff's co-defendant, Vernon Horn, to place the fourth phone call on January 25, 1999; and

    **d.** Shaquan Pallet's statement that he got out of the taxi at the Deli and observed Plaintiff standing outside.

198. Dease, Adger, and Breland fabricated evidence by, among other things:

    **a.** Inventing "evidence," planting it into the mouths of witnesses during coaching sessions, and destroying evidence of those coaching sessions;

    **b.** Telling witnesses which photographs to select; and

38

    **c.**  Coercing witnesses by threatening to charge them with crimes in which they

        knew the witnesses played no role.

**199.**   This fabrication of evidence by Dease, Adger, and Breland proximately caused Plaintiff's

detention and loss of liberty.

**200.**   Dease, Adger and Breland acted under pretense and color of state law. Their acts were

beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.

They acted with the specific intent to deprive Plaintiff of his constitutional rights.

**201.**   As a direct and proximate result of their misconduct and abuse of authority, Plaintiff

suffered the damages alleged herein.

**THIRD CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments – Unreasonably Prolonged
Detention (Against Defendants Dease, Adger, and Breland)

**202.**   Plaintiff realleges the above paragraphs as if they were fully set forth here.

**203.**   Dease, Adger, and Breland knew that "ORIG" referred to the origin of the calls from the

stolen cell phone. They either did obtain, or in the alternative could have obtained with a single

fax or phone call, information about the specific location from which all of the calls from the

stolen phone originated.

**204.**   This evidence conclusively establishes Plaintiff's innocence.

**205.**   Once Dease, Adger, and Breland obtained the records of the stolen cell phone, Plaintiff

had a right to be free from continued detention stemming from their mishandling or suppression

of exculpatory evidence.

**206.**   By failing to get the readily available exculpatory information from the phone company,

or in the alternative by getting and suppressing it, Defendants Dease, Adger, and Breland

violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States

Constitution.

207.    Dease, Adger, and Breland acted with deliberate indifference to Plaintiff's constitutional

rights.  Their conduct shocks the conscience.

208.    Dease, Adger and Breland acted under pretense and color of state law. Their acts were

beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.

209.    As a direct and proximate result of their misconduct and abuse of authority, Plaintiff

suffered the damages alleged herein.

**FOURTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Failure To Intervene
(Against Defendants Dease, Adger, and
Breland)

210.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

211.    To the extent that they were not directly responsible for the withholding of exculpatory

evidence, fabrication of evidence, and unreasonably prolonged detention despite readily

available evidence of innocence, Dease, Adger and Breland had a realistic opportunity to

intervene and prevent misconduct by others that caused preventable harm to Plaintiff.

212.    A reasonable detective in the position of Dease, Adger, and Breland would have known

that Plaintiff's constitutional rights were being violated.

213.    Dease, Adger, and Breland failed to take reasonable steps to intervene.

214.    Dease, Adger and Breland acted under pretense and color of state law. Their acts were

beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.

215.    As a direct and proximate result of their misconduct and abuse of authority, Plaintiff

suffered the damages alleged herein.

**FIFTH CAUSE OF ACTION**
42 U.S.C. § 1983 – *Brady* – Withholding Material Exculpatory
Evidence (Against Defendant Stephenson)

216.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

217.    The February 1999 and February 2000 General Rifling Characteristics Reports are

material exculpatory evidence. Had they been disclosed to Plaintiff, there would have been at

least a reasonable probability of a different outcome at his trial.

218.    At all relevant times, including when creating the second General Rifling Characteristics

Report, Stephenson was acting on behalf of law enforcement and as an arm of the NHPD

investigatory and prosecution team. He had a duty to give material exculpatory evidence to the

prosecutor so it could be disclosed to the defense.

219.    Stephenson did not provide either of the General Rifling Characteristics Reports to the

State's Attorney's Office. Instead, he withheld them and unconstitutionally suppressed material

exculpatory evidence to which Plaintiff and his counsel were entitled.

220.    As a result of Stephenson's failure to disclose the reports, Plaintiff was unaware during

his trial that Stephenson manipulated the margin of error to make his conclusions fit the

statements of the State's key witness.

221.    Stephenson acted under pretense and color of state law. His acts were beyond the scope

of his jurisdiction, without authority of law, and in abuse of his powers. He acted with the specific intent to deprive Plaintiff of his constitutional rights.

**222.**     As a direct and proximate result of Stephenson's misconduct and abuse of authority, Plaintiff suffered the damages alleged herein.

**SIXTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Municipal Liability – Fourth and Fourteenth Amendments –
Policy and Custom of Coercive Police Interrogation and Fabricated Witness Statements
(Against Defendant City of New Haven)

**223.**     Plaintiff realleges the above paragraphs as if they were fully set forth here.

**224.**     Before, during, and after the violation of Plaintiff's constitutional rights, the City of New Haven had a policy or custom of unconstitutional investigative techniques, including coercion of witnesses, the fabrication of inculpatory evidence, the destruction of evidence, and the suppression of exculpatory evidence.

**225.**     The City was aware of, permitted, tolerated, and was deliberately indifferent to NHPD officers' and detectives' coercive techniques, fabrication of evidence, and withholding and destruction of evidence.

**226.**     Dease, Adger, and Breland acted consistently with and pursuant to the City's policy or custom when they engaged in their conduct set forth above.

**227.**     The City, acting under color of state law, violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

**228.**     As a direct and proximate result of the City's policy or custom, Plaintiff suffered the damages alleged herein.

## SEVENTH CAUSE OF ACTION
Negligence
(Against Defendants Dease, Adger, and Breland)

**229.**   Plaintiff realleges the above paragraphs as if they were fully set forth here.

**230.**   Dease, Adger, and Breland owed Plaintiff a duty to exercise reasonable care in their investigation of crimes, to reasonably pursue and disclose exculpatory evidence, and to refrain from fabricating evidence.

**231.**   Dease, Adger, and Breland breached these duties by their conduct set forth above.

**232.**   As a direct and proximate result of their negligent acts and omissions, Plaintiff suffered the damages alleged herein.

## EIGHTH CAUSE OF ACTION
Article First, §§ 7, 8, and 9 of the Connecticut Constitution
(Against Defendants Dease, Adger, and Breland)

**233.**   Plaintiff realleges the above paragraphs as if they were fully set forth here.

**234.**   Dease, Adger, and Breland caused Plaintiff to be wrongfully arrested, charged, prosecuted, convicted, and incarcerated. By their conduct set forth above, they coerced witnesses, fabricated evidence, manipulated evidence, withheld exculpatory evidence, and failed to conduct an adequate investigation.

**235.**   As a direct and proximate result of their unlawful acts and omissions, Plaintiff suffered the damages alleged herein.

## NINTH CAUSE OF ACTION
Indemnification – Conn. Gen. Stat. § 7-
465 (Against Defendant City of New
Haven)

236.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

237.    Defendants Dease, Adger, and Breland were police detectives acting in performance of their duties within the scope of their employment with Defendant City of New Haven and under color of law.

238.    As set forth above, Dease, Adger, and Breland infringed Plaintiff's civil rights and caused him physical damages to his person and property while performing their duties and acting within the scope of their employment.

239.    As a direct and proximate result of their conduct, Plaintiff suffered the damages alleged herein.

240.    On or about June 25, 2018, which was within six months after the foregoing causes of action had accrued, pursuant to Conn. Gen. Stat. § 7-465, Plaintiff filed with the clerk of the City of New Haven written notice of his intention to commence this action and of the time when and the place where the damages were incurred or sustained.

241.    Pursuant to one or more of Causes of Action One through Eight, Defendant City of New Haven is liable for those damages under Conn. Gen. Stat. § 7-465.

## TENTH CAUSE OF ACTION
Direct Action – Conn. Gen. Stat § 52-
557n (Against Defendant City of New
Haven)

242.    Plaintiff realleges the above paragraphs as if they were fully set forth here.

**243.**    Defendants Dease, Adger, and Breland were police detectives acting within the scope of their employment and official duties with Defendant City of New Haven and under color of law.

**244.**    Dease, Adger, and Breland owed Plaintiff a duty to exercise reasonable care in their investigation of crimes, to reasonably pursue and disclose exculpatory evidence, and to refrain from fabricating evidence.

**245.**    Dease, Adger, and Breland breached these duties by their conduct set forth above.

**246.**    Even to the extent that Dease, Adger, and Breland were performing discretionary functions, they disregarded the risk of imminent harm to Plaintiff, an identifiable person. Dease, Adger, and Breland were obligated before and during Plaintiff's trial to disclose exculpatory evidence to him.

**247.**    In the alternative, Dease, Adger, and Breland's acts involved malice, malicious intent to vex or trouble, and/or intent to injure.

**248.**    As a direct and proximate result of Dease, Adger, and Breland's acts and omissions, Plaintiff suffered the damages alleged herein.

**249.**    The Defendant City of New Haven is liable for those damages pursuant to Conn. Gen. Stat. § 52-557n.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

**a.**  Compensatory damages against all Defendants in an amount to be determined at trial;

**b.**  Punitive damages against Defendants Dease, Adger, Breland, and Stephenson in an amount to be determined at trial;

**c.**  Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

**d.**  Such other and further relief as this Court may deem just and proper.

Dated: New Haven, Connecticut
March 13, 2019

THE PLAINTIFF: MARQUIS JACKSON

By:     /s/ *Kenneth Rosenthal*
          Kenneth Rosenthal (ct05944)
          Law Office of Kenneth Rosenthal
          700 State Street
          New Haven, CT 06511
          (203) 915-4235
          krosenthal@gs-lawfirm.com

          Daniel F. Lage (ct30196)
          Ruane Attorneys at Law
          1 Enterprise Drive, Suite 305
          Shelton, CT 06484
          daniel@ruaneattorneys.com

          *Attorneys for Plaintiff*