# EXHIBIT 1

MARCH 31, 2000                          65

1    THEREUPON,

2                    J A M E S    S T E V E N S O N,

3                    278 Colony Street, Meriden, Connecticut,

4                    first having been duly sworn, was examined

5                    and testified as follows:

6                         THE COURT:  Thank you very much.  Please be

7                    seated.

8    DIRECT EXAMINATION

9    BY MR. NICHOLSON:

10        Q       Good afternoon, Mr. Stevenson.  Can you tell

11   the jury, if you would please, sir, what your present

12   occupation is?

13        A       I'm a firearms examiner.

14        Q       And how long -- how long have you been a

15   firearms examiner with the State of Connecticut, sir?

16        A       With the State of Connecticut, six years.

17        Q       Okay.  And prior to your employment as a

18   firearms examiner with the State of Connecticut, can you

19   tell the jury what you did before that, sir?

20        A       I was a detective with the New Haven Department

21   of Police Services for a period of 20 years.

22        Q       And what did you do for the New Haven Police

23   Department, Mr. Stevenson?

24        A       I was a detective assigned to the

25   identification unit.  The last three years of my employment

26   with them I was the firearms examiner for the New Haven

27   department.

MARCH 31, 2000                    66

1      Q      Now, Mr. Stevenson, can you give us a thumbnail

2    sketch, if you would please, as to your background,

3    training and experience to become a firearms examiner with

4    the State of Connecticut?

5      A      I went through a two year training program with

6    the State Police Forensic Science Laboratory while still

7    with the New Haven Department of Police Services, I was

8    sent to the laboratory where I worked on a daily basis.

9                    MR. MOSCOWITZ:  Your Honor, I stipulate to

10                   his qualification.

11                   MR. NICHOLSON:  I think the jury would like

12                   to hear them.

13                   THE COURT:  Go ahead, Mr. Stevenson.

14                   THE WITNESS:  I worked there for two years

15                   learning the field of firearms identification,

16                   including the operability and functioning of

17                   firearms, the microscopic comparisons

18                   necessary to compare components of ammunition

19                   to the test fires that were fired and the

20                   inner relationship of those components of

21                   ammunition to the different types of

22                   investigations.

23                   I'm a member of the Association of Firearms and

24                   Tool Mark Examiners, which is a professional

25                   organization based on firearms and tool mark

26                   comparisons.

27                   During that time frame and continuing over the

1          years, I have attended numerous courses including

2          Smith & Wesson, Glock, Colt to name some of them.

3          I have attended three 40 hour seminars offered by

4          the Association of Firearms and Tool Mark

5          Examiners to keep current on the field of firearms

6          identification.

7    BY MR. NICHOLSON:

8          Q      Now, Mr. Stevenson, have you had occasion to

9    testify here in Connecticut state court as an expert

10   witness in regard to firearms examination, sir?

11         A      In the field of firearms identification, state

12   and Federal Court, 126 times.

13         Q      All right.  Now, in connection with this

14   particular case, Mr. Stevenson, did you have occasion to

15   examine some physical evidence?

16         A      Yes, I did.

17         Q      And in connection with that examination of

18   physical evidence, did you make out a written report which

19   contains your results of those examinations?

20         A      Yes, I did.

21         Q      That particular report, was that made in the

22   ordinary course of the State Police Lab's business, sir?

23         A      Yes, it is.

24         Q      And is it in the ordinary course of the

25   laboratory's business to make such a report?

26         A      Yes, it is.

27         Q      And was that report made out at or around the

1    time that you finished your examinations and arrived at

2    your conclusions?

3        A     Yes, it was.

4              MR. NICHOLSON:  I would like to offer this

5              document.

6              MR. MOSCOWITZ:  No objection.

7              MR. AHERN:  I just want to --

8              No objection, your Honor.

9              THE COURT:  Full exhibit, the firearms

10             report, it's number 80.

11             (Whereupon, a report was marked

12             as State's Exhibit 80 full exhibit.)

13             MR. MOSCOWITZ:  That's 80?

14             THE COURT:  8-0.

15   BY MR. NICHOLSON:

16       Q     This document, State's Exhibit Number 80,

17   Mr. Stevenson, could you identify that for the record, if

18   you would please?

19       A     This is a report I prepared for the findings

20   that I did in this investigation.

21       Q     All right.  Now, the first thing that I would

22   like to ask you, Mr. Stevenson, is I have five items that I

23   would like you to examine.  And previously they have been

24   marked as full exhibits 34, 38, 39, 49 and 75, I would like

25   to have you just look at these items for a moment, sir.

26       A     (Reviewing.)

27             Yes, sir.

1      Q      Did you examine those items up at the State

2  Police Forensic Laboratory?

3      A      Yes, I did.

4      Q      First of all, can you tell us the caliber of

5  each of those items?

6      A      They are 9-mm Luger.

7      Q      All right.  And spent shell casings, is that

8  what they are?

9      A      That's correct, discharged fired casings I

10  referred to them as.

11      Q      Did you do any examination of those five spent

12  cartridges?

13      A      Yes, I did.

14      Q      Could you tell the jury what you did?

15      A      With this type of evidence, you are making a

16  determination to see if they are fired from the same

17  firearm or different firearms, and in doing so I used the

18  comparison microscope where I'm able to observe two objects

19  at the same time by mounting them on this same -- the

20  microscope and making those comparisons.  In this case,

21  cartridge case to cartridge case, you are able to determine

22  whether it has the same class characteristics and also the

23  same individualized characteristics to possibly make a

24  positive identification statement.

25      Q      Now, when you examined those five individual

26  spent cartridge casings, did you come to any conclusions

27  about whether or not each of those spent shell casings was

1    fired from the same weapon?

2         A       Yes, I did.

3         Q       Could you tell us what your conclusion was?

4         A       All five were fired from the same firearm.

5         Q       Now, in examining those spent cartridge

6    casings, were you able to tell whether or not those shell

7    casings were fired from a revolver versus a semi-automatic

8    pistol?

9         A       These were all fired from a semi-automatic type

10   of pistol.

11        Q       How did you determine that, sir?

12        A       It's based upon looking at the class

13   characteristics of the bridge face marks and also the

14   caliber of the cartridge case itself and any marks that

15   might be found upon the surfaces that we use for comparison

16   purposes.

17        Q       Now, some of the jurors may already be aware,

18   but could you just explain to us, if you would please, the

19   difference in operation between a semi-automatic pistol and

20   a revolver?

21        A       The revolver is a handgun which has the --

22   holds the cartridges in a cylindrical piece of metal

23   forward of the hammer, it's above the trigger.  The

24   cartridges are loaded into this cylinder and they are held

25   there.  The action of a revolver is to pull the trigger,

26   and in pulling the trigger or the hammer rearward, it

27   rotates the cylinder placing the cartridge in line with the

1   barrel.  What happens next is the hammer is released to its

2   furthest most point to the rear, it falls forward striking

3   the primer of the cartridge which detonates the powder

4   which pushes the bullet down the barrel of the firearm.

5   The cartridge remains in that position until the trigger or

6   hammer is actuated again causing the cylinder to rotate,

7   bringing the bullet within the cylinder to that ready to

8   fire position again.

9            In a semi-automatic pistol, the cartridges are

10  loaded into a magazine, one on top of each other, which is

11  placed into the handgrip of the firearm.  The action of a

12  semi-automatic pistol is for the slide to come back, and as

13  it's released and let go letting forward, it takes that top

14  cartridge, which is in the magazine, and it's forced by the

15  slide into the barrel of the firearm.  The action then is to

16  pull the trigger, this causes the firing pin to go forward,

17  strike the primer, and go through that action.  But what

18  happens in the semi-automatic pistol is the slide now comes

19  rearward and because of the gases working upon the interior

20  surface of that cartridge, cause it to push it backwards, the

21  spring mechanism makes the slide come rearward, in doing so, it

22  reaches its furthest most point, can't go any farther and the

23  cartridge is now ejected because it's being pulled rearward

24  with that slide as it comes back.  It's now out of the way and

25  if there is a cartridge in line in the magazine it can now be

26  pushed into the barrel and ready to be fired again.  Each

27  individual shot is pulled by pulling the trigger.  This would

1    continue until such time there are no more cartridges in line

2    to be fired.

3                        MR. NICHOLSON:  Can I have one moment,

4                    Judge?

5                        THE COURT:  Sure.

6    BY MR. NICHOLSON:

7        Q        I would like to have you look at these three

8    items, Detective Stevenson.  They have been marked as

9    State's Exhibits 40 -- 31, 43 and 69, and I would ask you

10   if you had occasion to examine those projectiles.  And the

11   one that is contained in the canister, if you feel a need

12   to, you could open it and examine it as well.

13       A        (Reviewing.)

14       Q        Have you examined those items, sir?

15       A        Yes, I have.

16       Q        And when you examined those three projectiles

17   and those three exhibits, can you tell the jury what

18   conclusions you came up with?

19       A        Each one of those envelopes contains a canister

20   which contains a jacketed hollow point bullet which I

21   examined relative to this investigation.

22       Q        All right.  Were they -- do you recall what

23   caliber those bullets were, sir?

24       A        They were 9-mm caliber.

25       Q        When you examined those, did you examine the

26   lands and grooves on the projectiles?

27       A        Yes, I did.

1      Q      Why were you doing that?

2      A      To determine what these items of evidence were.

3      Q      All right.  And we say lands and grooves, can

4  you explain to the jury what that is, sir?

5      A      On the interior surface of the barrel of the

6  firearm, the manufacturer cuts grooves into them creating

7  high spots and low spots.  Depending upon the manufacturer

8  specifications, it would correspond to the number of lands

9  and the number of grooves that they would have on the

10  interior surface of the barrel.  These have a twist to

11  them, so we refer to them as a right twist or a left twist

12  depending on how the manufacturer places those on the

13  interior surface of the firearm.  These are placed in there

14  for stability so that when the bullet is being fired, it

15  creates a spin which gives it stability during flight.  But

16  we're also able to measure those distances, those widths of

17  those lands and the widths of those grooves, and by knowing

18  the class characteristics of the bullet weight or bullet

19  diameter, we could put those together to determine the

20  types of firearms from which bullets may be fired from.

21  You do that in cases where you have just a bullet and not a

22  firearm at that present time to make a comparison to.  So,

23  you are looking at those class characteristics, the weight

24  of the bullet and those widths of the lands and grooves to

25  make your determination as to the caliber.  The caliber

26  refers to the board diameter for which a bullet can travel.

27      Q      Let me ask you this.  Those three projectiles

1    that you have on the witness stand, can you tell the jury

2    whether or not after you examined those projectiles,

3    whether or not they were fired from the same weapon, sir?

4         A      Yes, they were.

5         Q      Two additional items, these have been

6    previously marked as State's Exhibits 59 and 51, and I

7    would like you to look at these also, Mr. Stevenson.

8         A      (Reviewing.)

9         Q      Did you examine those items, sir?

10        A      Yes, I did.

11        Q      What conclusions did you arrive at after

12   looking at them?

13        A      These two items were fragmentary pieces of

14   bullets, meaning there are portions of lead and jacketing

15   material that is adhering to each other and also evidence

16   of rifling found on the side of the jacket.  So, I'm able

17   to make a comparison of just those rifling characteristics

18   which are on the surfaces, and then in this case, because

19   they are -- one weighed approximately 27 grains and the

20   other one weighed 77 grains, they are not a full bullet.

21   What you now do is compare those to the items which you

22   have that have larger amounts of lands and grooves, and

23   using that same comparison microscope, you can determine

24   whether they are the same size lands and grooves.

25              In this case, these two items had consistently the

26   same size lands and grooves, but I couldn't make that positive

27   statement to say that they were fired from the same firearm as

1    the other three bullets.

2         Q      And is that because there simply wasn't enough

3    of the -- the item, there wasn't enough of the item left

4    for you to make a positive identification?

5         A      There wasn't enough of the individual

6    striations or individual markings upon those lands and

7    grooves where I could make that statement.

8         Q      Now, you are telling the jury that you couldn't

9    make a positive identification on those two items as being

10   fired from the same weapon that fired the other three

11   projectiles, but based on what was there, was it consistent

12   with the other projectiles?

13        A      Yes, they were.

14        Q      Finally, this item, State's Exhibit Number 52,

15   did you look at this and examine it?

16        A      Yes, I did.

17        Q      And could you come to any conclusion with

18   respect to that particular item?

19        A      In the plastic envelope there are three pieces

20   of jacketing and lead material, no further identification

21   could be made as there were no individual characteristics

22   or class characteristics that I could identify.

23        Q      Now, you indicated that you examined the lands

24   and grooves on the projectiles, you also examined the shell

25   casings.  Are you able to say, Mr. Stevenson, as far as

26   what type or what manufacturer of the weapon would have

27   fired those particular items?

1       A       We come up with a list of possible firearms

2  from those class characteristics to make a -- to give an

3  idea as to the types of manufacturers of firearms that

4  would make a firearm that would fire a bullet with those

5  rifling characteristics.  It's not an all inclusive list of

6  every firearm that is made, but it is compiled by what we

7  call the general rifling characteristics file.  We put in

8  parameters of the number of lands and grooves, we know the

9  caliber of the bullet, in this case it was 9-mm, six lands

10 and grooves with a right twist.  The width of the lands

11 were approximately 69 thousandths of an inch.  The width of

12 the grooves are 105 thousandths of an inch.  In looking at

13 those parameters, I was able to come up with several

14 firearms from which it could have been fired from, but not

15 limited to distance.

16      Q       Let me ask you, first of all, as far as the

17 firearms that could have been the source or would have been

18 the source of those shell casings and projectiles, was it a

19 semi-automatic pistol?

20      A       All of them were.

21      Q       All of them were?

22      A       Yes, sir.

23      Q       In that grouping of semi-automatic pistols, can

24 you tell us what manufacturers would have or among the list

25 that could have produced that ballistic evidence?

26      A       The list which I prepared of manufacturers was

27 Calico, FEG, Browning, Heckler & Koch, Hungarian, Kassnar,

MARCH 31, 2000                                  77

1  Norinco, Walther, Sigsauer, I believe, were the names of

2  the firearms which I located at that time.

3        Q       Now, a couple of weeks ago, did you have -- did

4  I have occasion to have a phone call with you?

5        A       Yes, you did.

6        Q       Did I make a request for you to check some

7  additional information?

8        A       Yes, you did.

9        Q       And based upon that request, did you come up

10 with any other manufacturers that also fit within the

11 parameters of this ballistics evidence?

12       A       Yes, I did.

13       Q       Can you tell us what that was?

14       A       The other firearm manufacturer was Barretta.

15               MR. NICHOLSON:   I would like to have an

16                item marked and I would like to show it to

17                counsel.

18               MR. AHERN:   Judge, perhaps the jury should

19                be excused at this time to argue a point of

20                law briefly.

21               THE COURT:   Ladies and gentlemen, I'll

22                excuse you for a moment.

23                (Whereupon, the jury left the courtroom.)

24               THE COURT:   Let's have that item marked for

25                identification.

26               MR. AHERN:   I would like the Court to look

27                at it obviously.

1          THE COURT:  Yeah, sure.

2          Why don't you return it to counsel and --

3          MR. AHERN:  I sort of jumped up and perhaps

4     because I didn't want the jury to see this,

5     you know, the nature of the offer.

6          I'm speculating what the nature of the offer

7     is, but to me and to my mind, this is a picture of

8     the gun that isn't in this case.  In other words,

9     we don't know what kind of a gun was in this case.

10    We have had a tremendous lengthy list of possible

11    manufacturers.  This particular gun has a

12    particular color, has a particular handle, and I

13    believe it blocks to one particular manufacturer,

14    so I'm interjecting now because I didn't want to

15    get into a situation where it was offered and

16    proffered and then the Court, if the Court deemed

17    my argument to be appropriate, was withdrawn and

18    the cat is out of the bag.  That's why I jumped up

19    at this point.

20         Perhaps it's best if the State tells me whether

21    I'm right or wrong on the issue of whether this is

22    the picture of the gun that was ever obtained.

23         THE COURT:  Well, what is the -- you are

24    objecting on what ground, irrelevant

25    information?

26         MR. AHERN:  I'm objecting that it's

27    irrelevant, it's misleading, you know, it's

1    not helpful to the jury.

2         THE COURT:  Okay.

3         MR. AHERN:  I think the length of the list

4    Mr. Stevenson gave was added to by Barretta,

5    here is something like nine, ten

6    manufacturers, if I'm right, and I think that

7    nine or ten possible manufacturers is not an

8    exhaustive list, there has been no evidence so

9    far.

10        THE COURT:  I understand your point.

11        What's the State's offer?

12        MR. NICHOLSON:  The State's offer is that

13   this, just so it's clear for the record, what

14   this item is, it's a picture of a Barretta

15   9-mm pistol, which appears in a certain

16   design.  I do expect that there is going to be

17   testimony from a witness later on in this

18   trial that he is going to describe the weapon

19   that Mr. Horn had and he is also going to

20   describe the color and shape and so forth and

21   he is also going to describe what make that

22   9-mm pistol was.

23        THE COURT:  That's demonstrative evidence

24   with respect to testimony that we have not

25   elicited yet, but what you are offering at

26   this juncture, there is an objection that it

27   is an inadequate foundation at this point

TT-0275

1     given the sort of apparently rather broad

2     range of firearms that could account for the

3     shell casings and the bullets that

4     Mr. Stevenson examined.  So, I mean, their

5     claim is, I guess, that with respect to

6     Mr. Stevenson it's not sort of narrowed enough

7     to allow that.

8           MR. NICHOLSON:  I understand.

9           THE COURT:  Are you going to press the

10    offer at this point?

11          MR. NICHOLSON:  No.  I will ask him some

12    additional questions, general questions about

13    this firearm, I won't pursue this offer at

14    this juncture.

15          MR. AHERN:  Well, wait a minute.  Can he

16    ask questions about a document that is not in

17    evidence?

18          THE COURT:  No, but he could ask questions

19    about -- the witness already said a Barretta,

20    and I guess he could ask questions about those

21    firearms that he is questioning about, but he

22    can't proffer that 81 for identification

23    because I don't think there is an adequate

24    foundation yet.

25          MR. AHERN:  I don't want the jury to see it

26    at this point because I understand what Mr.

27    Nicholson is saying, there may or may not be

MARCH 31, 2000                                    81

1          evidence in the future, and I don't want them

2          to get a look at it now and find out that it

3          is not linked in the future.

4              THE COURT:  Fair enough.  We will not

5          parade it in front of the jury.

6              I'm sustaining the defendant's objection to

7          that offer now, it can remain marked for

8          identification and we'll continue the questioning.

9              If there is further objections, we'll deal with

10         it.

11             Ask the jurors to step out please.

12             (Whereupon, the jury entered the

13         courtroom.)

14             THE COURT:  Counsel please stipulate to the

15         presence of the jurors and alternates?

16             MR. NICHOLSON:  The State will stipulate.

17             MR. MOSCOWITZ:  The defense will.

18             MR. AHERN:  Yes, sir.

19    BY MR. NICHOLSON:

20         Q     Mr. Stevenson, you indicated during the course

21    of your testimony here today that the Barretta 9-mm

22    semi-automatic pistol falls within the parameters that

23    would produce the ballistics evidence that you have on the

24    witness stand, is that correct, sir?

25         A     Yes, sir, it could.

26         Q     Now, I want to ask you some very general

27    questions about Barretta 9-mms.  Barretta 9-mms, do you

1    recall or do you know in what finishes or what colors they

2    come in?

3                    MR. AHERN:  I object.  This is totally

4                    irrelevant, what colors do they come in.

5                    THE COURT:  Objection overruled.

6                    You could answer the question.

7                    THE WITNESS:  They are made -- depending

8                    upon the model, depending, their firearms are

9                    in blue, blue or dark black, whatever your eye

10                   sees, finishes or stainless or mat finish,

11                   those would be three of the basic ones that

12                   you would usually find these firearms.

13   BY MR. NICHOLSON:

14        Q     As far as the Barretta semi-automatic 9-mm

15   pistol, physically the size of that weapon, would you

16   consider it to be large in size or small in size?  How

17   would you describe physically the size of the pistol?

18                   MR. AHERN:  Objection.  It's too

19                   generalized, large, small as compared to what?

20                   THE COURT:  Well, he is an expert.  The

21                   objection is overruled.

22                   You can have cross-examination.

23   BY MR. NICHOLSON:

24        Q     You may answer.

25        A     Depending upon the particular model, the 9-mm

26   firearms basically made by Barretta have a barrel length of

27   around anywhere from six inches to four inches, three and a

MARCH 31, 2000                    83

1    half inches.  Their overall length is ten to twelve inches.

2         Q      Now, let me ask you this, Mr. Stevenson, the

3    semi-automatic 9-mm pistols that are manufactured by

4    Barretta, the shape of them, what sort of shape are we

5    talking about generally?

6         A      The slide portion of a Barretta firearm usually

7    has an open portion to the top, to the top of the slide.

8    Most manufacturers usually have a full slide, the material,

9    the metal goes completely over the barrel.  Barretta tends

10   to use an open slide on the top.  The configuration is that

11   of any other semi-automatic pistol, with the handgrip and

12   the barrel and slide.

13        Q      Now, let me ask you this, Mr. Stevenson, does

14   Barretta make a 9-mm semi-automatic pistols which have a

15   small barrel protruding at the end of the gun, do you

16   know -- do you understand the question, first of all?

17        A      Some of their models, because of the way in

18   which they manufacture them with that open type of slide,

19   the front portion of the barrel in the front site do tend

20   to protrude past the front portion of the slide material,

21   so.

22        Q      All right.  And, finally, Mr. Stevenson, the

23   ballistics evidence that you examined in this case, can you

24   tell us within a reasonable degree of scientific certainty

25   whether or not the firearm that fired the shell casings and

26   the projectiles, whether or not that particular firearm

27   would have had a barrel of less than twelve inches?

1        A        By the rifling characteristics that I looked at

2    on the surface of that bullet evidence and comparing that

3    to the files, the rifling characteristics files, there were

4    no firearms listed of anything less than -- a

5    semi-automatic pistol that would have barrel lengths of

6    less than twelve inches.

7        Q        Thank you very much, Mr. Stevenson.

8                 MR. NICHOLSON:  I have no further

9            questions.

10                THE COURT:  Mr. Moscowitz.

11                MR. MOSCOWITZ:  Can I have one moment

12           please, your Honor?

13                THE COURT:  Sure.

14   CROSS EXAMINATION

15   BY MR. MOSCOWITZ:

16       Q        Detective Stevenson, you indicated that five

17   casings came from a similar weapon, am I correct?

18       A        They were fired from the same firearm, yes.

19       Q        Same firearm.  So, at least you could conclude

20   that one of the suspects armed with a firearm fired a

21   minimum of five shots from the same weapon, am I correct?

22       A        (Pause.)

23       Q        If you don't understand the question, I'll

24   repeat it.

25                MR. NICHOLSON:  Well, I'm going to object

26           at this point, your Honor.  I think that there

27           is an insufficient foundation for this witness

TT-0280

1          to know how many shots any particular person

2          fired.

3              THE COURT:  He doesn't know whether one

4          person had it or five people had it, that's an

5          unfair question.

6              Objection sustained.

7   BY MR. MOSCOWITZ:

8       Q     Can we conclude that if the individual didn't

9   pass that weapon around, that one individual fired one

10  weapon that fired five similar casings, am I correct?

11      A     (Pause.)

12      Q     Just yes?

13      A     I don't know how many individuals, but there

14  were five cartridge casings fired from the same gun.

15      Q     And if the weapon was not passed around, one

16  individual fired that weapon?

17              MR. NICHOLSON:  I'm going to object.  It's

18          assuming facts not in evidence.

19              THE COURT:  Beyond his capability.

20              MR. MOSCOWITZ:  I have no -- I have no more

21          questions.

22              MR. AHERN:  I have a few.

23              THE COURT:  Okay.

24  CROSS EXAMINATION

25  BY MR. AHERN:

26      Q     So, I understand correctly.  You have testified

27  many, many times, haven't you, sir?

MARCH 31, 2000                    86

1      A       Yes, I have.

2      Q       How many times have you testified?

3      A       In firearms identification, 126 times.

4      Q       And so, on 126 times at least, you made reports

5   about evidence submitted to you and your findings, isn't

6   that correct?

7      A       That's correct.

8      Q       And you forward these reports to whom, sir?

9      A       It goes back to the agency who submits the

10  evidence for a comparison.

11     Q       Okay.  So, in this case, for instance, it's

12  submitted to you by the New Haven Police Department, is

13  that correct?

14     A       That's correct.

15     Q       And so, you issue these reports, the

16  information is to be used, I guess, you tell me if I'm

17  wrong, at trials or whatever other purposes it might be

18  needed during an investigation wherein your findings are

19  needed, is that correct?

20     A       That's correct.

21     Q       Okay.  Now, if I understand, do you have a copy

22  of your report or?

23     A       There is one.

24     Q       So, when did you do your report in this

25  particular case?

26     A       February 4th, 1999.

27     Q       And you have testified at length very

Case 3:19-cv-00388-RNC   Document 34-2   Filed 04/30/19   Page 24 of 41

1    accurately about what is in that report?

2         A       That's correct.

3         Q       If I understand correctly, on February 4 of

4    1999, you indicated that the bullets and bullet fragments,

5    apparently that you are testifying about and pointed out to

6    the ladies and gentlemen of the jury, are consistent with

7    being a 9-mm, is that correct?

8         A       Yes, sir.

9         Q       And they may have been fired from but not

10   limited to a self-loading pistol?  By the way, what is a

11   self-loading, another word for a semi-automatic?

12        A       Yes.

13        Q       Manufactured by Calico, is that correct?

14        A       Yes, sir.

15        Q       Now, does Calico make guns -- what color guns

16   do Calico make?

17        A       I'm familiar with a blue version of a firearm

18   they make.

19        Q       Do they have any guns that have a small barrel

20   protruding at the end?

21        A       I'm not familiar with that, sir.

22        Q       Okay.  And you are not familiar either with a

23   Calico or with the answer to the question?

24               MR. NICHOLSON:  I object.  It's

25               argumentative, if your Honor pleases.

26               THE COURT:  The objection is overruled.

27   BY MR. AHERN:

1       Q       Yes.

2       A       I'm not familiar with the fact if they do or do

3   not.

4       Q       They might?

5       A       There is that possibility.

6       Q       You don't know the answer?

7       A       That's correct.

8       Q       Okay.  FEG, what does that stand for?

9       A       It's FEG, it's a -- I believe it's a Hungarian

10  firearms manufacturer.

11      Q       Okay.  It's all in caps, is there a reason why

12  it's all in caps?

13      A       That's the way they specify their firearms.

14      Q       Okay.  Now, do you know whether or not they

15  make guns which fire bullets, 9-mm in this case, that, in

16  fact, have barrels less than twelve inches?

17      A       Yes, they do.

18      Q       Do they?

19      A       Yes, they do.

20      Q       What color guns do they make?

21      A       I'm familiar with a blue version.

22      Q       Okay.  They don't make a silver version, are

23  you sure of that?

24      A       I'm not sure of that.

25      Q       Do they make a gun that has a small barrel

26  protruding from the end?

27      A       I'm not sure of that.

TT-0284

1       Q       Let's go on to the next one.  How about

2   Browning?  I've never even heard of Browning.  Do they make

3   a 9-mm semi-automatic with a barrel that is less than

4   twelve inches in length?

5       A       Yes, they do.

6       Q       What color 9-mm does Browning make?

7       A       I'm familiar with a blue version of that

8   firearm.

9       Q       Do you know whether or not they make a silver

10  version?

11      A       Not to my knowledge.

12      Q       Okay.  Here is -- I don't know if I understood

13  your answer, do you know whether or not they make a silver

14  version?

15      A       And I said not to my knowledge, sir.

16      Q       Not to your knowledge they don't or not to your

17  knowledge they do, I mean?

18      A       I have no individual knowledge.

19      Q       You don't know the answer?

20      A       That's correct.

21      Q       Okay.  The next one is Heckler & Kotch, is that

22  correct?

23      A       That's correct.

24      Q       Now, do they make a 9-mm semi-automatic that

25  has a barrel less than twelve inches?

26      A       Yes, they do.

27      Q       Do they make such a gun that has a small barrel

1   protruding at the end?

2        A        I don't know, sir.

3        Q        Do you know what colors they are made in?

4        A        I'm familiar with a blue version of that

5   firearm.

6        Q        Do you know whether they make a silver one?

7        A        No, sir, I do not.

8        Q        Hungarian, do you know whether or not they make

9   a semi-automatic 9-mm with a barrel less than twelve

10  inches?

11       A        Yes, sir, they do.

12       Q        And do they?

13       A        Yes, sir, they do.

14       Q        Is it fair to say that thus far I have asked

15  you about Calico, FEG, Browning, Heckler & Kotch, and

16  Browning, and I may be wrong, do all of them make 9-mm

17  semi-automatic that have barrels less than twelve inches?

18       A        They do.

19       Q        Let's complete the process.  We only have three

20  more to go.

21                Kasner, does Kasner make a 9-mm semi-automatic with

22  a barrel less than twelve inches in length?

23       A        Yes, they do.

24       Q        Do you know what color gun Kasner produces?

25       A        I believe theirs is black.

26       Q        Do you know whether or not they make a silver

27  one?

TT-0286

MARCH 31, 2000                                    91

1        A        I believe it's a satin finish.

2        Q        I didn't hear you, I'm sorry?

3        A        I believe it's a satin finish.

4        Q        Okay.  Do you know of any other kinds of finish

5    Kasner does?

6        A        No, sir, I don't.

7        Q        Do you know whether or not Kasner 9-mm handguns

8    semi-automatics with barrels less than twelve inches have a

9    small barrel protruding at the end?

10       A        No, sir, I do not.

11       Q        Norinco, does Norinco make a 9-mm with a barrel

12   less than twelve inches long?

13       A        Yes, they do.

14       Q        Do you know what colors Norinco makes 9-mms

15   such as I just described?

16       A        They are basically blue.

17       Q        Do you know whether they make a silver or

18   silver-looking gun?

19       A        No, sir, I do not.

20       Q        They may, you just don't know?

21       A        That's correct.

22       Q        What about Walther, do they make a silver or

23   silver-looking semi-automatic 9-mm with a barrel less than

24   twelve inches?

25       A        Yes, they do.

26       Q        So, they do.  Do they make any other guns,

27   color-wise?

MARCH 31, 2000                              92

1      A      Blue, sir.

2      Q      They do make blue?

3      A      Yes.

4      Q      Now, do they make a gun that has a barrel less

5  than twelve inches, is silver and has a small barrel

6  protruding at the end?

7      A      They make a barrel with less than twelve

8  inches; as far as protrusion, sir, I do not know.

9      Q      Now, in this particular report, I think that's

10  your complete listing of manufacturers, but it's not an

11  exhaustive listing, in other words, there is other possible

12  manufacturers, is that correct?

13     A      That's correct.

14     Q      And then if I understand your testimony, how

15  recent was it that Mr. Nicholson, the State's Attorney in

16  this case, contacted you?

17     A      I believe it was February 15th.

18            THE COURT:  Do you have many more

19            questions, Mr. Ahern?

20            MR. AHERN:  Yes.

21            THE COURT:  Let's break then.

22            We will take the luncheon recess now until two

23            o'clock.

24            And, as I said before, don't discuss the case,

25            don't let anybody discuss it with you and see you

26            back here outside this room at approximately two

27            o'clock.

MARCH 31, 2000                    93

1          Recess now please.

2              (Whereupon, the jury left the courtroom.)

3              (Whereupon, there was a lunch recess.)

4          THE COURT:  Okay.  Any matters that we need

5      to take up before we ask the jurors to come

6      back in?

7          MR. NICHOLSON:  Judge, I want to mention to

8      the Court and I just mentioned to counsel,

9      that I have reviewed the statement that was

10     given by Howard Roberts as a witness that is

11     going to be called after Mr. Stevenson, and in

12     looking at my copies, it appears that there is

13     one page that is missing out of that

14     statement.  I think it was page number --

15         MR. MOSCOWITZ:  Six.

16         MR. NICHOLSON:  Six.  And I have alerted

17     counsel to that.  I did also advise him of the

18     fact that Mr. Roberts can't read, so that if

19     there comes a point in his examination where

20     he is going to need his recollection

21     refreshed, he is going to have to listen to

22     the tape, which I have up here with the tape

23     machine.

24         THE COURT:  Have you gotten page six now?

25         MR. NICHOLSON:  It's on the tape, but I

26     don't have it transcribed.

27         MR. AHERN:  So, in other words, we're all

1          operating without page six?

2               MR. MOSCOWITZ:  The only thing I would

3          request is that prior to Mr. Roberts coming

4          up, could we have an opportunity to review the

5          tape?

6               THE COURT:  Sure.

7               MR. MOSCOWITZ:  I don't think it's long.

8               MR. NICHOLSON:  No, it's not.

9               THE COURT:  Mr. Stevenson, retake the

10         witness stand and ask the jurors to come in

11         please.

12              I'll reserve my other comments that we talked

13         about until later obviously.

14              (Whereupon, the jury entered the

15         courtroom.)

16              THE COURT:  Will counsel please stipulate

17         to the jurors and alternates?

18              MR. NICHOLSON:  The State will stipulate.

19              MR. MOSCOWITZ:  Yes.

20              MR. AHERN:  Yes.

21              THE COURT:  Go ahead, Mr. Ahern.

22              MR. AHERN:  Thank you, your Honor.

23    BY MR. AHERN:

24         Q    Mr. Stevenson, to reiterate briefly, your

25    original report is dated February 4, 1999, is that correct?

26         A    Yes, sir, it is.

27         Q    And then there were inquiries made of you, am I

1    right, from Attorney Nicholson representing the State, is

2    that correct?

3         A      That's correct.

4         Q      Subsequent to that report?

5         A      Yes.

6         Q      When were those inquiries made?

7         A      I believe it was February 15th of this year.

8         Q      So, February 15 of the year 2000?

9         A      That's correct.

10        Q      More than a year later than your original

11   report, is that correct?

12        A      That's correct.

13        Q      And did you generate a report of any kind as a

14   result of his inquiries?

15        A      Just notes that I kept for myself, but there

16   was no report generated through the department.

17        Q      Now, let's see, what exactly was he asking you

18   to do?

19        A      He asked if a Barretta, semi-automatic pistol

20   possibly would fall within the ranges of the rifling

21   characteristics.

22        Q      Okay.  And so it's your testimony that it

23   could?

24        A      Because of that second examination I did in

25   February, that's correct.

26        Q      All right.  And because of the original

27   examination you did more than a year ago, all the names

1    that we went through in your earlier testimony before the

2    lunch break also could produce such an item, correct?

3          A       That's correct.

4          Q       What about Sigsauer?

5          A       I don't believe that Sigsauer was part of the

6    list.

7          Q       Okay.  Are there any -- no, it wasn't part of

8    the list, it was a nonexhaustive list.  So, I'm just

9    asking, do you know whether Sigsauer makes a 9-mm less than

10   twelve inches long on the issue of its barrel?

11         A       It does.

12         Q       That wasn't on your report either?

13         A       That's correct.

14         Q       But for some -- so, in essence, you were asked

15   to add the name, if I understand correctly, to check and

16   see whether it would be appropriate to add the name

17   Barretta to this list of, nonexhaustive list of possible

18   manufacturers, right?

19         A       I was asked if a Barretta had similar class

20   characteristics, that's correct.

21         Q       Now, was any gun ever forwarded to you in this

22   case by the New Haven Police Department?

23         A       No, sir.

24         Q       Okay.  Now, from your 126 other reports and

25   involvements, both as a New Haven police officer and in

26   your job as a firearms examiner, when you are asked to

27   examine bullets, as you have done here, in a murder

1    scenario, if there is, in fact, a gun that was seized

2    that's part of the evidence that the police have, don't

3    they usually forward it to you as well?

4           A       I believe they would, sir.

5           Q       In fact, the last item in your original report

6    of February, '99 really kind of requests that if, in fact,

7    a firearm is developed, in other words, found to be

8    relevant, it ought to be submitted to you, correct?

9           A       That statement was in there, yes.

10                  MR. AHERN:  If I could have just one

11                  moment, Judge?

12                  THE COURT:  Sure.

13                  MR. AHERN:  Those are all the questions I

14                  have.

15                  Thank you, Mr. Stevenson.

16                  THE COURT:  Redirect examination.

17   REDIRECT EXAMINATION

18   BY MR. NICHOLSON:

19          Q       Mr. Stevenson, with regard to the questions

20   that Mr. Ahern asked you about the manufacturer Sigsauer,

21   do you know, as you sit here today whether or not the

22   Sigsauer rifling characteristics are consistent with the

23   ballistics evidence that you examined in this case?

24          A       I don't believe they are, sir.  I don't recall

25   seeing them on the list that I generated.

26          Q       Okay.  Thank you very much.

27                  THE COURT:  Okay.  Further questions, Mr.

1              Moscowitz?

2    CROSS EXAMINATION

3    BY MR. MOSCOWITZ:

4        Q      Just to pick up that last question.  You say

5    you don't think they are, but you don't know, am I correct?

6        A      That's correct.

7        Q      Okay.  Let's talk about, you're a weapons

8    expert, small caliber, am I correct?

9        A      (Pause.)

10       Q      I'm saying it an easy way so we could all

11   understand it, am I correct?

12       A      I've testified as an expert witness.

13       Q      Now, we're talking about semi-automatic

14   weapons, am I correct in saying that one of the most first

15   or original semi-automatic weapons was the army .45

16   semi-automatic weapon, am I correct?

17            MR. NICHOLSON:  Your Honor, I'm going to

18            object at this point.  I think that this is

19            going well beyond the scope of my redirect

20            examination.  I asked this question, one

21            question about a particular brand of weapons,

22            Sigsauer, now it seems that, like, we're going

23            into this whole area all over again.  I don't

24            see this to be related to that question that I

25            asked on redirect and I would object on that

26            basis.

27            MR. MOSCOWITZ:  If the Court wants me to

1                 address --

2                     THE COURT:  Well --

3                     MR. MOSCOWITZ:  It was brought out.

4                     THE COURT:  Well, I'm going to permit you

5           to ask the question.

6                     MR. MOSCOWITZ:  I won't go very far, just

7           to lay a foundation.

8                     THE COURT:  Go ahead.

9                     The pending question is -- hold on.  He hasn't

10              given an answer to the pending question.

11   BY MR. MOSCOWITZ:

12        Q     Go ahead.

13                    THE COURT:  Do you recall the question?

14                    If you could read the last question.

15                    (Whereupon, the court reporter read back

16              the previous question.)

17                    THE WITNESS:  It was one of the earlier.

18   BY MR. MOSCOWITZ:

19        Q     Okay.  And the thing that was unique about that

20   weapon, it had an exposed hammer, am I correct?

21        A     Depending upon the model, there is an exposed

22   hammer, that's correct.

23        Q     Now, moving up to today's date now, most 9-mm

24   weapons have a hidden hammer, am I correct?

25        A     I wouldn't say that that is a correct

26   statement.

27        Q     Luger, 9-mm, hidden hammer, am I correct?

1   A        It's an exposed hammer on the models that I'm

2   familiar with.

3   Q        Does Luger put one out that is a hidden hammer?

4   A        Not that I'm familiar with.

5   Q        Let's go to Barretta.  Am I correct in saying

6   that new Berrettas have a hidden hammer, am I correct?

7   A        I would say they are exposed.

8   Q        They are exposed?

9   A        Yes, sir.

10  Q        Well, which 9-mms have hidden hammers?

11  A        The list, depending upon -- you're specifically

12  saying hammer.  There are firearms that are manufactured

13  that do not have hammers at all and operate from the

14  striker mechanism on the interior, therefore, there is no

15  hammer exposed.  When you are representing the word

16  "hammer," we're referring to a device on the back of the

17  firearm that is usually visible that you could pull

18  rearward, it has -- can be fired in either single action or

19  double action.

20  Q        That's correct.  And I'm asking you, which

21  9-mms do not have an exposed hammer?

22  A        I -- there would probably be an exhaustive list

23  and I couldn't give you all of them.  If you want to find

24  one that is not, we would list the Glock.  The Glock does

25  not have an exposed hammer.

26  Q        Of the -- you identified five cartridges coming

27  from one weapon, am I correct?

1       A       That's correct.

2       Q       Do you know whether or not that weapon had an

3  exposed hammer or a hidden hammer?

4       A       I do not, sir.

5       Q       There is no way of telling from those shells,

6  am I correct?

7       A       That's correct.

8       Q       And am I correct in just -- if you could just

9  tell the jury, a 9-mm does come with a hidden hammer, some

10 that are produced?

11      A       There are some, yes, sir.

12      Q       And, in fact, a large majority of police

13 officers have the hidden hammer 9-mm, am I correct?

14      A       It would depend upon what the departments

15 issue.

16      Q       Let's say New Haven Police Department.  You

17 have been a member of the New Haven Police Department?

18      A       That's correct.

19      Q       Have you noticed whether they had exposed

20 hammers or hidden hammers?

21      A       The department carries a Glock, which doesn't

22 have a hammer, it has a striker.

23      Q       9-mm, am I correct?

24      A       That's correct.

25      Q       No hammer at all?

26      A       That's correct.

27      Q       And the only thing you see on that is the

1    slide, is that correct?

2        A       That's correct.

3        Q       So, that in order -- if you had a round in the

4    chamber, there is no hammer to pull that or fire that, am I

5    correct?

6        A       On a Glock 9-mm pistol, no, sir.

7        Q       You just pull the trigger?

8        A       The slide has to be actuated.

9        Q       After it's actuated?

10       A       That's correct.

11       Q       Even a weapon with a hammer, you still have to

12   have a bullet in the chamber?

13       A       And it -- and the trigger mechanism caught.

14               MR. MOSCOWITZ:  I have no further

15               questions, your Honor.

16               THE COURT:  Any further questions based on

17               the questioning of Mr. Moscowitz from either

18               side?

19               MR. NICHOLSON:  No.

20               MR. AHERN:  No.

21               THE COURT:  Thank you, Mr. Stevenson.  You

22               may step down.

23               MR. NICHOLSON:  Your Honor, the next

24               witness is going to be Mr. Howard Roberts.  We

25               need a brief recess to get him here.

26               THE COURT:  We need to take a couple of

27               minutes.  If you would file into the jury room

1   and we'll arrange to have the next witness

2   presented and we'll continue with the

3   evidence.

4        (Whereupon, the jury left the courtroom.)

5        MR. MOSCOWITZ:  Might I just address the

6   Court?

7        THE COURT:  Is it possible to call

8   downstairs to the cell block and have other

9   sheriffs bring Mr. Roberts up so we could

10  leave the defendants here.

11       MR. MOSCOWITZ:  Could we take the

12  opportunity to listen to the tape?  It won't

13  take long.

14       THE COURT:  Listen to the tape and we'll

15  bring the witness up.

16       I'll take a short recess now and when

17  everything is ready, let me know.

18       Short recess.

19       (Whereupon, there was a short recess.)

20       THE COURT:  Okay.  Any matters for me to

21  take up before we summon the jury?

22       MR. NICHOLSON:  No, your Honor.

23       MR. MOSCOWITZ:  No, your Honor.

24       THE COURT:  Ask the jurors to step out

25  please.

26       (Whereupon, the jury entered the

27  courtroom.)

MARCH 31, 2000                          104

1          THE COURT:  Sorry for the delay, folks.

2          Will counsel please stipulate to the presence

3     of the jurors and alternates?

4          MR. AHERN:  Yes.

5          MR. NICHOLSON:  Yes.

6          THE COURT:  Sir, please stand-up and face

7     the clerk and raise your right-hand.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27