UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARQUIS JACKSON | : | NO.: 3:19-CV-00388 (RNC) |
| | : | |
| v. | : | |
| | : | |
| CITY OF NEW HAVEN, ET AL | : | JUNE 7, 2021 |

## **LOCAL RULE 56(a)1 STATEMENT**

Pursuant to Rule 56(a)1 of the Local Rules of Civil Procedure, the defendant, CITY OF NEW HAVEN, respectfully submits the following statement of undisputed material facts in support of its Motion for Summary Judgment:

1. On January 24, 1999 at approximately 3:32 a.m., the New Haven Police Department ("NHPD") responded to the Dixwell Deli on a report of an armed robbery wherein Caprice Hardy was fatally shot. See Vernon Horn Arrest Warrant Application, **Ex. 1**, at 1; Marquis Jackson Arrest Warrant Application, **Ex. 2**, at 1; Steve Brown Arrest Warrant Application, **Ex. 3**, at 1.

2. During the course of the robbery, a cell phone was stolen from deli employee, Vernon Butler. See Vernon Horn Arrest Warrant Application, **Ex. 1**, at 3; Marquis Jackson Arrest Warrant Application, **Ex. 2**, at 3; Steve Brown Arrest Warrant Application, **Ex. 3**, at 3.

3. NHPD Detectives Petisia Adger, Leroy Dease and Daryle Breland worked on the Caprice Hardy homicide investigation. See Petisia Adger 12/11/19 Dep., **Ex. 4**, at 9:23–10:1; Daryle Breland 12/16/19 Dep., **Ex. 5**, at 36:8-10.

4. On January 24, 1999, Regina Wolfinger, a witness present at the Dixwell Deli at the time of the robbery/homicide, gave a recorded statement to Detective Dease. See Regina Wolfinger Transcribed Statement, **Ex. 6**.

...

5. In her transcribed statement, Wolfinger viewed a photo array and selected a photo of Vernon Horn indicating that he looked familiar. See Regina Wolfinger Transcribed Statement, **Ex. 6**, at 10.

6. On January 26, 1999, Kendall Thompson (referred to as "K.T."), an eye witness to the robbery/homicide, gave a recorded statement to Detective Dease. See Kendall Thompson Transcribed Statement, **Ex. 7**.

7. In his transcribed statement, Thompson viewed a photo array and identified Vernon Horn as the gunman in the Deli who ordered him to the ground, stating therein that he identified Horn because he recognized his eyes. See Kendall Thompson Transcribed Statement, **Ex. 7**, at 3-4.

8. Thompson also identified Marquis Jackson as one of the other suspects involved in the robbery/homicide. See Kendall Thompson Transcribed Statement, **Ex. 7**, at 4-5.

9. On February 2, 1999, the NHPD received a fax from Omnipoint Communications with the call detail record from Vernon Butler's stolen cell phone in response to a request for said records pursuant to a signed consent. See Omnipoint Phone Records, **Ex. 8**.

10. The stolen cell phone call detail record disclosed five calls as having been made following the robbery, from 4:14 a.m. on 1/24/99 through 2:32 p.m. on 1/25/99. See Omnipoint Phone Records, **Ex. 8**.

11. The first and fourth phone calls were identified as having been made to a Bridgeport number registered to Willie Sadler. See Vernon Horn Arrest Warrant

2

Application, **Ex. 1**, at 4; Marquis Jackson Arrest Warrant Application, **Ex. 2**, at 4; Steve Brown Arrest Warrant Application, **Ex. 3**, at 4.

12. The second phone call was identified as having been made to a Stratford number registered to Sandra Moore. See Vernon Horn Arrest Warrant Application, **Ex. 1**, at 4; Marquis Jackson Arrest Warrant Application, **Ex. 2**, at 4; Steve Brown Arrest Warrant Application, **Ex. 3**, at 4.

13. The third phone call was identified as having been made to a Bridgeport number registered to Floyd Jackson. See Vernon Horn Arrest Warrant Application, **Ex. 1**, at 4; Marquis Jackson Arrest Warrant Application, **Ex. 2**, at 4; Steve Brown Arrest Warrant Application, **Ex. 3**, at 4.

14. The fourth phone call was identified as having been made to a West Haven number registered to Stanley Cheronzy. See Vernon Horn Arrest Warrant Application, **Ex. 1**, at 4; Marquis Jackson Arrest Warrant Application, **Ex. 2**, at 4; Steve Brown Arrest Warrant Application, **Ex. 3**, at 4.

15. On February 5, 1999, Marcus Pearson gave a recorded statement to Detective Breland. See Marcus Pearson 2/5/99 Transcribed Statement, **Ex. 9**.

16. In his transcribed statement, Pearson stated that Vernon Horn came to his house on January 25, 1999, morning after murder, and he used a cell phone give to him by Horn to make the fourth phone call to Crystal Sykes who worked at the Cheronzy residence. See Marcus Pearson 2/5/99 Transcribed Statement, **Ex. 9**, at 3-5.

17. On February 25, 1999, Detective Adger applied for a Search and Seizure Warrant directed to AT&T seeking phone records relative to the number registered to

Sandra Moore, the recipient of the second phone call from the stolen cell phone.  See AT&T Search and Seizure Warrant, **Ex. 10**.

18. Records which were the subject of the AT&T Warrant were obtained on March 2, 1999, and the Return of Inventory relative to the same was signed by Detective Adger on March 4, 1999.  See AT&T Search and Seizure Warrant Return, **Ex. 11**.

19. On February 25, 1999, Detective Adger also applied for a Search and Seizure Warrant directed to SNET seeking phone records relative to the numbers registered to Floyd Jackson and Stanley Cheronzy, the recipients of the third and fourth phone calls from the stolen cell phone, as well as the phone numbers utilized by Vernon Horn and Marquis Jackson.  See SNET Search and Seizure Warrant, **Ex. 12**.

20. Records which were the subject of the SNET Warrant were obtained on February 26, 1999, and the Return of Inventory relative to the same was signed by Detective Adger on March 4, 1999.  See SNET Search and Seizure Warrant Return, **Ex. 13**.

21. A portion of the phone records obtained by Petisia Adger during the course of her investigation exist within the Records Division of the NHPD, and other portions of the phone records could not be located.  See Racheal Cain 9/18/20 Dep., **Ex. 14**, at 268:9-20, 269:6-11.

22. On March 6, 1999, NHPD detectives traveled to the Bridgeport Police Department and matched fingerprints found at the scene of the Dixwell Deli to the fingerprints of Steve Brown that were on file with the Bridgeport police.  See Steve Brown Arrest Warrant Application, **Ex. 3**, at 7.

23. On March 9, 1999, Detective Dease applied for an Arrest Warrant Application for the arrest of Steve Brown, which was granted on the same date. See Steve Brown Arrest Warrant Application, **Ex. 3**.

24. On March 10, 1999, following his arrest, Steve Brown gave a recorded statement to Detectives Dease and Adger. See Steve Brown Transcribed Statement, **Ex. 15**.

25. In his transcribed statement, Brown confessed to being involved in the Dixwell Deli robbery/murder. See Steve Brown Transcribed Statement, **Ex. 15**, at 3.

26. Brown further viewed a photo array and identified Vernon Horn and Marquis Jackson as his accomplices in the crime. See Steve Brown Transcribed Statement, **Ex. 15**, at 4-5.

27. On March 12, 1999, Detective Adger applied for an Arrest Warrant Application for the arrest of Vernon Horn, which was granted on the same date. See Vernon Horn Arrest Warrant Application, **Ex. 1**.

28. Vernon Horn was arrested on March 22, 1999. See Horn Criminal Case Defendant Look-up Information, **Ex. 16**.

29. On March 12, 1999, Detective Adger applied for an Arrest Warrant Application for the arrest of Marquis Jackson, which was granted on the same date. See Marquis Jackson Arrest Warrant Application, **Ex. 2**.

30. Marquis Jackson was arrested on March 24, 1999. See Jackson Uniform Arrest Report, **Ex. 17**.

31. During the 1990's, the NHPD had between 350-365 sworn police officers per year. See Melvin Wearing Dep., **Ex. 18**, at 268:1-4.

32. During the 1990's, the NHPD had approximately 35-45 detectives per year. See Melvin Wearing Dep., **Ex. 18**, at 268:5-9.

33. During the 1990's, the NHPD handled well over 2,000 felony cases each year. See Melvin Wearing Dep., **Ex. 18**, at 268:11-19; Connecticut Uniform Crime Reports for City of New Haven, **Ex. 19**.

34. All evidence is brought to either the Property/Evidence Room or Records Room. See Melvin Wearing Dep., **Ex. 18**, at 44:21-23; Racheal Cain 12/9/19 Dep., **Ex. 20**, at 121:9-19.

35. Physical evidence is kept in the Property Room, and record evidence is kept in the Records Room. See Petisia Adger 12/11/19 Dep., **Ex. 4**, at 120:11-121:12, 125:9-24.

36. The Property/Evidence Room is manned by a supervisor; all evidence is logged in and had to be signed in or out. See Melvin Wearing Dep., **Ex. 18**, at 60:9-16.

37. The Records Room is staffed twenty-four hours a day. See Melvin Wearing Dep., **Ex. 18**, at 60:20-25.

38. Both the Property/Evidence Room and Records Room are secure locations; officers are not permitted to go into them and remove items on their own. See Melvin Wearing Dep., **Ex. 18**, at 62:17-63:21; Racheal Cain 12/9/19 Dep., **Ex. 20**, at 122:10-14.

39. The State's Attorneys and their investigators are permitted to enter the Property Room or Records Room to retrieve materials they need from a file. See Melvin Wearing Dep., **Ex. 18** at 46:2-9, 64:19-23, 268:20-25; Petisia Adger 12/11/19

6

Dep., **Ex. 4**, at 123:15-25; Gary Nicholson Dep., **Ex. 21**, at 44:6-16, 45:12–47:6, 54:22–55:3, 278:24–279:4, 280:13-18.

40. Once a warrant has been executed, the officer brings in the Search Warrant Application and the Return of Inventory to the clerk's office. See Barbara Thigpen Dep., **Ex. 22**, at 115:1-11, 116:7-14, 129:9-24.

41. A JDCR-20 form (a carbon-copy index card) is prepared noting the date on which the executed warrant and inventory is returned to Court, and the form/index card is signed by the clerk confirming the same. See Barbara Thigpen Dep., **Ex. 22**, at 32:4-14, 34:7-14, 35:1-3, 36:15–37:19, 56:1-2.

42. A carbon copy of the JDCR-20 Index Card is provided to the officer as a receipt for their files, and the original index card is placed with the warrant and is filed away with the Clerk's office until such time as an arrest has been made. See Barbara Thigpen Dep., **Ex. 22**, at 37:8-19, 38:1-10.

43. The JDCR-20 Index Card is attached to the search warrant itself and not the actual Inventory of Seized Property Form. See Barbara Thigpen Dep., **Ex. 22**, at 61:10-12, 102:5-18.

44. No other log or record of the return of the executed warrant is prepared in circumstances where an arrest has not yet been made at the time the executed warrant is returned to the Court. See Barbara Thigpen Dep., **Ex. 22**, at 37:20-23.

45. Barbara Thigpen prepared and signed the JDCR-20 Index Card appended to the front of the NHPD Search and Seizure Warrant directed to SNET confirming that the Warrant and Return of Inventory was received by the Clerk's office on March 5,

1999.  See Barbara Thigpen Dep., **Ex. 22**, at 31–36; Warrants and JDCR-20 Index Card, **Ex. 23**.

46. Gary Nicholson, the State's Attorney who prosecuted this case, was an Assistant State's Attorney for New Haven for 24 years.  See Gary Nicholson Dep., **Ex. 21**, at 35:10-12.

47. State's Attorney Nicholson regularly worked with the NHPD detectives, including working with the evidence seized by detectives and witness statements secured by them.  See Gary Nicholson Dep., **Ex. 21**, at 37:12-20.

48. The State's Attorney's office would typically have their investigator/inspector go over to the NHPD Property Room, Records Room, steno pool, Patrol Division and Investigative Services Unit to review evidence, reports, statements and audio recordings of same, and to obtain copies of the materials in a case.  See Gary Nicholson Dep., **Ex. 21**, at 44:6-16, 45:12–47:6, 54:22–55:3.

49. Mel Cartocetti (now deceased) was the State's Attorney Investigator/Inspector assisting Attorney Nicholson in the prosecution of this case.  See Gary Nicholson Dep., **Ex. 21**, at 278:17-23.

50. Mel Cartocetti had access to the NHPD Property/Evidence Room, as well as the Records Room.  See Gary Nicholson Dep., **Ex. 21**, at 278:24–279:4, 280:13-18.

51. Attorney Nicholson requested that Cartocetti retrieve and make copies of any audio tapes of witness statements for this case.  See Gary Nicholson Dep., **Ex. 21**, at 289:22-25.

52. On February 16, 2000, Cartocetti signed out several audio/cassette tapes of witness statements from the NHPD evidence/property room, only two of which were

8

signed back in as having been returned on April 24, 2000.  See NHPD Evidence Sign-out Log, **Ex. 24**.

53.     When retrieving NHPD records for Attorney Nicholson, Cartocetti would, at times, make judgment calls about what records to copy.  See Gary Nicholson Dep., **Ex. 21**, at 300:12-19.

54.     Attorney Nicholson cannot say whether Cartocetti saw 137 pages of phone records in the NHPD Records Room and made a decision not to copy them or that they were not needed, and it is possible that that happened.  See Gary Nicholson Dep., **Ex. 21**, at 301:1-15.

55.     During his 24 years as Assistant State's Attorney for New Haven, Attorney Nicholson never heard any information or complaints indicating that Detective Leroy Dease ever coerced or threatened a witness, or that Detective Dease had ever fabricated evidence in a case.  See Gary Nicholson Dep., **Ex. 21**, at 307:8–308:11.

56.     During his 24 years as Assistant State's Attorney for New Haven, Attorney Nicholson never heard any information or complaints indicating that Detective Petisia Adger ever coerced or threatened a witness, or that Detective Adger had ever fabricated evidence in a case.  See Gary Nicholson Dep., **Ex. 21**, at 308:23–309:12.

57.     During his 24 years as Assistant State's Attorney for New Haven, Attorney Nicholson never heard any information or complaints indicating that Detective Daryle Breland ever coerced or threatened a witness, or that Detective Breland had ever fabricated evidence in a case.  See Gary Nicholson Dep., **Ex. 21**, at 310:3-11.

58. At the time of the Horn and Jackson criminal trial, defense counsel had possession of audiotaped recordings of witness statements. See Michael Moscowitz Dep., **Ex. 25**, at 110:10-15.

59. At the time of the Horn and Jackson criminal trial, defense counsel had copies of Search and Seizure Warrants in the case, including copies of the Search and Seizure Warrants regarding phone records from SNET and AT&T, and the JDCR-20 Index Cards executed by Barbara Thigpen. See Michael Moscowitz Dep., **Ex. 25**, at 234:7-15; Horn Rule 26(a)1 Initial Disclosures, **Ex. 26**, at § (ii)(10); Horn Defense Counsel Copies of Warrants and JDCR-20 Index Cards, **Ex. 27**  Marquis Jackson July 29, 2019 Resp. to Prod. Req. 25, **Ex. 29**; Jackson Defense Counsel Copies of Warrants and JDCR-20 Index Cards, **Ex. 29**.

60. State's Attorney Nicholson gave Vernon Horn and Marquis Jackson's criminal defense counsel copies of everything in the State's file, including audiotapes and search and seizure warrants. See Michael Moscowitz Dep., **Ex. 25**, at 110:19-25, 234:7-15; Leo Ahern Dep., **Ex. 30**, at 18:25–19:6; Gary Nicholson Dep., **Ex. 21**, at 129:17-23.

61. Vernon Horn and Marquis Jackson's criminal defense counsel had a joint defense agreement and shared the contents of file materials during the criminal trial. See Michael Moscowitz 3/19/13 Horn v. Warden Habeas Trial Test., **Ex. 31**, at 111–114, 135:5-12.

62. Attorney Michael Moscowitz retained the services of an investigator to look into and develop a possible "Bridgeport connection" for purposes of a third-party liability defense, however, they were not able to expand any information or leads in

support of such a defense. See Michael Moscowitz 3/19/13 Horn v. Warden Habeas Trial Test., **Ex. 31**, at 107:10-21, 134:10–135:4; See Leo Ahern 3/19/13 Horn v. Warden Habeas Trial Test., **Ex. 32**, at 157:7-16.

63. At the time of habeas proceedings in March of 2013, the State's Attorney's Office had difficulty locating various items. See Eugene Calistro Dep. **Ex. 33**, at 11:19-25, 17:1-7, 21:7-21, 22:1-13.

64. At the time of habeas proceedings in March of 2013, the original audio tapes of witness statements could not be located other than two audio tapes of statements by Marcus Pearson. See Eugene Calistro Dep. **Ex. 33**, at 24:10-20, 64:4-7.

65. Each New Haven police officer is required to successfully complete a municipal police officer training academy program or a state-accepted equivalent to the municipal training academy. See Robert Maturo Aff., **Ex. 34**, at ¶ 5.

66. In addition, each officer is further required to complete state-mandated re-certification training every three years to continue as a municipal police officer. This training covers all aspects of law enforcement, including but not limited to, training in constitutional requirements, laws of arrest and search and seizure, crime scene investigation, documentation, interviewing techniques, and the handling of exculpatory evidence, among other subject areas. Additionally, New Haven police officers receive training on internal general policies and procedures, including the handling of evidence, records and report writing. See Robert Maturo Aff., **Ex. 34**, at ¶ 6.

67. Leroy Dease, Petisia Adger and Daryle Breland were duly sworn police officers with the City of New Haven as of January 1999, and had each successfully

11

completed the municipal police officer training academy program or a state-accepted equivalent  See Robert Maturo Aff., **Ex. 34**, at ¶ 7.

68. As New Haven police officers, Leroy Dease, Petisia Adger and Daryle Breland were required to complete at least 40 hours of training in job-related subjects every three years in order to maintain their re-certification as police officers.  See Robert Maturo Aff., **Ex. 34**, at ¶ 8.

69. As of January 1999, Leroy Dease, Petisia Adger and Daryle Breland had attended supplemental training courses as part of their re-certification requirements, and were in full compliance with the re-certification requirements in place at that time. See Robert Maturo Aff., **Ex. 34**, at ¶ 9.

70. Petisia Adger, Daryle Breland and Leroy Dease, had no civilian complaints against them involving claims of failure to disclose Brady material, fabrication of evidence, and/or coercion of witnesses.  See City's Resp. to First Consolidated Set of Interrog. and Prod. Req., **Ex. 35**, at Request 20.

71. NHPD officers are taught about their obligations under Brady at the police academy, as well as during updated in-service training through the Connecticut State's Attorney's office.  See Melvin Wearing Dep., **Ex. 18**, at 48:1-10; Racheal Cain 12/9/19 Dep., **Ex. 20**, at 104:13-19; Racheal Cain 9/18/20 Dep., **Ex. 14**, at 222:6-9.

72. NHPD officers go through re-certification training every year, which reemphasizes the fundamental training all officers receive that witnesses may not be coerced, witnesses may not threatened, and witnesses may not be directed to select specific photos from a photo array.  See Melvin Wearing Dep., **Ex. 18**, at 233:11-21.

73. In 1999, Petisia Adger knew that it was improper for an officer to tell a witness what to say in their statement.  See Petisia Adger 12/11/19 Dep., **Ex. 4**, at 217:4-9.

74. In 1999, Petisia Adger knew that it was improper for an officer to threaten a witness, to threaten to violate a witness's probation if they did not cooperate, and to threaten to arrest a witness.  See Petisia Adger 12/11/19 Dep., **Ex. 4**, at 271:10-24.

75. In 1999, Petisia Adger knew that it was improper for an officer to fail to turn over evidence that was favorable to the defense.  See Petisia Adger 12/11/19 Dep., **Ex. 4**, at 272:5-12.

76. In 1999, Petisia Adger knew that it was improper to threaten a witness's family.  See Petisia Adger 12/11/19 Dep., **Ex. 4**, at 272:13-16.

77. Petisia Adger knew of her obligation to turn over exculpatory information.  See Petisia Adger 9/22/20 Dep., **Ex. 36**, at 412:12–413:24.

78. Daryle Breland received training on what constituted proper and improper investigative techniques.  See Daryle Breland 1/13/20 Dep., **Ex. 37**, at 290:8-18.

79. Daryle Breland received training on what constituted proper and improper methods of interrogating witnesses.  See Daryle Breland 1/13/20 Dep., **Ex. 37**, at 290:19-21.

80. Daryle Breland received training at the police academy regarding interviewing techniques and basic principles of law.  See Daryle Breland 1/13/20 Dep., **Ex. 37**, at 357:22–358:6.

81. Daryle Breland also received training on report writing and the law, and how to document facts in a report. See Daryle Breland 1/13/20 Dep., **Ex. 37**, at 358:25–359:3, 361:19–362:1.

82. Daryle Breland knew of and understood Brady and his obligations to disclose exculpatory material. See Daryle Breland 12/16/19 Dep., **Ex. 5**, at 67:6-15; Daryle Breland 1/13/20 Dep., **Ex. 37**, at 329:6-17, 366:6-19.

83. At the time of the Caprice Hardy homicide investigation from January 1999 through March 1999, and prior thereto, the NHPD had in place a General Order providing that, "Reports, when completed, shall accurately reflect the information concerning the episode and shall indicate specifically what actions were taken by each involved police officer." See NHPD G.O. 76-3 II. 4, **Ex. 38**.

84. At the time of the Caprice Hardy homicide investigation from January 1999 through March 1999, and prior thereto, the NHPD had in place a General Order providing that, "THE RETENTION OF EVIDENCE OR PROPERTY BY A MEMBER OF THE DEPARTMENT IS EXPRESSLY PROHIBITED." See NHPD G.O. 87-6 II (emphasis in original), **Ex. 39**.

85. At the time of the Caprice Hardy homicide investigation from January 1999 through March 1999, and prior thereto, the NHPD had in place a Code of Conduct providing that, "Employees of the Department shall observe the following regulations as to conduct and deportment and may be punished by reprimand, suspension, reduction in rank, or by dismissal upon conviction of failing to follow the following: . . . 15. No employee of the Department shall make false official reports knowingly or willingly enter

or cause to be entered into any department books, records or reports any inaccurate, false or improper information or material matter." See NHPD Code of Conduct, **Ex. 40**.

86. At the time of the Caprice Hardy homicide investigation from January 1999 through March 1999, and prior thereto, the NHPD had in place a Code of Conduct providing that, "Employees of the Department shall observe the following regulations as to conduct and deportment and may be punished by reprimand, suspension, reduction in rank, or by dismissal upon conviction of failing to follow the following: . . . 23. Employees of the Department shall not fabricate, withhold or destroy any evidence of any kind." See NHPD Code of Conduct, **Ex. 40**.

87. At the time of the Caprice Hardy homicide investigation from January 1999 through March 1999, and prior thereto, the NHPD had in place a Training Bulletin providing that, "… tapes of incoming calls by a defendant, victim (or both) and eye witness or a non-eye witness who may later testify at a trial should be preserved. Also tapes of statements of such persons should be preserved as evidence even if such are transcribed." See NHPD Training Bulletin 8-3, **Ex. 41**.

88. At the time of the Caprice Hardy homicide investigation from January 1999 through March 1999, and prior thereto, the NHPD had in place a Training Bulletin providing that, "All Field notes of police officers should be preserved for at least three years since they may be discoverable as a statement of a witness or in the alternative, as a statement of the officer if he or she is called to testify." See NHPD Training Bulletin 8-3, **Ex. 41**.

89. The entire police department staff is issued all of the training bulletins and general orders, and during basic training all of the department's rules, regulations,

general orders and training bulletins are gone over. See Racheal Cain 9/18/20 Dep., **Ex. 14**, at 179:11-15.

90. The NHPD policies, practices, procedures and training in place at the time of the Caprice Hardy investigation were in accordance with generally accepted police policies, procedures, training and practices in 1999. See Joseph Stine Expert Report, **Ex. 42**, at 21–23.

91. The NHPD did not have a policy or practice of coercing witness statements, manipulating witness statements, threatening a witness into giving a statement, or to identify someone, telling witnesses what to say under threat. See Melvin Wearing Dep., **Ex. 18**, at 53:24–54:4, 145:11–146:9; Edward Kendall Dep., **Ex. 43**, at 282–284, 302–307; Stephen Coppola Dep., **Ex. 44**, at 123:11–124:8.

92. The NHPD did not have a policy or practice of tampering with or fabricating evidence. See Edward Kendall Dep., **Ex. 43**, at 308:12–309:13; Stephen Coppola Dep., **Ex. 44**, at 125:3-18, 144:3-23.

93. The NHPD detectives' investigation of the stolen cell phone, and information generated from the same, was in accordance with the generally accepted practices and procedures commonly in use in 1999. See Joseph Stine Expert Report, **Ex. 42**, at 12-13; Elliot Spector Expert Report, **Ex. 45**, at 18.

94. Cellular data and cell site analysis was in its infancy and not commonly used in 1999. See James Wines Dep., **Ex. 46**, at 42–43; Robert Moledor Expert Report, **Ex. 47**, at 2; Joseph Stine Expert Report, **Ex. 42**, at 19.

95. The FBI did not begin exploring the use of cellular data until the early 2000s, and did not have a cellular investigative unit until 2010.  See James Wines Dep., **Ex. 46**, at 42–43; Robert Moledor Expert Report, **Ex. 47**, at 2.

96. Prior to 2005, investigative resources and training regarding cellular data and cell site analysis was extremely limited.  See James Wines Dep., **Ex. 46**, at 44–45; Robert Moledor Expert Report, **Ex. 47**, at 2.

97. In fact, at the criminal trial in 2000, Richard Lindemulder, the Omnipoint employee who testified at the trial, stated that the information regarding where the cell calls originated did not appear on the call detail log, that such information could only be obtained by way of Court order rather than a subpoena, and that cell site location data is only retained for 30 days and was no longer available.  See Richard Lindemulder 4/4/00 Criminal Trial Test., **Ex. 48**, at 154:20–155:5, 157:4–159:17.

98. The practice of recording statements by witnesses and suspects was not a common or generally accepted practice in 1999.  See Joseph Stine Expert Report, **Ex. 42**, at 16; Elliot Spector Expert Report, **Ex. 45**, at 22.

99. It was a commonly accepted practice to conduct an informal conversation with a witness or suspect prior to beginning a formal recorded interview.  See Joseph Stine Expert Report, **Ex. 42**, at 16-17; Elliot Spector Expert Report, **Ex. 45**, at 1, 22; Brian Donnelly Dep., **Ex. 49**, at 112:4-8.

100. The FBI investigation into Detective Vincent Raucci began sometime after March 1995 and ended sometime in early 1997, and involved solely an investigation into Raucci with regard to the Turner/Fields homicide.  See Brian Donnelly Dep., **Ex. 49**, at 134:4–135:6, 164:5-12.

101. Agent Donnelly never presented his report regarding the Raucci investigation to the NHPD.  See Brian Donnelly Dep., **Ex. 49**, at 101:9-16.

102. Agent Donnelly is not aware of anyone at the FBI ever presenting the FBI's investigation into Raucci with the NHPD or in communications with the Chief of Police.  See Brian Donnelly Dep., **Ex. 49**, at 102:1-15.

103. Agent Donnelly's report was shared with the U.S. Attorney's Office, who then shared it with the State's Attorney's office, but that is as far as his report went.  See Brian Donnelly Dep., **Ex. 49**, at 124:6-10.

104. No one from the FBI contacted then NHPD Chief Pastore during the course of their investigation into Vincent Raucci.  See Brian Donnelly Dep., **Ex. 49**, at 74: 7-10.

105. When Agent Donnelly completed his investigation and report, he submitted it to U.S. Attorney Len Boyle, who declined to prosecute Raucci.  See Brian Donnelly Dep., **Ex. 49**, at 135:23–136:9, 170:20–172:2.

106. Nothing in Agent Donnelly's investigation established a sufficient criminal link between Detective Raucci and criminal activity with Mr. Parese.  See Brian Donnelly Dep., **Ex. 49**, at 210:14–211:13.

107. Agent Donnelly did not conduct any independent investigation into whether any of the witnesses had any motivation to give a false statement when recanting their testimony.  See Brian Donnelly Dep., **Ex. 49**, at 137:19–138:7.

108. Ovil Rodriguez gave Agent Donnelly a statement recanting his prior statement under oath to the NHPD and his trial testimony, and at the end of Agent

Donnelly's investigation, Rodriguez recanted his recantation.  See Brian Donnelly Dep., **Ex. 49**, at 139:17–140:5.

109.  By the end of Agent Donnelly's investigation into Vincent Raucci, the FBI elected to stop speaking with the main witness, Ovil Rodriguez, because they concluded that they could not believe anything Rodriguez said.  See Brian Donnelly Dep., **Ex. 49**, at 196:23–198:9, 264:8-13.

110.  The FBI had a very good relationship with the NHPD, and even used their photo array system because it was a very good system.  See Brian Donnelly Dep., **Ex. 49**, at 47:11-23.

111.  Up to 2006, the FBI was not recording witness interviews, either by way of audio tape or videotape, as it was their policy not to do so.  See Brian Donnelly Dep., **Ex. 49**, at 132:17–133:2, 159:15-21.

112.  It is not uncommon to start a conversation with an individual to see if they will give a signed statement.  See Brian Donnelly Dep., **Ex. 49**, at 112:4-8.

113.  During the times that Agent Donnelly worked with Detective Vincent Raucci from 1985 to 1990, he never saw Detective Raucci doing anything illegal, causing a witness to testify falsely, or securing false testimony in any fashion, including by way of promises/favors.  See Brian Donnelly Dep., **Ex. 49**, at 140:24–142:25.

114.  Agent Donnelly had been present during interviews conducted by NHPD officers where he observed them stop and start the tape and speak to witnesses to determine what information they had prior to beginning the recording, however, he found nothing improper about the detectives doing so during those times.  See Brian Donnelly Dep., **Ex. 49**, at 160:13-24.

115. Agent Donnelly never observed any NHPD officer feed a witness information, or stop the tape to coach a witness during any of the interviews he was present for.  See Brian Donnelly Dep., **Ex. 49**, at 161:1-16.

                                                DEFENDANT,
                                                CITY OF NEW HAVEN

By      /s/ Beatrice S. Jordan
       Thomas R. Gerarde (ct05640)
       Beatrice S. Jordan (ct22001)
       Howd & Ludorf, LLC
       65 Wethersfield Avenue
       Hartford, CT  06114-11921
       Ph:  (860) 249-1361
       Fax:  (860) 249-7665
       E-mail: tgerarde@hl-law.com
       E-mail: bjordan@hl-law.com