## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARQUIS JACKSON,<br><br>     Plaintiff,<br><br> -against-<br><br>CITY OF NEW HAVEN; and LEROY DEASE, PETISIA ADGER, DARYLE BRELAND, and JAMES STEPHENSON, in their individual capacities,<br><br>     Defendants. | Civ. No. 3:19-cv-00388 (RNC)<br><br><br><br>JUNE 14, 2021 |

### DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT OF FACTS

 Pursuant to D. Conn. L. Civ. R. 56(a)(1), Defendants, LEROY DEASE, PETISIA ADGER, and DARYLE BRELAND, (collectively referred to as Defendants) by and through their attorneys, NIELSEN, ZEHE & ANTAS, P.C., submit this statement of undisputed material facts in support of their Motion for Summary Judgment.

***The Robbery/Murder***

 1. The victim of the robbery and murder, Caprice Hardy, worked at a TGI Friday's restaurant in Hamden about three miles from the Dixwell Deli ("Deli") located on Dixwell Avenue in New Haven. (Ex. 1, Horn Am. Compl. ¶37, May 6, 2020).

 2. On January 24, 1999, the manager of TGI Friday's called a taxi for Hardy and his friend and fellow employee, Shaquan Pallet, and they were picked up at 3:18 a.m. At Hardy's request, the taxi stopped at the Deli at approximately 3:26 a.m. so he could buy cigarettes. (Ex. 1, Horn Am. Compl. ¶¶38-39; *admitted in* Ex. 2, Def. Adger's Answer ¶¶38-39, May 20, 2020; Ex. 3, Def. Dease's Answer ¶¶38-39, May 20, 2020).

 3. While Hardy was at the counter making a purchase from Abby Yousif, a co-owner of the Deli, three armed, masked men burst into the Deli. The first gunman immediately

opened fire. Hardy was shot and killed and Yousif was wounded in the shoulder but played dead throughout the robbery. (Ex. 1, Horn Am. Compl. ¶¶39-42; *admitted in* Ex. 2, Def. Adger's Answer ¶¶39-42; Ex. 4, Def. Breland's Answer ¶¶39-42, May 20, 2020; Ex. 3, Def. Dease's Answer ¶¶39-42; Ex. 5, Yousif Statement 4-6, NH000242-244, Jan. 26, 1999).

4.     At the time the robbers entered, three other people were in the Deli. One was an employee of the Deli, who fled to the basement storeroom and tripped and fell down the stairs. The second was a homeless man, who hung around the store and sometimes did odd jobs and was near the back of the store. The third was Vernon Butler, an associate of Yousif, who was asleep in a chair in the office located at the back of the store. (Ex. 1, Horn Am. Compl. ¶43; *admitted in* Ex. 2, Def. Adger's Answer ¶43; Ex. 4, Def. Breland's Answer ¶43; Ex. 3, Def. Dease's Answer ¶43).

5.     Two customers entered the store during the robbery. The first, Kendall Thompson, a young man from the neighborhood, entered with a dollar in his hand. The masked gunman standing near the door, pointed a gun at him and ordered him on the floor, taking the dollar. (Ex. 1, Horn Am. Compl. ¶¶46-47; *admitted in* Ex. 2, Def. Adger's Answer ¶¶46-47; Ex. 4, Def. Breland's Answer ¶¶46-47; Ex. 3, Def. Dease's Answer ¶¶46-47).

6.     Around the same time, a woman named Regina Wolfinger and a man named Howard Roberts, drove up to the Deli, parking approximately 50 feet from the front of the Deli. Roberts entered the Deli to buy cigarettes with five dollars. When he walked in, the same gunman told Roberts to get down on the floor. Roberts initially refused but eventually complied and gave the gunman his five dollars. (Ex. 1, Horn Am. Compl. ¶¶48-49; *admitted in* Ex. 2, Def. Adger's Answer ¶¶48-49; Ex. 4, Def. Breland's Answer ¶¶48-49; Ex. 3, Def. Dease's Answer ¶¶48-49).

7.      The robbers could not open the cash register. One of the robbers said, "Get the nigga in the back," and two of the robbers went to the office at the back of the store. One of the robbers pistol-whipped Butler and brought him to the front to open the register. However, Butler was unable to because it was jammed. (Ex. 1, Horn Am. Compl. ¶44; *admitted in* Ex. 2, Def. Adger's Answer ¶44; Ex. 4, Def. Breland's Answer ¶44; Ex. 3, Def. Dease's Answer ¶44; Ex. 6, Jackson Am. Compl. ¶15, Apr. 24, 2020; *admitted in* Ex. 7, Def. Adger's Answer ¶15, May 20, 2020; Ex. 8, Def. Breland's Answer ¶15, May 20, 2020; Ex. 9, Def. Dease's Answer ¶15, May 20, 2020).

8.      The robbers took Butler's cell phone and pager from the back office. They also took approximately $2,000 from Yousif's person. (Ex. 1, Horn Am. Compl. ¶45; *admitted in* Ex. 2, Def. Adger's Answer ¶45; Ex. 4, Def. Breland's Answer ¶45; Ex. 3, Def. Dease's Answer ¶45; Ex. 6, Jackson Am. Compl. ¶14; *admitted in* Ex. 7, Def. Adger's Answer ¶14; Ex. 8, Def. Breland's Answer ¶14; Ex. 9, Def. Dease's Answer ¶14).

9.      During this time, the third robber searched the homeless man who had fled to the back office to hide. While in the office, the robber rifled through cigar boxes on the desk, looking for money. (Ex. 1, Horn Am. Compl. ¶68; *admitted in* Ex. 2, Def. Adger's Answer ¶68; Ex. 4, Def. Breland's Answer ¶68; Ex. 3, Def. Dease's Answer ¶68; Ex. 6, Jackson Am. Compl. ¶14; *admitted in* Ex. 7, Def. Adger's Answer ¶14; Ex. 8, Def. Breland's Answer ¶14; Ex. 9, Def. Dease's Answer ¶14; Ex. 10, Dease Report 2, NH000065, Mar. 11, 1999; Ex. 11, Brown Statement 12-13, DET00863-864, Mar. 10, 1999).

10.     The gunman near the door was wearing a black hoodie and ski mask. The gunman behind the counter wore a hoodie and black mask. (Ex. 12, Crim. Trial Tr., 72, 135-137, Apr. 4, 2000; Ex. 13, Thompson Statement 3-5, NH000216-218, Jan. 26, 1999).

3

11.     Before Butler could get the cash register open, the gunmen heard an ambulance siren. Believing the police were approaching, the three gunmen fled the scene. Butler then called 911 at 3:32 a.m. (Ex. 1, Horn Am. Compl. ¶50; *admitted in* Ex. 2, Def. Adger's Answer ¶50; Ex. 4, Def. Breland's Answer ¶50; Ex. 3, Def. Dease's Answer ¶50; Ex. 6, Jackson Am. Compl. ¶15; *admitted in* Ex. 7, Def. Adger's Answer ¶15; Ex. 8, Def. Breland's Answer ¶15; Ex. 9, Def. Dease's Answer ¶15).

### The Police Investigation

12.     The investigation into the Deli robbery/homicide was assigned to Leroy Dease. Dease had been a New Haven police officer for 31 years and a detective in the Investigative Services Unit for approximately 20 years. Dease retired from the New Haven Police Department (NHPD) in April 1999 and was thereafter employed as an investigator with the State's Attorney's Office in New Haven. (Ex. 14, *Habeas* Trial Tr., 48:18-49:23, Mar. 18, 2013).

13.     Assisting Dease with the investigation was Petisia Adger. Adger had been a detective since 1993. She worked on six homicide investigations prior to January 1999. (Ex. 15, Adger Dep. 6:25-8:6, Dec. 11, 2019). She was promoted to Sergeant in 2000, Lieutenant in 2008, and Assistant Chief of Police in 2011. (Ex. 15, Adger Dep. 6:25-8:16, Dec. 11, 2019).

14.     Daryle Breland was also assigned to the investigation. Breland had been a New Haven police officer for 21 years and a detective for 16 years. Breland assisted with witness interviews during the Dixwell Deli investigation. (Ex. 16, Breland Dep. 31:12-33:8, 38:24-41:12, Dec. 16, 2019).

15.      At all relevant times to the events set forth in Plaintiffs' Amended Complaints, I, Leroy Dease, and Daryle Breland performed typical and customary law enforcement functions during our investigation of the Deli robbery-homicide. (Ex. 17, Adger Aff. ¶¶3-4).

4

16.    Butler described the offenders as follows: Suspect No. 1: black male, 5'11" to 6' tall, 200 to 210 pounds, stocky build. Suspect No. 2: black male, 5'10" tall, 175-180 pounds. Suspect No. 3: black male. Multiple witnesses said the robbers wore black hoodies. (Ex. 18, Broadcast Information Sheet, DET00995).

17.    The description of Vernon Horn on the day of his arrest was: black male, 5'11" tall; 200 pounds. The description of Marquis Jackson on the day of his arrest was: black male 5'8" tall; 160 pounds. (Ex. 19, Arrest Cards, DET00777-780).

18.    Bureau of Identification detectives recovered two shotguns and a machete from behind the counter where Yousif was standing. The shotguns were not loaded, but ammunition was ready. (Ex. 20, Shelton Report 4-5, NH000034-35, Jan. 26, 1999).

19.    Butler told police that the offenders probably had been in the store before because they knew he worked there and could open the register. (Ex. 21, Butler Statement 7, NH000237, Jan. 24, 1999).

20.    In a February 1, 1999, interview with detectives, Butler stated that Horn was a regular customer at the Deli and often stood behind the counter to make sandwiches for customers. Horn was familiar with the layout of the store and employee shifts. Butler stated that Horn would have known the location of the two shotguns behind the front counter. (Ex. 22, Adger Report 3, NH000082, Feb. 1, 1999).

21.    Detectives interviewed two eyewitnesses shortly after the robbery. The first witness was Regina Wolfinger, who was interviewed on January 24, 1999. Wolfinger waited outside the Deli in the car while her boyfriend, Howard Roberts, entered the Deli. She had been drinking and taking drugs earlier in the day. She confirmed in a taped transcribed statement that shortly after Roberts entered, two black men exited the Deli and stood outside the Deli for a couple of minutes before fleeing on foot. Roberts then came out and they drove away. During the

interview, Wolfinger was shown a photo array and identified Vernon Horn, who she was "pretty positive" she saw outside the Deli, further stating, "Possibly, yes. He looks pretty familiar." At the criminal trial, Wolfinger said she was about 75% certain of her identification. (Ex. 1, Horn Am. Compl. ¶¶58-59, 61-62; Ex. 6, Jackson Am. Compl. ¶¶25-26, 29; Ex. 23, Crim. Trial Tr., 134:1-3, Apr. 6, 2000; Ex. 24, Adger Dep. Ex. 51, at 10; Ex. 25, Wolfinger Statement 3, 5, 10, NH000197, NH000199, NH000204, Jan. 24, 1999).

22.     The second eyewitness was Kendall Thompson. Thompson is referred to as "K.T." in police reports at Thompson's request to protect his identity. (Ex. 12, Crim. Trial Tr., 9:5-11, Apr. 4, 2000).

23.     Dease, Adger, and Breland interviewed Thompson on January 26, 1999. Thompson was shown a photo array of eight photographs. Thompson identified Vernon Horn as the gunman who ordered him to get on the floor. Thompson's identification of Horn was based on the gunman's yellow eyes and mouth which he could see in open holes in the mask. (Ex. 12, Crim. Trial Tr., 105:11-106:3, Apr. 4, 2000; Ex. 13, Thompson Statement 3-4, NH000216-217, Jan. 26, 1999).

24.     Thompson also identified a photo of Marquis Jackson, based on Jackson's complexion, as the offender attempting to open the cash register. Thompson knew Jackson from the neighborhood. Thompson admitted that he was not 100% certain of either identification. (Ex. 12, Crim. Trial Tr., 91:1-25, Apr. 4, 2000; Ex. 13, Thompson Statement 3-5, NH000216-218, Jan. 26, 1999).

25.     Thompson also stated that each robber wore a black hoodie. (Ex. 12, Crim. Trial Tr., 72:4-6, Apr. 4, 2000; Ex. 26, Thompson Dep. 16:7-8, 21:18-20, Oct. 3, 2019; Ex. 13, Thompson Statement 3, NH000216, Jan. 26, 1999).

26.     A hearing on a Motion to Suppress Wolfinger's and Thompson's identifications of Horn and Jackson was conducted at the criminal trial and was denied by the Court. (Ex. 12, Crim. Trial Tr., 60:4-61:26, 78:4-80:11, Apr. 4, 2000).

27.     On January 29, 1999, Detective Dease interviewed Roberts. Roberts gave a taped transcribed statement. Roberts could not identify the robbers, but he recalled that a robber, that came from the back of the store, was wearing a "bandana around his face like the old western days." He added, "The robber behind the counter was going crazy grabbing cigarettes." (Ex. 27, Crim. Trial Tr., 118:12-119:1, Mar. 31, 2000; Ex. 28, Roberts Statement 4, NH000226, Jan. 24, 1999).

28.     Among other witnesses, Dease and Adger interviewed the wounded victim, Yousif. Yousif began work at 3:10 a.m. Yousif knew Horn and Jackson generally, as they were regular customers. He did not see Horn or Jackson come into the store that morning prior to the robbery. (Ex. 29, Crim. Trial Tr., 123:13, 137:6-27, Apr. 3, 2000; Ex. 30, Adger Report 4, NH000069, Jan. 24-31, 1999; Ex. 5, Yousif Statement 8-10, NH000246-248, Jan. 26, 1999).

29.     Yousif last saw Horn and Jackson in the store the previous Thursday, at which time they looked around the store and Horn said to Jackson, "You were right, you were right." Horn told Yousif that Jackson was his brother. (Ex. 29, Crim. Trial Tr., 149:1-12, Apr. 3, 2000; Ex. 30, Adger Report 4, NH000069, Jan. 24-31, 1999; Ex. 5, Yousif Statement 8-10, NH000246-248, Jan. 26, 1999).

30.     On January 27, 1999, Dease and Breland interviewed Mesha Forbes. Forbes was the sister of the victim, Caprice Hardy. Forbes had previously seen Horn and Jackson. She provided a taped transcribed statement that on January 24, 1999, she was outside Yvette Faulkner's house with Lena Graham when Horn and Jackson drove up in a small gray car. Horn told Forbes that they knew about the robbery because they drove by the store when the robbery

occurred, and that Horn heard gunshots. Mesha gave a transcribed statement on February 17, 1999. (Ex. 23, Crim. Trial Tr., 96:26-97:23, Apr. 6, 2000; Ex. 31, Dease Report 1, NH000074, Feb. 17, 1999; Ex. 32, Forbes Statement 4-5, NH000101-102, Feb. 17, 1999).

31.     On January 27, 1999, Dease and Breland interviewed Lena Graham. Graham had known Horn and Jackson for six years. She was with Forbes when Horn and Jackson drove up on January 24, 1999. Graham heard Horn say he and Jackson drove by the Deli when they [the robbers] were shooting. Lena gave a taped transcribed statement on February 17, 1999. (Ex. 23, Crim. Trial Tr., 108:4-27, 114:24-115:3, Apr. 6, 2000; Ex. 31, Dease Report 2, NH000075, Feb. 17, 1999; Ex. 33, Graham Statement 2-4, NH000178-180, Feb. 17, 1999).

***Vernon Horn's Alibi***

32.     Vernon Horn was 19 years old on January 24, 1999. He had sold crack cocaine for two years before his arrest. (Ex. 34, Horn Dep. 20:15-21:2, Dec. 6, 2019).

33.     When Horn was released from prison after a successful habeas petition in 2013, he sold crack cocaine until his re-arrest in 2016. (Ex. 34, Horn Dep. 25:22-26:22, Dec. 6, 2019).

34.     On January 2, 1999, prior to the Deli homicide, Horn was arrested and charged with selling drugs – a charge that was pending after his arrest for the Deli homicide, to which he later pled guilty. (Ex. 34, Horn Dep. 37:2-40:3, Dec. 6, 2019).

35.     Horn and Jackson knew each other since age 10 and they saw each other every day. They sold drugs together. Jackson was also arrested with Horn on January 2, 1999. (Ex. 34, Horn Dep. 59:19-23, 64:22-66:10, 69:18-70:4, Dec. 6, 2019).

36.     At age 15, Horn was sentenced to 8 months in a juvenile detention center for possession of a fireman. He was on probation for that offense at the time of the robbery. (Ex. 34, Horn Dep. 32:13-33:21, 86:9-19, Dec. 6, 2019).

37.     Dease interviewed Horn on January 25, 1999. Horn had reluctantly come to the police station with his sister. (Ex. 35, Dease Report 6, NH000018, Jan. 29, 1999).

38.     During the interview, Horn claimed he and Jackson went to a club in downtown New Haven at 11:00 p.m. and left when the club closed at 2:00 a.m. Jackson met his girlfriend, Tesha Smith, at the club and he intended to spend the night with her. (Ex. 1, Horn Am. Compl. ¶¶20-21; Ex. 6, Jackson Am. Compl. ¶16; Ex. 30, Adger Report 5, NH000070, Jan. 24-31, 1999).

39.     Horn drove Jackson in a gray vehicle to the Athenian Diner, but they decided not to eat. They then drove past a party in the neighborhood and observed Zaneta Berryman Cooper (Zaneta) standing outside. (Ex. 1, Horn Am. Compl. ¶¶22-24; Ex. 6, Jackson Am. Compl. ¶33; Ex. 35, Dease Report 6, NH000018, Jan. 29, 1999).

40.     Horn knew Zaneta from the neighborhood, and they saw each other periodically. (Ex. 1, Horn Am. Compl. ¶23; Ex. 36, Berryman Cooper Statement 4-5, NH000262-263 (undated)).

41.     Horn offered to drive Zaneta to her boyfriend, Marquis Pearson's house, who was also a friend of Horn's. She agreed and got in the car. (Ex. 37, Crim. Trial Tr., 157:26-159:17, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 18:2-11, Sept. 23, 2019; Ex. 39, Breland Report 2, NH000025, Jan. 31, 1999; Ex. 36, Berryman Cooper Statement 6, NH000264 (undated)).

42.     Zaneta asked Horn if the car was stolen or a "basehead" rental (a car "rented" from someone who needs drug money). Horn said the car was not stolen or a basehead rental. Zaneta asked because of the type of person Horn is. (Ex. 37, Crim. Trial Tr., 162:22-163:25, 215:19-23, Apr. 13, 2000; Ex. 39, Breland Report 2, NH000025, Jan. 31, 1999).

43.     On the way, Horn drove to the Dixwell Deli in New Haven at approximately 2:45 a.m. (Ex. 1, Horn Am. Compl. ¶¶26-27; Ex. 37, Crim. Trial Tr., 163:27-164:8, Apr. 13, 2000;

9

Ex. 38, Berryman Cooper Dep. 21:20-22:4, Sept. 23, 2019; Ex. 36, Berryman Cooper Statement 5-7, NH000263-265 (undated)).

44.     Horn and Jackson entered the Deli and Horn bought a soda, loose cigarettes, and condoms. Jackson got change for a dollar and went across the street to use a payphone to call Tesha Smith. Zaneta stayed in the car. (Ex. 1, Horn Am. Compl. ¶27; Ex. 37, Crim. Trial Tr., 166:16-167:7, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 24:21-25:22, Sept. 23, 2019; Ex. 30, Adger Report 5, NH000070, Jan. 24-31, 1999; Ex. 36, Berryman Cooper Statement 7, NH000265 (undated)).

45.     When Horn exited the Deli, he saw Marcus Pearson, who was getting a ride home after buying food at the Deli. Horn and Pearson chatted briefly. Horn did not tell Pearson he was with Pearson's girlfriend, but an employee heard Horn say to Pearson something to the effect of, "I will probably see you later." Pearson and Zaneta had an ongoing sexual relationship at the time. (Ex. 1, Horn Am. Compl. ¶28; Ex. 35, Dease Report 8, NH000020, Jan. 29, 1999).

46.     Horn then met Jackson back at the car. Upon entering, Horn threw the condoms at Zaneta, which angered her, and she threw them back at him. (Ex. 37, Crim. Trial Tr., 167:1-13, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 25:14-26:8, Sept. 23, 2019; Ex. 39, Breland Report 3, NH000026, Jan. 31, 1999).

47.     The three of them drove to a rooming house, located at 235 W. Ivy Street, three blocks from the Deli, that was rented by Jackson. Horn told Zaneta the room was his. (Ex. 1, Horn Am. Compl. ¶29; Ex. 6, Jackson Am. Compl. ¶16; Ex. 37, Criminal Trial Tr., 167:25-168:9, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 27:9-28:10, Sept. 23, 2019; Ex. 36, Berryman Cooper Statement 8, NH000266 (undated)).

48.     Jackson dropped off Horn and Zaneta at the rooming house. Jackson then left in the car. (Ex. 37, Criminal Trial Tr., 167:25-168:4, 170:7-18, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 29:18-30:10, Sept. 23, 2019).

49.     Horn and Zaneta went to the second floor of the house, but Zaneta was on her menstrual cycle and went to the bathroom. She asked Horn to get her tissue. She remained in the bathroom alone for approximately 10 to 20 minutes. (Ex. 37, Criminal Trial Tr., 169:3-170:6, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 30:20-32:4, 104:8-107:2, Sept. 23, 2019; Ex. 36, Berryman Cooper Statement 10-12, NH000268-270 (undated)).

50.     After Zaneta locked the bathroom door, she heard a padlocked door on an adjoining room unlock. She then heard Horn enter the adjoining bedroom and walk down the stairs. (Ex. 37, Criminal Trial Tr., 199:21-201:27, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 108:25-110:3, Sept. 23, 2019).

51.     When Zaneta was finished in the bathroom, she did not see Horn. She called downstairs for him three times. He did not respond. Finally, someone on the first floor yelled for Horn out the front door and Horn returned from outside. (Ex. 37, Crim. Trial Tr., 202:14-204:24, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 111:25-114:11, Sept. 23, 2019; Ex. 36, Berryman Cooper Statement 12-13, NH000270-271 (undated)).

52.     Zaneta noticed she had messages from Pearson on her pager, and she decided to return his pages. Horn borrowed a cordless phone from the owner of the house. (Ex. 1, Horn Am. Compl. ¶¶32-33; Ex. 6, Jackson Am. Compl. ¶17; Ex. 37, Crim. Trial Tr., 172:16-173:20, Apr. 13, 2000; Ex. 36, Berryman Cooper Statement 23, NH000281 (undated)).

53.     Horn then chased Zaneta around the apartment wearing one of the condoms. She refused to have sex with him. (Ex. 38, Berryman Cooper Dep. 32:22-35:1, Sept. 23, 2019).

54.     Zaneta called Pearson, but Horn grabbed the phone from her and hung up. Zaneta called back and this time, Horn took the phone and told Pearson that he would walk Zaneta back to Pearson's house. They agreed to meet at the Deli. (Ex. 1, Horn Am. Compl. ¶34; Ex. 6, Jackson Am. Compl. ¶17; Ex. 37, Crim. Trial Tr., 173:1-175:7, 206:2-22, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 33:4-35:21, Sept. 23, 2019; Ex. 36, Berryman Cooper Statement 14-16, NH000272-274 (undated)).

55.     Pearson, in a statement to the police, confirmed he received the call from Zaneta at approximately 3:30 a.m., but the call could have been received as late as 3:45 a.m. (Ex. 40, *Habeas* Trial Tr., 97:2-98:2, Mar. 12, 2013; Ex. 41, Pearson Statement 14-15, NH000175-176 (undated)).

56.     Horn was wearing a black and red Avirex jacket when they arrived at the apartment. As they walked to the Deli, Zaneta noticed Horn was wearing a black hoodie. Jackson was also wearing a black hoodie prior to the robbery. (Ex. 42, Crim. Trial Tr., 5:3-10, Apr. 14, 2000; Ex. 38, Berryman Cooper Dep. 21:3-17, 134:10-24, Sept. 23, 2019; Ex. 36, Berryman Cooper Statement 20-21, NH000278-279 (undated)).

57.     When Zaneta and Horn reached the Deli, they observed police activity. They were told to stay for an interview. (Ex. 38, Berryman Cooper Dep. 120:5-15, Sept. 23, 2019).

58.     When Zaneta and Horn were told one of the victims was Yousif, an owner of the Deli, Zaneta was upset. Horn stated, "Fuck that nigger. He ain't nobody." (Ex. 37, Crim. Trial Tr., 178:18-179:25, 213:15-25, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 120:16-122:5, Sept. 23, 2019; Ex. 36, Berryman Cooper Statement 22, NH000280 (undated)).

59.     Officer Michael Ferraro was dispatched to the Deli and encountered Horn and Zaneta standing outside. Ferraro had a conversation with Horn and Zaneta and reported, "Vernon Horn and Zaneta initially told Captain Verrelli that they saw the subjects run out of the Deli, but

after waiting at the scene for a while, they said they really didn't see anything and had to leave." After the interview, they were allowed to leave. (Ex. 15, Adger Dep. 232:13-20, Dec. 11, 2019; Ex. 43, Ferraro Report 1, NH000048, Jan. 24, 1999).

60.     When Verrelli questioned Horn and Zaneta, he reported that Horn was reluctant to provide his name. Zaneta testified that Horn was going to give a false name because he was on parole, however, Zaneta convinced him to give his real name. Horn responded, "I'm not worried, you're my alibi anyway. I was with you." (Ex. 37, Crim. Trial Tr., 180:9-182:19, 212:1-22, Apr. 13, 2000; Ex. 38, Berryman Cooper Dep. 124:7-127:4, Sept. 23, 2019; Ex. 30 Adger Report 3, NH000068, Jan. 24-31, 1999; Ex. 36, Berryman Cooper Statement 17-18, NH000275-276 (undated)).

61.     Zaneta estimated that it would take about one minute to run from Jackson's apartment to the Deli. (Ex. 37, Crim. Trial Tr., 213:6-12, Apr. 13, 2000).

62.     Horn told Dease he had sex with Zaneta at Jackson's apartment. He did not mention that he left the apartment before he walked Zaneta halfway to Pearson's home. (Ex. 1, Horn Am. Compl. ¶32; Ex. 35, Dease Report 6, NH000018, Jan. 29, 1999).

63.     Zaneta unequivocally denied having sex with Horn. (Ex. 37, Crim. Trial Tr., 189:15-22, 214:10-12, Apr. 13, 2000; Ex.38, Berryman Cooper Dep. 137:1-3, Sept. 23, 2019; Ex. 36, Berryman Cooper Statement 23, NH000281 (undated)).

64.     On February 1, 1999, Dease and Adger interviewed Horn at Whalley Avenue Correctional Facility. Horn was in custody for a probation violation. During the interview, Horn stated that when he was at the Deli with Jackson and Zaneta, he spoke with Yousif about business and $15.00 he owed Yousif. Horn said he purchased a Pepsi and two loosies (cigarettes) from Yousif. (Ex. 34, Horn Dep. 260:1-3, Dec. 6, 2019; Ex. 22, Adger Report 2-3, NH000081-82, Feb. 1, 1999).

65.     Horn further stated that when he was released from prison on November 15, 1998, he borrowed a Tech-9 nine-millimeter handgun, which he kept for about one month. Horn got the handgun from someone at the Quinnipiac Terrace Housing Complex where Horn sold narcotics.

On February 1, 1999, Dease and Adger interviewed Horn's friend, Imar Robinson. Robinson provided a taped transcribed statement that Horn showed him a nine-millimeter "Tech 9" one month before. (Ex. 34, Horn Dep. 260:1-261:1, Dec. 6, 2019; Ex 22, Adger Report 4, NH000083, Feb. 1, 1999; Ex. 44, Robinson Statement 9-12, NH000150-153, Feb. 1, 1999).

*Jackson's Alibi*

66.     Jackson knew Horn for 6-9 years prior to January 1999. They hung out, chased girls, drank alcohol, and went to bars they should not have been able to get into. Jackson did not do drugs, but Horn did. (Ex. 45, Jackson Dep. 45:16-48:14, Dec. 10, 2019).

67.     Jackson had been selling marijuana since 1998 and knew Horn sold crack cocaine in Fair Haven. (Ex. 45, Jackson Dep. 57:15-60:15, 62:23-64:21, Dec. 10, 2019).

68.     Jackson was arrested with Horn on January 2, 1999, for the crime of conspiracy to sell drugs. (Ex. 45, Jackson Dep. 87:3-22, Dec. 10, 2019).

69.     On January 25, 1999, Adger and another detective interviewed Jackson. His chronology of the events was similar to Horn's. Jackson added that he and Horn ate at the Athenian Diner, and they arrived at the Deli at 3:30 a.m. (Ex. 30, Adger Report 4-5, NH000069-70, Jan. 24-31, 1999).

70.     After Jackson dropped off Horn and Zaneta at his apartment, Jackson stated he went to his mother's house to retrieve some belongings and was paged by Tesha Smith, who he called back. (Ex. 45, Jackson Dep. 179:4-180:2, 183:2-17, Dec. 10, 2019; Ex. 30, Adger Report 5, NH000070, Jan. 24-31, 1999).

71.     Jackson said after he called Smith, he returned to the rooming house and exchanged keys with Horn at 4:15 a.m. He then drove to Smith's house and stayed with her for the remainder of January 24, 1999. (Ex. 30, Adger Report 5, NH000070, Jan. 24-31, 1999).

72.     During the interview with Jackson, Adger called Tesha Smith. Smith stated she was with Jackson at the Alley Cat Club until 1:45 a.m. She then went home. She further stated Jackson arrived at her home 10 minutes later, where they spent the remainder of the day together. (Ex. 30, Adger Report 7, NH000072, Jan. 24-31, 1999; Ex. 46, Smith Statement 4-5, NH000210-211, Jan. 25, 1999).

**Stolen Cell Phone Investigation**

73.     Detective, Lisa Dadio of the Bureau of Identification, lifted latent fingerprints from the Deli, including from a cigar box in the back office that the robbers had rummaged through. However, no matches were identified until March 5, 1999. (Ex. 1, Horn Am. Compl. ¶68; *admitted in* Ex. 2, Def. Adger's Answer ¶68; Ex. 4, Def. Breland's Answer ¶68; Ex. 3, Def. Dease's Answer ¶68; Ex. 6, Jackson Am. Compl. ¶35; *admitted in* Ex. 7, Def. Adger's Answer ¶35; Ex. 8, Def. Breland's Answer ¶35; Ex. 9, Def. Dease's Answer ¶35; Ex. 27, Crim. Trial Tr., 26:13-28:23, Mar. 31, 2000; Ex. 47, Shelton Report 1, DET00758, Mar. 5, 1999).

74.     On February 2, 1999, Dease and Adger obtained the records from Butler's cell phone that was stolen from the Deli. Butler signed a consent to search form, and the company issuing the phone, Omnipoint Communications Services, provided a call detail record of the calls made from the phone after the robbery and before Butler discontinued service. Five calls were

made from Butler's cell phone after the robbery. (Ex. 1, Horn Am. Compl. ¶¶70-71; *admitted in* Ex. 2, Def. Adger's Answer ¶¶70-71; Ex. 4, Def. Breland's Answer ¶¶70-71; Ex. 3, Def. Dease's Answer ¶¶70-71; Ex. 6, Jackson Am. Compl. ¶¶36-38; *admitted in* Ex. 7, Def. Adger's Answer ¶¶36-38; Ex. 8, Def. Breland's Answer ¶¶36-38; Ex. 9, Def. Dease's Answer ¶¶36-38; Ex. 48, Dease Report 2, NH000007, Feb. 5, 1999; Ex. 49, Consent to Search Form, NH000379; Ex. 50, Omnipoint Fax, NH001036-1038).

75.     The call detail record from the stolen phone appears as follows:



Ex. 1, Horn Am. Compl. ¶72; *admitted in* Ex. 2, Def. Adger's Answer ¶72; Ex. 4, Def. Breland's Answer ¶72; Ex. 3, Def. Dease's Answer ¶72; Ex. 6, Jackson Am. Compl. ¶¶39-44; *admitted in* Ex. 7, Def. Adger's Answer ¶¶39-44; Ex. 8, Def. Breland's Answer ¶¶39-44; Ex. 9, Def. Dease's Answer ¶¶39-44; Ex. 48, Dease Report 2, NH000007, Feb. 5, 1999).

76.     Dease and Adger determined that the first and fifth calls were made to Willie Sadler, a resident of Bridgeport. The first call was made at 4:14 a.m. on the day of the robbery and the fifth call was made at 2:32 p.m. the following day. (Ex. 1, Horn Am. Compl. ¶¶72-73; Ex. 6, Jackson Am. Compl. ¶39; Ex. 48, Dease Report 3, NH000008, Feb. 5, 1999).

77.     The Detectives interviewed Sadler several times in February and early March 1999, but he claimed he could not remember who called him. (Ex. 1, Horn Am. Compl. ¶74; Ex.

2, Def. Adger's Answer ¶74; Ex. 4, Def. Breland's Answer ¶74; Ex. 3, Def. Dease's Answer ¶74; Ex. 6, Jackson Am. Compl. ¶40; *admitted in* Ex. 7, Def. Adger's Answer ¶40; Ex. 8, Def. Breland's Answer ¶40; Ex. 9, Def. Dease's Answer ¶40; Ex. 48, Dease Report 3, NH000008, Feb. 5, 1999).

78.     The second call from the stolen phone was made at 10:48 p.m. on January 24 to Adrianne Younger, a Stratford resident. When Dease, Breland, and Adger interviewed Younger on February 2, 1999, she also did not recall who called her. (Ex. 1, Horn Am. Compl. ¶75; *admitted in* Ex. 2, Def. Adger's Answer ¶75; Ex. 4, Def. Breland's Answer ¶75; Ex. 3, Def. Dease's Answer ¶75; Ex. 6, Jackson Am. Compl. ¶41; *admitted in* Ex. 7, Def. Adger's Answer ¶41; Ex. 8, Def. Breland's Answer ¶41; Ex. 9, Def. Dease's Answer ¶41; Ex. 48, Dease Report 3-4, NH000008-9, Feb. 5, 1999).

79.     The third call made at 10:40 a.m. on January 25 was placed to Tamika Fuller, a Bridgeport resident. Detectives interviewed Fuller on February 2, 1999. She also did not remember who called her but said her boyfriend, Marlo Macklin, might have been at her house at that time. When detectives interviewed Macklin on February 4, 1999, he denied being Fuller's boyfriend and that he was at her house at the time of the third call. He claimed Fuller was a drug-dealing associate of Sadler. (Ex. 1, Horn Am. Compl. ¶76; *admitted in* Ex. 2, Def. Adger's Answer ¶76; Ex. 4, Def. Breland's Answer ¶76; Ex. 3, Def. Dease's Answer ¶76; Ex. 6, Jackson Am. Compl. ¶42; *admitted in* Ex. 7, Def. Adger's Answer ¶42; Ex. 8, Def. Breland's Answer ¶42; Ex. 9, Def. Dease's Answer ¶42; Ex. 48, Dease Report 3, NH000008, Feb. 5, 1999).

80.     The fourth call was made at 11:07 a.m. on January 25 to a house in West Haven owned by an elderly couple and where Crystal Sykes worked as a live-in nurse's aide. (Ex. 1, Horn Am. Compl. ¶77; *admitted in* Ex. 2, Def. Adger's Answer ¶77; Ex. 4, Def. Breland's Answer ¶77; Ex. 3, Def. Dease's Answer ¶77; Ex. 6, Jackson Am. Compl. ¶¶43-44; *admitted in*

Ex. 7, Def. Adger's Answer ¶¶43-44; Ex. 8, Def. Breland's Answer ¶¶43-44; Ex. 9, Def. Dease's

Answer ¶¶43-44; Ex. 48, Dease Report 2-3, NH000007-8, Feb. 5, 1999).

81.     On February 2, 1999, Dease, Breland, and Adger visited Sykes at the West Haven

house. They asked Sykes if she received a call at the house at the time of the fourth phone call.

Sykes stated that she would be the only one to answer the telephone at that time. She initially

indicated she could not remember receiving a telephone call and was hesitant to continue the

interview because she was at the West Haven house where she worked. (Ex. 51, *Habeas* Trial

Tr., 13:16-15:25, Mar. 13, 2013; Ex. 48, Dease Report 2-3, NH000007-8, Feb. 5, 1999).

82.     An hour later, Sykes and her mother came to the Investigative Services Division

to resume the interview. At that time, she informed Dease and Breland that she believed it was

Pearson who called her. She had known Pearson approximately four to five months, and Pearson

had been calling her to ask for an invitation to her birthday party on February 24, 1999. Sykes

identified a photograph of Pearson. (Ex. 51, *Habeas* Trial Tr., 15:26-17:17, 20:5-22, Mar. 13,

2013; Ex. 48, Dease Report 2-3, NH000007-8, Feb. 5, 1999).

83.     After a brief pre-interview, Sykes gave a taped transcribed statement, which

memorialized the following exchange:

Q.     Ms. Sykes I'm gonna refer you back to January [25th, 1999].  Was you
       working at 59 West Ivy Street in West Haven?

A.     Yes.

Q.     Ms. Sykes, do you recall receiving a telephone call at that location?

A.     No I don't recall taking or receiving a phone call from Marcus [Pearson]
       but the paper said that he called.  Like I explained to them if I was
       sleeping, knowing that I'm up all through the hours of the night.  I get
       wake up calls in the morning, I don't recall a man calling me or whoever
       called me at that particular time.  I don't know even from yesterday who
       called me so . . .

Q.     Ms. Sykes, so you're telling me that it's a good possibility that Marcus
       Pearson may have called you around [11:00] on 1/25/99?

A.     Yes.

(Ex. 1, Horn Am. Compl. ¶101; Ex. 52, Sykes Statement 4-5, NH000254-255, Feb. 2, 1999).

84.    Dease used the words, "a good possibility" in his question because Sykes stated
there was "a good possibility" Pearson called her during her pre-interview. (Ex. 15, Adger Dep.
222:5-23, Dec. 11, 2019).

85.    Sykes knew Pearson well because she frequently purchased marijuana from him,
and she was smoking "five blunts" a day in 1999. (Ex. 1, Horn Am. Compl. ¶99; Ex. 6, Jackson
Am. Compl. ¶68; Ex. 51, *Habeas* Trial Tr., 8:20-9:22, Mar. 13, 2013; Ex. 53, Pearson Dep.
109:3-13, Sept. 20, 2019).

86.    At Horn's *Habeas* hearing, Sykes testified that she told detectives the recorded
transcribed statement was true. (Ex. 51, *Habeas* Trial Tr., 22:4-14, 25:25-27:23, Mar. 13, 2013).

87.    At Horn's *Habeas* hearing, Sykes gave conflicting testimony and at the
conclusion of her testimony, the Court stated:

       "That will be the finding. I can assure you that there is no clarify (sic) on this
       testimony that bounced back now, by my count, at least four times but I think five
       times we've gotten from one side of the court to the other. And I cannot make a
       finding as to any clarify (sic) on that issue. For whatever…that's worth…to both
       sides."

(Ex. 51, *Habeas* Trial Tr., 42:6-44:6, Mar. 13, 2013).

***Confirmation of Fourth Call with Marcus Pearson***

88.     Breland interviewed Pearson on January 26 regarding Pearson's interactions with Zaneta and Pearson's visit to the Deli on January 24. During this interview, Pearson said he was at the Deli and talked to someone in the parking lot but claimed he did not recall who it was or what they discussed. Pearson also confirmed that after he returned home from the Deli, he received calls from Zaneta with Horn on the line at about 3:30 a.m., but it could have been as late as 3:45 a.m. Pearson claims this statement was given voluntarily. (Ex. 16, Breland Dep. 205:11-206:15, Dec. 16, 2019; Ex. 53, Pearson Dep. 294:4-9, Sept. 20, 2019; Ex. 54, Breland Report 1-3, NH000028-30, Jan. 31, 1999; Ex. 41, Pearson Statement 1-15, NH000162-176 (undated)).

89.     Breland interviewed Pearson on January 28 at his home to follow up on information learned from Saliem Al-Dubai, an employee at the Deli, that Horn spoke to Pearson at the Deli prior to the robbery. However, the tape was garbled and never transcribed. (Defs.' Rule 56a Statement, *supra* ¶45, at 10).

90.     After Breland and Dease interviewed Sykes on February 2, 1999, Breland re-interviewed Pearson and took a taped transcribed statement from him on February 3, 1999. (Ex. 56, Pearson Statement, 1-8, Feb. 3, 1999).

91.     In the February 3, 1999 interview, Pearson stated that on January 25, 1999, he, Horn and Horn's cousin, Sholanda Jenkins, (a/k/a "Yogi"), were on Pearson's porch at approximately 11:00 a.m. Pearson, although initially reluctant, admitted he called Sykes from his porch after Horn lent him a cell phone (the stolen phone). Pearson stated he called Sykes because he was upset that Horn said he had sex with Pearson's girlfriend, Zaneta, and Pearson wanted to show Horn that he had another girlfriend. (Ex. 16, Breland Dep. 226:8-227:17, Dec. 16, 2019;

Ex. 55, Breland Report 2, NH000079, Feb. 1, 1999; Ex. 56, Pearson Statement, 3:5-6:13, Feb. 3, 1999).

92.     After the February 3, 1999 interview, Breland submitted the tape to be transcribed, but Breland never received the transcribed statement, leading Breland to believe the tape was lost. Therefore, on February 5, 1999, Breland returned to Pearson's house to repeat the interview with a new tape. Pearson's mother was also home. (Ex. 16, Breland Dep. 221:2-222:10, Dec. 16, 2019; Ex. 57, Breland Dep. 299:5-302:21, Jan. 13, 2020; Ex. 55, Breland Report 2, NH000079, Feb. 1, 1999).

93.     In Pearson's February 5, 1999, taped statement, Pearson repeated his previous statement that Horn lent him a cell phone on his porch, which he used to call Sykes. (Ex. 57, Breland Dep. 301:8-302:21, Jan. 13, 2020; Ex. 58, Pearson Statement 2-4, NH000157-159, Feb. 5, 1999).

94.     In the February 3rd and February 5th statements, Pearson identified Horn's cousin Yogi as also being present on his porch on January 25, 1999, at approximately 11:00 a.m. when he called Sykes. He also was asked if he had any other information and he declined. (Ex. 55, Breland Report 2, NH000079, Feb. 1, 1999; Ex. 56, Pearson Statement 3:5-21, 7:12-15, Feb. 3, 1999; Ex. 58, Pearson Statement 2-3, NH000157-158, Feb. 5, 1999).

95.     In each statement Pearson stated that his mother arrived home from work when he, Horn and Yogi were on the porch. Dease asked Pearson to come to the station with his mother to see if they could identify Yogi. (Ex. 57, Breland Dep. 309:7-311:18, Jan. 13, 2020; Ex. 58, Pearson Statement 3, NH000158, Feb. 5, 1999).

96.     On February 9, 1999, Pearson and his mother came to the station. They identified a photo of Yogi as Sholanda Jenkins. (Ex. 57, Breland Dep. 310:17-311:13, Jan. 13, 2020; Ex. 59, Dease Report 1-2, NH000076-77, Feb. 10, 1999).

97.     Pearson also repeated his statement that Horn handed him the cell phone on his porch on January 24, 1999. Dease asked Pearson why he had been reluctant to identify Horn as the person who gave him the phone, and Pearson said that he did not want to "rat anyone out." (Ex. 59, Dease Report 2, NH000077, Feb. 10, 1999).

98.     During his interview with Pearson, Dease told him he had witnesses who put the stolen phone in Pearson's hand and that Pearson either got the phone from the robbery, or he got it from someone else [Horn]. (Ex. 14, *Habeas* Trial Tr., 139:25-140:8, Mar. 18, 2013).

99.     During this interview with Pearson, Dease knew Pearson had custody of two seven-month-old twins and was on probation. He advised Pearson that he was in some jeopardy and had a problem [if he went to jail]. (Ex. 14, *Habeas* Trial Tr., 140:2-141:2, Mar. 18, 2013).

**Steve Brown, The Third Gunman**

100.    Dease, Adger, and Breland continued to question Sadler about the first and fifth phone calls that were made to his phone number from the stolen phone. However, Sadler did not know the identity of the person that called him. Detectives learned that Sykes' boyfriend, William Newkirk, was a close friend and dealt drugs with Sadler. (Ex. 1, Horn Am. Compl. ¶121; Ex. 6, Jackson Am. Compl. ¶89; Ex. 14, *Habeas* Trial Tr., 3:14-23, 11:4-13, Mar. 18, 2013; Ex. 15, Adger Dep. 170:12-171:12, Dec. 11, 2019).

101.    As the investigation continued, Sadler and Newkirk became frustrated with the attention they were drawing from the detectives. Newkirk told Sadler to tell the detectives who called him after the Deli robbery. (Ex. 1, Horn Am. Compl. ¶126; Ex. 6, Jackson Am. Compl. ¶94; Ex. 14, *Habeas* Trial Tr., 19:2-20:21, Mar. 18, 2013; Ex. 60, Dease Report 2, PL0006285, Mar. 8, 1999).

102.    On March 4, Dease and Adger met with Sadler and Newkirk in Bridgeport. Sadler told the detectives that the person who called him was named "Steve," but he did not know

22

Steve's last name. Sadler said Steve was the brother-in-law of Marlo Macklin, another Bridgeport resident. Sadler also said Steve was good friends with Tamika Fuller. Fuller had received the third phone call from the stolen phone. (Ex. 1, Horn Am. Compl. ¶127; Ex. 6, Jackson Am. Compl. ¶¶95-96; Ex. 14, *Habeas* Trial Tr., 20:14-21:25, Mar. 18, 2013; Ex. 60, Dease Report 2, PL0006285, Mar. 8, 1999).

103.    Detectives learned from Macklin that Steve's last name was Brown. (Ex. 1, Horn Am. Compl. ¶128; *admitted in* Ex. 2, Def. Adger's Answer ¶128; Ex. 3, Def. Dease's Answer ¶128; Ex. 6, Jackson Am. Compl. ¶97; *admitted in* Ex. 7, Def. Adger's Answer ¶97; Ex. 9, Def. Dease's Answer ¶97; Ex. 60, Dease Report 2, PL0006285, Mar. 8, 1999).

104.    The next day, Sadler identified a photo of Steve Brown. Dease and Adger obtained Brown's fingerprints from the Bridgeport Police Department, and they matched a latent print lifted from the cigar box in the back office of the Deli. (Ex. 1, Horn Am. Compl. ¶129; *admitted in* Ex. 2, Def. Adger's Answer ¶129; Ex. 3, Def. Dease's Answer ¶129; Ex. 6, Jackson Am. Compl. ¶98; *admitted in* Ex. 7, Def. Adger's Answer ¶98; Ex. 8, Def. Dease's Answer ¶98; Ex. 60, Dease Report 2, PL0006285, Mar. 8, 1999).

105.    On March 9, Dease and Adger obtained a warrant for Brown's arrest and Brown was arrested at his home the next day. (Ex. 1, Horn Am. Compl. ¶130; *admitted in* Ex. 2, Def. Adger's Answer ¶130; Ex. 4, Def. Breland's Answer ¶130; Ex. 3, Def. Dease's Answer ¶130; Ex. 6, Jackson Am. Compl. ¶99; *admitted in* Ex. 7, Def. Adger's Answer ¶99; Ex. 8, Def. Breland's Answer ¶99; Ex. 9, Def. Dease's Answer ¶99; Ex. 10, Dease Report 1, NH000064, Mar. 11, 1999).

106.    After his arrest, Brown was brought to the station. After he was read his Miranda rights, Brown gave a taped transcribed statement to Dease and Adger, admitting that he participated in the Deli robbery. (Ex. 11, Brown Statement 3, DET00854, Mar. 10, 1999).

107.    Brown identified Horn and Jackson as his accomplices, selecting their photos from a photo array. (Ex. 10, Dease Report 2, NH000065, Mar. 11, 1999; Ex. 11, Brown Statement 4-5, DET00855-856, Mar. 10, 1999).

108.    A hearing on a Motion to Suppress Brown's identification of Horn and Jackson was conducted at the criminal trial and denied by the Court. (Ex. 61, Crim. Trial Tr., 105:17-107:4, Apr. 10, 2000).

109.    Prior to recording Brown's statement, the detectives conducted a "pre-interview." A pre-interview was conducted before every recorded statement and was the practice and procedure of the NHPD. (Ex. 15, Adger Dep. 64:17-65:9, Dec. 11, 2019).

110.    The pre-interview is conducted to relax the witness, ask preliminary questions, and learn if the witness has relevant information. (Ex. 15, Adger Dep. 66:1-9, Dec. 11, 2019; Ex. 62, Kendall Dep. 101:8-102:14, Feb. 12, 2020).

111.    It is the practice and procedure of NHPD detectives, including Adger, not to share information about the investigation with a witness during a pre-interview. The only objective of a pre-interview was to find out what the witness knows. (Ex. 15, Adger Dep. 66:10-67:11, Dec. 11, 2019).

112.    Detectives may take notes during a pre-interview, but it was not required or departmental policy to take notes. Adger took notes during pre-interviews, but her practice was to discard her notes after transposing them into her police report. That is what she did with her notes from the Brown pre-interview. (Ex. 17, Adger Aff. ¶15; Ex. 63, Wearing Dep. 112:16-23, Mar. 16, 2020; Ex. 15, Adger Dep. 68:10-18, 69:3-12, Dec. 11, 2019; Ex. 64, Cain Dep. 96:7-21, Dec. 9, 2019).

113.    After transposing notes into a report, detectives had the option to keep their notes, file them, or discard them. (Ex. 63, Wearing Dep. 115:2-10, Mar. 16, 2020; Ex. 62, Kendall Dep. 74:20-75:7, 76:23-77:11, Feb. 12, 2020).

114.    In a taped interview, Brown told Dease and Adger the following facts, that were consistent with his pre-interview (Adger Aff. ¶15):

a)    Brown knew Jackson by the nickname, "Son," and Horn by the nickname, "Tye or Trae." (Ex. 11, Brown Statement 4-5, DET00855-856, Mar. 10, 1999).

b)    Brown had met Horn and Jackson two or three times before January 24, 1999. Brown had heard they were hustlers making a living on the street. (Ex. 11, Brown Statement 6, 18, DET00857, DET00869, Mar. 10, 1999).

c)    On January 24, they met at a club and smoked weed and chilled for two hours. (Ex. 11, Brown Statement 6-7, DET00857-858, Mar. 10, 1999).

d)    The three then drove to New Haven, stopped at a "chick's" house, and then drove to the Deli. (Ex. 11, Brown Statement 8-9, DET00859-860, Mar. 10, 1999).

e)    Before entering the store, Brown observed a cab pull up to the Deli and two men entered the store. Horn, Jackson, and Brown then exited their car and entered the store. (Ex. 11, Brown Statement 9, 16, DET00860, DET00867, Mar. 10, 1999).

f)    Horn entered the store first and started firing at the people in the store with a 9-millimeter Beretta. (Ex. 11, Brown Statement 10-11, DET00861-862, Mar. 10, 1999).

g)    One person was shot and was laying on the ground, choking on blood. (Ex. 11, Brown Statement 13, DET00864, Mar. 10, 1999).

h)    Brown went to the back of the store and saw a person in a chair and another trying to hide. (Ex. 11, Brown Statement 12, DET00863, Mar. 10, 1999).

i)    Brown said he knocked some boxes off the desk. (Ex. 11, Brown Statement 13, DET00864, Mar. 10, 1999).

j)    Brown thought Horn took a cell phone from the back room. (Ex. 11, Brown Statement 13, DET00864, Mar. 10, 1999).

k)    Horn forced the two guys from the back of the store to the front. (Ex. 11, Brown Statement 13, DET00864, Mar. 10, 1999).

l)    Jackson was trying to open the cash register. (Ex. 11, Brown Statement 13, DET00864, Mar. 10, 1999).

m)    Brown did not have a gun and was given a colored scarf to wear; he stated he was unaware that Horn and Jackson were going to rob the store. (Ex. 11, Brown Statement 16-17, DET00867-868, Mar. 10, 1999).

n)    Brown said he had no choice but to go through with it or get shot. (Ex. 11, Brown Statement 24, DET00875, Mar. 10, 1999).

o)    Brown did not know how much money was taken, but knew they took a bag full of cigarettes. (Ex. 11, Brown Statement 24-25, DET00875-876, Mar. 10, 1999).

p)    After the robbery, the three smoked more weed and on the highway back to Bridgeport, Brown called Willie Sadler from the stolen cell phone. (Ex. 11, Brown Statement 19-20, DET00870-871, Mar. 10, 1999).

q)   Brown said he later used the stolen phone again to call "AJ," who lived in Stratford. "This chick I know that I was gonna fuck." (Ex. 11, Brown Statement 20-21, DET00871-872, Mar. 10, 1999).

r)   Brown said he later called Tamika Fuller from the same phone. (Ex. 11, Brown Statement 21-22, DET00872-873, Mar. 10, 1999).

s)   Brown said they drove around until the morning and then Brown gave the phone back to Horn who told him never to say anything about the robbery. (Ex. 11, Brown Statement 22, DET00873, Mar. 10, 1999).

115.   The substance of Brown's statement, described by Adger in the arrest warrants issued for Horn and Jackson, is as follows:

That while the threesome was in the city of New Haven, Jackson stopped the vehicle in front of a store and all three (3) departed from the vehicle and entered the store. Brown said that Horn walked into the store first "bussin" (firing rounds from a 9mm handgun), while Brown and Jackson followed. Jackson remained at the front door while Brown went toward the rear of the deli. While adorned with a scarf around his face, Brown said that he stepped over the body of a male subject lying on the floor and entered a back room. Brown said that he knocked over boxes that were seated on a desk in the back room and then left the back room, stating "after I left the back room, I stepped over the person that was laying there and I heard him choking on his own blood and then that's when I knew he was dead." Brown then said that Jackson was behind the counter attempting to open the cash register and stuffing cigarettes into a bag. Jackson then ran from the store followed by Horn and Brown. The threesome then jumped back into the vehicle and traveled back to Bridgeport, CT.

That Steve Brown said that Vernon Horn was the individual that walked into the store first and began shooting people in the store with a 9mm type handgun and that he, Brown, believed it was Horn that stole the cellular telephone during the commission of the robbery/murder, Brown said that he used the cellular telephone to call Willie Sadler. Brown, in addition, said that he made subsequent telephone calls on the cellular telephone at Adrianne Younger and to Tamika Fuller, respectfully.

(Ex. 65, Adger Dep. Ex. 46, at 9-10; Ex. 66, Adger Dep., Ex. 166 at 9-10; Ex. 10, Dease Report 2, NH000065, Mar. 11, 1999).

116.   Brown also admitted making four of the five phone calls on the stolen phone's call detail record. The first and fifth calls were placed to Sadler and the third call was to Tamika

Fuller. (Ex. 15, Adger Dep. 54:20-23, Dec. 11, 2019; Ex. 10, Dease Report 2, NH000065, Mar. 11, 1999).

117.    Brown called Fuller at 10:40 a.m. on January 25. Brown stated he then gave the phone to Horn, who returned it to Brown later in the day. (Ex.15, Adger Dep. 55:10-56:2, Dec. 11, 2019; Ex. 11, Brown Statement 21-22, DET00872-873, Mar. 10, 1999).

118.    Arrest warrants were issued for Horn and Jackson on March 12, 1999, for the charges of murder and robbery. (Ex. 65, Adger Dep. Ex. 46, at 10; Ex. 66, Adger Dep. Ex. 166, at 10; Ex. 67, Dease Report 2, NH000061, Mar. 23, 1999).

119.    Horn was arrested on March 22, 1999, and Jackson was arrested on March 24, 1999. (Ex. 67, Dease Report 2, NH000061, Mar. 23, 1999; Ex. 19, Arrest Cards, DET00777-780).

120.    On April 10, 2000, Brown testified at the criminal trial of Horn and Jackson. (Ex. 61, Crim. Trial Tr., 107:15-108:15, Apr. 10, 2000).

121.    Brown pled guilty to the charges of first-degree accessory to manslaughter with a firearm, and conspiracy to commit robbery. (Ex. 61, Crim. Trial Tr., 109:9-17, Apr. 10, 2000).

122.    Brown was offered a sentence of 25 years suspended after serving 18 years. He knew his attorney could argue for a shorter sentence after his testimony. (Ex. 61, Crim. Trial Tr., 110:13-111:4, Apr. 10, 2000).

123.    Brown admitted that when he gave his statement to police on March 10, 1999, he was not entirely truthful because he had been arrested for felony murder and he was afraid of being charged with a killing he did not commit. (Ex. 61, Crim. Trial Tr., 114:5-115:2, Apr. 10, 2000).

124.    Brown testified consistent with the facts in the transcribed statement he gave to the police, however, he also testified that he was not forced to participate in the robbery. (Ex. 68, Crim. Trial Tr., 5:7-22, Apr. 12, 2000).

125.    Brown added the following additional facts during his trial testimony:

a)      When Brown, Horn, and Jackson arrived at the Dixwell Deli, they parked the car and stood on the side of the Deli for about a minute. (Ex. 61, Crim. Trial Tr., 122:3-12, Apr. 10, 2000).

b)      Brown smoked a cigarette and Horn and Jackson smoked cigar-shaped blunts that smelled like magic marker. (Ex. 61, Crim. Trial Tr., 123:2-26, Apr. 10, 2000).

c)      While they were on the side of the store, Brown stood in the shadows and Horn and Jackson stood near the front of the store. Three or four people entered and left the store, including a female with a leather coat and baseball cap. (Ex. 61, Crim. Trial Tr., 124:18-126:22, Apr. 10, 2000).

d)      A taxi pulled up and two men got out and walked into the store. Then one exited the store, got into the taxi, and left. (Ex. 61, Crim. Trial Tr., 127:3-128:2, Apr. 10, 2000).

e)      At that moment, Horn and Jackson said they were going to stick up the store. Jackson handed Brown a scarf to put on his face and Horn and Jackson pulled their "skellies" down. (Ex. 61, Crim. Trial Tr., 128:3-129:24, Apr. 10, 2000).

f)      One of them handed Brown a small silver gun. Horn had a big squarish gun, "the barrel stuck out a little bit. It could have looked similar to a Beretta or Taurus." Jackson also had a gun. (Ex. 61, Crim. Trial Tr., 130:4-131:6, Apr. 10, 2000).

g)      Horn entered the Deli with Brown behind him. Horn began shooting multiple shots toward the left side of the store. People inside scattered. (Ex. 61, Crim. Trial Tr., 131:26-133:3, Apr. 10, 2000).

h)      When the shooting stopped, Jackson hopped over the counter and attempted to open the register. (Ex. 61, Crim. Trial Tr., 134:11-20, Apr. 10, 2000).

i)      Horn and Brown went to the back room. Brown stepped over a man that was shot. Horn opened the door to the back room where a man was in a chair and another "bum-ish," homeless man was trying to hide. (Ex. 61, Crim. Trial Tr., 134:23-136:7, Apr. 10, 2000).

j)      Brown searched the homeless man and found nothing. Horn grabbed the man in the chair and brought him to the front of the store. (Ex. 61, Crim. Trial Tr., 136:13-137:11, Apr. 10, 2000).

k)      While at the back of the store, Brown searched through "Philly blunt boxes" looking for money. He found none. Horn and Jackson were in the front of the store. (Ex. 61, Crim. Trial Tr., 137:25-138:13, Apr. 10, 2000).

l)      Brown walked to the front and saw the man on the floor dying, making gurgling noises. Jackson was filling a bag with cigarettes. (Ex. 61, Crim. Trial Tr., 138:24-139:21, Apr. 10, 2000).

m)      Brown heard a siren and they all exited the store. (Ex. 61, Crim. Trial Tr., 140:16-27, Apr. 10, 2000).

28

n)     Brown confirmed that neither detective that interviewed him on March 10 told him who to identify as his accomplices and he was not promised anything for his statement. (Ex. 61, Crim. Trial Tr., 162:19-24, 163:9-17, Apr. 10, 2000).

126.     On February 15, 2011, Brown testified at Jackson's *habeas* hearing. He again identified Jackson as one of his co-conspirators in committing the Dixwell Deli murder. (Ex. 69, *Habeas* Trial Tr., 15:21-16:17, 20:7-10, Feb. 15, 2011).

127.     On March 14, 2013, Brown testified at Horn's *habeas* hearing. He again identified Horn as one of his co-conspirators in committing the Dixwell Deli murder. (Ex. 70, *Habeas* Trial Tr., 3:1-7, 85:18-86:8, Mar. 14, 2013).

128.     Breland did not participate in any interview or investigation involving Brown as he was assigned to other cases. (Ex. 57, Breland Dep. 264:13-266:20, Jan. 13, 2020).

### *Arrest of Shaquan Pallet*

129.     In early March 1999, Dease and Adger interviewed Shaquan Pallet. Pallet was the other TGI Friday's employee who left work with his friend, and murder victim, Caprice Hardy. Pallet was interviewed when he visited his probation officer. (Ex. 72, Crim. Trial Tr., 137:9-138:26, Apr. 7, 2000; Ex. 15, Adger Dep. 261:8-22, Dec. 11, 2019; Ex. 67, Dease Report 2-3, NH000061-62, Mar. 23, 1999; Ex. 71, Pallet Statement 2-3, NH000135-136, Mar. 23, 1999).

130.     Prior to March, Pallet declined Dease and Adger's requests to interview him because he was scared. (Ex. 72, Crim. Trial Tr., 135:25-136:21, Apr. 7, 2000; Ex. 71, Pallet Statement 7-8, NH000140-141, Mar. 23, 1999).

131.     During the early March interview, Pallet stated he exited the taxi with Caprice Hardy, and he saw three men on the side of the Deli smoking "wet" (marijuana soaked in embalming fluid). (Ex. 1, Horn Am. Compl. ¶149; *admitted in* Ex. 2, Def. Adger's Answer ¶149; Ex. 3, Def. Dease's Answer ¶149; Ex. 6, Jackson Am. Compl. ¶118; *admitted in* Ex. 7, Def. Adger's Answer ¶118; Ex. 9, Def. Dease's Answer ¶118; Ex.72, Crim. Trial Tr., 122:2-123:12,

Apr. 7, 2000; Ex. 67, Dease Report 3, NH000062, Mar. 23, 1999; Ex. 71, Pallet Statement 3, NH000136, Mar. 23, 1999).

132.    Pallet recognized two of the men, having previously seen them at the store. The third person stood further back in the dark and Pallet could not see his face. (Ex. 72, Crim. Trial Tr., 125:23-126:13, Apr. 7, 2000; Ex. 71, Pallet Statement 5, NH000138, Mar. 23, 1999).

133.    Pallet stated Hardy purchased cigarettes and gave him some. (Ex. 1, Horn Am. Compl. ¶149; *admitted in* Ex. 2, Def. Adger's Answer ¶149; Ex. 3, Def. Dease's Answer ¶149; Ex. 6, Jackson Am. Compl. ¶118; *admitted in* Ex. 7, Def. Adger's Answer ¶118; Ex. 9, Def. Dease's Answer ¶118; Ex. 72, Crim. Trial Tr., 124:1-11, Apr. 7, 2000; Ex. 67, Dease Report 3, NH000062, Mar. 23, 1999; Ex. 71, Pallet Statement 3, NH000136, Mar. 23, 1999).

134.    Pallet stated that as he left the store, two of the three men he had seen smoking "wet" were outside the door pulling skellies (masks) down on their faces. Pallet was wearing a gold chain and thought he might be robbed. (Ex. 72, Crim. Trial Tr., 128:11-130:20, Apr. 7, 2000; Ex. 71, Pallet Statement 3, NH000136, Mar. 23, 1999).

135.    Pallet then walked to the taxi and left the area. (Ex. 1, Horn Am. Compl. ¶150; *admitted in* Ex. 2, Def. Adger's Answer ¶150; Ex. 3, Def. Dease's Answer ¶150; Ex. 6, Jackson Am. Compl. ¶119; *admitted* in Ex. 7, Def. Adger's Answer ¶119; Ex. 9, Def. Dease's Answer ¶119; Ex. 72, Crim. Trial Tr., 130:21-131:25, Apr. 7, 2000).

136.    During the early March interview, Pallet was shown a photo array of suspects, however, he was afraid to make a positive identification. Instead, he pushed away all the photos except Horn and Jackson's photos and said, "Take it for what it's worth." (Ex. 67, Dease Report 3, NH000062, Mar. 23, 1999).

137.    On March 23, 1999, the day after Horn's arrest, Pallet was arrested by the NHPD for unrelated robberies. (Ex. 1, Horn Am. Compl. ¶147; *admitted in* Ex. 2, Def. Adger's Answer

¶147; Ex. 3, Def. Dease's Answer ¶147; Ex. 6, Jackson Am. Compl. ¶116; *admitted in* Ex. 7, Def. Adger's Answer ¶116; Ex. 9, Def. Dease's Answer ¶116).

138.    Dease learned of Pallet's arrest and arranged to interview him with Assistant State's Attorney, Gary Nicholson, the lead prosecutor on the Dixwell Deli robbery and murder. (Ex. 1, Horn Am. Compl. ¶148; *admitted in* Ex. 2, Def. Adger's Answer ¶148; Ex. 3, Def. Dease's Answer ¶148; Ex. 6, Jackson Am. Compl. ¶117; *admitted in* Ex. 7, Def. Adger's Answer ¶117; Ex. 9, Def. Dease's Answer ¶117).

139.    During the interview with Dease and ASA Nicholson, Pallet repeated the information he gave in early March; he positively identified Horn and Jackson from a photo array, and he gave a taped transcribed statement. (Ex. 72, Crim. Trial Tr., 144:22-146:21, Apr. 7, 2000; Ex. 71, Pallet Statement 3-5, NH000136-138, Mar. 23, 1999).

140.    A hearing on a Motion to Suppress Pallet's identification of Horn and Jackson was conducted during the criminal trial and denied by the Court. (Ex. 72, Crim. Trial Tr., 108:24-109:15, Apr. 7, 2000).

141.    After Pallet gave his statement, a more favorable sentence was discussed concerning the unrelated robberies in exchange for his cooperation and truthful testimony in the Dixwell Deli murder case and the identification of his co-conspirators in his robberies. He ultimately pled guilty to two counts of conspiracy to commit robbery. (Ex. 72, Crim. Trial Tr., 113:18-116:22, Apr. 7, 2000; Ex. 67, Dease Report 3, NH000062, Mar. 23, 1999).

142.    During the criminal trial, Pallet testified consistently with his transcribed statement. The prosecutor raised an issue about a note Pallet wrote recanting his identification of Jackson and Horn during his incarceration at Whalley Correctional Facility on September 24, 1999. (Ex. 72, Crim. Trial Tr., 148:7-150:13, Apr. 7, 2000).

143.    Pallet explained he wrote the note, but only because a separate note was slipped under his jail cell door telling him to write the recantation note. He does not know who wrote the note or who put it under his door, but it is inferred that the note was threatening. (Ex. 72, Crim. Trial Tr., 150:10-18, 152:1-14, 155: 18-23, 159:32-160:2, Apr. 7, 2000).

144.    Jackson's lawyer objected to referencing the recantation note at trial because of the inference that his client, Jackson, wrote the threatening note. The note was not recovered. (Ex. 72, Crim. Trial Tr., 155:2-12, 159:21-160:2, Apr. 7, 2000).

145.    The trial court struck the recantation note from evidence, all testimony about it, and instructed the jury to disregard it. (Ex. 72, Crim. Trial Tr., 172:15-175:8, Apr. 7, 2000).

146.    Breland was not involved in the interviews of Brown as he was no longer assigned to the Dixwell investigation and he was working on other assignments. Breland was not involved in the interviews of Shaquan Pallet. (Ex. 57, Breland Dep. 264:13-266:20; 429:24-430:14, Jan. 13, 2020).

***Phone Records Received from Phone Companies***

147.    During the Deli investigation, Adger sought the records associated with the phone numbers on the stolen phone's call detail record and the phone records of additional persons that were associated with the investigation. (Ex. 15, Adger Dep. 103:11-104:22, Dec. 11, 2019.)

148.    Adger applied for a search warrant to Southern New England Telephone Company ("SNET"), which was issued February 25, 1999. The search warrant listed the phone numbers of Vernon Horn, Marcus Pearson, Floyd Jackson (whose daughter was Tamika Fuller), and the residential telephone number of the elderly couple Crystal Sykes worked for. The records requested were from January 1, 1999 through February 23, 1999. (Ex. 15, Adger Dep. 101:10-18, 102:18-22, Dec. 11, 2019; Ex. 73, Adger Dep. Ex. 53; Ex. 48, Dease Report 3, NH000008, Feb. 5, 1999).

32

149.    Adger also applied for a search warrant, directed to AT&T Corporation, which was issued February 25, 1999. The search warrant listed the phone number of Sandra Moore, who resided in the residence where Adrianne Younger lived. The records requested were for January 1, 1999, through February 23, 1999. (Ex. 15, Adger Dep. 99:8-100:17, Dec. 11, 2019; Ex. 74, Adger Dep. Ex. 52; Ex. 48, Dease Report 3-4, NH000008-9, Feb. 5, 1999).

150.    Adger also received the phone records of Willie Sadler and Glen Spray (the phone used by Marquis Jackson) through an informal request to the telephone companies that serviced Sadler's and Spray's phone. (Ex. 17, Adger Aff. ¶9; Ex. 15, Adger Dep. 106:20-107:19, Dec. 11, 2019).

151.    Responses from the search warrants and requests were obtained on or before March 4, 1999. (Ex. 17, Adger Aff. ¶11).

152.    Upon receiving the records, Adger made a copy for herself, Dease, and Sergeant Direk Rogers, who was supervising the investigation. (Ex. 15, Adger Dep. 10:24-11:1, Dec. 11, 2019; Ex. 75, Adger Dep. 361:10-13, Sept. 22, 2020).

153.    Consistent with NHPD practice and procedure, Adger then delivered the original phone records to the New Haven Police Records Division. (Ex. 15, Adger Dep. 111:10-16, 120:11-122:4, Dec. 11, 2019; Ex. 75, Adger Dep. 357:1-21, Sept. 22, 2020; Ex. 76, Adger Dep. Ex. 54).

154.    Former Assistant Chief Rachel Cain testified that detectives were permitted to file records from third parties in the Records Division, the Property Room, or both. (Ex. 64, Cain Dep. 120:3-121:19, Dec. 9, 2019).

155.    After delivering the original records with the Records Division, Adger did not know what happened to the records, and she does not know the Records Division procedure. (Ex. 15, Adger Dep. 109:13-110:10, Dec. 11, 2019).

156.   The records filed in the Records Division were available to officers, detectives, Assistant State's Attorneys, and inspectors employed by the State's Attorney's Office. (Ex. 17, Adger Aff. ¶7; Ex. 77, Nicholson Dep. 54:6-55:17, Feb. 5, 2020).

157.   During a criminal prosecution, the Assistant State's Attorney and/or an inspector employed by the State's Attorney's Office were permitted to copy all or a portion of the records filed in the Records Division. In the Deli homicide prosecution, Mel Cartoceti (deceased), a State's Attorney inspector, was assigned to assist ASA Gary Nicholson. (Ex. 77, Nicholson Dep. 45:15-46:9, 54:22-55:3, 278:13-23; 279:11-23, Feb. 5, 2020).

158.   ASA Nicholson had an open file policy on the cases he prosecuted. Nicholson stated, "I generally turned everything over that I had" to criminal defense attorneys. (Ex. 77, Nicholson Dep. 55:25-56:18, 62:6-10, Feb. 5, 2020.)

159.   ASA Nicholson prepared a discovery face sheet listing every document he produced in discovery. His practice was to give a copy of the discovery face sheet to defense counsel to avoid issues about what was produced. (Ex. 77, Nicholson Dep. 56:23-58:3, 59:21-62:10, Feb. 5, 2020).

160.   The discovery face sheet listing every document turned over in discovery for the Horn/Jackson prosecution is not in the State's Attorney Office's file and never has been produced in discovery. (Ex. 78, Delcore Aff. ¶4).

161.   Investigator Cartoceti could have taken contents from the State's Attorney's file to work on, and not return the contents to the file. Nicholson is not aware if this happened in this case. (Ex. 77, Nicholson Dep. 283:5-14, Feb. 5, 2020).

162.   When retrieving NHPD records for ASA Nicholson, Cartoceti would, at times, make judgment calls about what records to copy. (Ex. 77, Nicholson Dep. 300:12-19, Feb. 5, 2020).

163.    ASA Nicholson cannot say whether Cartoceti saw the 137 pages of phone records in the NHPD Record Division and decided not to copy them or decided that they were not needed, and it is possible that happened. (Ex. 77, Nicholson Dep. 301:1-15, Feb. 5, 2020).

164.    In 2018, some original phone records filed by Adger with the Records Division remained in the file in the Records Division and were not missing (Ex. 79, Cain Dep. 268:9-269:11, Sep. 18, 2020). The Records Division file still contained:

a.    Omnipoint records of the stolen cell phone; (Ex.50, Omnipoint Phone Records, NH001036-1038, also produced by Plaintiffs Ex. 80, PL0006290-6292).

b.    Phone records of Glen Spray (the phone used by Marquis Jackson); (Ex. 81, Glen C. Spray Phone Records, NH000888-895, also produced by Plaintiffs Ex. 82, PL0006317-6324).

c.    Phone records produced pursuant to a search warrant for Sandra Moore (the phone used by Adrienne Younger); (Ex. 83, Phone Records from Sandra Moore Search Warrant, NH001011-1019, also produced by Plaintiffs Ex. 84, PL0006595-6606).

d.    Search warrants issued to SNET and AT&T and inventory returns (Ex. 85, AT&T Search Warrant and Inventory Return, NH000344-348, NH000355, also produced by Plaintiffs Ex. 86, PL0006724-6729; Ex. 87, SNET Search Warrant and Inventory Return, NH000350-354, 349, also produced by Plaintiffs Ex. 88, PL0006731-6736); and

e.    Correspondence to telephone companies. (Ex. 78, Delcore Aff.  ¶5). Ex. 89, AT&T Phone Correspondence, NH002080, also produced by Plaintiffs Ex. 90, PL0006730; Ex. 91, SNET Phone Correspondence, NH002042, also produced by Plaintiffs Ex. 92, PL0006737).

165.    All of the phone numbers for which Adger obtained records by warrant and informal request are found in the detective's investigative reports with the name of the owner/user of the phone records, with the exception of Glen Spray's phone used by Marquis Jackson. (Ex. 17, Adger Aff. ¶8).

166.    In 1999, the practice and procedure of the NHPD was to file search warrants and the related search warrant inventories with the Administrative Assistant for the Judicial Clerk, so that the Judicial Clerk could keep track of the search warrants and deliver them to the proper criminal file. (Ex. 93, Thigpen Dep. 32:7-14, 36:19-37:1, Oct. 4, 2019).

167.     Upon receipt of a search warrant inventory, the Administrative Assistant filled out a two-ply index card form created by the Judicial Clerk containing the signature of the officer, the clerk's name, the date of receipt, the police file number, and the name of the criminal defendants. The card is a business record of the Judicial Clerk. (Ex. 93, Thigpen Dep. 37:2-19, Oct. 4, 2019).

168.     When a search warrant inventory was filed with the Judicial Clerk, one of the index cards was filled out by the Clerk and a carbon copy of the card was given to the police officer as a receipt. (Ex. 93, Thigpen Dep. 37:24-38:8, Oct. 4, 2019).

169.     An Administrative Assistant for the Judicial Clerk, Barbara Thigpen, identified a copy of the index cards she filled out for the search warrant to SNET and inventory on March 5, 1999. (Ex. 93, Thigpen Dep. 38:11-40:25, Oct. 4, 2019; Ex. 94, Thigpen Dep. Ex. W, at DET01629).

170.     On March 5, 1999, Adger filed the two search warrants and inventories for phone records with the Judicial Clerk and received a copy of the index cards prepared by the Clerk. Adger then placed the receipt index card in the investigative file. (Ex. 17, Adger Aff. ¶10; Ex. 93, Thigpen Dep. 35:12-40:25, Oct. 4, 2019; Ex. 94, Thigpen Dep. Ex. W, at DET01628-1629).

171.     During the time between the receipt of the phone records on or about March 4, 1999, and the arrest of Brown on March 10, 1999, Adger began examining the phone records by using a reverse directory phone service to determine who made certain calls. (Ex. 17, Adger Aff. ¶11; Ex. 15, Adger Dep. 140:23-142:7, Dec. 11, 2019).

172.     Adger prepared charts attempting to understand if the phone records established a connection between the phone calls made between individuals associated with the phone numbers in the records and the Deli homicide, but her analysis did not permit her to make such a

determination. (Ex. 15, Adger Dep. 146:10-147:6, Dec. 11, 2019; Ex. 75, Adger Dep. 425:7-24, Sept. 22, 2020; Ex. 76, Adger Dep. Ex. 54, at PL008760-8761).

173.    Adger shared information regarding the records in the chart with Dease and her supervisor, Sgt. Rogers. However, no connection to the Deli robbery/homicide was identified. (Ex. 75, Adger Dep. 430:18-25, Sept. 22, 2020).

174.    Adger's investigative work related to the Deli homicide ended after Brown was arrested and he confessed to committing the crime with Horn and Jackson. (Ex. 75, Adger Dep. 425:7-19, 430:3-11, Sept. 22, 2020.)

175.    Adger discontinued further examination of the phone records. She then focused on drafting arrest warrants for Horn and Jackson.  (Ex. 15, Adger Dep. 18:14-20:19, Dec. 11, 2019; Ex. 75, Adger Dep. 425:16-426:25, Sept. 22, 2020; Ex. 65, Adger Dep. Ex. 46, at DET00395-404).

176.    At that time, Adger had not completed her examination of the phone records and she had not determined that a relationship between the phone numbers in the phone records were connected to the Deli homicide. As such, she did not consider the records evidence and she did not describe her review of the records in a police report. (Ex. 17, Adger Aff. ¶12; Ex. 15, Adger Dep. 128:19-131:3, 154:24-155:16, Dec. 11, 2019; Ex. 75, Adger Dep. 425:7-426:6, Sept. 22, 2020).

***Discovery of Adger's Copy of the Filed Phone Records***

177.    Adger kept her working copy of the phone records in her desk drawer at the Investigative Services Department. (Ex. 15, Adger Dep. 111:10-112:3, Dec. 11, 2019).

178.    Detectives routinely made copies of records to be kept in their desks as working copies when needed. (Ex. 17, Adger Aff. ¶5).

179.    No policy or procedure of the NHPD prohibited detectives from making or using working copies of records. (Ex. 17, Adger Aff. ¶6).

180.    In or about December 2000, Adger was promoted to Sergeant and was transferred to another division. (Ex. 15, Adger Dep. 110:21-111:4, Dec. 11, 2019).

181.    When Adger cleaned out her desk, she removed the contents, which included training documents, memos, seminar materials, and other paperwork. She put the contents in a box to review at home in the future to determine whether to discard it. (Ex. 17, Adger Aff. ¶13; Ex. 15, Adger Dep. 110:21-113:24, Dec. 11, 2019).

182.    Adger placed the box in her basement without reviewing the contents. (Ex. 15, Adger Dep. 114:12-116:24, Dec. 11, 2019).

183.    One week before January 30, 2018, Adger's basement flooded. Water soaked many of her belongings, including her boxes of work papers. Adger discarded the wet contents and placed the dry materials in a larger box. As she did this, she noticed her working copy of the phone records and other documents she had saved from her employment with the NHPD. (Ex. 15, Adger Dep. 114:12-116:24, Dec. 11, 2019).

184.    On or about January 30, 2018, Marc Caporale, an investigator for the Federal Defender's Office representing Horn, contacted the detectives assigned to the Deli homicide to determine if they had records related to the search warrants for the phone records. (Ex. 95, Caporale Dep. 42:7-43:3, July 21, 2020; Ex. 96, Caporale Dep. Ex. UU, at 1).

185.    On January 30, 2018, Caporale phoned Adger and explained what he was looking for. Adger agreed that she would look in her basement at the work materials she had kept when she retired. (Ex. 95, Caporale Dep. 36:12-37:3, 42:7-22, 51:20-52:3, July 21, 2020).

186.    Caporale then texted Adger the phone numbers from the search warrants and Adger looked in her basement for the documents. (Ex. 95, Caporale Dep. 39:5-21, 44:3-22, July 21, 2020; Ex. 15, Adger Dep. 114:12-116:24, Dec. 11, 2019).

187.    The next day, January 31, 2018, Adger spoke with Caporale. The same day she voluntarily produced 137 pages of phone records she discovered the week before. She provided Caporale the documents so he could make a copy. (Ex. 95, Caporale Dep. 44:3-16, 45:6-12, 52:13-22, July 21, 2020).

188.    Throughout Caporale's process of obtaining the phone records, Adger was pleasant, cordial, and cooperative. (Ex. 95, Caporale Dep. 61:15-62:5, July 21, 2020).

189.    Adger then delivered her original working copy to Kathleen Foster, Senior Assistant Corporation Counsel for the City of New Haven (Ex. 97, Foster Dep. 21:21-22:13, Sept. 14, 2020).

190.    Adger was not aware that the phone records were in the materials she removed from her desk in 2000, and she had not intended to remove them. (Ex. 17, Adger Aff. ¶13; Ex. 15, Adger Dep. 116:20-117:18, Dec. 11, 2019).

191.    The box of materials from Adger's desk, which was stored in her basement, has been produced in discovery. The materials include NHPD memos, training material, and assorted research for various projects Adger conducted through her career. (Ex. 17, Adger Aff. ¶14; Ex. 78, Delcore Aff. ¶¶9-13).

192.    Among other things, the 137 pages of phone records show numerous calls between: Brown and Macklin, Sadler and Macklin, Sadler and Newkirk, Sadler and Fuller, and Sadler and Younger. (Ex. 76, Adger Dep. Ex. 54, PL0008656-8792).

193.    The police reports tendered to Horn and Jackson's defense attorneys in the criminal prosecution described the following relationships:

a)   Steve Brown was the brother-in-law of Willie Sadler; (Ex. 11, Brown Statement 19, NH000122, Mar. 10, 1999);

b)   Tamika Fuller was a drug dealing associate of Willie Sadler; (Ex. 48, Dease Report 3, NH000008, Feb. 5, 1999; Ex. 98, Sadler Statement 3, NH000131, Mar. 5, 1999);

c)   Willie Sadler is the first cousin of Marlo Macklin; (Ex. 48, Dease Report 3, NH000008, Feb. 5, 1999);

d)   Willie Sadler is the boyfriend of Tamika Fuller; (Ex. 48 Dease Report 3, NH000008, Feb. 5, 1999);

e)   Adrianne Younger knows Marlo Macklin; (Ex. 99, Adger Report 2, NH000093, Mar. 5, 1999);

f)   Willie Sadler was a close friend of William Newkirk; (Ex. 14, *Habeas* Trial Tr., 11:11-13, Mar. 18, 2013);

g)   Adrienne Younger is a friend of Steve Brown. (Ex. 99, Adger Report 2, NH000093, Mar. 5, 1999).

194.   Criminal defense attorney for Jackson, Michael Moscowitz, retained an investigator to investigate the "Bridgeport crew" for purposes of a third-party liability defense. The investigation included Willie Sadler, but the investigator was unable to develop information or leads. (Ex. 100, *Habeas* Trial Tr., 107:10-21, 134:10-135:4, 138:24-27, Mar. 19, 2013).

195.   No records have been produced in discovery that Horn's and Jackson's respective criminal attorneys and their respective *habeas* attorneys subpoenaed or requested the phone records of Sadler, Macklin, Newkirk, and Fuller. (Ex. 78, Delcore Aff. ¶6).

196.   No records have been produced in discovery identifying or describing the substance of the telephone conversations made between callers in the 137 pages of phone records associated with Brown, Sadler, Macklin, Newkirk, and Fuller. (Ex. 78, Delcore Aff. ¶7).

197.   No records have been produced that Macklin and Newkirk called each other from January 1 to February 3, 1999. (Ex. 78, Delcore Aff., ¶8).

198.   At Horn and Jackson's *habeas* hearings, Macklin testified that he did not know Newkirk's name and although he had seen him before, he did not "hang out" with him.  (Ex. 51, *Habeas* Trial Tr., 193:3-195:9, Mar. 13, 2013).

199.    Newkirk testified at the *habeas* hearing that he knew Macklin only by his nickname, "Mai," and they were not close friends. (Ex. 14, *Habeas* Trial Tr., 4:2-27, 11:19-22, Mar. 18, 2013).

200.    Newkirk denied being the head of a gang in Bridgeport. (Ex. 14, *Habeas* Trial Tr., 12:4-13, Mar. 18, 2013).

201.    Newkirk testified he cooperated when Dease contacted him about Sadler. Newkirk told Sadler to tell Dease who called Sadler from the stolen phone. (Ex. 14, *Habeas* Trial Tr., 28:8-29:26, Mar. 18, 2013).

202.    Macklin testified he never spoke to his cousin, Steve Brown, about the Deli homicide. (Ex. 51, *Habeas* Trial Tr., 204:12-14, Mar. 13, 2013).

203.    Newkirk and Macklin testified at Jackson's and Horn's *habeas* hearings that they were not involved in the Deli homicide. Macklin testified he was never in New Haven in the years during and after the crime. (Ex. 51, *Habeas* Trial Tr., 212:25-213:18, Mar. 13, 2013; Ex. 14, *Habeas* Trial Tr., 25:17-21, Mar. 18, 2013).

204.    Federal Public Defender, Terrance Ward, delivered the 137 pages of phone records to Patrick Griffin, the New Haven State's Attorney, and his Chief Deputy, Leonard Boyle, as part of his *Habeas Corpus* petition. Ward argued that the phone calls represented therein, implicated the Bridgeport crew as the offenders that committed the robbery with Brown. (Ex. 101, Griffin Dep. 22:11-23:13, Apr. 8, 2021; Ex. 102, Griffin Dep. Ex. 172, at 4-5 (letter dated Mar. 5, 2018)).

205.    After reviewing the documents, Griffin concluded that the documents would not support a third-party culpability claim because the records did not constitute direct evidence of involvement in the crime. (Ex. 101, Griffin Dep. 34:18-35:10, Apr. 8, 2021).

41

206.     Griffin concluded that the phone calls in the 137 pages of phone records, fell far short of probable cause and did not provide evidence that the Bridgeport group was responsible for the murder. (Ex. 101, Griffin Dep. 76:11-22, 118:18-119:3, Apr. 8, 2021).

207.     Griffin did not dismiss the criminal case against Horn and Jackson on the basis of actual innocence. (Ex. 101, Griffin Dep. 132:22-133:25, Apr. 8, 2021).

*The "ORIG" Column*

208.     A column of numbers under the title "ORIG" was on the call detail record of the stolen phone. (Defs.' Rule 56a Statement, *supra* ¶75, at 15-16).

209.     There is no evidence that prior to 2018, any detective, prosecutor, judge, criminal defense attorney, or investigator involved with the Horn and Jackson prosecution and defense inquired about or knew what the designation "ORIG" meant or what the numbers in that column represented. (Ex. 103, *Fed. Habeas* Status Conf. Tr., 6:5-24, Apr. 5, 2018).

210.     Knowledge of cell phone historical call analysis was virtually non-existent in 1999. The investigative technique was developed in or around 2005. Before that, investigative resources and training concerning the use of cellular data was extremely limited for law enforcement officers, which is consistent with the complete lack of knowledge about the "ORIG" column of the detectives in the Dixwell murder investigation. (Ex. 17, Adger Aff. ¶16; Ex. 104, Robert Moledor, Curriculum Vitae (2018); Ex. 105, Opinions of Robert G. Moledor 2, Mar. 29, 2021; Ex. 106, Wines Dep. 44:22-45:7, Oct. 2, 2019).

211.     A dedicated FBI cellular investigative unit was not established until 2010. (Ex. 104, Robert Moledor, Curriculum Vitae (2018); Ex. 105, Opinions of Robert G. Moledor 2, Mar. 29, 2021; Ex. 106, Wines Dep. 42:1-3, Oct. 2, 2019).

212.    Michael Moscowitz and Leo Ahern, who represented Jackson and Horn respectively, did not investigate the numbers on the stolen phone call detail record. (Ex. 107, Moscowitz Dep. 101:25-108:17, Feb. 21, 2020; Ex. 108, Ahern Dep. 20:9-21:9, Feb. 21, 2020).

213.    ASA Nicholson identified the stolen phone call detail record as an exhibit that he presented to the judge and jury as "Exhibit No. 95". He did not know what "ORIG" column or the numbers beneath it meant at the time of the trial. No criminal defense attorney raised an issue about the "ORIG" column, either. (Ex. 12, Crim. Trial Tr., 154:1-155:18, Apr. 4, 2000; Ex. 77, Nicholson Dep. 312:6-315:12, Feb. 5, 2020).

214.    A representative from Omnipoint Communications, Richard Lindemulder, testified at the criminal trial to authenticate the call detail record. He was shown the call detail record with the "ORIG" column. When asked about the cell site information, Lindemulder claimed the information could only be obtained by court order:

By Mr. Moscowitz:

Q       Now, do you know where the cell phone of Mr. Butler, what town that was in, that made the phone calls to those areas?

A       No that would actually require a court order, not a subpoena, so that information wasn't provided.

By Ahern:

Q       What information would we be able to get?

.       .       .

A       Through a court order, cell site information, the cell site, the phone actually used to make the call.

Q       What does that mean, what town? I didn't mean to interrupt you.

A       What it will do, it will be more specific of where the person or the cell phone was at the time the call was made within anywhere from a three to five mile radius.

43

Q      …[L]et me ask you this, the first page of that information, that information
does not appear?

A      No, it does not.

(Ex. 12, Crim. Trial Tr., 157:4-8, 157:25-158:9, Apr. 4, 2000).

215.    Lindemulder's testimony was incorrect and misleading as the "ORIG" column
and numbers identifying the cell tower location was on the "first page" of Exhibit No. 95. (Ex.
105, Opinions of Robert G. Moledor ¶4, Mar. 29, 2021).

***Marcus Pearson Recants***

216.    Pearson had been a criminal since between the ages of 10 and 13 when he began
stealing cars and selling and using drugs. (Ex. 109, Pearson Dep. 257:2-8, Oct. 30, 2019).

217.    In February 1999, Pearson was 21 years old. Pearson had been convicted of the
sale of narcotics and was sentenced to five years (3 years suspended) and served two years in
prison. His incarceration was followed by three years' probation beginning after his release in
1997. He had one year of probation remaining in January 1999. (Ex. 53, Pearson Dep. 45:3-
46:13, Sept. 20, 2019).

218.    In 1998, Pearson was the father of two twin children. He met the mother of his
children when he was released from prison in 1997, and within 30 days she was pregnant. The
twins were born in June 1998. (Ex. 53, Pearson Dep. 45:3-8, Sept. 20, 2019; Ex. 109, Pearson
Dep. 263:21-264:1, Oct. 30, 2019).

219.    In January 1999, the twins' mother was arrested on a warrant from South Carolina
and was serving a sentence in a prison in Niantic, Connecticut.  Pearson took care of the twins
with his mother and a babysitter. (Ex. 53, Pearson Dep. 45:12-23, Sept. 20, 2019; Ex. 109,
Pearson Dep. 266:19-267:7, Oct. 30, 2019).

220.    In January 1999, while on probation, Pearson was selling and smoking weed, which could have caused his probation to be violated, but he knew how to clean his urine. (Ex. 53, Pearson Dep. 46:20-47:9, Sept. 20, 2019).

221.    Pearson believed he was a suspect in the Deli robbery/homicide because detectives told him that two witnesses from the Deli identified him as being at the store before and after the crime. He lived a short distance away and fit the description of the robbers at 6' tall, 240 pounds. (Ex. 53, Pearson Dep. 65:3-66:1, Sept. 20, 2019; Ex. 109, Pearson Dep. 173:17-174:6, Oct. 30, 2019).

222.    Pearson believed that being a suspect in a robbery/homicide constituted a violation of probation, which would mean he could serve an additional three years in prison. (Ex. 109, Pearson Dep. 174:12-175:3, Oct. 30, 2019).

223.    Pearson's testimony at Horn and Jackson's criminal trial was consistent with the taped transcribed statements he gave on February 3 and 5 to Dease and Breland. Pearson testified that:

a.    Yogi and Horn came to his porch on January 25, 1999, at around 11:00 a.m. (Ex. 12, Crim. Trial Tr., 184:11-20, Apr. 4, 2000).

b.    Horn told Pearson about having sex with Zaneta the day before. (Ex. 12, Crim. Trial Tr.,186:14-187:7, Apr. 4, 2000).

c.    Horn let Pearson use a cell phone to call Sykes from Pearson's porch. (Ex. 12, Crim. Trial Tr., 188:3-190:21, Apr. 4, 2000).

d.    Pearson identified Horn in Court and also identified a photo of Horn he signed during each police interview. (Ex. 12, Crim. Trial Tr., 202:5-205:21, Apr. 4, 2000).

e.    On February 9, Pearson went to the police station with his mother because he was tired of the questioning. (Ex. 12, Crim. Trial Tr., 206:12-27, Apr. 4, 2000).

f.    On February 9, Pearson identified a photo of Horn again and he also identified a photo of Yolanda Jenkins. (Ex. 12, Crim. Trial Tr., 209:21-210:13, Apr. 4, 2000).

g.    Pearson testified that he was interviewed three times about the stolen phone and that the police were harassing him. (Ex. 12, Crim. Trial Tr., 221:7-11, 222:19-21, Apr. 4, 2000; Ex. 110, Crim. Trial Tr., 31:21-27, 95:16-18, Apr. 5, 2000).

h.    Pearson called Sykes after he was interviewed by police and Sykes told him she remembered him calling her about her birthday party. (Ex. 110, Crim. Trial Tr., 25:6-17, 103:4-104:6, Apr. 5, 2000).

i.    Pearson denies telling Dease that he was reluctant to identify Horn because he did not want to "rat out" anybody. (Ex. 12, Crim. Trial Tr., 222:3-223:15, Apr. 4, 2000).

j.    When police began questioning Pearson about the stolen cell phone, he thought he was a suspect. (Ex. 110, Crim. Trial Tr., 10:26-11:6, 23:8-16, Apr. 5, 2000).

k.    Pearson did not remember calling Sykes until police showed him the records from the stolen phone. (Ex. 110, Crim. Trial Tr., 23:17-25:5, Apr. 5, 2000).

l.    Pearson further testified, "They [police] made it clear – they made it clear that I used the cell phone. They made it clear that the numbers on here is identification of my porch and they made it clear that he [Horn] was there that – while I knew he was there that morning, I was talking to him. They told me if I didn't get a phone from him, I took it from the scene which I didn't take it from the scene, sir." (Ex. 110, Crim. Trial Tr., 74:15-22 Apr. 5, 2000).

m.    Pearson further testified, "They [police] asked me first and then they made it clear, they made me – they let me know that they know I made the call." (Ex. 110, Crim. Trial Tr., 102:10-12, Apr. 5, 2000).

224.    In 2006, Pearson was in Cheshire Correctional Facility, where he encountered Jackson, who told Pearson to tell the truth. (Ex. 40, Horn *Habeas* Trial Tr., 84:15-85:15, 118:17-24, Mar. 12, 2013).

225.    Shortly after meeting Jackson, and while still in prison, Pearson wrote an affidavit in front of Jerry O'Donnell, an investigator working for Jackson's defense team. (Ex. 40, Horn *Habeas* Trial Tr., 91:26-94:9, 125:3-126:16, Mar. 12, 2013; Ex. 111, Pearson Dep. Ex. 4 (Pearson Aff., Apr. 11, 2006).

226.    In the affidavit, Pearson does not allege that he was coerced during his January 26, 1999 interview with Dease and Breland. Pearson states that he told the truth about the events of January 24, 1999. (Ex. 109, Pearson Dep. 293:21-294:9, Oct. 30, 2019).

227.    At deposition in these lawsuits, Pearson testified he was interviewed a total of 6 times by both Dease and Breland Some of the interviews took place at Pearson's home and some at police headquarters. (Ex. 53, Pearson Dep. 52:6-18, Sept. 20, 2019; Ex. 109, Pearson Dep. 189:17-24, Oct. 30, 2019).

228.    Pearson further testified that before his statement was tape recorded, he repeatedly told detectives there was no cell phone and no call was made to Sykes. (Ex. 53, Pearson Dep. 52:18-25, 56:1-14, 71:1-18, Sept. 20, 2019).

229.    Pearson testified that detectives rewound the tape and recorded over statements he made that the detectives did not want to hear. (Ex. 53, Pearson Dep. 58:17-59:10, Sept. 20, 2019).

230.    When Pearson was interviewed at police headquarters during the investigation, he felt he was in custody and that he was going to jail. (Ex. 53, Pearson Dep. 60:8-62:14, Sept. 20, 2019).

231.    Pearson testified to the following at Jackson's *Habeas* hearing in 2011; Horn's *Habeas* hearing in 2013, and his deposition in 2019.

a.    Dease and Breland told Pearson, "The evidence shows that either he [Horn] let you use it [the cell phone], or you took it from the crime scene. Which one is it?" (Ex. 53, Pearson Dep. 66:9-67:4, Sept. 20, 2019);

b.    Dease and Breland told Pearson that he either admit Horn let Pearson use the phone or Pearson was going to face charges for robbery and murder. (Ex. 53, Pearson Dep. 67:23-68:7, 74:9-11, Sept. 20, 2019);

c.    Dease and Breland came up with the idea of Horn giving Pearson the cell phone to call Crystal Sykes because he and Sykes knew each other. (Ex. 53, Pearson Dep. 72:5-12, Sept. 20, 2019);

47

d.     Pearson's probation officer called him and said she had knowledge of the situation and if Pearson did not cooperate and give a statement to detectives, she would violate his probation and that he could lose his kids to DCFS, which his probation officer unequivocally denies. (Ex. 53, Pearson Dep. 75:5-76:3, Sept. 20, 2019; Harris Dep. 18:2-22:6, Jan. 24, 2020);

e.     Dease and Breland also threatened to violate his probation and he would lose his children (Ex. 53, Pearson Dep. 76:7-25, Sept. 20, 2019).;

f.     The idea of Horn giving Pearson a cell phone and calling Sykes came from the detectives. (Ex. 53, Pearson Dep. 72:5-8, Sept. 20, 2019);

g.     Detectives told Pearson that if he did not cooperate with the statement, his mother would be charged with perjury. (Ex. 53, Pearson Dep. 78:11-16, Sept. 20, 2019);

h.     Detectives told him that his children's mother was in prison, if he were charged, Pearson believed the State would take his children and put them in foster care. (Ex. 53, Pearson Dep. 77:1-20, Sept. 20, 2019);

i.     He felt pressure thinking of himself and his family. (Ex. 53, Pearson Dep. 86:4-25, Sept. 20, 2019);

j.     Pearson concluded, "I lied for my freedom and my children's wellbeing." (Ex. 53, Pearson Dep. 87: 13-16, Sept. 20, 2019).

232.    Pearson stated that his mother was present at the February 9 interview at the station. Dease and Breland said that if he did not tell then what they wanted to hear, he was not going to walk out of there that day. (Ex. 53, Pearson Dep. 82:13-15, Sept. 20, 2019).

### *Kendall Thompson Recants*

233.    Prior to January 24, 1999, Thompson had four to six criminal adjudications as a juvenile and was on adult probation at the time for a fight at school. (Ex. 26, Thompson Dep. 101:3-20, 178:5-22, 180:1-181:2, Oct. 3, 2019).

234.    Thompson witnessed the Deli robbery/murder when he walked into the Deli during the crime. He was 19 years old. (Defs.' Rule 56a Statement, *supra* ¶¶19-22 at 5-6; Ex. 26, Thompson Dep. 119:23-120:14, 127:16-23, 135:11-24, Oct. 3, 2019).

235.    Thompson fled the Deli when two gunmen went to the back of the store. He left the scene with a friend who was waiting outside in a car. Thompson went to his friend's home without calling the police. (Ex. 12, Crim. Trial Tr., 81:25-82:10, 83:14-84:10, 85:11-16, 98:2-4, Apr. 4, 2000; Ex. 26, Thompson Dep. 105:3-17, Oct. 3, 2019, Ex. 113, Thompson Statement 2, PL0013523, Jan. 26, 2012).

236.    A couple of days later, Dease and Breland arrived at Thompson's home to interview him at the police station. Thompson had described the Deli robbery to his friend, Shamar Madden. Madden assisted the detectives by showing them where Thompson lived. (Ex. 12, Crim. Trial Tr., 85:22-86:11, 100:20-101:10, Apr. 4, 2000; Ex. 26, Thompson Dep. 26:12-27:14, Oct. 3, 2019; Ex. 35, Dease Report 7, NH000019, Jan. 29, 1999; Ex. 113, Thompson Statement 3, PL0013524, Jan. 26, 2012).

237.    Thompson initially refused to cooperate. The detectives threatened to arrest Shamar Madden if Thompson did not come to the station. Thompson's aunt was also home when the detectives arrived and encouraged Thompson to cooperate. (Ex. 12, Crim. Trial Tr., 100:20-101:10; 113:14-23, Apr. 4, 2000; Ex. 26, Thompson Dep. 27:21-28:23, 32:2-33:23, 135:11-136:13, Oct. 3, 2019).

238.    On the way to the station, the detectives dropped off Shamar Madden at his home. According to Thompson, he was taken to the police station for a two-hour interview that was conducted in a police interview room. (Ex. 12, Crim. Trial Tr., 102:4-103:3, 147:20-148:12, Apr. 4, 2000; Ex. 26, Thompson Dep. 53:14-54:24; 114:4-14, 137:13-138:21, Oct. 3, 2019).

239.    Dease and Breland explained to Thompson that he was not a suspect and was not under arrest, however, Thompson claimed he was still scared. (Ex. 12, Crim. Trial Tr., 101:16-22, 104:5-10, 114:7-17, Apr. 4, 2000; Ex. 26, Thompson Dep. 136:17-19, Oct. 3, 2019).

240.     At the criminal trial, Thompson testified that he did not tell the detectives he could identify anyone, and he was surprised Dease showed him a photo array. (Ex. 12, Crim. Trial Tr., 106:7-107:11, 115:19-23, Apr. 4, 2000).

241.     Thompson looked at the photo array and pointed to Horn because Horn's eyes and mouth looked like the yellow eyes and mouth of the robber, not because he saw Horn in the Deli during the robbery. (Ex. 12, Crim. Trial Tr., 105:24-106:3, 108:17-110:7, 143:20-146:10, Apr. 4, 2000).

242.     Thompson picked out Jackson because he recognized Jackson from seeing him on the basketball court. Thompson could not say that Jackson was in the Deli during the robbery. (Ex. 12, Crim. Trial Tr., 118:6-119:7, 121:11-20, Apr. 4, 2000; Ex. 26, Thompson Dep. 47:14-48:4, Oct. 3, 2019).

243.     At the criminal trial, Thompson testified he was not certain of his identifications. (Ex. 12, Crim. Trial Tr., 91:1-92:12, Apr. 4, 2000).

244.     Thompson testified at the criminal trial that police officers did not pressure him, and he did not say what the officers wanted to hear. (Ex. 12, Crim. Trial Tr., 144:6-145:14, Apr. 4, 2000).

245.     On January 26, 2012, Thompson was in prison for drug trafficking, when he was interviewed by "three attorneys." (Ex. 26, Thompson Dep. 12:5-19, 14:9-20, Oct. 3, 2019).

246.     On that date, Thompson signed a written statement, prepared by one of the "attorneys" on stationary with the heading "Bulldog Investigations." Thompson claimed in his statement that he was pressured by Dease and Breland to make an identification. He claimed Dease and Breland threatened to violate his probation if he did not cooperate. (Ex. 26, Thompson Dep. 55:14-57:8, Oct. 3, 2019; Ex. 16, Breland Dep. 157:5-24, Dec. 16, 2019; Ex. 114, Thompson Dep. Ex. 21, at 4).

247.    However, Thompson's written statement does not state that Thompson told police that he could not identify anyone. (Ex. 114, Thompson Dep. Ex. 21).

248.    Breland testified at deposition in these lawsuits that Thompson said he could not identify the offenders "maybe twice," but Breland clarified that Thompson said he could make a partial identification "based on [the offender's] nose and complexion and the eye content." (Ex. 16, Breland Dep. 159:13-160:4, 162:3-15, Dec. 16, 2019).

249.    At his October 2019 deposition in these consolidated lawsuits, Thompson claimed that when Dease and Breland came to his house, they told him and his aunt that they could get a warrant for his arrest if he did not voluntarily come to the police station. (Ex. 26, Thompson Dep. 27:21-30:23, Oct. 3, 2019).

250.    At deposition, Thompson stated he told detectives "about 18 times" that he could not make an identification. (Ex. 26, Thompson Dep. 57:20-58:10, Oct. 3, 2019; Ex. 16, Breland Dep. 158:23-160:9, Dec. 16, 2019).

251.    Thompson does not fault the officers for asking about the mouth and eyes or that they kept coming back to it, since that was all he saw. (Ex. 26, Thompson Dep. 120:13-121:14, 124:18-125:3, Oct. 3, 2019).

252.    At deposition, Thompson stated he did not feel pressure by the police when testifying at trial and confirmed that he told the truth at trial. (Ex. 26, Thompson Dep. 68:11-19, 116:9-20, Oct. 3, 2019).

253.    At deposition, Thompson confirmed that he told the truth in the transcribed statement from January 26, 1999 taken by the police. (Ex. 26, Thompson Dep. 119:11-22, Oct. 3, 2019).

***Admitted Facts***

254.    At all relevant times, Dease, Adger, and Breland acted in accordance with the policies, procedures, custom and practices at the NHPD. (Ex. 115, Def. Adger's Resps. to Pl.'s Second Consolidated Reqs. for Admis. and Interrogs. ¶1, Oct. 14, 2020; Ex. 116, Def. Breland's Resps. to Pl.'s Second Consolidated Reqs. for Admis. and Interrogs. ¶1, Oct. 14, 2020; Ex. 117, Def. Dease's Resps. to Pl.'s Second Consolidated Reqs. for Admis. and Interrogs. ¶1, Oct. 14, 2020).

255.    At all relevant times, Dease, Adger, and Breland acted within the scope of their employment as employees of the NHPD. (Ex. 115, Def. Adger's Resps. to Pl.'s Second Consolidated Reqs. for Admis. and Interrogs. ¶2;  Ex. 116, Def. Breland's Resps. to Pl.'s Second Consolidated Reqs. for Admis. and Interrogs. ¶2; Ex. 117, Def. Dease's Resps. to Pl.'s Second Consolidated Reqs. for Admis. and Interrogs. ¶2).

Respectfully submitted,

NIELSEN, ZEHE & ANTAS, P.C.

_____
Jeffrey R. Zehe

Jeffrey R. Zehe
Bradford S. Krause
NIELSEN, ZEHE & ANTAS, P.C.
55 W. Monroe, Suite 1800
Chicago, Illinois 60603
(312) 322-9900
*jzehe@nzalaw.com*
*bkrause@nzalaw.com*
*Attorneys for Defendants Leroy Dease,*
*Petisia Adger, and Daryle Breland*