## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARQUIS JACKSON, | : | NO.: 3:19-CV-00388 (RNC) |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF NEW HAVEN, ET AL. | : | |
| | : | |
| *Defendants*. | : | JUNE 14, 2021 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
## LEROY DEASE, PETISIA ADGER, AND DARYLE BRELAND

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, and Local Rule 56, Defendants, Leroy Dease, Petisia Adger, and Daryle Breland have moved for Summary Judgment as to Counts I, II, III, IV, VII, VIII, and XI of Plaintiff's Amended Complaint dated April 24, 2020, and hereby submits this Memorandum of Law in Support of such motion.

## STATEMENT OF UNDISPUTED FACTS

### 1)      *The Dixwell Deli Robbery/Homicide*

On January 24, 1999, at approximately 3:26 a.m., Vernon Horn ("Horn") and Marquis Jackson ("Jackson"), along with Steve Brown ("Brown"), set out to rob the Dixwell Deli ("the Deli") on Dixwell Avenue in New Haven. They were wearing masks and carrying handguns. (Defs.' Rule 56a Statement ¶125(e)-(f), at 27). Horn began firing upon entering the Deli. (Defs.' Rule 56a Statement ¶125(g), at 27). One bullet struck Caprice Hardy ("Hardy"), a customer, killing him. A second bullet struck Abbey Yousif ("Yousif"), an owner of the Deli, in the shoulder. (Defs.' Rule 56a Statement ¶3, at 1-2). The gunmen were unable to open the register, but Horn grabbed an employee's cell phone, and they took cash from another employee. The three heard a siren and they all fled. (Defs.' Rule 56a Statement ¶¶3-11, at 1-4).

2)      *The Investigation and Crime Scene*

That morning, the Deli homicide was assigned to Detective Leroy Dease ("Dease"). Dease had been a New Haven police officer for 31 years and was a senior detective in the NHPD Investigative Services Division having served for approximately 20 years. Dease retired from the NHPD on April 23, 1999. He then began employment as an inspector for the New Haven Judicial District State's Attorney's Office. (Defs.' Rule 56a Statement ¶12, at 4).[1] Detective Petisia Adger ("Adger") had been a detective since 1993. She worked on six homicide cases prior to January 1999. She was promoted to Sergeant in 2000, Lieutenant in 2008, and Assistant Chief of Police in 2011. (Defs.' Rule 56a Statement ¶13, at 4). Detective Daryle Breland ("Breland") was also assigned to the investigation. Breland was a New Haven police officer for 21 years and a detective for 16 years. Breland's role in the Deli investigation was limited to assisting with witness interviews. (Defs.' Rule 56a Statement ¶14, at 4).

Shortly after the crime, Dease and Adger learned that at approximately 3:26 a.m. on January 24, 1999, a taxi pulled up in front of the Deli with Caprice Hardy and Shaquan Pallet. They were friends that had been working at TGI Friday's in Hamden. (Defs.' Rule 56a Statement ¶2, at 1). Their manager had called a taxi for them. At Hardy's request, the taxi drove them to the Deli to buy cigarettes. (Defs.' Rule 56a Statement ¶¶1, 2, at 1). They entered the Deli, and after Hardy gave cigarettes to Pallet, Pallet returned to the taxi. (Defs.' Rule 56a Statement ¶135, at 29). Hardy remained in the Deli. (Defs.' Rule 56a Statement ¶2, at 1).

Moments later, Horn, Jackson and Brown stormed into the Deli. Horn entered first and immediately fired shots with a 9mm gun in the direction of the cash register. Store co-owner Yousif was wounded in the shoulder and Hardy was killed. (Defs.' Rule 56a Statement ¶¶3, 125

---

[1] During the pendency of these lawsuits, Leroy Dease suffered from cancer and debilitating strokes. After a confidential psychological evaluation, it was stipulated by the parties that his condition would not permit him to testify at deposition or trial. (Stipulation, ECF No. 149, Mar. 19, 2020).

(e)-(g), at 1-2, 27-28). After being struck, Yousif laid on the floor playing dead. (Defs.' Rule 56a Statement ¶3, at 1-2). Three other people were in the Deli when Horn, Jackson, and Brown entered. One person was a Deli employee, who fled to the basement storeroom and tripped and fell down the stairs. The second was a homeless man, who hung around the store and sometimes did odd jobs. He ran to the back of the store to hide. The third was Vernon Butler ("Butler"), an associate of Yousif, who was asleep in a chair in the office located at the back of the store. (Defs.' Rule 56a Statement ¶4, at 2).

After Horn shot Hardy and Yousif, Jackson hopped over the counter and attempted to open the cash register. (Defs.' Rule 56a Statement ¶125 (h), at 27). When he could not open it, one of the robbers said, "[g]et the nigga in the back." (Defs.' Rule 56a Statement ¶7, at 2-3). Horn and Brown then went to the office at the back of the store where Butler was sleeping. (Defs.' Rule 56a Statement ¶114 (h), at 24). Horn hit Butler on the head with the butt of a gun and searched for money. No money was found, but Butler's cell phone and pager were taken. (Defs.' Rule 56a Statement ¶¶7, 114 (j) at 2-3, 24). While in the office, Brown rifled through cigar boxes on the desk, looking for money. (Defs.' Rule 56a Statement ¶125 (k), at 27).

Horn then led Butler to the front of the store to open the cash register. (Defs.' Rule 56a Statement ¶¶7, 125 (j), at 24, 27). However, Butler was unable to open the register because it was jammed. (Defs.' Rule 56a Statement ¶7, at 2-3). When Butler could not open the register, a gunman took $2,000 in cash from Yousif's pockets. (Defs.' Rule 56a Statement ¶8, at 3). Before Butler could get the cash register open, the robbers heard an ambulance siren. Believing the police were approaching, Horn, Jackson and Brown fled the scene. Butler then called 911 at 3:32 a.m. (Defs.' Rule 56a Statement ¶11, at 3-4).

*3)*   ***Witness Interviews***

Two other witnesses entered the Deli during the crime. Kendall Thompson ("Thompson"), a young man from the neighborhood was the first to enter. Horn, the masked gunman standing near the door, pointed a gun at Thompson, ordered him on the floor, and took the dollar from his hand. (Defs.' Rule 56a Statement ¶5, at 2). Thompson explained that the gunman standing near the entrance door and the gunman behind the counter were wearing black hoodies and black masks. (Defs.' Rule 56a Statement ¶10, at 3). Thompson escaped from the store when two of the assailants went to the back of the store. (Defs.' Rule 56a Statement ¶235, at 47).

Around the same time, Regina Wolfinger ("Wolfinger") and Howard Roberts ("Roberts") drove up to the Deli, parking approximately 50 feet from the front of the Deli. Roberts entered the Deli to buy cigarettes with five dollars. When Roberts entered, the same gunman told Roberts to get on the floor. Roberts initially refused, but he eventually complied and gave the gunman his five dollars. (Defs.' Rule 56a Statement ¶6, at 2).

Wolfinger remained in the car. She had been drinking and taking drugs earlier that night. She told police that she saw three men walk out of the Deli. One of the men jumped into a car and fled (this was later determined to be Thompson). The other two men exited the Deli, removed their masks, talked to each other, and ran down the street. She described the two men as "light-skinned." Roberts then returned to the car, and they drove away. (Defs.' Rule 56a Statement ¶21, at 5).

Police were dispatched to the Deli where they encountered Horn and Zaneta Berryman ("Zaneta") standing outside. Horn and Zaneta and other bystanders were told to remain there to be interviewed. At that time, Zaneta became upset when she learned Yousif had been shot. Horn responded, "[f]uck that nigger. He ain't nobody." (Defs.' Rule 56a Statement ¶¶58, 59, at 12).

Captain Verrelli questioned Horn and Zaneta outside the Deli. Captain Verrelli reported that Horn was reluctant to provide his name. Zaneta told the detectives that Horn was going to give a false name because he was on parole, however, Zaneta convinced him to give his real name. Horn responded, "I'm not worried, you're my alibi anyway. I was with you." (Defs.' Rule 56a Statement ¶60, at 12).

Officer Ferraro spoke with Horn and Zaneta and reported that "Vernon Horn and Zaneta initially told Captain Verrelli that they saw the subjects run out of the Deli." However, after waiting at the scene for a while, they said "they really didn't see anything and had to leave." After speaking with Officer Ferraro, Horn and Zaneta were permitted to leave the scene. (Defs.' Rule 56a Statement ¶59, at 12).

On January 25, 1999, Dease and Adger interviewed Yousif. Yousif began work on January 24, 1999, at 3:10 a.m., about 20 minutes before the robbery. Yousif knew Horn and Jackson generally, as they were regular customers. He did not see Horn or Jackson come into the Deli that morning before the robbery. (Defs.' Rule 56a Statement ¶28, at 7). Yousif last saw Horn and Jackson in the Deli the previous Thursday, at which time they looked around the Deli. While they were in the Deli, Yousif heard Horn say to Jackson, "[y]ou were right, you were right." Horn also told Yousif that Jackson was his brother. (Defs.' Rule 56a Statement ¶29, at 7).

Detectives interviewed eyewitness Wolfinger on January 24, 1999. Wolfinger confirmed in a taped transcribed statement that shortly after Howard entered the Deli, two black men exited and stood outside for a couple of minutes before fleeing on foot.  She was shown a photo array that included Horn and seven other men. She identified Horn, who she was "pretty positive" she saw outside the Deli, stating "[p]ossibly, yes. He looks pretty familiar." At trial, Wolfinger testified she was 75% sure of her identification. (Defs.' Rule 56a Statement ¶21, at 5-6).

Dease and Adger then talked to Thompson on January 26, 1999. (Defs.' Rule 56a Statement ¶23, at 6). Thompson refused to contact the police because he was scared, but he had told a friend about the incident. (Defs.' Rule 56a Statement ¶236, at 47). Later that day, Thompson's friend came to his house with the detectives. Thompson's aunt and friend convinced Thompson to go to the police station to be interviewed. (Defs.' Rule 56a Statement ¶237, at 48). Because of his apprehension, Thompson is referred to as "K.T." in the police reports to conceal his identity. (Defs.' Rule 56a Statement ¶22, at 6).

During his interview, Thompson was shown a photo array. From the array he identified Jackson based on Jackson's complexion, as the offender attempting to open the cash register. Thompson recognized Jackson from the neighborhood. (Defs.' Rule 56a Statement ¶24, at 6). He also identified Horn as the gunman who ordered him to get on the floor. Thompson's identification of Horn was based on the gunman's yellow eyes and mouth which were not covered by the mask. (Defs.' Rule 56a Statement ¶23, at 6). However, he was not 100% positive about either identification. (Defs.' Rule 56a Statement ¶24, at 6). Thompson's identifications were presented during the criminal trial. During cross-examination, Thompson conceded that he identified the photos of Jackson and Horn because the photos were of people he recognized, and because Jackson's complexion and Horn's eyes and mouth were similar to the offenders. He claimed he did not select Horn and Jackson's photos because he recognized them from the robbery. (Defs.' Rule 56a Statement ¶¶241, 242, at 48). Wolfinger's and Thompson's identification were challenged at trial with Motions to Suppress, which were denied. (Defs.' Rule 56a Statement ¶26, at 6). Thompson also stated that the robbers wore black hoodies. (Defs.' Rule 56a Statement ¶25, at 6).

### 4)   *Horn Offers an Incomplete Alibi*

Horn and Jackson fit the general description of the robbers. (Defs.' Rule 56a Statement ¶¶16-17, at 4-5). Additionally, because Horn and Jackson were familiar with the Deli, and because of Wolfinger's partial identification of Horn, they were interviewed as part of the investigation.

On January 25, 1999, Dease interviewed Horn. Horn reluctantly came to the police station with his sister. (Defs.' Rule 56a Statement ¶37, at 8). During the interview, Horn claimed that on January 23, 1999, he and Jackson went to a club in downtown New Haven at 11:00 p.m. (Defs.' Rule 56a Statement ¶38, at 8). They left the club when it closed at 2:00 a.m. Jackson met his girlfriend, Tesha Smith ("Smith"), at the club and he intended to spend the night with her. (Defs.' Rule 56a Statement ¶38, at 8). From the club, Horn drove Jackson in a gray vehicle to the Athenian Diner, but they decided not to eat. They then drove past a party in the neighborhood and observed Zaneta standing outside. (Defs.' Rule 56a Statement ¶39, at 9). Horn knew Zaneta from the neighborhood, and they saw each other periodically. (Defs.' Rule 56a Statement ¶40, at 9). Horn offered to drive Zaneta to her boyfriend, Marcus Pearson's house. Pearson was also a friend of Horn's. She agreed and got in the car. (Defs.' Rule 56a Statement 41, at 9). Zaneta asked Horn if the car was stolen or a "basehead" rental (a car "rented" from someone who needs drug money). Horn said the car was not stolen or a basehead rental. Zaneta asked because of the type of person Horn was. (Defs.' Rule 56a Statement ¶42, at 9).

Horn then drove to the Deli at approximately 2:45 a.m. (Defs.' Rule 56a Statement ¶43, at 9). Horn and Jackson entered the Deli and Horn bought a soda, loose cigarettes, and condoms. Jackson got change for a dollar and went across the street to use a payphone to call Smith. Zaneta stayed in the car. (Defs.' Rule 56a Statement ¶44, at 9-10). When Horn exited the Deli, he

saw Pearson, who was getting a ride home after buying food at the Deli. Horn and Pearson chatted briefly. Horn did not tell Pearson he was with Zaneta and that Zaneta was sitting in his car. Saliem Al-Dubai ("Al-Dubai"), a Deli employee, heard Horn say to Pearson, "I will probably see you later." (Defs.' Rule 56a Statement ¶45, at 10). Horn then met Jackson at the car. As Horn entered, he threw the condoms at Zaneta, which angered her, and she threw them back at him. (Defs.' Rule 56a Statement ¶46, at 10).

The three of them drove to a rooming house Jackson rented, located at 235 W. Ivy Street, three blocks from the Deli. Horn told Zaneta the room was his. (Defs.' Rule 56a Statement ¶47, at 10). Jackson dropped off Horn and Zaneta at the rooming house, and then left in the car. (Defs.' Rule 56a Statement ¶48, at 10).

Horn and Zaneta went to the second floor of the house. Zaneta was on her menstrual cycle and immediately went to the bathroom. She asked Horn to get her tissue and she remained alone in the bathroom for approximately 10 to 20 minutes. (Defs.' Rule 56a Statement ¶49, at 10). After Zaneta locked the bathroom door, she heard a padlocked door on an adjoining room unlock. She then heard Horn enter the adjoining bedroom and walk down the stairs. (Defs.' Rule 56a Statement ¶50, at 11).

When Zaneta was finished in the bathroom, she did not see Horn. She called downstairs for him three times and got no response. Finally, someone on the first floor yelled for Horn out the front door and Horn returned from outside. (Defs.' Rule 56a Statement ¶51, at 11). Horn was wearing a black and red Avirex jacket when they arrived at the apartment, but when Zaneta saw Horn later, he was wearing a black hoodie. Jackson was also wearing a black hoodie prior to the robbery. (Defs.' Rule 56a Statement ¶52, at 11). It only takes about one minute to run to the Deli from Jackson's apartment. (Defs.' Rule 56a Statement ¶61, at 13).

8

After exiting the bathroom, Zaneta noticed she had messages from Pearson on her pager and decided to call him. Horn borrowed a cordless phone from the owner of the rooming house. (Defs.' Rule 56a Statement ¶52, at 11). Zaneta called Pearson, but Horn grabbed the phone from her and hung up. Zaneta called back, and this time, Horn took the phone and told Pearson that he would walk Zaneta back to Pearson's house. They agreed to meet at the Deli. (Defs.' Rule 56a Statement ¶54, at 11). Horn then chased Zaneta around the apartment wearing a condom. However, she refused to have sex with him. (Defs.' Rule 56a Statement ¶53, at 11). Horn told Dease he had sex with Zaneta at Jackson's apartment. (Defs.' Rule 56a Statement ¶62, at 13). Zaneta denied having sex with Horn. (Defs.' Rule 56a Statement ¶63, at 13). Horn never mentioned that he left the apartment before he walked to the Deli with Zaneta. (Defs.' Rule 56a Statement ¶58, at 12).

On February 1, 1999, detectives again interviewed Horn. Horn was incarcerated for a probation violation for possession of a firearm for which he served 8 months in juvenile detention. (Defs.' Rule 56a Statement ¶¶36, 64 at 8, 13). In talking to Dease, Horn repeated that he arrived at the Deli to purchase a Pepsi and two loosies (single cigarettes) and that Horn spoke to Yousif about the $15.00 he owed him. (Defs.' Rule 56a Statement ¶64, at 13). However, Yousif did not arrive at the Deli for work until 3:10 a.m. Yousif testified he did not see Horn before the robbery. (Defs.' Rule 56a Statement ¶28, at 7). Horn, Jackson, and Zaneta were at the Deli at 2:45 a.m. and they had purportedly left before Yousif arrived. (Defs.' Rule 56a Statement ¶43, at 9). The only way Horn would know Yousif was at the store was if Horn saw him after 3:10 a.m. – during the robbery.

During the same interview, Horn volunteered that after his release from prison in November 1998, he borrowed a Tech-9 automatic handgun from someone at the housing project

where he sold drugs. Detectives interviewed another witness who confirmed he saw Horn with a Tech-9 a month before the robbery. (Defs.' Rule 56a Statement ¶65, at 13).

### 5) *Jackson's Uncorroborated Alibi*

Jackson had known Horn since they were 10 years old and saw each other every day. (Defs.' Rule 56a Statement ¶35, at 8). They hung out, chased girls, and got into bars underaged. (Defs.' Rule 56a Statement ¶66, at 14). Jackson had sold marijuana since 1998, and Jackson knew Horn sold crack cocaine. (Defs.' Rule 56a Statement ¶67, at 14). Jackson and Horn were arrested together for felony conspiracy to sell drugs on January 2, 1999, and the charges were pending during the Deli investigation. (Defs.' Rule 56a Statement ¶¶34, 35, 68, at 8, 14).

On January 25, 1999, Adger and another detective interviewed Jackson. His chronology of the events was similar to Horn's. Jackson added that they ate at the Athenian Diner, and they arrived at the Deli at 3:30 a.m. (Defs.' Rule 56a Statement ¶69, at 14). After Jackson dropped off Horn and Zaneta at his apartment, Jackson stated he went to his mother's house to retrieve some belongings and was paged by Tesha Smith, who he called back. (Defs.' Rule 56a Statement ¶70, at 14). Jackson said after he called Smith, he returned to the rooming house and exchanged keys with Horn at 4:15 a.m. He then drove to Smith's house and stayed with her for the reminder of January 24, 1999. (Defs.' Rule 56a Statement ¶71, at 14). During the interview with Jackson, Adger called Smith. Smith stated she was with Jackson at the Alley Cat Club until 1:45 a.m. She then went home, and Jackson arrived at her home 10 minutes later, where they spent the remainder of the day together. (Defs.' Rule 56a Statement ¶72, at 14).

The next day, on January 26, police interviewed Marcus Pearson ("Pearson"). Pearson admitted he was at the Deli before the robbery. He also admitted he saw and talked to someone outside the Deli before the murder, but Pearson did not recall who he spoke to or what was

discussed. Police learned from Al-Dubai that Pearson had talked to Horn outside the Deli minutes before the crime. (Defs.' Rule 56a Statement ¶¶88, 89, at 19). Pearson also confirmed that he received calls from Zaneta at approximately 3:30 a.m. and that Horn was on the call, but the calls could have been received as late as 3:45 a.m. (Defs.' Rule 56a Statement ¶¶55, 88, at 11, 19).

On January 27, 1999, Dease and Breland interviewed Mesha Forbes ("Forbes"). Forbes was the sister of the victim, Caprice Hardy. Forbes knew Horn and Jackson prior to the Deli robbery. Forbes stated that on January 24, 1999, she was outside a friend's house with Lena Graham ("Graham") when Horn and Jackson drove up in a small gray car. Horn told Forbes that they knew about the robbery because they drove by the Deli when the robbery occurred, and that Horn heard gunshots. She later gave a transcribed statement on February 17, 1999. (Defs.' Rule 56a Statement ¶30, at 7). The detectives also interviewed Graham. Graham had known Horn and Jackson for six years. She was with Forbes when Horn and Jackson drove up to them on January 24, 1999. Graham heard Horn say that he and Jackson drove by the Deli when [the robbers] were shooting. (Defs.' Rule 56a Statement ¶31, at 7-8).

### 6)    *The Stolen Cell Phone Investigation*

On February 2, the detectives obtained the call detail record of Butler's stolen cell phone from Omnipoint Communications (depicted below). The call detail record revealed that five calls were made in the two days after the murder before the phone's service was discontinued. (Defs.' Rule 56a Statement ¶¶74, 75, at 15-16).

ON-LINE CALL DETAIL INQUIRY
COMPANY 0840 OMNIPOINT COMMUNICATIONS,   SRVA/SLOC 0001 0001 84/NEW YORK
IMSI/MOBILE # 310160100400239 DATE RANGE FROM 01 / 12 / 99   THRU 01 / 25 /
TOTAL CALLS 00047          TOTAL MINUTES 00093          TOTAL CHARGES      0

| DATE | TIME | CALLED PLACE | CALLED NUMBER | MINS | AMOUNT | TYP | ORIG | ESN |
|------|------|--------------|---------------|------|--------|-----|------|-----|
| 01-24 | 04:14A | BRIDGEPORTCT | 203-395-6641 | 1 | .00 | H/A | 61923 | 0203435 |
| 01-24 | 10:48P | BRIDGEPORTCT | 203-375-4651 | 1 | .00 | H/A | 61922 | 0203435 |
| 01-25 | 10:40A | BRIDGEPORTCT | 203-696-1495 | 1 | .00 | H/A | 61923 | 0203435 |
| 01-25 | 11:07A | NEW HAVEN CT | 203-933-5833 | 4 | .00 | H/A | 60153 | 0203435 |
| 01-25 | 02:32P | BRIDGEPORTCT | 203-395-6641 | 1 | .00 | H/A | 60141 | 0203435 |

The first call at 4:14 a.m. on Sunday January 24 (45 minutes after the murder) and the fifth call at 2:32 p.m. on Monday January 25 were to a phone owned by Willie Sadler ("Sadler"), a drug dealer in Bridgeport. (Defs.' Rule 56a Statement ¶76, at 16). Dease, Adger, and Breland went to Sadler's house several times, but Sadler claimed he could not remember who called him. (Defs.' Rule 56a Statement ¶77, at 16). The second call, on Sunday January 24 at 10:48 p.m., was to Adrianne Younger ("Younger") in Bridgeport. Younger also said she could not remember who called her. (Defs.' Rule 56a Statement ¶78, at 16-17). The third call, on Monday January 25 at 10:40 a.m., was to Tameka Fuller ("Fuller"), a suspected drug dealer in Bridgeport and associate of Sadler. Fuller said she could not remember who called her. (Defs.' Rule 56a Statement ¶79, at 17).

The fourth call, on Monday January 25 at 11:07 a.m., lasted four minutes and was placed to a house in New Haven where a woman named Crystal Sykes ("Sykes") was a caretaker for an elderly couple living there. (Defs.' Rule 56a Statement ¶80, at 17). Dease, Adger, and Breland spoke to Sykes at the house. Sykes had known Pearson for months as he sold her marijuana. Sykes smoked marijuana daily. (Defs.' Rule 56a Statement ¶¶82, 85, at 18-19). Sykes said she received a call at that time, but she was not sure who called. During that period of time, Pearson had been calling her about attending her birthday party. She was uncomfortable continuing the

interview at her employer's home, so she and her mother went to the police station to further discuss the matter. (Defs.' Rule 56a Statement ¶¶81, 82, at 17-18).

At the station, Dease first conducted a pre-interview. A pre-interview is an interview with a potential witness during which the detective asks general questions to make the witness comfortable and find out if the witness has information that is relevant to the investigation. At the conclusion of the pre-interview, a tape-recorded statement may be taken. (Defs.' Rule 56a Statement ¶¶109-110, at 23). After Sykes' pre-interview, Dease conducted a tape-recorded statement with Sykes. A portion of the statement is as follows: (Defs.' Rule 56a Statement ¶83, at 18).

> Q:    Ms. Sykes, do you recall receiving a telephone call at that location [on January 25]?
>
> A:    No, I don't recall taking or receiving a phone call from Marcus [Pearson], but the paper said that he called. … I don't recall a man calling me or whoever called me at that particular time. I don't know even from yesterday who called me so…
>
> Q:    Ms. Sykes, so you're telling me that it's a good possibility that Marcus Pearson may have called you around [11:00] on 1/25/99?
>
> A:    Yes.

Adger, who was present during the pre-interview and the taped statement, explained that Sykes used the phrase "a good possibility" when describing her memory of the call in the pre-interview. Dease repeated the phrase in the taped interview. (Defs.' Rule 56a Statement ¶84, at 18). Sykes did not testify at the criminal trial, but at Horn's *habeas* hearing, Sykes testified that what she told the detectives in her recorded transcribed statement was true. (Defs.' Rule 56a Statement ¶86, at 19).

The next day, February 3, 1999, Breland and Dease followed up with an interview of Pearson at his home. (Defs.' Rule 56a Statement ¶90, at 20). In total, the detectives interviewed

Pearson on five separate occasions. Breland had previously interviewed Pearson on January 26 regarding Pearson's interactions with Zaneta and his visit to the Deli on January 24. (Defs.' Rule 56a Statement ¶88, at 19). Breland also met Pearson on January 28 at his home to follow up on information learned from Al-Dubai, a Deli employee, regarding the comment Horn made to Pearson in the Deli parking lot just prior to the robbery. However, the taped statement from Breland's interview of Pearson on January 28 was garbled and never transcribed. (Defs.' Rule 56a Statement ¶89, at 19).

During the February 3 interview, Pearson initially denied calling Sykes, but he eventually told them that Horn came to his house around 11:00 a.m. on January 25 with Horn's cousin, "Yogi" at approximately the time when the fourth phone call was made. Pearson said at that time he borrowed the stolen cell phone from Horn, and he called Sykes because he was upset when Horn told him he had sex with Zaneta. Pearson wanted to show Horn that he had another girlfriend. (Defs.' Rule 56a Statement ¶91, at 20). Pearson then returned the phone to Horn.

The detectives recognized that if Pearson called Sykes on the stolen cell phone from the porch with Horn present, Pearson had either obtained the cell phone from Horn or Pearson had taken it from the Deli. Dease knew Pearson had custody of two seven-month-old twins and was on probation. He advised Pearson that he was in some jeopardy and had a problem [if he went to jail]. (Defs.' Rule 56a Statement ¶¶98-99, at 21).

After the February 3, 1999 interview, Breland submitted Pearson's taped statement to be transcribed at the police station, but Breland never received the transcribed statement. Breland believed the tape was lost. Therefore, on February 5, 1999, Breland returned to Pearson's house to repeat the interview with a new tape. Pearson's mother was also home. (Defs.' Rule 56a Statement ¶92, at 20). In Pearson's February 5, 1999 taped statement, Pearson repeated his

14

previous statement that Horn lent him a cell phone on his porch, which he used to call Sykes. (Defs.' Rule 56a Statement ¶93, at 20).

On February 9, 1999, the detectives located a photo of Yogi, and Dease contacted Pearson and his mother to come to the station. At the station, Pearson and his mother identified Yogi as being on his porch at the time of the fourth phone call. (Defs.' Rule 56a Statement ¶¶94-96, at 20-21). Pearson also repeated his statement that Horn handed him the cell phone on his porch on January 25, 1999. (Defs.' Rule 56a Statement ¶97, at 21). Dease asked Pearson why he had been reluctant to identify Horn as the person who gave him the phone, and Pearson said that he did not want to "rat anyone out." (Defs.' Rule 56a Statement ¶97, at 21). Breland and Dease also spoke to Pearson's mother and Yogi.

### 7) *Steve Brown, the Third Gunman, Identifies Horn and Jackson*

Dease and Adger continued to press Sadler for information regarding the first and fifth phone call. Sadler repeatedly claimed he did not recall who had called him from the stolen cell phone. (Defs.' Rule 56a Statement ¶100, at 21-22). Finally, on March 4, they met with Sadler and William Newkirk ("Newkirk"). Newkirk was Sadler's friend and they sold drugs together. (Defs.' Rule 56a Statement supra ¶100, at 21-22). During the interview, Sadler finally admitted that "Steve" had called him, but Sadler did not know "Steve's" last name. (Defs.' Rule 56a Statement ¶102, at 22). Sadler added that "Steve" was the brother-in-law of another Bridgeport resident, Marlo Macklin ("Macklin"). Macklin was friends with Tamika Fuller, who had received the third call. (Defs.' Rule 56a Statement ¶102, at 22). Detectives learned from Macklin that Steve's last name was "Brown." (Defs.' Rule 56a Statement ¶103, at 22).

After obtaining Steve Brown's photo, Dease confirmed Brown's identification with Sadler. Dease then obtained Brown's fingerprints from the Bridgeport Police Department.

(Defs.' Rule 56a Statement ¶104, at 22). On March 5, 1999, Dease matched Brown's fingerprints with the fingerprints lifted from the Deli's back office. (Defs.' Rule 56a Statement ¶¶73, 104, at 15, 22). An arrest warrant was issued for Brown, and he was arrested at his home in Bridgeport on March 10. (Defs.' Rule 56a Statement ¶105, at 23).

Dease and Adger brought Brown to the NHPD to be interviewed. After Brown waived his Miranda rights, a pre-interview was conducted, and Brown gave a tape-recorded statement to the detectives. (Defs.' Rule 56a Statement ¶¶106, 109, at 23). During the pre-interview, the detectives did not share information about the investigation, did not tell him who to identify, and did not promise him anything for his statement. (Defs.' Rule 56a Statement ¶¶111-125 (n), at 23-28). Brown confessed, admitting he robbed the Deli with Horn and Jackson, who he picked out of photo line-up. (Defs.' Rule 56a Statement ¶107, at 23). Brown told detectives that he had met Horn and Jackson two or three times before January 24, 1999. Brown stated that he met Horn and Jackson at a Polish club in Bridgeport at midnight. They then drove to a "chick's house" in New Haven and decided to rob the Deli. Brown told the detectives he was given a scarf to wear across his face. He said, however, that he did not have a gun and that Horn forced him at gunpoint to participate in the robbery. Horn had a 9mm Beretta and did all the shooting.

Consistent with witness testimony, Brown admitted he went to the rear of the store and saw a homeless man trying to hide. He knocked several cigar boxes off the desk, as Horn beat another employee and led the employee to the front counter to open the cash register. They then heard a siren that caused them to leave. (Defs.' Rule 56a Statement ¶114 (a)-(s), at 24-25).  After fleeing the scene, they drove to Bridgeport and Brown admitted making all of the calls on the stolen phone except the fourth call. (Defs.' Rule 56a Statement ¶116, at 26). He stated that after the third call, he gave the phone to Horn. (Defs.' Rule 56a Statement ¶117, at 26).

16

Prior to the criminal trial, Brown had been promised a recommended sentence of 18 years in prison on lessor charges of manslaughter and robbery. (Defs.' Rule 56a Statement ¶¶120-122, at 26). Brown testified at trial that he did not tell the detectives the whole truth in his original statement. (Defs.' Rule 56a Statement ¶123, at 26). He related the same story concerning the robbery, but he admitted he was not forced to participate against his will. At trial, Brown stated he was aware Horn and Jackson were going to rob the store. The three waited outside the Deli as Horn and Jackson stood near the front of the Deli, smoked blunts that smelled like magic markers, and waited for some customers to leave. When a cab pulled up and the customers went into the Deli, Brown was given a small silver handgun and a scarf to cover his face. When one of the customers came out and got back in the cab, Horn and Jackson pulled their masks down and went in with Horn shooting towards the counter. When the shooting stopped, Brown and Horn went towards the back room and Brown stepped over the dying victim. Brown searched the homeless man while Horn pistol-whipped another man who was in a chair. Horn took the other man to the register while Brown searched several cigar boxes for money. As Brown returned to the front of the store, he heard a siren and they all fled. (Defs.' Rule 56a Statement ¶125 (a)-(m), at 27).

Brown testified at Horn and Jackson's *habeas* hearings in 2011 and 2013. At each *habeas* hearing Brown identified Horn and Jackson as his co-perpetrators. (Defs.' Rule 56a Statement ¶¶126-127, at 28).

*8)*    ***Shaquan Pallet Identifies Horn and Jackson***

Dease and Adger had attempted to interview Shaquan Pallet ("Pallet"), the friend and co-worker of the victim, Hardy. However, Pallet had avoided the detectives because he was scared.

(Defs.' Rule 56a Statement ¶130, at 28). In early March 1999, Dease and Adger finally interviewed Pallet at Pallet's probation officer's office. (Defs.' Rule 56a Statement ¶129, at 28).

During the interview, Pallet gave a statement that on January 24, 1999, he left work with Hardy. They took a taxi to the Deli for cigarettes. As Pallet and Hardy entered the Deli, Pallet saw three men smoking "wet," marijuana soaked with embalming fluid outside the Deli. (Defs.' Rule 56a Statement ¶131, at 28-29). Pallet recognized Horn and Jackson as two of the men, as he had seen them at the Deli before. (Defs.' Rule 56a Statement ¶132, at 29) The third man was in the shadows. (Defs.' Rule 56a Statement ¶132, at 29). Pallet exited the Deli ahead of Hardy and returned to the taxi. (Defs.' Rule 56a Statement ¶135, at 29). As he left, he saw two men pull masks over their faces. Afraid of being robbed, Pallet jumped in the taxi alone and rushed home. (Defs.' Rule 56a Statement ¶¶ 134, 135, at 29).

Pallet was shown a photo array that contained photos of Horn and Jackson. Pallet said he was afraid to identify anyone, but he pushed all the photos away from him except Horn and Jackson's photos. Pallet told the officers "[t]ake it for what it's worth." (Defs.' Rule 56a Statement ¶136, at 29).

On March 23, 1999, a day after Horn's arrest, Pallet was arrested and charged with several unrelated robberies. (Defs.' Rule 56a Statement ¶137, at 29-30). Pallet was interviewed by Dease and ASA Gary Nicholson ("Nicholson"). Nicholson tried the criminal case for the State. (Defs.' Rule 56a Statement ¶138, at 30). Pallet provided the same statement he gave at his previous interview, however, this time he clearly identified photos of Horn and Jackson. Pallet was offered a reduced sentence for his truthful testimony at the criminal trial. (Defs.' Rule 56a Statement ¶¶139, 141, at 30).

*9)*     ***Phone Records Received from Phone Companies***

During the Deli murder investigation, Adger began investigating phone records related to the stolen cell phone and some of the individuals that were involved in the investigation. She sought the billing records of phone numbers listed on the stolen phone call detail record and the phone records of other persons involved in the investigation. (Defs.' Rule 56a Statement ¶147, at 31). On February 25, Dease and Adger obtained two search warrants and made several requests for the phone records of each of the five persons who had received a call from the stolen cell phone, as well as the phone records of Sadler and Glen Spray (the phone used by Plaintiff Jackson). (Defs.' Rule 56a Statement ¶150, at 32).

On February 25, 1999, a search warrant was directed to Southern New England Telephone Company ("SNET"). The search warrant listed the phone numbers of Horn, Pearson, Floyd Jackson (the father of Adrianne Younger), and the residential telephone number of the elderly couple where Crystal Sykes worked. The search warrants requested records from January 1, 1999 through February 23, 1999. (Defs.' Rule 56a Statement ¶148, at 31).

On February 25, 1999, Adger applied for a second search warrant, directed to AT&T Corporation. The search warrant listed the phone number of Sandra Moore, who owned the phone Tamika Fuller used. (Defs.' Rule 56a Statement ¶149, at 32).

Adger also received the phone records of Sadler and Glen Spray (owner of the phone used by Jackson) by a written request to Nextel. The records requested were from January 1, 1999 to January 23, 1999. (Defs.' Rule 56a Statement ¶150, at 32).

Over the next week, Adger received responses to the search warrants and records requests. Adger made a working copy of the records for herself, as well as a copy for Dease and Sgt. Derik Rodgers, who was supervising the investigation. Consistent with NHPD practice and

procedure, Adger then delivered the original phone records to the NHPD Records Division. (Defs.' Rule 56a Statement ¶152, 153, at 32).

Former NHPD Assistant Chief Rachel Cain testified that detectives were permitted to file records from third parties in the Records Division (a/k/a Records Room), the Property Room, or both. (Defs.' Rule 56a Statement ¶154, at 32). The records filed in the Records Division were available to officers, detectives, and/or inspectors employed by the State's Attorney's Office. (Defs.' Rule 56a Statement ¶156, at 33).  When an Assistant State's Attorney prosecuted a criminal case, the prosecutor and/or investigators from the State's Attorney's Office were permitted to copy all or a portion of the records in the Records Division. State's Attorney investigator, Mel Cartoceti, (now deceased) retrieved the police records for the Horn/Jackson prosecutor, Nicholson. (Defs.' Rule 56a Statement ¶157, at 33).

Nicholson had an open-file-policy on the cases he prosecuted. His practice was to turn over "everything he had" to criminal defense attorneys. (Defs.' Rule 56a Statement ¶158, at 33). Nicholson prepared a "discovery face sheet" listing every document produced in discovery. His practice was to give a copy of the discovery face sheet to counsel and file it with the Court to avoid issues about what was produced. (Defs.' Rule 56a Statement ¶159, at 33).  The face sheet for the Horn and Jackson criminal prosecution that lists all documents produced is not in the prosecutor's file and has never been located. (Defs.' Rule 56a Statement ¶160, at 33). When retrieving NHPD records for ASA Nicholson, Cartoceti would, at times, make decisions about what records to copy. (Defs.' Rule 56a Statement ¶162, at 33). Nicholson confirmed it is possible that Cartoceti either decided not to copy the phone records or decided they were not needed. (Defs.' Rule 56a Statement ¶163, at 34). Investigator Cartoceti also could have taken contents from the Records Division file to work on and not returned the contents to the file. However,

Nicholson is not aware that this happened in the Horn and Jackson criminal cases. (Defs.' Rule 56a Statement ¶161, at 33).

In 2018, it was discovered that some of the phone records obtained by Adger were missing from the prosecutor's file and allegedly not turned over to the defense. However, some phone records filed by Adger with the Records Division remained in the file. When the Records Division file was examined, it contained:

a)   Omnipoint records of the stolen cell phone (Defs.' Rule 56a Statement ¶164 (a), at 34);

b)   Phone records of Glen Spray (the phone used by Marquis Jackson), (Defs.' Rule 56a Statement ¶164(b), at 34);

c)   Phone records produced pursuant to a search warrant for Sandra Moore (phone used by Adrienne Younger, (Defs.' Rule 56a Statement ¶164 (c), at 34);

d)   Search warrants issued to SNET and AT&T and inventory returns (Defs.' Rule 56a Statement ¶164 (d), at 34);

e)   Correspondence to telephone companies. (Defs.' Rule 56a Statement ¶164(e), at 34).

In 1999, the NHPD practice and procedure was to file search warrants and related search warrant inventories with the Administrative Assistant for the Judicial Clerk so that the Judicial Clerk could keep track of the search warrants and deliver them to the criminal file. (Defs.' Rule 56a Statement ¶166, at 34). Upon receipt of a search warrant inventory, the Administrative Assistant filled out a two-ply index card form created by the Judicial Clerk. The form contained the signature of the Officer, the Clerk's name, the date of receipt, the police file number, and the name(s) of the criminal defendant(s). The index card is a business record of the Judicial Clerk. (Defs.' Rule 56a Statement ¶167, at 35).  One of the index cards was filled out by the Clerk and a carbon copy of the card was given to the police officer as a receipt. (Defs.' Rule 56a Statement ¶168, at 35). The Administrative Assistant for the Judicial Clerk, Barbara Thigpen, identified the

index cards she filled out for the search warrant to SNET and inventory on May 5, 1999. (Defs.' Rule 56a Statement ¶169, at 35).  On March 5, 1999, Adger filed the two search warrants and inventories for phone records with the Judicial Clerk and received a copy of the index cards prepared by the Clerk. (DET01628 and DET01629). Adger then placed the receipt card in the investigation file. (Defs.' Rule 56a Statement ¶170, at 35).

During the time between the receipt of the phone records on or about March 4, 1999, and the arrest of Steve Brown on March 10, 1999, Adger examined the phone records by using a reverse phone directory service to determine the owners of the phone that placed certain calls. (Defs.' Rule 56a Statement ¶171, at 35).  She prepared two charts attempting to determine if there was a connection between the phone calls and the Deli robbery/murder. However, Adger was not able to draw a connection between the phone call information and the Deli robbery/murder. (Defs.' Rule 56a Statement ¶172, at 35). Adger shared her incomplete review with Dease and her supervisor, Sgt. Rogers. (Defs.' Rule 56a Statement ¶173, at 36).

Adger's assignment to the Deli murder ended after Brown was arrested and he confessed to committing the crime with Horn and Jackson. (Defs.' Rule 56a Statement ¶174, at 36).  Adger then focused on drafting arrest warrants for Horn and Jackson, and she discontinued further examination of the phone records. (Defs.' Rule 56a Statement ¶175, at 36). At that time, Adger had not completed her examination of the phone records, and she had not determined that a relationship between the phone numbers in the phone records were connected to the Deli homicide. As such, she did not consider the records evidence and did not describe her review of the records in a police report. (Defs.' Rule 56a Statement ¶176, at 36).

**10)**    ***Discovery of Adger's Working Copy of the Filed Phone Records***

During the phone investigation, Adger kept her working copy of the phone records in her desk drawer at the Investigative Services Division. (Defs.' Rule 56a Statement ¶177, at 36). Keeping a working copy at her desk was consistent with NHPD practice and procedure. (Defs.' Rule 56a Statement ¶¶178-179, at 36). In or about December 2000, Adger was promoted to Sergeant and was transferred to another division. (Defs.' Rule 56a Statement ¶180, at 36). Adger cleaned out her desk and removed its contents, which included training documents, memos, seminar materials, and other paperwork. She put the contents in a box to review at home to determine what to discard. (Defs.' Rule 56a Statement ¶¶181, at 37). However, Adger placed the box in her basement and never reviewed it. (Defs.' Rule 56a Statement ¶182, at 37).

In January 2018, Adger's basement flooded. Water soaked many of the belongings, including her boxes of work papers. She discarded the wet contents and placed the dry materials in a larger box. As she did this, she noticed that her working copy of the phone records were mixed in with other documents she saved from her employment with the NHPD. (Defs.' Rule 56a Statement ¶183, at 37).

A week after Adger's basement flooded, Marc Caporale ("Caporale"), an investigator for the Federal Defender's Office representing Horn, contacted the detectives assigned to the Deli investigation to determine if they had records related to the phone record search warrants. (Defs.' Rule 56a Statement ¶184, at 37). On January 30, 2018, Caporale phoned Adger and explained what he was looking for. Adger agreed to look in her basement at the work materials she kept when she was promoted. (Defs.' Rule 56a Statement ¶185, at 37). Caporale then texted Adger the phone numbers from the search warrants and Adger looked in her basement for the documents. (Defs.' Rule 56a Statement ¶186, at 37).

The next day, January 31, 2018, Adger voluntarily produced the 137 pages of phone records she discovered the week before. She provided Caporale the documents so he could make a copy. (Defs.' Rule 56a Statement ¶187, at 37-38). Throughout Caporale's process of obtaining the phone records, Adger was pleasant, cordial, and cooperative. (Defs.' Rule 56a Statement ¶188, at 38). Adger then delivered her original working copy to Kathleen Foster, Senior Assistant Corporation Counsel for the City of New Haven. (Defs.' Rule 56a Statement ¶189, at 38). Adger was not aware that the phone records were in the materials she removed from her desk in 2000, and she had not intended to remove them. (Defs.' Rule 56a Statement ¶190, at 38). The box of materials from Adger's basement has been produced in discovery in these lawsuits. The materials include NHPD memos, training material, and assorted research for various projects Adger conducted through her career. (Defs.' Rule 56a Statement ¶191, at 38).

## 11)   *Adger's Working Copy of the Phone Records Do Not Inculpate the "Bridgeport Crew"*[2]

Among other things, the phone records show numerous calls between: Brown and Macklin; Sadler and Macklin; Sadler and Newkirk; Sadler and Fuller; and Sadler and Younger. (Defs.' Rule 56a Statement ¶192, at 38). The police reports, which contained the phone numbers of each of these individuals, were tendered to Horn and Jackson's criminal trial counsel. The police reports described the following relationships:

a)   Steve Brown was the brother-in-law of Willie Sadler. (Defs.' Rule 56a Statement ¶193(a), at 38);

b)   Tamika Fuller was a drug dealing associate of Willie Sadler. (Defs.' Rule 56a Statement ¶193(b), at 38);

c)   Willie Sadler is the first cousin of Marlo Macklin. (Defs.' Rule 56a Statement ¶193(c), at 38);

---

[2] The "Bridgeport Crew" or "Gang" is a term coined by Plaintiffs in their Amended Complaints. It collectively refers to the Bridgeport residents referenced herein. There is no known crew, group, gang, etc. by that title.

  d)  Willie Sadler is the boyfriend of Tamika Fuller. (Defs.' Rule 56a Statement ¶193(d), at 38);

  e)  Adrianne Younger knows Marlo Macklin. (Adger 03/05/1999 Report) (Defs.' Rule 56a Statement ¶193(e), at 39);

  f)  Willie Sadler was a close friend of William Newkirk. (Defs.' Rule 56a Statement ¶193(f), at 39);

  g)  Adrienne Younger is a friend of Steve Brown. (Defs.' Rule 56a Statement ¶193(g), at 39).

Horn and Jackson's criminal trial counsel and their *habeas* counsel did not subpoena or request the phone records of Sadler, Macklin, Newkirk, and Fuller. (Defs.' Rule 56a Statement ¶¶195, 212, at 39, 41). Michael Moscowitz and Leo Ahern represented Jackson and Horn, respectively at the criminal trial. They did not investigate the numbers on the stolen phone call detail record. (Defs.' Rule 56a Statement ¶212, at 41). Moscowitz also hired a private detective to investigate the "Bridgeport crew," including Sadler, but he was unable to connect them with the robbery. (Defs.' Rule 56a Statement ¶194, at 39).

There is no evidence concerning the substance of the telephone conversations between the phone numbers associated with Sadler, Macklin, Newkirk, and Fuller. (Defs.' Rule 56a Statement ¶196, at 39). Further, the phone records provide no evidence that Macklin and Newkirk called each other. (Defs.' Rule 56a Statement ¶197, at 39). At Horn and Jackson's *habeas* hearings, Macklin testified that he did not know Newkirk's name and, although he had seen him before, he did not "hang out" with him. (Defs.' Rule 56a Statement ¶198, at 39). Newkirk testified at the *habeas* hearing that he knew Macklin only by his nickname, "Mai," and they were not close friends. (Defs.' Rule 56a Statement ¶199, at 39). Newkirk denied being the head of a gang in Bridgeport. (Defs.' Rule 56a Statement ¶200, at 39). Newkirk cooperated by telling Sadler to tell Dease who called Sadler from the stolen phone. (Defs.' Rule 56a Statement

¶201, at 40).   Macklin testified he never spoke to his cousin, Steve Brown, about a Deli homicide. (Defs.' Rule 56a Statement ¶202, at 40).   Newkirk and Macklin testified at Jackson's and Horn's *habeas* hearings, and they denied involvement in the Deli homicide. Macklin testified he was never in New Haven in the years during and after the robbery. (Defs.' Rule 56a Statement ¶203, at 40).

In 2018, Federal Public Defender, Terrance Ward, produced the 137 pages of phone records to Patrick Griffin, the New Haven State's Attorney, as part of his Federal *habeas corpus* petition. (Defs.' Rule 56a Statement ¶204, at 40). After reviewing the documents, Griffin concluded that the documents would not support a third-party culpability claim because the records did not constitute direct evidence of involvement in the crime. (Defs.' Rule 56a Statement ¶205, at 40). Griffin concluded that even with the phone connectivity exhibited in the 137 pages of phone records, the evidence fell short of probable cause and did not provide evidence that the "Bridgeport crew" was responsible for the murder. (Defs.' Rule 56a Statement ¶206, at 40).

### 12)   *The Criminal Trial, April 2000*

The State's theory at trial was that after Horn and Zaneta arrived at Jackson's apartment, Horn went to the Deli while Zaneta was in the bathroom. Horn committed the crime with Jackson and Brown, and he ran back to Jackson's apartment. Horn then walked Zaneta back to the Deli, where they spoke to police. Pearson testified that Horn loaned him the stolen cell phone to make the fourth phone call to Sykes. Thompson and Wolfinger's partial eyewitness identifications were also presented at trial. Pallet testified he saw Horn and Jackson outside the Deli with masks just before they entered the Deli. Brown unequivocally identified Horn and

Jackson as having committed the crime with him. *See, Jackson v. Commissioner of Correction*, 149 Conn. App. 681 (2014); *Horn v. Commissioner of Correction*, 321 Conn. 767 (2016).

Although we now know that the evidence regarding Pearson's use of the stolen phone to call Sykes from his porch in New Haven did not occur, there remains no direct evidence that Plaintiffs did not commit the crime. There is also no direct evidence that anyone other than Brown, Horn and Jackson committed the crime. Plaintiffs' claim that they did not commit the crime is based on speculation, inferences, and recanted testimony from unsavory witnesses who have spent much of their adult life in prison. Conversely, ample evidence remains that Horn and Jackson committed the crime, and that the evidence to convict was Constitutionally obtained. The evidence includes:

- The witnesses' physical description of the offenders matched the size and weight of Horn and Jackson;
- Horn and Jackson were at the crime scene moments before the crime, and Horn was present at the scene moments after the crime;
- Horn and Jackson did not have airtight alibis accounting of where they were and who they were with at the time of the crime;
- Jackson's alibi witness, Teisha Smith, stated that Jackson was with her when the crime was committed. However, Jackson was not with Smith when the crime occurred, and he acknowledges he did not arrive at Smith's house until well after the crime had been committed;
- Horn's alibi witness, Zaneta Berryman, testified that Horn left Jackson's apartment building for 10-20 minutes at the time the crime occurred, and Horn had removed the Avirex jacket he had been wearing and returned wearing a black hoodie, similar to the clothing that witnesses testified the perpetrators wore;
- Assuming Horn was with Berryman, the close proximity of Jackson's apartment to the Deli, allowed Horn to leave Jackson's apartment, commit the crime, and return in minutes;
- Abbey Yousif did not see Horn and Jackson on the date of the murder, yet, Horn claims he had a conversation with him (knowing Yousif was one of the victims of the shooting).
- The crime took less than five minutes. Based on the expediency of the perpetrators' actions, they must have known the layout of the store and that there was a back room where money may be kept. Based on frequent visits to the store, Horn and Jackson had this knowledge;
- Horn knew shotguns were kept behind the store counter, which is why upon entering the store, he immediately started shooting toward the counter (Defs.' Rule 56a Statement ¶¶ 18, 20, at 5);

- Horn admitted he possessed an automatic handgun and showed it to a witness a month before the crime;
- Brown unequivocally identified Horn and Jackson as his accomplices. Brown accurately described the jacket Horn was wearing, the car he claims he, Horn and Jackson were in, and robbery-related facts that confirmed witness accounts;
- Brown testified at the criminal trial and Horn and Jackson's *habeas* hearing that he committed the crime with Horn and Jackson. Brown has never recanted;
- Shaquan Pallet, who accompanied the shooting victim into the Deli, identified Horn and Jackson as two of the three individuals outside the Deli pulling masks down over their faces seconds before the robbery.

### 13) *The Stolen Cell Phone Call Detail Record*

The stolen cell phone's call detail record, which details the calls made from the stolen cell phone, was an exhibit at the criminal trial. (Defs.' Rule 56a Statement ¶¶208, 213, at 41-42). However, neither the prosecutor, defense attorneys, nor investigators knew or inquired about what the "ORIG" meant or what the numbers in the "ORIG" column represented. (Defs.' Rule 56a Statement ¶209, at 41).

During the trial, the State called an employee of Omnipoint Communications as a witness to interpret the information on the call detail record. Omnipoint provided cellular service for the stolen cell phone. The Omnipoint representative was asked whether it could be determined where the stolen cell phone call originated, but the representative inaccurately stated that the call detail record did not provide a means to locate the origin location of the phone calls. (Defs.' Rule 56a Statement ¶214, at 42). The prosecutor took the cell phone company representative at his word, and the defense attorneys did not challenge the conclusion that the location of the cell phone calls could be determined. (Defs.' Rule 56a Statement ¶215, at 42).

Presently, the meaning of the "ORIG" column on the stolen cell phone call record is understood. However, universal knowledge regarding cell phone technology and cell phone call origin was virtually non-existent in 1999. An FBI cell phone expert, who analyzes cell phone records and call detail records, testified that in 1999 the FBI did not regularly use cell phone

28

tower analysis to identify the location where a phone call originated. (Defs.' Rule 56a Statement ¶¶210-211, at 41).

In 2017, the Federal Public Defender's Office filed a Federal *habeas* corpus petition, citing new evidence. The Petition observed that the phone record of the five calls from the stolen phone that the police obtained in 1999 had a column labeled "ORIG" that may identify the cell tower in closest proximity to where the calls were made. Pet'r's Mem. Providing Factual and Procedural Background in Advance of Status Conf., No. 3:17-cv-0164-JAM (D. Conn. Apr. 2, 2018), ECF No. 25. James Wines, an FBI agent who has expertise in cell phone tracking, was retained to examine the call detail record. Wines confirmed that the "ORIG" column plus additional information establishes that all the calls on the stolen cell phone were made from Bridgeport, precluding the possibility that Pearson called Sykes from his porch in New Haven. The Federal Public Defender pointed out that this was "new evidence" and neither the police, prosecutors, judges, nor the defense attorneys appreciated the meaning of the "ORIG" column in the call detail records.

On April 20, 2018, the State filed a Motion to Set Aside the Judgment of Conviction and Restore the Case to the Superior Court Docket as to Vernon Horn. On May 1, 2018, the State filed an identical Motion to Set Aside Marquis Jackson's conviction. The Motions to Set Aside were not based upon a finding of actual innocence but were based on the totality of the information that sufficiently undermined the State's confidence in the judgment of conviction, such that justice required setting the judgment aside and restoring the case to the Superior Court docket. New Haven Judicial District's State's Attorney, Patrick Griffin, who set aside Horn and Jackson's convictions, did not do so based on actual innocence. (Defs.' Rule 56a Statement ¶209, at 41).

**14)     *Post-Trial Litigation***

Following a jury trial in April 2000, Horn and Jackson were convicted on felony murder, robbery, and related charges. They were sentenced to 75 years and 45 years, respectively. For his cooperation and truthful testimony, Brown pled guilty and received a sentence of 10 years for imprisonment to manslaughter in the first degree. Pallet also received consideration for his cooperation and truthful testimony. He pled guilty to the unrelated robberies and received two years in prison.

Horn and Jackson filed direct appeals of their convictions. *See State v. Jackson et al.*, 73 Conn. App. 338 (2002). Therein, Horn and Jackson alleged, in part, that the trial court had erred in failing to suppress the identifications made by witnesses Wolfinger, Pallet and Brown. *Id.* at 372-73. The Appellate Court affirmed the trial court's decision denying the motion to suppress Wolfinger's identification, finding that the photo array presented to Wolfinger was not unnecessarily suggestive. *Id.* at 374-76. The Appellate Court further affirmed the trial court's decision denying the Motion to Suppress Pallet's identification, finding that Pallet had identified them, that the photo arrays were not unnecessarily suggestive and that Dease's comments to Pallet did not taint the identification. *Id.* at 376; *See also*, Case 3:18-cv-01502-RNC Document 220-2 Filed 06/07/21 Page 3 of 804 79. Finally, the Appellate Court affirmed the trial court's decision denying the Motion to Suppress Brown's identification, finding that the photo array was not suggestive, and that Brown's identification was reliable. *Id.* at 379-83. Thereafter, Horn and Jackson filed *habeas* petitions alleging ineffective assistance of counsel and actual innocence. *See Jackson v. Commissioner of Correction,* 149 Conn. App. 681 (2014); *Horn v. Commissioner of Correction,* 321 Conn., 767 (2016).

After unsuccessful post-trial motions and State Appeals, a hearing on Jackson's *habeas* corpus petition was held in 2011. During the hearing, Pearson recanted his statement to police about the fourth phone call. Several alibi witnesses, including Sykes, and Brown testified, but the petition was denied.

Horn's *habeas* corpus petition hearing was held in 2013. Horn's actual innocence claim was denied, but his petition based on ineffective assistance of counsel was granted. Horn was released from prison in 2014. However, the Connecticut Supreme Court reversed the decision of the Circuit Court and Horn returned to prison in 2016. The Supreme Court ruled that even with Pearson's recantation and without evidence about the fourth call, there was sufficient evidence to convict. The Court stated, "even if we were to assume that there is reasonable probability that the new evidence could have persuaded the jury at the criminal trial that the petitioner was not in possession of the cell phone, there still would have been sufficient evidence to convict him." *Horn* at 788.

## 15)    *The Current Litigation*

Following his release, Horn filed suit by way of Complaint filed on September 7, 2018. Horn, thereafter, filed the operative First Amended Complaint [Doc. 153] on May 6, 2020. Following his release, Jackson filed suit on March 13, 2019. Jackson, thereafter, filed the operative First Amended Complaint [Doc. 110] on April 24, 2020. In their First Amended Complaints, which are nearly identical, Plaintiffs alleges the following claims directed against Dease, Adger, and Breland:

- Count One alleges § 1983 *Brady* – Withholding Material Exculpatory Evidence;
- Count Two alleges § 1983 Denial of Due Process – Fabrication of Evidence;
- Count Three alleges § 1983 – Fourth and Fourteenth Amendments – Unreasonably Prolonged Detention;
- Count Four alleges § 1983 – Failure to Intervene;
- Count Seven alleges Common Law Negligence;

- Count Eight alleges claims based on Article First § 7, 8, and 9 of the Connecticut Constitution;
- Count Eleven alleges Common Law Negligence

The remaining claims, Counts Six, Nine, Ten, Twelve and Thirteen are directed to the City of New Haven, alleging Municipal Liability, Direct Action Liability, and State Indemnification. Count Five is directed to the James Stephenson, alleging a § 1983 *Brady* claim for withholding of material exculpatory evidence.

Dease, Adger, and Breland hereby incorporate the facts set forth in their Rule 56(a)1 Statement as if more fully set forth herein.

Dease, Adger, and Breland now move for summary judgment as to the counts against them in their entirety.

### STANDARD OF REVIEW

Summary judgment is proper if the pleadings, depositions, and other facts in evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). The language of Rule 56 specifically requires the nonmoving party to come forward with "specific facts showing there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (emphasis in original). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288, 88 S. Ct. 1575, 1592 (1968)). Stated differently, there is no genuine issue of material fact when the nonmoving party fails to establish an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-3, 106 S. Ct. 2548, 2552 (1986).  "The substantive law governing the case will identify those facts that are not material, and 'only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)).

In order to overcome summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Anderson*, 477 U.S. at 252); *see also Bellamy v. City of New York*, 914 F.3d 727, 750 (2d Cir. 2019) (holding that "pure speculation [is] insufficient to raise a triable issue of fact"); *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir. 1992) (summary judgment cannot be defeated "on the basis of conjecture or surmise"). Instead, the nonmoving party must produce *admissible* evidence that supports its pleadings. *First Nat'l Bank of Ariz.*, 391 U.S. at 289-90 (emphasis added); *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (court "may only rely on admissible evidence"). The "mere existence of a scintilla of evidence supporting the non-movant's case is also insufficient to defeat summary judgment." *Anderson*, 477 U.S. at 252; *see also D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (a nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful"). Rather, there must be sufficient evidence favoring the nonmovant so that a jury could reasonably return a verdict for that party. *Anderson*, 477 U.S. at 252; *Jeffreys*, 426 F.3d at 554.

## ARGUMENT

### FIRST CAUSE OF ACTION – 42 U.S.C. § 1983 – *BRADY* – WITHHOLDING MATERIAL EXCULPATORY EVIDENCE (AGAINST DEFENDANTS DEASE, ADGER AND BRELAND)

Plaintiffs allege that Defendants hid 137 pages of phone records that were obtained during the Deli homicide investigation. Plaintiffs further allege that the phone records point to

persons associated with a "Bridgeport crew" as the perpetrators of the Deli homicide. Additionally, Plaintiffs allege that Defendants failed to record the search warrants used to obtain the phone records and failed to ensure that the records were provided to the New Haven State's Attorney's Office. Rather, Plaintiffs allege that Adger hid the records in her basement for 18 years. However, the evidence does not support these allegations, and therefore, summary judgment is appropriate.[3]

The evidence actually reveals that Adger filed the phone records in the NHPD Records Division (also known as the "Records Room"), where they were available to law enforcement officers, Assistant State's Attorneys, and their Investigators. After records were placed in the Records Division these individuals had the ability to examine, copy, and remove the records for examination and/or production to criminal defense counsel.

Further, the contents of the allegedly concealed phone records are not "material exculpatory evidence" under *Brady,* as their disclosure would not have resulted in a reasonable probability of a different outcome.[4]

## I.    Plaintiffs' *Brady* Rights Were Not Violated.

To prevail on a § 1983 civil claim for withholding material exculpatory evidence, a plaintiff must prove by a preponderance of evidence that 1) plaintiff's *Brady* rights were violated during the course of the underlying state criminal prosecution;[5] 2) defendant's conduct caused

---

[3] During the Deli investigation, Breland never obtained, possessed, or examined the phone records.

[4] Plaintiffs also assert that Defendants' failure to disclose verbal statements allegedly made by Marcus Pearson and Kendall Thompson during investigation interviews violate *Brady.* The evidence does not establish a *Brady* violation, as these alleged statements are not "material exculpatory evidence." This argument is addressed in Part II of the argument in conjunction with the fabrication argument.

[5] To establish a *Brady* violation during a criminal prosecution 1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; 2) the evidence must have been suppressed by the State, either willfully or inadvertently; and 3) prejudice must have ensued. *United States v. Rivas*, 377 F. 3d 195, 199 (2d Cir. 2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-2, 119 S. Ct. 1936, 1948 (1999)).

the *Brady* violation; and 3) defendant acted with the requisite culpable state of mind. 42 U.S.C. §

1983; *Daniels v. Williams*, 474 U.S. 327, 328, 106 S. Ct. 662, 663 (1986); *Shannon v.

Jacobowitz*, 394 F.3d 90, 94 (2d Cir. 2005).

  While *Brady* establishes a no-fault obligation on the part of prosecutors to turn over

exculpatory evidence in criminal prosecutions, civil liability under § 1983 requires that the

officer acted, at a minimum, with less than good faith. *See e.g., Arizona v. Youngblood*, 488 U.S.

51, 58, 109 S. Ct. 333, 337 (1988); *Daniels*, 474 U.S. at 328 (in a § 1983 action, a due process

violation may not be based upon an official's negligent conduct); *see also, Cnty. of Sacramento

v. Lewis*, 523 U.S. 833, 848-9, 118 S. Ct. 1708, 1718 (1998) (stating that because the Court

refuses to impose liability every time a state officer causes harm, "liability for negligently

inflicted harm [will be] categorically beneath the threshold of constitutional due process").

  The Second Circuit has held that police officers can only be liable for civil *Brady*

violations when they "intentionally suppress exculpatory evidence." *Fappiano v. City of New

York*, 640 F. App'x 115, 118 (2d Cir. 2016); *Poventud v. City of New York*, 750 F.3d 121, 138

(2d Cir. 2014); *Bermudez v. City of New York*, 790 F.3d 368, 376 n.4 (2d Cir. 2015); *Walker v.

City of New York*, 974 F.2d 293, 300 (2d Cir. 1992). To hold otherwise would require the officer

to engage in an unnecessary evaluation of the nature of all information obtained during an

investigation and determine whether such information is considered "material" under *Brady*.

*Walker*, 974 F.2d at 299.

  **A. Defendants' Alleged Failure to Produce 137 Pages of Phone Records Was Not a
   *Brady* Violation.**

   **i. Adger filed the phone records in the NHPD Records Division, which were
    then Available to the State's Attorney's Office and Plaintiffs' Defense
    Counsel.**

During the Deli investigation, Adger obtained phone records corresponding to the phone numbers on the call detail record of the stolen cell phone. She also obtained phone records of additional persons associated with the investigation. (Defs.' Rule 56a Statement ¶147, at 31). Adger requested the phone records from the cell phone companies that serviced the phone numbers. Several companies voluntarily produced the records, and two companies required a search warrant. In response to the requests and search warrants, phone records corresponding to the cell phones of Vernon Horn, Glen Spray (Jackson's phone), Marcus Pearson, Willie Sadler, the Chorozny's (the elderly couple Crystal Sykes worked for), Sandra Moore, (Adrienne Younger's phone), and Floyd Jackson (Tamika Fuller's phone) were obtained. (Defs.' Rule 56a Statement ¶¶148-150, at 31-32).

Adger testified that upon receiving the records, she made copies for her, Dease, and their supervisor, Sgt. Rogers. (Defs.' Rule 56a Statement ¶152, at 32).  Consistent with NHPD police procedure and practice, Adger delivered the original records to the NHPD Records Division. (Defs.' Rule 56a Statement ¶153, at 32).  Adger does not know what happened to the original records after she delivered them to the Records Division. (Defs.' Rule 56a Statement ¶155, at 32).

There is no evidence that Adger intentionally failed to file the phone records with the NHPD to conceal them. Conversely, the following evidence supports that Adger filed the original records in the Records Division:

a.  The NHPD records file contained the two search warrants and an inventory returned for each search warrant listing the phone records sought. (Defs.' Rule 56a Statement ¶164 (d), at 34);

b.  The prosecutor's files contained copies of index cards signed by Adger when she filed the search warrants and inventories with the Administrative Assistant for the Judicial Clerk. Detectives were required to file a copy of all search warrants with the Judicial Clerk. At the time of the filing, a two-ply index card was prepared containing the signature of the

officer, the Clerk's name, date of receipt, police file number, and the names of criminal defendant(s). (Defs.' Rule 56a Statement ¶167 at 34). The detectives received a copy of the card to confirm the filing. (Defs.' Rule 56a Statement ¶¶166-168, at 34-35). Barbara Thigpen, the Administrative Assistant for the Judicial Clerk, authenticated the card she received on March 5, 1999, related to Adger's search warrants for phone records. The Administrative Assistant then delivered the search warrants to the proper criminal file. (Defs.' Rule 56a Statement ¶¶169-170, at 35);

c.   In addition to the copies of the search warrants, inventories, and Clerk's receipt, some *original phone records* obtained by Adger were in the Records Division file. The file contained 8 pages of records from Glen Spray's (Marquis Jackson) phone; 9 pages of records from Sandra Moore (Adrianne Younger); and correspondence to the telephone companies. (Defs.' Rule 56a Statement ¶164 (b), (c), (e), at 34). Because these records were filed by Adger, it stands to reason that the remaining missing records must have been filed;

d.   Each of the phone numbers that were the basis for the request for the phone records, were cited in the detectives' investigation reports. (Defs.' Rule 56a Statement ¶165, at 34). Plaintiffs do not allege that these reports and the phone numbers referenced were concealed. The prosecutor and criminal defense counsel could have issued subpoenas, requests, or used other investigative techniques to obtain the same records Adger obtained, but they did not. (Defs.' Rule 56a Statement ¶195, at 39).

Additionally, records filed in the Records Division were accessible to other detectives and investigating officers upon request. (Defs.' Rule 56a Statement ¶156, at 33). Assistant State's Attorneys and their Investigators could also examine and remove documents from the Records Division. During Plaintiffs' criminal prosecution, Mel Cartoceti, (deceased) was the State's Attorney Investigator assigned to the Deli homicide prosecution. (Defs.' Rule 56a Statement ¶157, at 33).   Cartoceti retrieved the investigation file from the NHPD Records Division for ASA, Gary Nicholson. Nicholson then prepared a discovery face sheet of the contents of this file and the materials produced in discovery. Nicholson's practice was to tender a copy of the discovery face sheet to criminal defense counsel to avoid issues about what was produced. (Defs.' Rule 56a Statement ¶159, at 33).   The face sheet for Plaintiffs' prosecution was not in the State's Attorney's file and has never been located. (Defs.' Rule 56a Statement ¶160, at 33).

ASA Nicholson had an open file policy, which gave criminal defense counsel the unfettered access to examine the documents in the State's file. (Defs.' Rule 56a Statement ¶158, at 33). Accordingly, after Adger filed the phone records in the Records Division, they would have been available to the prosecutors and the prosecutors' inspectors, which would have then made the State's file available to Plaintiffs' defense counsel to examine pursuant to the open file policy. This assumes the records made it to the State's file. Nicholson's inspector, Cartoceti, had discretion in what he copied from the NHPD Records Division. Nicholson acknowledged the possibility that Cartoceti may not have copied the phone records or concluded they were unnecessary. Cartoceti may have also removed the records, worked on them, and failed to return them. (Defs.' Rule 56a Statement ¶¶161-163, at 33-34).

The whereabouts of the original phone records remain unknown. This may be due to the numerous attorneys that requested and obtained the NHPD investigation file after the criminal trial. Plaintiffs filed direct appeals and the file was transferred to and examined by numerous attorneys that represented Plaintiffs in their appeals. There is no accounting of the documents that were examined and removed from the NHPD file, or which documents were transferred between the parties and their attorneys after the criminal trial.

All these documents would have been available to the prosecutor and to defense counsel after Adger placed the records in the Records Division. Whether the records were lost, misplaced, taken by other investigators, and/or not returned, present possibilities and are not material. There is no evidence that Adger, and the Defendants generally, intentionally withheld the phone records.

### ii.  Adger Did Not Intentionally Hide the Phone Records at Her Home.

There is no evidence that Adger intentionally hid her working copy of the phone records at her home for 18 years. Rather, the evidence shows that Adger's possession of her copy of the phone records was unintentional and inadvertent.

Adger began reviewing her copy of the phone records on or before March 4, 1999. She made notes in the margins and a flow chart of the details of the calls. (Defs.' Rule 56a Statement ¶¶171-172, at 35).  She then shared her notes with Dease and Sgt. Rogers, but they determined the phone records did not establish a connection to the Deli homicide. (Defs.' Rule 56a Statement ¶173, at 36).

On March 5, 1999, fingerprint evidence implicated Steve Brown in the Deli homicide. (Defs.' Rule 56a Statement ¶104, at 22). On March 10, 1999, Brown confessed and implicated Horn and Jackson. (Defs.' Rule 56a Statement ¶107, at 23). When this occurred, Adger discontinued her review of the phone records and began drafting Horn's and Jackson's arrest warrants. (Defs.' Rule 56a Statement ¶¶174-175, at 36). She did not complete her review of the phone records. (Defs.' Rule 56a Statement ¶176, at 36).  Because she could not establish a connection between the records and Deli homicide, Adger did not consider the phone records evidence and she did not write a report about her review. (Defs.' Rule 56a Statement ¶176, at 36). She also knew that she placed the original phone records in the Records Division. (Defs.' Rule 56a Statement ¶153, at 32). Adger kept her working copy in her desk drawer. (Defs.' Rule 56a Statement ¶177, at 36).

In December 2000, Adger was promoted to Sergeant and transferred to another division. (Defs.' Rule 56a Statement ¶180, at 36). She removed the contents of her desk, placed it in a box, and brought the box home. She did not review the contents because she intended to review

the box in the future to decide what to keep. (Defs.' Rule 56a Statement ¶181, at 37).  She placed the box in her basement, but never went through it. (Defs.' Rule 56a Statement ¶182, at 37).

In January 2018, Adger's basement flooded, and water soaked many of her belongings, including the box containing her old work documents. (Defs.' Rule 56a Statement ¶183, at 37). As she tried to salvage the materials, she noticed the box containing her working copy of the phone records and additional documents from her NHPD employment. (Defs.' Rule 56a Statement ¶183, at 37). Before January 2018, Adger did not know she had removed her working copy of the phone records from her desk in the Investigative Services Division. (Defs.' Rule 56a Statement ¶190, at 38). The box contained the copy of the phone records training documents, memos, seminar materials, and other paperwork. (Defs.' Rule 56a Statement ¶191, at 38).

On January 30, 2018, Marc Caporale, an investigator for the Federal Public Defender, contacted Dease, Adger, and Breland regarding whether they had phone records related to the search warrants. (Defs.' Rule 56a Statement ¶184, at 37). Prior to 2018, Horn and Jackson's criminal defense attorneys and their *habeas* attorneys did not inquire about the phone record search warrants or additional phone records that existed in the Deli investigation file. (Defs.' Rule 56a Statement ¶195, at 39).

Adger immediately went through her old work documents, recovering her working copy of the phone records, 137 pages. The next day, Adger gave Caporale the documents to make a copy. (Defs.' Rule 56a Statement ¶187, at 37-38).  Caporale admits Adger was pleasant, cordial, and cooperative. (Defs.' Rule 56a Statement ¶188, at 38).  Adger had nothing to hide. She then, upon request, provided her working copy of the phone records to the City of New Haven. (Defs.' Rule 56a Statement ¶189, at 38).  Adger's immediate, voluntary production of the phone records

demonstrates she did not intentionally hide the records, and that she filed the original records in the Records Division.

Additional evidence undercuts Plaintiffs' claim that Defendants intentionally withheld the phone records. Defendants have no history of dishonesty or *Brady* violations. This matter does not involve a racial motive. Defendants harbored no animosity against Plaintiffs, and they had no previous contact. After leaving her position as a detective, Adger had an exemplary law enforcement career, eventually becoming the Deputy Chief of Police.

There is no evidence supporting Plaintiffs' allegation that Defendants withheld and then hid the phone records. Plaintiffs' claim is pure speculation. Accordingly, as a matter of law, summary judgment should be granted as to Count One.

### iii. The Phone Records Were Not Material Exculpatory Evidence Pursuant to *Brady*.

The phone records were not material exculpatory evidence, that if available, would have resulted in a reasonable probability of a different outcome. Contrary to Plaintiffs' contention, the phone records do not establish direct evidence that members of a "Bridgeport crew" committed the Deli homicide.

Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017); *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985); *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S. Ct. 1555, 1566 (1995).

> The touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Leka*, 257 F.3d at 104 (quoting *Kyles*, 514 U.S. at 434).

The materiality inquiry is not a test for sufficiency of the evidence; the defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 434-5. The court must examine the "cumulative effect of suppression" in light of evidence as a whole and conduct its "own independent examination of the record in determining whether the suppressed evidence is material." *Id.* at 436-7; *see also*, *Wearry v. Cain*, 577 U.S. 385, 136 S. Ct. 1002, 1007 (2016).

In the case *sub judice*, the phone records do not "put the whole case in such a different light as to undermine confidence in the verdict." The supposition that the phone records prove that a "Bridgeport crew" committed this crime is so speculative that it would not have been admitted as evidence. *See, Bellamy*, 914 F.3d at 750 ("[w]hen reviewing a summary judgment determination, [the court] may only consider admissible evidence. . .pure speculation…is insufficient to raise a triable issue of fact").

Plaintiffs ignore the eyewitness testimony of Brown and Pallet and additional evidence implicating Horn and Jackson in furtherance of the speculative theory that Sadler, Macklin, and/or Newkirk committed the Deli robbery with Brown.

The phone records only establish that Sadler, Macklin, Newkirk, and the other individuals in phone records were friends, family, acquaintances, and drug-dealing associates, who frequently called each other. The phone records provide no direct connection between these individuals and the crime. (Defs.' Rule 56a Statement ¶¶192-195, at 38-39).

Two decades after the Deli homicide, there remains no direct evidence that Sadler, Macklin and/or Newkirk committed the crime. No witness has ever implicated Sadler, Macklin, or Newkirk with direct evidence of having committed the crime. No witness, including the eyewitnesses to the crime, place them at the Deli.

None of them have testified thus far in this litigation, and Brown, who also has not testified in this litigation, has never implicated them. On the contrary, Newkirk and Macklin testified at Jackson's and Horn's *habeas* hearings, and they denied involvement in the Deli robbery. Macklin further testified that he was never in New Haven in the years during and after the robbery. (Defs.' Rule 56a Statement ¶203, at 40).   He did not know Newkirk's name, and although he had seen him before, he did not "hang out" with him. (Defs.' Rule 56a Statement ¶198, at 39).  Macklin testified he never spoke to Brown about the Deli robbery. (Defs.' Rule 56a Statement ¶202, at 40).

There is also no motive for the "Bridgeport crew" to have robbed the Deli. There is no evidence as to how Sadler, Macklin, or Newkirk, Bridgeport residents, would have chosen to rob the Deli in New Haven. Similarly, there is no evidence they were previously at the Deli or were familiar with the Deli. The evidence implicating them is speculative and falls short of probable cause. Comparatively, the inculpatory evidence against Plaintiffs is overwhelming.

Furthermore, the "Bridgeport crew", their relationships, involvement in the investigation, and phone numbers were disclosed in the police reports that were tendered to Plaintiffs' defense attorneys. (Defs.' Rule 56a Statement ¶195, at 39). Plaintiffs' defense attorneys failed to use this information to subpoena phone records to establish a connection that Plaintiffs' now assert.

It must be appreciated that Sadler, Macklin, Newkirk, Pearson, and Sykes had significant criminal histories, were involved in the drug trade, and did not fully cooperate the investigation. Despite these obstacles, Defendants applied for warrants and acquired information related to the phone records. Defendants interviewed numerous witnesses and reviewed the phone records to try to determine the origin of calls to assess if a direct connection existed between the calls and the crime. No connection existed.

The following relationships were known to Plaintiffs at trial: Brown was Sadler's brother-in-law. Fuller was a drug dealing associate of Sadler. Sadler is Macklin's first cousin. (Dease Report 3, Feb. 5, 1999). Sadler was Fuller's boyfriend. Fuller was Brown's close friend. Younger knew Macklin. Sadler was Newkirk's longtime friend. Younger was Brown's friend. (Defs.' Rule 56a Statement ¶193 (a)-(g), at 38-39). Jackson's criminal defense attorney retained an investigator to investigate the "Bridgeport crew" for purposes of a third-party liability defense. The investigation included Willie Sadler, but the investigator was unable to develop information or leads. (Defs.' Rule 56a Statement ¶194, at 39).

Newkirk testified at the *habeas* hearing that he knew Macklin only by his nickname, "Mai," and they were not close friends. (Defs.' Rule 56a Statement ¶199, at 39). Newkirk denied being the head of a gang in Bridgeport. (Defs.' Rule 56a Statement ¶200, at 39). Newkirk testified he cooperated when Dease contacted him about Sadler. Newkirk told Sadler to tell Dease who called him from the stolen phone. (Defs.' Rule 56a Statement ¶201, at 40).

When the Federal Public Defender, Terrance Ward, presented the 137 pages of phone records to the New Haven State's Attorney, Patrick Griffin, Mr. Griffin concluded that the phone records established connections between the Bridgeport residents, but they did not constitute evidence that they were guilty of murder. Pursuant to Griffin's investigation, the phone records neither established probable cause that the Bridgeport crew was involved in the murder, nor constituted sufficient evidence for a third-party culpability instruction. (Defs.' Rule 56a Statement ¶¶204-206, at 40).

Plaintiffs' contention that the phone records would have provided a bases for third-party culpability defense has no merit. To establish a bases for a third-party culpability defense, the evidence must *directly connect* the third party to the crime. *State v. Sauris*, 227 Conn. 389, 401,

44

631 A.2d 238, 244-45 (1993) (overruled in part on other grounds, *Label Sys. Corp. v. Aghamohammadi*, 270 Conn. 291 (2004)); *State v. Hernandez*, 224 Conn. 196, 202, 618 A.2d 494, 497 (1992); *State v. Echols*, 203 Conn. 385, 392, 524 A.2d 1143, 1147 (1987) (emphasis added). "It is not enough to show that another [party] had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime which the defendant is accused." *Echols*, 203 Conn. at 392. (Internal citations omitted). "The restrictions placed upon third-party culpability are concerned primarily with reliability and, in essence, seek to ensure that a defendant does not introduce tenuous evidence of third-party culpability in an attempt to divert from himself the evidence of guilt." *State v. Cerreta*, 260 Conn. 251, 262, 796 A.2d 1176, 1183 (2002).

The trial court denied Plaintiffs' third-party culpability defense based on lack of evidence. The Appellate Court affirmed. *Jackson v. Comm'r of Corr.*, 149 Conn. App. 681, 89 A.3d 426 (2014). Here, evidence to advance a third-party liability defense is still insufficient. The phone records do not provide additional evidence establishing a direct connection between and the phone numbers to where the calls were made and involvement in the homicide. The records serve as cumulative evidence to the police reports confirming that the individuals knew each other. *United States v. Persico,* 645 F.3d 85, 111 (2d Cir. 2011) (evidence that furnishes additional basis to challenge evidence that is already questionable is not material); *Orsini v. Manson*, 5 Conn. App. 277, 281, 498 A.3d 114, 117 (1985) (cumulative evidence is not material in constitutional sense).

The claim that Sadler, Newkirk and/or Macklin committed the Deli crime remains a suspicion and is not supportive of a third-party culpability defense. The phone records are,

therefore, not material and summary judgment as to Count I on Plaintiffs' *Brady* claim is warranted.

<u>SECOND CAUSE OF ACTION – 42 U.S.C. § 1983 – DENIAL OF DUE PROCESS – FABRICATION OF EVIDENCE (AGAINST DEFENDANTS DEASE, ADGER AND BRELAND)</u>

Plaintiffs' allegation that Defendants fabricated evidence is speculative and not supported by the evidence.

Plaintiffs claim Defendants knowingly fabricated evidence by manipulating statements and testimony from Crystal Sykes, Marcus Pearson, Kendall Thompson, Steve Brown, and Shaquan Pallet. Plaintiffs further claim that Defendants knowingly provided the alleged fabricated evidence to the prosecution to convict Plaintiffs. However, there is an utter lack of evidence to support these allegations. Additionally, the alleged fabricated evidence was not material to Plaintiffs' criminal prosecutions, as significant evidence established Plaintiffs' guilt.

**I.** **Defendants Did Not Knowingly Fabricate Evidence and The Evidence Plaintiffs Allege Was Fabricated Was Not Material to Plaintiffs' Convictions.**

There is no direct evidence that Defendants knowingly fabricated evidence. When the Deli investigation is examined through the contemporaneous lens that existed in 1999, as Defendants attempted to piece together the evidence, the record does not support Plaintiffs' claim that Defendants fabricated evidence and manipulated witnesses to convict Plaintiffs. Rather, the record reveals that for 47 days Defendants thoroughly and properly investigated the Deli homicide. Defendants followed leads - some of which led to dead-ends and resulted in immaterial evidence; collected scientific evidence; executed search warrants; obtained and examined phone records; repeatedly traveled to Bridgeport and spoke with individuals connected to the stolen phone; and they interviewed dozens of witnesses, many of whom were recalcitrant, uncooperative, unsavory and had significant criminal records.

In addition to the inculpatory evidence establishing Plaintiffs' guilt, the investigation materials (provided to Plaintiffs' criminal defense counsel) include significant exculpatory evidence that undercuts Plaintiffs' claim that Defendants intentionally fabricated evidence, coerced witnesses, and withheld *Brady* material. The exculpatory evidence includes inconsistencies in Brown's statement, Thompson's and Wolfinger's inexact identifications, non-identifications by other eyewitnesses, inconsistencies in Pallet's statement, and the statements of numerous alibi witnesses. When considered in this context, Plaintiffs' claims fall far short of meeting their burden under the law, and summary judgment should be granted.

*     *     *

To succeed on a § 1983 claim for fabrication of evidence, a plaintiff must prove, by a preponderance of the evidence that: "an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty or property as a result." *Ashley v. City of New York*, 992 F.3d 128, 139 (2d Cir. 2021) (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016)); *see also Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003). However, "a mere mistake, or misinformation, contained in the written record is not a basis for finding a constitutional violation." *Garnett v. Undercover Officer C0039*, No. 1:13-cv-7083-GWH, 2015 U.S. Dist. LEXIS 45232, at *6-7 n. 2 (S.D.N.Y. Apr. 6, 2015).

The Second Circuit has held that government officials "may be held liable for fabricating evidence through false statements and omission that are made knowingly." *Ashley*, 992 F.3d at 139. The Second Circuit has defined "false" as "untrue when made and . . . known to be untrue when made by the person making it or causing it to be made" and "fraudulent" as "falsely made

*with intent to deceive*." *Morse v. Fusto*, 804 F.3d 538, 549 (2d Cir. 2015) (emphasis in original). The Second Circuit has held that information may be "false" if material omissions render an otherwise true statement false. *Id.* at 548.

To prove fabrication of evidence, the false information must be "likely to influence a jury's decision." *Ricciuti*, 124 F.3d at 130 (alleged false confession); *see also e.g., Jocks*, 316 F.3d at 138 (alleged false confession); *Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 452 (S.D.N.Y. 2012 (alleged false inculpatory statement). Whether the fabricated evidence is likely to influence a jury's decision can be satisfied by showing that the fabricated evidence was material to the prosecutor's case. *Garnett*, 838 F.3d at 277. Stated differently, when the false information is immaterial, plaintiff is unable to satisfy his burden of proof. *Jones v. City of New York*, No. 12-CV-3658 (JG), 2013 U.S. Dist. LEXIS 162235, at *30-31 (E.D.N.Y. Nov. 14, 2013) (police officers' allegedly false statements to the district attorney that they conducted a show-up were "insufficiently material" to sustain a denial of fair trial claim because there was identification evidence that "render[ed] evidence of the allegedly fabricated show-up essentially immaterial") (vacated on other grounds, 603 Fed. App'x. 13 (2d Cir. Mar. 4, 2015)).

### A.  Steve Brown's Identification of Plaintiffs Was Not Fabricated.

Plaintiffs offer no direct evidence, only speculation, in support of their claim that Brown's statement and testimony was knowingly fabricated. Further, Plaintiffs' speculative claims are not material given Brown's repeated identifications and sworn testimony that Plaintiffs committed the crime.

Brown was arrested on March 10, 1999, after his fingerprint matched the latent print lifted from the backroom of the Deli. (Defs.' Rule 56a Statement ¶73, 104-105, at 15, 22-23). Dease and Adger interviewed Brown after reading him his Miranda rights.[6] During the interview, Brown identified Plaintiffs as co-perpetrators. (Defs.' Rule 56a Statement ¶¶106-107, at 23). Plaintiffs were subsequently arrested. (Defs.' Rule 56a Statement ¶119, at 26). Brown testified at Plaintiffs' criminal trial, identifying Horn and Jackson as his accomplices. In 2011 and 2013, Brown testified at Horn's and Jackson's *habeas* hearings, again confirming that he committed the crime with Plaintiffs. Brown has not testified in the current lawsuits, and he has never recanted. (Defs.' Rule 56a Statement ¶126-127, at 28).

Brown's statement to the detectives provides a detailed account of his interactions with Plaintiffs and their involvement in the crime. (Defs.' Rule 56a Statement ¶114 (a)-(e), at 24). Plaintiffs cite to "inconsistencies" in Brown's testimony as support that his statement was fabricated. However, Brown gave a version to the detectives that minimized his involvement in the crime. It was an exculpatory version that he was forced at gunpoint to participate in a robbery that he did not know was going to occur. The detectives documented it in police reports and on tape as Brown presented it.

Brown admitted at trial that he was not completely truthful with the detectives, as he minimized his active role in the crime because he was afraid of being charged with a murder he did not commit. (Defs.' Rule 56a Statement ¶123, at 26). Brown admitted he was a willing participant in the murder (Defs.' Rule 56a Statement ¶125 (e), at 27), he helped search the back room of the Deli, (Defs.' Rule 56a Statement ¶125 (i), at 27), and wielded a gun (Defs.' Rule 56a Statement ¶125 (f), at 27). In both statements, however, he was consistent with the witness's description of the robbery. Both versions were subjected to vigorous cross-examination at both

---

[6] Breland did not participate in Steve Brown's interview.

the criminal trial and the two *habeas* hearings. Nevertheless, Brown's testimony has remained essentially the same, and his identification of Plaintiffs has never wavered. (Defs.' Rule 56a Statement ¶114 (a)-(m), at 24-25).

Brown denied at trial that the detectives told him who to identify. He also denied being promised anything for his cooperation. (Defs.' Rule 56a Statement ¶125 (n), at 27-28). Plaintiffs speculate that Brown was fed fabricated evidence during a pre-interview where detectives "coached" Brown into inculpating Horn and Jackson. There is no direct evidence of this and Plaintiffs' allegations in this regard are speculation.

Pre-interviews were used as an introduction to an interview to relax the witness and determine what relevant information the witness knew. Pre-interviews were a common interviewing practice at NHPD. (Defs.' Rule 56a Statement ¶¶109-110, at 23). Notes were not required to be taken during the interview (Defs.' Rule 56a Statement ¶112, at 24); however, if notes were taken, discarding the notes after they were incorporated into a report was permitted and common practice. (Defs.' Rule 56a Statement ¶113, at 24).

Adger confirmed she and Dease conducted a pre-interview of Brown. She took notes and prepared a report, but she discarded her notes thereafter. (Defs.' Rule 56a Statement ¶112, at 24). She testified that the taped statement taken after the pre-interview, mirrors what was discussed with Brown in the pre-interview. (Defs.' Rule 56a Statement ¶114, at 24).

Simply put, there is no direct evidence that Brown was provided facts to fabricate his statement and testimony. *See, Bellamy*, 914 F.3d at 750. ("[w]hen reviewing a summary judgment determination, [the court] may only consider admissible evidence … pure speculation…is insufficient to raise a triable issue of fact"). Plaintiffs can only speculate that

Brown's statement was fabricated, and therefore, summary judgment should be granted as to this allegation.

### B.  Shaquan Pallet's Identification of Plaintiffs Was Not Fabricated.

Plaintiffs also speculate that Pallet's identification of Plaintiffs was fabricated. Pallet testified at Plaintiffs' criminal trial that he saw Plaintiffs outside the Deli just as they were entering the Deli to commit the crime. Pallet has never recanted.

Pallet gave a statement to the detectives in early March 1999. (Defs.' Rule 56a Statement ¶129, at 28). Pallet stated that when he and Hardy arrived at the Deli, he saw three men standing on the side of the Deli smoking "wet" (marijuana soaked in embalming fluid). (Defs.' Rule 56a Statement ¶131, at 28-29).  Pallet recognized Plaintiffs, having previously seen them at the Deli. The third person stood further back in the dark and Pallet could not see his face. (Defs.' Rule 56a Statement ¶132, at 29).

Hardy and Pallet entered the Deli. Hardy and purchased cigarettes and gave some to Pallet. (Defs.' Rule 56a Statement ¶133, at 29).  As Pallet left the Deli, two of the three men he had seen smoking "wet" were outside the door pulling skellies (masks) down on their faces. Pallet was wearing a gold chain and thought he might be robbed. Pallet then walked to the taxi and left. (Defs.' Rule 56a Statement ¶¶134-135, at 29).

During the early March interview, Pallet was shown a photo array of suspects. However, he was afraid to make a positive identification. Instead, Pallet pushed away all the photos except Horn and Jackson's photos, saying, "take it for what it's worth." (Defs.' Rule 56a Statement ¶136, at 29).

On March 23, 1999, the day after Horn's arrest, Pallet was arrested by the NHPD for unrelated robberies. (Defs.' Rule 56a Statement ¶137, at 29-30). Dease arranged to interview

Pallet with Assistant State's Attorney, Gary Nicholson, the lead prosecutor of the Deli robbery. (Defs.' Rule 56a Statement ¶138, at 30). During the interview, Pallet repeated his statement from early March, but this time, he positively identified Horn and Jackson from a photo array. He also gave a taped transcribed statement, identifying Plaintiffs. (Defs.' Rule 56a Statement ¶139, at 30). Pallet testified consistently with his transcribed statement at Plaintiffs' criminal trial. (Defs.' Rule 56a Statement ¶142, at 30).

Plaintiffs assert that inconsistencies in Pallet's statement and testimony confirm that his testimony was fabricated. However, these inconsistencies in Pallet's testimony and impeachment issues that Plaintiffs raise have existed since Plaintiffs' criminal trial. There is no direct evidence that Pallet's testimony was fabricated, or that Pallet was coerced, threatened, or physically harmed or intimidated, resulting in his statement and trial testimony. There is also no evidence that Pallet's testimony was coached.

A hearing on a Motion to Suppress Pallet's identification of Horn and Jackson was conducted during the criminal trial and denied. (Defs.' Rule 56a Statement ¶140, at 30). Additionally, through the years, Judges, a jury, and Appellate Courts have addressed Pallet's identification of Plaintiffs, which has never been discredited. Plaintiffs' assertion that Pallet lied is not based on evidence, but on pure conjecture.

Plaintiffs claim Pallet falsely identified Plaintiffs to obtain leniency for unrelated crimes. However, this theory is an unsubstantiated and was tested at trial. If Pallet had lied, it would have undercut any deal he could have made with the prosecutor for a favorable sentence.[7] Plaintiffs offer no new material evidence that discredits Pallet's identification of Plaintiffs. Plaintiffs can

---

[7] Plaintiffs refer to a recantation note authored by Pallet in their Complaint. (Horn's Amended Complaint, ¶153). This issue was raised at the criminal trial and the court struck the testimony and recantation note and advised the jury to disregard it. (Defs.' Rule 56a Statement ¶142-145, at 30-31).

only speculate that Pallet's statement and testimony was fabricated, and therefore, summary judgment should be granted as to this allegation.

### C. Omitting Kendall Thompson's Initial Denial From The Police Reports That He Could Not Identify the Masked Assailants is Not a *Brady* Violation.

Plaintiffs allege that Defendants violated *Brady* by failing to include in the police reports Thompson's alleged initial denial during his police interview that he could not identify Plaintiffs.[8] This claim fails, however, because Thompson's initial identifications were uncertain, and he then testified at Plaintiffs' criminal trial that he could not identify Plaintiffs as being involved in the Deli robbery. Accordingly, omitting Thompson's initial denial was not material evidence under *Brady*.

Thompson first claimed that he told detectives he could not identify anyone during his 2019 deposition in these cases – 20 years after the crime. Thompson testified that he told detectives "about 18 times" that he could not make an identification. (Defs.' Rule 56a Statement ¶¶247-250, at 49-50). Breland added at his deposition that Thompson reluctantly agreed to an interview because he was scared, and that he initially stated he could not identify the offenders "maybe twice", but that Thompson then added that he could make general identification based on "[the offender's] nose, the complexion and the eye content." (Defs.' Rule 56a Statement ¶248, at 49).

In 1999, Thompson was 19 years old. He was on adult probation and had prior arrests. (Defs.' Rule 56a Statement ¶234, at 47). Thompson walked into the Deli as the robbery was taking place. (Defs.' Rule 56a Statement ¶234, at 47). Because the gunmen wore masks, he could

---

[8] This *Brady* allegation, based on Thompson's initial denial, was not included in the Plaintiffs' original Complaints. It is also not included in their First Amended Complaints. Rather, Plaintiffs asserted this claim by notice letter on January 27, 2020 (Horn), and January 30, 2020 (Jackson), months before the First Amended Complaint was filed. Plaintiffs associated Kendall Thompson's statement with paragraph 250 of the Horn Complaint and paragraph 191 of Jackson's Complaint, which states that the detectives failed to disclose other *Brady* material to the State's Attorney's office was well.

only see one of the gunmen's eyes and mouth and the complexion of another. (Defs.' Rule 56a Statement ¶¶23-24, at 6). Thompson was able to flee during the robbery, escaping the area with his friend. He did not call the police. Thompson's identity became known to the detectives a few days later when Thompson described the robbery to another friend, and this friend led the police to Thompson's house. (Defs.' Rule 56a Statement ¶¶235-237, at 47-48).

Thompson initially refused to cooperate, but he ultimately agreed to an interview. (Defs.' Rule 56a Statement ¶237, at 48). During the interview, Thompson picked Horn's photo from a photo array because Horn's eyes and mouth in the photo appeared similar to the nose and yellow eyes of the gunman. (Defs.' Rule 56a Statement ¶241, at 48). Thompson selected Jackson's photo because the other gunman's complexion was similar to Jackson's. Thompson said he had seen Jackson before on the basketball court. (Defs.' Rule 56a Statement ¶242, at 48).  During the interview, Thompson stated he was not 100% certain of his identifications. (Defs.' Rule 56a Statement ¶243, at 49).

Thompson's uncertain identifications of Horn and Jackson were subjected to cross-examination at Plaintiffs' criminal trial. Thompson testified that he never told detectives he could identify anyone, and he was surprised the detectives showed him a photo array. (Defs.' Rule 56a Statement ¶240, at 48). He testified that he picked Horn's photo because Horn's eyes and mouth looked like the yellow eyes and mouth of the assailant, *not because he saw Horn in the Deli during the robbery*. (Defs.' Rule 56a Statement ¶241, at 48). Thompson picked out Jackson because he recognized Jackson from seeing him on the basketball court. *Thompson did not identify Jackson because he saw Jackson in the Deli during the robbery.* (Defs.' Rule 56a Statement ¶242, at 48). Thompson also confirmed that he was not sure of his identifications.

(Defs.' Rule 56a Statement ¶243, at 49). Thompson testified at the criminal trial that he was *not* pressured by police. (Defs.' Rule 56a Statement ¶244, at 49).

In 2012, Thompson was serving a 10-year prison sentence, when he was visited by "three attorneys". During the meeting, Thompson, for the first time, attributed his uncertain identifications to pressure exerted by the detectives. (Defs.' Rule 56a Statement ¶¶245-246, at 49). Thompson's 2012 written statement does not state that he initially told police he could not identify anyone – the allegation lodged here. (Defs.' Rule 56a Statement ¶247, at 49). Rather, at his deposition in these lawsuits, Thompson testified that everything he told the detectives, and his trial testimony was true. (Defs.' Rule 56a Statement ¶252, at 50).

Thompson's alleged undisclosed denial of his inability to identify Plaintiffs is not material evidence given his very equivocal identification and his inability at trial to place Horn and Jackson in the Deli. He testified that he could not identify Plaintiffs as having committed the crime, but that Plaintiffs' features (their eyes, mouth, and complexion) were similar to the assailants.

Further, Thompson's uncertain identifications of Plaintiffs was only one piece of evidence linking Plaintiffs to the crime. Impeachment evidence has been found to be material under a *Brady* analysis where the witness at issue supplied *the only evidence* linking the defendant to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case. *See e.g., Smith v. Cain*, 565 U.S. 73, 76, 132 S. Ct. 627, 630 (2012) (emphasis added); *United States v. Ruiz*, 536 U.S. 622, 628, 122 S. Ct. 2450, 2454-55 (2002) (characterizing *Giglio v. United States* as defining "exculpatory evidence" to include "evidence affecting witness credibility, where the witness' reliability is likely determinative of guilt or innocence").

Thompson's uncertain, general identifications were not the only evidence linking Plaintiffs to the crime. At trial, Thompson admitted he was not identifying Horn or Jackson as the perpetrators in the Deli at the time of the robbery.  Further, Thompson's initial reticence, criminal history, jailhouse recantation, and inconsistent statements, discredit his recantation deposition in these cases. His deposition testimony is also consistent with his trial testimony where Thompson fully disclosed the limitations of his identifications.

Accordingly, Plaintiffs' assertion that Defendants failed to disclose in their reports Thompson's alleged denial that he could not identify Plaintiffs during his interview with the detectives was not material to Plaintiffs' guilty verdict, and it is not material to Plaintiffs' claims in these lawsuits. Therefore, summary judgment should be granted as to this allegation.

### D. Statements Related to the Fourth Phone Call from the Stolen Cell Phone Were Not (1) Knowingly Fabricated; (2) Coerced; and (3) Material Exculpatory *Brady* Evidence.

Defendants did not fabricate and/or coerce Pearson into claiming he made the fourth phone call with the stolen cell phone.[9] It is important to appreciate how, through proper policing, the facts led Defendants to question Pearson, and how and why Pearson claimed to have made the phone call without Defendants having fabricated or coerced this admission. In this context, Defendants reasonably accepted and relied on Pearson's admission.

We now know, through a greater appreciation of cellular technology, that Pearson did not make the fourth phone call from his porch in New Haven. However, the fact that Pearson did not make the phone call, does not compel the conclusion that Defendants knowingly fabricated and coerced Pearson's admission. Rather, when the evidence is examined in the context of the totality of the circumstances as it was understood contemporaneously when received by the

---

[9] Adger was not involved in any of the interviews of Marcus Pearson.

Defendants during the investigation, it is apparent that Defendants did not knowingly fabricate and coerce Sykes's and Pearson's statements regarding the fourth phone call.

When Defendants received the call detail record for stolen cell phone on February 2, they had already learned that Pearson and Horn were at the Deli just before and after the crime. Defendants also knew that Pearson spoke to Horn at the Deli just before and after the crime. (Defs.' Rule 56a Statement ¶¶45, 89, at 10, 19). However, when Breland interviewed Pearson, two days after the crime, Pearson claimed he did not recall who he spoke to in the Deli parking lot or what was said. (Defs.' Rule 56a Statement ¶88, at 19).

Thereafter, Defendants learned that Pearson had spoken to Horn in the parking lot, and Horn was overheard saying to Pearson, that he will probably see him later (Defs.' Rule 56a Statement ¶¶45, 8 at 10, 3). Thus, Pearson's veracity was in question and his possible involvement in the crime was considered when Breland and Dease interviewed Pearson about the stolen cell phone.

Defendants also learned that Pearson and Horn were drug dealers (Defs.' Rule 56a Statement ¶¶261-217, at 43), and that Zaneta was Pearson's girlfriend. However, Horn and Jackson had earlier that morning picked up Zaneta, and she was in their car when they were at the Deli just before the crime. (Defs.' Rule 56a Statement ¶¶41, 43, at 9-10). Horn withheld Zaneta's presence at the Deli from Pearson when Horn and Jackson spoke in the parking lot. Horn told Defendants that he had sex with Zaneta at Jackson's apartment, before Horn walked Zaneta back to the Deli so she could meet Pearson. Zaneta denied having sex with Horn. (Defs.' Rule 56a Statement ¶¶45, 62, 63, at 13). She admitted Horn wanted to have sex with her, but she refused. (Defs.' Rule 56a Statement ¶53, at 10,11).

Defendants had also interviewed Horn and Jackson shortly after the crime before the call detail record was received, and Defendants learned that Horn and Jackson did not have airtight alibis. Their alibi witnesses also provided facts that conflicted with Horn and Jackson's version of the events and/or implicated them in the crime. As a result, when the call detail record was received, it was appropriate for Defendants to have questioned Sykes (who was connected to a call from the stolen phone) and then Pearson concerning their possible connection to the stolen phone and involvement in the crime.

### E. Crystal Sykes' Statement That Marcus Pearson May Have Called Her Was Not Fabricated and Was Not Material to Plaintiffs' Convictions.

#### i. Sykes' Statement Was Not Fabricated.

After receiving the call detail record, Defendants tracked the fourth phone call to the New Haven house where Sykes worked as a live-in caregiver. Defendants met Sykes at the home on February 2, but she was uncomfortable speaking there because it was where she worked. At her request, the discussion was continued at the police station. Sykes arrived later with her mother. (Defs.' Rule 56a Statement ¶¶80-82, at 17-18).

Because Pearson was a person of interest, Defendants asked Sykes if she knew Pearson, and if Pearson had made the fourth call to her. Sykes informed Defendants that she had known Pearson for months; that Pearson sold her drugs; that Pearson had been calling her recently regarding an invitation to her birthday party; and that it was possible Pearson called her at the time of the fourth phone call. (Defs.' Rule 56a Statement ¶82, at 18).

Prior to recording a taped statement from Sykes, Defendants conducted a "pre-interview" with Sykes to determine what she knew about the fourth call. During the pre-interview, Sykes said she was not sure who called her, but there was a "good possibility" that Pearson called her at the time of the fourth phone call. (Defs.' Rule 56a Statement ¶83-84, at 18). Sykes never told

Defendants that someone other than Pearson called her. Based on this, Defendants documented Sykes' response to their questions in a taped statement. In her transcribed statement, which was provided to Plaintiffs' defense counsel, Dease repeated that it was a "good possibility" Pearson called her, quoting Sykes from her pre-interview, and Sykes replied, "Yes." (Defs.' Rule 56a Statement ¶84, 86, at 18-19).

As a matter of law, Sykes' statement was voluntary and not fabricated. Plaintiffs' theory that Sykes' statement was fabricated was tested at Plaintiffs' *habeas* hearings, yet those hearings produced no evidence that Defendants mistreated Sykes or coerced her statement and testimony.

At Horn's *habeas* hearing, Sykes vacillated concerning receipt of the fourth call. Nevertheless, she confirmed that Pearson may have called her. Her confirmation regarding this possibility was consistent with the fact that Sykes had known Pearson, he sold her drugs, and Pearson had frequently called her at the New Haven residence. (Defs.' Rule 56a Statement ¶¶82, 83, at 18). Based on this information, Defendants reasonably relied on information obtained from Sykes and they proceeded to interview Pearson about the fourth call.

Plaintiffs have produced no affirmative evidence that Defendants put words in Sykes' mouth. She was free to respond to the questions as she chose. Further, there is no evidence that Defendants attempted to embellish Sykes' statement to be more inculpatory than what is included in the transcript. Sykes' involvement and her equivocation concerning the fourth phone call was not concealed. Based on these facts, Defendants reasonably believed Pearson may have called Sykes.

### ii.  Sykes' Statement Was Not Material to Plaintiffs' Convictions.

Sykes did not testify at the criminal trial. Because of this, Sykes' statement was not material and not causative to Plaintiffs' convictions.[10]

Sykes did testify at Jackson's and Horn's *habeas* hearings in 2011 and 2013. At the hearings, Sykes confirmed that her transcribed statement was true. (Defs.' Rule 56a Statement ¶86, at 19). However, the Judge at Horn's *habeas* hearing concluded that Sykes' testimony concerning whether Pearson called her provided "no clarity on the issue" and did not help either side. (Defs.' Rule 56a Statement ¶87, at 19). Accordingly, Sykes' statement was found not to be material, had no influence on the fact finder at Horn's *habeas* hearing, and her statement is not material to Plaintiffs' fabrication claims.

In addition, there is no evidence that Defendants knew what Sykes told them was not true. Plaintiffs' assertion in this regard is speculative, as even Sykes ultimately admitted that she told detectives the truth.

**F. Pearson's Claim That He Made the Fourth Phone Call (1) Was Not Fabricated; (2) Was not Coerced; (3) Was not Material Exculpatory Evidence; and (4) is Subject to Qualified Immunity.**

---

[10] In *Zahrey v. Coffey*, the Second Circuit held that "the manufacture of false evidence 'in and of itself' . . . does not impair anyone's liberty, and therefore does not impair anyone's constitutional right . . . the deprivation of liberty which [plaintiff] complains [must] be shown to be the result of [the defendant's] fabrication of evidence." 221 F.3d 342, 348 (2d Cir. 2000). The court then went on to cite the following case illustrations: *Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994) ("*Buckley IV*") (if prosecutor tortured witness to obtain statement implicating defendant and put statement "in a drawer, or framed it and hung it on the wall *but took no other step*," no constitutional right of defendant would be violated) (emphasis in original); *Landrigan v. City of Warwick*, 628 F.2d 736, 744 (1st Cir. 1980) ("We do not see how the existence of a false police report, sitting in a drawer in a police station, by itself deprives a person of a right secured by the Constitution and laws.").

### i. Defendants Did Not Knowingly Fabricate Pearson's Claim That He Made the Fourth Phone Call.

Defendants did not fabricate Pearson's statement and testimony that he made the fourth phone call. Rather, Pearson's assertion that he made the call resulted from a proper investigation and Defendants reasonably accepted Pearson's admission based on facts known to the Defendants at the time.

By the age of 21, Pearson was familiar with law enforcement and the criminal justice system. Pearson began committing crimes at the ages of 10 and 13, when he stole cars and sold and used drugs. (Defs.' Rule 56a Statement ¶216, at 43). Prior to the Deli robbery, Pearson had been convicted of selling narcotics and was sentenced to five years (three years suspended). His incarceration was followed by three years of probation beginning after his release in 1997. In January 1999, he had one year remaining on probation. (Defs.' Rule 56a Statement ¶217, at 43).

In 1998, Pearson was the father of twin children. He met the children's mother when he was released from prison in 1997. The twins were born in June 1998. (Defs.' Rule 56a Statement ¶218, at 43). In January 1999, the twins' mother was incarcerated in Niantic, Connecticut. As a result, Pearson was allegedly caring for the twins with his mother and hiring a babysitter. (Defs.' Rule 56a Statement ¶219, at 43). Despite being on probation and being a new father, Pearson admitted that in January 1999 he was selling and using drugs. Pearson understood that this conduct alone could have caused his probation to be violated. (Defs.' Rule 56a Statement ¶220, at 43).

Defendants spoke with Pearson at his home on February 3, 1999, the day after they spoke to Sykes. (Defs.' Rule 56a Statement ¶90, at 20). Breland explained to Pearson that a phone call was made to Sykes at the New Haven phone number that appeared in the call detail record; that

61

Sykes said Pearson was her drug dealer; that Pearson had been calling Sykes; and that she said he may have made the fourth call to Sykes. (Defs.' Rule 56a Statement ¶223 (k)-(m), at 44-45).

At the February 3 interview, Pearson stated that on January 25, 1999, Horn and Horn's cousin Sholanda Jenkins (known as Yogi) were on his porch with Pearson at approximately 11:00 a.m. when Horn lent Pearson a cell phone. Pearson then used the cell phone to call Sykes because he was upset that Horn said he had sex with Zaneta. Pearson wanted to show Horn that he had another girlfriend. (Defs.' Rule 56a Statement ¶91, at 20). Pearson provided a transcribed statement of his admission, however, after Breland submitted the tape to be transcribed at the NHPD, he did not receive a transcribed copy. This lead Breland to believe the tape had been lost. (Defs.' Rule 56a Statement ¶92, at 20).

As a result, on February 5, 1999, Breland returned to Pearson's house to repeat the interview with a new tape, and Pearson obliged. Pearson's mother was also home. In Pearson's February 5, 1999 taped statement, Pearson repeated his previous statement that Horn lent him a cell phone on his porch, which he used to call Sykes. (Defs.' Rule 56a Statement ¶¶92-93, at 20). In both his February 3 and February 5 statements, Pearson identified Horn's cousin Yogi as also being present on the porch. In each statement, Pearson stated that his mother arrived home from work when he, Horn, and Yogi were on the porch. (Defs.' Rule 56a Statement ¶¶94-95, at 20-21). In his statements, Pearson added that the statements were voluntarily and, when asked, he declined to provide additional information. (Defs.' Rule 56a Statement ¶¶93-94, at 20-21).

Dease then asked Pearson to come to the station with his mother to see if they could identify Yogi. On February 9, 1999, Pearson and his mother came to the station. They identified a photo of Yogi as Sholanda Jenkins. (Defs.' Rule 56a Statement ¶¶95-96, at 21). During the interview, Pearson confirmed that he made the fourth the phone call to Sykes.

The allegation that Defendants fabricated Pearson's statement and testimony that he made the fourth phone call is meritless. Given the totality of the evidence and circumstances, Defendants reasonably believed and accepted that Pearson called Sykes. As a result, summary judgment as to this claim should be granted.

### ii. Defendants Did Not Coerce Pearson's Admission That He Made the Fourth Phone Call.

Plaintiffs assert that Pearson lied about making the fourth phone call because he was coerced. However, the facts do not support this claim.

The Due Process Clause of the Fourteenth Amendment prohibits the admission of coerced confessions procured by means "so offensive to a civilized system of justice that they must be condemned." *Colorado v. Connelly*, 479 U.S. 157, 163, 107 S. Ct. 515, 519 (1986). An admission is deemed to be coerced when the conduct of the law enforcement officials is such as to overbear the accused's will to resist. *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987). An involuntary confession may result from psychological, no less than physical, coercion by law enforcement officials. However, not all psychological tactics are unconstitutional. *Id.*

In determining whether a confession was unconstitutionally elicited, courts look at the totality of the circumstances concerning whether a defendant's will was overborne in a particular case. *Id.* Factors to consider in assessing the totality of the circumstances include the age, education, and intelligence of the accused, whether the accused has been informed of his constitutional rights, the length of the questioning, the repeated and prolonged nature of the questioning, and the use of the physical punishment, such as deprivation of food or sleep. *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-226, 93 S. Ct. 2041, 2047 (1973)); *see also, Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988); *Terry v. LeFevre*, 862 F.2d 409, 413 (2d Cir. 1998).

In the cases *sub judice*, the totality of the circumstances does not support Pearson's after-the-fact claim that his statement was involuntarily coerced. Rather, the facts support that at the time of the investigation, Pearson was a drug-dealing, convicted felon, whose admission to making the fourth phone call was not the result of coercion, but rather a self-serving means to deflect blame away from himself and onto Horn. The facts also support that Defendants' interviews of Pearson were proper and not "so offensive to a civilized system of justice that they must be condemned."

### iii. Pearson Was a Criminal Whose Will Was Not Overcome.

In 1999, Pearson was a convicted felon and drug dealer, who was on probation. He was 6'0", 240 lbs. (Defs.' Rule 56a Statement ¶221, at 43). By age 21, he had already led a life of crime for 10 years. (Defs.' Rule 56a Statement ¶216, at 43). Subsequently, Pearson has spent a significant portion of his adult life incarcerated. Pearson has had many encounters with law enforcement and the legal system. It is within this context in which the present claims of coercion must be considered.

There is no evidence Pearson was not at least of average intelligence. There is also no evidence that Pearson was particularly susceptible to police pressure. Pearson had a decade of experience of dealing with law enforcement, the criminal justice system, and police questioning. Furthermore, at the inception of Deli investigation and Pearson's initial interview, he did not provide the complete truth about his contacts and communications with Horn just before the crime. (Defs.' Rule 56a Statement ¶¶45, 88-89, at 10, 19). Pearson readily lied to police, and he was not susceptible to being easily overcome by police questioning.

### iv.  Pearson's Interviews Were Not Coercive.

Pearson was interviewed five times. The first interview was on January 26, 1999. Pearson admitted he was not coerced during this interview. (Defs.' Rule 56a Statement ¶¶88, 226, at 19, 45). At this interview, Pearson lied about his contacts with Horn.

Pearson was interviewed four additional times, although two of these interviews (the January 28 and February 3 interviews) resulted because there were problems with transcriptions of the taped statements. (Defs.' Rule 56a Statement ¶¶92, 93, at 20). The follow-up interviews were repeat interviews to re-tape the previous statements. Over the course of the interviews, Pearson was questioned by Breland and Dease, two African American officers.

The interviews were short. They occurred during normal hours. The interviews were not of the length where Pearson's stamina was overcome. Pearson has not complained of the length of the interviews, nor has this been alleged. The interviews were significantly shorter than instances in which Courts found interviews to not be coercive. *See e.g., Guarno*, 819 F.2d at 31 (upholding finding that confession was voluntary when interview lasted approximately two and a half hour); *United States ex rel. Stanbridge v. Zelker*, 514 F.2d 45, 51 (2d Cir. 1975) (finding confession voluntary when interrogation lasted seven or eight hours)*, overruled on other grounds by Cruz v. New York*, 481 U.S. 186, 107 S. Ct. 1714 (1978); *United States ex rel. Coleman v. Mancusi*, 423 F.2d 985, 986-87 (2d Cir. 1970) (upholding on *habeas* review a finding that confession was voluntary after six-hour interrogation).

At his deposition, Pearson testified that he felt harassed by the number of times he was interviewed. However, two of the interviews were repeat interviews to re-transcribe a previous statement. By the time several of the interviews were conducted, Pearson had already admitted

he had made the fourth phone call. The interviews were merely to re-tape the statement and then have Pearson identify Yogi. Pearson did not recant his initial admission to making the phone call at these interviews. There is no evidence that Defendants interviewed Pearson to harass him (as Pearson claims) or wear him down.  Each interview served a legitimate investigatory purpose.

Additionally, many of the interviews were at Pearson's home, and his mother was present. In at least one of the tapes, Pearson's mother can be heard in the background. At the last interview on February 9, 1999, where Pearson and his mother identified Yogi and reaffirmed that he made the fourth phone call, Pearson and his mother drove themselves to the police station and drove home. By this time, Pearson had days to reconsider his previous statements, but he reiterated his previous statement. Pearson voluntarily showed up at the police station, was interviewed, and left with his mother. (Defs.' Rule 56a Statement ¶¶96-97, at 21).

Pearson is not alleging that he was physically harmed or threatened. He is not alleging he was screamed at. He was not placed in isolation. He was not deprived of food, water, use of the bathroom or other creature comforts. Pearson was not overcome because he wanted the interview to stop, and he never asked to stop an interview. Pearson was never placed in handcuffs. He claims he felt intimidated by the size of the interview room at the police station. He was not exclusively questioned at the police station, and as noted above, some interviews were at his home. There is also no direct evidence that the size of the room at the police station led to his admission. There is also no evidence that the room where he was questioned was any different than interview rooms where police typically interview witnesses.

Pearson claims that he felt psychologically pressured to admit he made the phone call. However, the Second Circuit has recognized that "a mere deception by an interrogator, *ipso facto*, does not invalidate a confession absent other compelling circumstances." *United States ex*

*rel. Lathan v. Deegan*, 450 F.2d 181, 185 (2d Cir. 1971). *See e.g.*, *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (holding that police conduct that is "false, misleading, or intended to trick and cajole the defendant into confession does not necessarily render the confession involuntarily"); *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992) (holding that to prevail on a claim of trickery and deception, plaintiff "must produce clear and convincing evidence that the [investigating agent] affirmatively misled [him]"); *United States v. Sanders*, 92-CR-0192 (LJF), 1992 U.S. Dist. LEXIS 8714, at *3 (S.D.N.Y. June 19, 1992) (holding a police detective's misleading investigative techniques did not rise to the level of coercion of a confession when the misleading statements were not made in a threatening, hostile manner). *See also, Ledbetter v. Edwards,* 35 F.3d 1062, 1069-70 (6th Cir. 1994) (holding than an investigator's use of a series of psychological ploys, including lying about evidence, staging a identification and showing charts and graphs allegedly linking the accused to the crime did not result in an involuntary confession).

Pearson testified at his deposition in these cases that Dease and Breland told him that "[t]he evidence shows that either he [Horn] let you use it [the cell phone], or you took it from the crime scene. Which one is it?" (Defs.' Rule 56a Statement ¶231 (a), at 46). That Dease and Breland told Pearson that he either admit that Horn let Pearson use the phone or Pearson was going to face charges for robbery and murder. (Defs.' Rule 56a Statement ¶231 (b), at 46). That Dease and Breland came up with the idea of Horn giving Pearson the cell phone to call Crystal Sykes because he and Sykes knew each other. (Defs.' Rule 56a Statement ¶231 (c), at 46). That his probation officer called him and said she had knowledge of the situation and if Pearson did not cooperate and give a statement to detectives, she would violate his probation and that he could lose his kids to DCFS (an allegation the probation officer denies). (Defs.' Rule 56a

Statement ¶231 (d), at 46). That Dease and Breland also threatened to violate his probation and he would lose his children. (Defs.' Rule 56a Statement ¶231 (e), at 46). The whole idea of Vernon Horn giving Pearson a cell phone and calling Crystal Sykes came from the detectives. (Defs.' Rule 56a Statement ¶231 (f), at 46). That detectives told Pearson that if he did not cooperate with the statement, his mother would be charged with perjury. (Defs.' Rule 56a Statement ¶231 (g), at 46). That because his children's mother was in prison, if he were charged, Pearson believed the State would take his children and put them in foster care. (Defs.' Rule 56a Statement ¶231 (h), at 46). He felt pressure thinking of himself and his family. (Defs.' Rule 56a Statement ¶231 (i), at 46). Pearson concluded, "I lied for my freedom and my children's wellbeing." (Defs.' Rule 56a Statement ¶231(j), at 47). Pearson stated that at the February 9 interview at the station that his mother attended, Dease and Breland said if he did not tell them what they wanted to hear, he was not going to walk out of there that day. (Defs.' Rule 56a Statement ¶232, at 47).

Defendants deny these accusations. (Defs.' Rule 56a Statement ¶¶98, 99, at 21). Pearson first made these allegations years after Pearson testified consistently with his statement at Plaintiffs' criminal trial. (Defs.' Rule 56a Statement ¶¶224-226, at 45).

Regardless, and assuming *arguendo* that some or all of these accusations are true, given the totality of the circumstances, the accusations are not demonstrative of coercion. Suspects are often in circumstances where their involvement in an alleged crime will have a negative impact on their life. However, questioning a witness and making a witness aware of the consequences that could result do not make such questioning coercive. *See, United States v. Major*, 912 F. Supp. 90, 96 (S.D.N.Y 1996) (detective's statement that defendant faced the rest of his life in prison did not make defendant's confession involuntary); *United States v. Ruggles*, 70 F.3d 262,

265 (2d Cir. 1995) (holding that statements to the effect that it would be to a suspect's benefit to cooperate are "merely common sense factual observations" and are not improperly coercive). The totality of the circumstances, and the claimed means of coercion in this matter, does not substantiate the claim that Pearson's statement regarding making the fourth phone call was coerced.

> **v. Pearson Had Motives to Claim That He Made the Fourth Phone Call, Belying His Claim That He Was Coerced, and It Was Reasonable for Defendants to Have Believed Pearson That He Made The Fourth Phone Call.**

Pearson had motives to claim that he made the fourth phone call, apart from his present accusation that he was coerced. Defendants understood during the investigation that Pearson may have been directly or indirectly involved in the crime; he may have sought revenge against Horn as a rival drug dealer; or, he may have sought revenge against Horn because Horn claimed he had sex with Pearson's girlfriend, Zaneta. (Defs.' Rule 56a Statement ¶91, at 20).

Nevertheless, it was reasonable for Defendants to have understood that Pearson's statement was truthful and not the result of fabrication or coercion. For this reason, prosecutors called Pearson to testify at trial and he testified that he made the fourth phone call. Defendants, like the prosecutor, understood Pearson's possible motivations, but they reasonably believed that Pearson told the truth when he claimed he made the fourth phone call.

Pearson recanted six years after Plaintiffs' criminal trials, but only after he spoke to Jackson while both were in prison. (Defs.' Rule 56a Statement ¶¶224-225, at 45). An investigator then visited Pearson, and he signed an affidavit recanting his statement and trial testimony that he called Sykes with the stolen cell phone. (Defs.' Rule 56a Statement ¶¶225-226, at 45). Pearson's explanations for his after-the-fact recantation are self-serving and do not substantiate his current claim of coercion.

### vi. Defendants Alleged Failure to Include Pearson's Initial Denial that He Made the Fourth Phone Call in the Police Report, and Pearson's Subsequent Admission that He Made the Fourth Phone Call, is not Material Exculpatory Evidence.

Pearson now claims that when questioned by Defendants, he initially denied making the fourth phone call. Based on this, Plaintiffs assert that Defendants' failure to disclose this initial alleged denial is a *Brady* violation.

Plaintiffs further assert that Pearson's admission that he made the fourth phone call was the result of fabrication and coercion. Both of these allegations fail because they are not material exculpatory evidence that resulted in Plaintiffs' guilty verdict.

The general issue of Pearson's identification was addressed at the criminal trial. Dease's police report states that Dease asked Pearson why he had been reluctant to identify Horn as the person who gave him the phone, and Pearson said that he did not want to "rat anyone out." (Defs.' Rule 56a Statement ¶97, at 21). Pearson, however, denied stating this to Dease. Nevertheless, this issue, i.e., Pearson's reticence to state that he made the fourth phone call, was addressed at the criminal trial. He also testified that the police harassed him and that he did not remember calling Sykes until the police showed him the stolen phone records and "made it clear that I used the phone." (Defs.' Rule 56a Statement ¶223(k-m) at 44-45). Lastly, Plaintiffs' present allegation that the police report did not reflect his initial denial is insignificant in comparison to the totality of the evidence adduced at trial, rendering his allegation immaterial.

In this regard, the evidence that Pearson made the fourth phone call is not the only evidence linking Plaintiffs to the crime. Evidence impeaching an eyewitness may not be material

if the State's other evidence is strong enough to sustain confidence in the verdict. *Smith*, 565 U.S. at 76. "[I]mpeachment evidence is not material if the testimony of the witness was corroborated, or when the suppressed evidence 'merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *United States v. Payne*, 63 F. 3d 1200, 1210 (2d Cir. 1995) (citing *United States v. Rosner*, 516 F.2d 269, 273-4 (2d Cir. 1975)); *see also Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1971) (no finding of materiality when the undisclosed evidence is merely "possibly useful to the defense but not likely to have changed the verdict"); *United States v. Amiel*, 95 F.3d 135, 145 (2d Cir. 1996) (rejecting *Brady* challenge where defense counsel already impeached witness with "lies previously told under oath").

The phone evidence does not discredit the abundance of evidence that linked Plaintiffs to the crime. Specifically, the absence of the evidence related to Pearson making the fourth phone call does not negate Brown's identification of Plaintiffs as his co-assailants. It also does not impact the general and partial identifications provided by Thompson and Wolfinger, and the certain identification by Pallet. It also does not create an alibi for Plaintiffs or negate the additional evidence that implicates Plaintiffs. Consequently, the evidence regarding the fourth phone call is not material and was not determinative of Plaintiffs' guilty verdict.

In *Horn v. Comm'r of Corr.*, the Connecticut Supreme Court considered all the evidence presented at trial and found that even if Horn were not in possession of the stolen cell phone, there was sufficient evidence to convict him. 321 Conn. 767, 788, 138 A.3d 908, 920 (2016). The Court further summarized the trial evidence, ruling that assuming Horn never possessed the stolen cell phone, sufficient evidence remained to convict Plaintiff. *Id.* at 788. The Court stated that, "contrary to the determination of the *habeas* court, the new evidence regarding the location

and use of the stolen cell phone in the days following the robbery and murder does not undermine confidence in the petitioner's guilty verdict . . ." *Id.* at 791.  Lastly, the cell tower evidence that was most recently learned merely furnishes an additional basis to challenge the previously admitted evidence, the credibility of which has already been shown to be questionable by the Connecticut Supreme Court: Therefore, the new evidence is cumulative and not material. *Id.* at 787.

### viii. Qualified Immunity Bars Liability Under Plaintiffs' Allegation that Pearson's Testimony that He Made the Fourth Phone Call Was Coerced.

Qualified immunity bars Plaintiffs' claims that Pearson's statements were fabricated or coerced. The Second Circuit uses a two-pronged test to determine if qualified immunity applies. "Qualified immunity shields government officials from claims for money damages unless a plaintiff adduces facts showing that (1) the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S. Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)); *accord Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013). *Mara v. Rilling*, 921 F.3d 48, 68 (2d Cir. 2019).

Specifically, the law must be so clearly established with respect to the "*particular* conduct" and the "specific context" at issue that "every reasonable official would have understood that his conduct was unlawful." *Mullenix v. Luna*, 557 U.S. 7, 12, 136 S. Ct. 305, 308 (2015) (emphasis in original) (internal quotation marks omitted). If the illegality of the challenged conduct would not be so apparent, officers are entitled to qualified immunity. *See, Zalaski*, 723 F.3d at 389. "In short, if at least *some* reasonable officers in the defendant's position 'could have believed that the challenged conduct was within the bounds of appropriate police

responses,' the defendant officer is entitled to qualified immunity." *Mara*, 921 F.3d at 68-69. (Emphasis added).

From a policy standpoint: this standard is deliberately "forgiving" to give public officials "breathing room to make reasonable but mistaken judgments" without fear of disabling liability. *Messerschmidt v. Millender*, 565 U.S. 535, 546, 132 S. Ct. 1235, 1244 (2012) (internal citations omitted). The Supreme Court has repeatedly observed that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986)).

With respect to qualified immunity in the context of interviewing witnesses, the methods used must be "so shocking, brutal, and inhumane that every reasonable police officer would be compelled to recognize that they violated substantive due process," and tactics such as "deceit and fear" do not violate this due process. *Mara*, 921 F.3d at 82. Interrogation methods egregious enough to sustain a due process violation have been described as those "so brutal and so offensive to human dignity" that they "shoc[k] the conscience." *Chavez v. Martinez*, 538 U.S. 760, 774, 123 S. Ct. 1994, 2005 (1994) (citing *Rochin v. California*, 342 U.S. 165, 172, 72 S. Ct. 205, 209 (1956) (overturning conviction based on evidence obtained by involuntary stomach pumping)); see also *Johnson v. Newburgh Enlarged School Dist.*, 239 F.3d 246, 249 (2d Cir. 2001) (denying qualified immunity to public school teacher who, inter alia, dragged, choked, punched and slammed middle-school student against the bleachers and a metal fuse box, and who had assaulted students on four other prior occasions).

Further, even if the conduct in interrogation is shocking or brutal enough to violate the Constitution, if a reasonable official would not have understood on the basis of the case law at the time of the incident that the conduct violated a clearly established constitutional right,

Defendants are still entitled to qualified immunity. *Fountain v. City of White Plains*, No. 13 CV 7016-LTS-FM, 2015 U.S. Dist. LEXIS 127456, at *23 (S.D.N.Y. Sep. 23, 2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 815-16 (2009)).

In these cases*, it cannot be said that every reasonable police officer would have known that Defendants' conduct in interviewing Sykes and Pearson was coercive and violative of the Constitution. Defendants followed the evidence of the fourth phone call from the call detail record to Sykes and then to Pearson, who was already a person of interest and known to have lied.

Years later, Pearson recanted, and he now claims his statement was coerced. However, the objective facts do not support that Pearson's statement was fabricated or coerced. Accordingly, a reasonable police office would not have understood that Defendants' conduct violated the Constitution, and therefore, qualified immunity bars this claim.

### THIRD CAUSE OF ACTION – 42 U.S.C. § 1983 – UNREASONABLY PROLONGED DETENTION (AGAINST DEFENDANTS DEASE, ADGER AND BRELAND)

Plaintiffs assert that Defendants knew that the "ORIG" column in the call detail record provided the cell tower location for the fourth call from the stolen cell phone, and that Defendants obtained this information or could have obtained this information and failed to disclose it to Plaintiffs.

Plaintiffs unreasonably prolonged detention claim fails because 1) it was reasonable for Defendants to not understand the significance of the ORIG information on the call detail records, as no reasonable law enforcement officer in 1999 should have understood the import of the "ORIG" column; 2) removing evidence of the fourth phone call does not exonerate Plaintiffs; and 3) Defendants' conduct does not "shock the conscious."

The Second Circuit has recognized a claim, arising under the Fourth Amendment, for unreasonably prolonged detention. *Russo v. City of Bridgeport*, 479 F.3d 196, 208 (2d Cir. 2007). To prevail on a § 1983 claim for unreasonably prolonged detention, a plaintiff must prove, by a preponderance of the evidence: "(1) that [he] has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the action of the officers violated that right, and (3) that the officers' conduct 'shocks the conscience.'" *Russo*, 479 F.3d at 209 (citing *Cty. Of Sacramento*, 523 U.S. at 846). Under the *Russo* framework, in order to satisfy the first prong, a plaintiff must show that his claim of innocence is "readily-verifiable." *Cafasso v. Nappe*, No. 3:15-CV-920 (MPS), 2017 U.S. Dist. LEXIS 153360, at *22-23 (D. Conn. Sep. 20, 2017) (citing *Russo*, 479 F.3d at 209). In addition, "the evidence must conclusively or affirmatively establish the plaintiff's innocence." *Cafasso*, 2017 U.S. Dist. LEXIS 153360, at *23. *See also, Harewood v. Braithwaite*, 64 F. Supp. 3d 384, 402 (E.D.N.Y. 2014) ("[t]he touchstone of an unreasonable detention claim is the existence of egregious conduct by an officer in connection with specific, readily-verifiable, exculpatory evidence").

## I. Defendants' Could Not Reasonably Have Known or Discovered the Significance of the "ORIG" Column on the Call Detail Record, and Defendants are Entitled to Qualified Immunity.

Plaintiffs assert that Defendants knew or should have known that the "ORIG" column in the call detail record provided the location of the cellular tower from where the fourth phone call originated, and that Defendants could have obtained this information. However, this allegation fails because no reasonable law enforcement officer could have understood the import the "ORIG" column in 1999, as cellular technology was still in its primitive stages, was not used as an investigative tool, and was not understood by law enforcement, including the FBI.

In these cases, despite years of appeals and *habeas* hearings, it was not until 2018, when the significance of the "ORIG" column was first considered. Before then, no detective, prosecutor, judge, criminal defense attorney, or investigator inquired about or knew the significance of the "ORIG" column and what the numbers in the column represented. (Defs.' Rule 56a Statement ¶209, at 41).

In 1999, law enforcement officers, including Defendants, were not trained in cellular-site analysis, and knowledge of cell phone historical analysis was virtually non-existent. (Defs.' Rule 56a Statement ¶210, at 41). FBI cellular technology expert, James Wine, and defense expert, Robert Moledor (a former FBI cellular technology analyst), agree that this investigative technique was developed in 2005. Before 2005, investigative resources and training for law enforcement officers concerning the cellular technology was extremely limited. The FBI did not train its officers in cellular technology in 1999 and the FBI's Cellular Analysis Survey Team ("CAST") was not established until 2010. (Defs.' Rule 56a Statement ¶¶210-211, at 41). As a result, Defendants did not have the expertise or knowledge to conduct a cellular cite origin analysis.

Furthermore, the "ORIG" information on the cell detail record was not hidden. It was available to Plaintiffs' defense counsel and investigators prior to Plaintiffs' criminal trial. It was thereafter available in appeals, *habeas* proceedings, and their Federal *habeas* proceedings. However, none of the Plaintiffs' defense attorneys obtained subpoenas or sought the cellular site information. (Defs.' Rule 56a Statement ¶212, at 41).

Although the call detail record was an exhibit at Plaintiffs' criminal trial, (Defs.' Rule 56a Statement ¶213, at 41-42) it was not until 2018 that Horn's Federal Public Defender, Terrance Ward, investigated the possible import of the information. Ward admitted to the Court

and in a PowerPoint that the cellular site evidence was "NEWLY DISCOVERED EVIDENCE,",
stating:

> We now know from the cellphone evidence that we have uncovered - and that was
> admitted at trial. There was a call detail record that, frankly, no one understood
> was the call record and that the cell tower identification was on there . . . there
> was a column on that one-page record called ORIG, it stands for call origination.
> No one knew that at the time." (*Fed. Habeas* Status Conf. Tr., 6, Apr. 5, 2018).

At the criminal trial, Richard Lindemulder, an employee of Omnipoint Communications
– the service provider of the stolen cell phone - testified to authenticate the call detail record.
Lindemulder was shown the call detail record with the "ORIG" column on it. When asked about
the cellular site origination information, Lindemulder claimed the information could only be
obtained by court order and that information concerning the origin of the call could not be
obtained from the call detail record. We now know that Lindemulder's testimony was incorrect
and misleading, as the "ORIG" column and the numbers identifying the cellular tower location
was included in the call detail record.  (Defs.' Rule 56a Statement ¶¶214-215, at 42). Like
Lindemulder, the attorneys and the Judge failed to appreciate the import of the "ORIG" column.
In the years thereafter, Plaintiffs' defense counsel filed appeals and *habeas* hearings were
conducted, and yet the "ORIG" information was never investigated or understood. To hold the
detectives accountable for what everyone else also did not understand is untenable.

Defendants are entitled to qualified immunity with respect to the alleged failure to
understand the significance of the "ORIG" column in the call record detail, as no reasonable
detective in Defendants' position in 1999 understood the import of this information.
Accordingly, summary judgment should be granted as to Count Three.

**II. Removal of the Fourth Phone Call as Evidence Does Not Exonerate Plaintiffs –
That is, Plaintiffs' Innocence is not Readily-Verifiable.**

If the cellular call location been understood in 1999, and the stolen phone evidence was not used at trial, the result would not have been different, i.e., Plaintiffs would not have been exonerated. For purposes of this analysis, removal of the fourth phone call evidence would not render Plaintiffs' innocence as readily-verifiable. At most, if the cellular tower location evidence had been understood, it would have negated just one piece of evidence. As noted above, in *Horn v. Comm'r of Corr.*, the Connecticut Supreme Court considered all the evidence presented at trial and found that even if Horn were not in possession of the stolen cell phone, there was sufficient evidence to convict him. 321 Conn. 767, 788, 138 A.3d 908, 920 (2016). The Court summarized the trial evidence, ruling that assuming Horn had never possessed the stolen cell phone, sufficient evidence remained to convict Plaintiffs. *Id.* at 788. For these same reasons, the "ORIG" information was not material exculpatory evidence.

The Court further noted, "Actual innocence is not demonstrated merely by showing that there was insufficient evidence to prove guilt beyond a reasonable doubt. Rather actual innocence is demonstrated by affirmative proof that the [Plaintiffs] did not commit the crime. Affirmative proof of actual innocence is that which might tend to establish that the petitioner could not have committed the crime even though it is unknown who committed the crime, that a third party committed the crime or that no crime actually occurred." *Id.* at 803.

Here, omitting the cell phone evidence does not negate the additional evidence that establishes Plaintiffs' guilt, including the eyewitness identifications (Brown, Pallet, etc.), Plaintiffs' lack of alibi witnesses (at the time the crime was committed) and additional incriminating evidence.

### III. Defendants' Failure to Understand the Significance of the "ORIG" Information Does Not "Shock the Conscience."

Defendants' failure to understand the significance of the "ORIG" column does not "shock the conscience". To trigger liability under §1983, "a police officer's actions must 'shock the conscience.'" *Russo*, 479 F.3d at 209-10 (quoting *Cty. of Sacramento*, 523 U.S. at 846). *See also, O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005) (holding that an officer's conduct must be "arbitrary in the constitutional sense"). Specifically, the Second Circuit has held that "deliberate indifference – but not negligence – can support a finding of liability in situations where the government owes a special duty of care to those in its charge." *Russo*, 479 F.3d at 210 (distinguishing *Baker*, where inadvertent omissions, rather than affirmative wrongdoing, led to detention"). *See, Baker v. McCollan*, 443 U.S. 137, 143, 99 S. Ct. 2689, 2694 (1979).

In the context of a claim for unreasonably prolonged detention, where evidence is only "arguably exculpatory," the conduct does not shock the conscience. *Nzegwu v. Friedman*, No. 10-CV-02994 (CBA) (RML), 2014 U.S. Dist. LEXIS 44019, at *45 (E.D.N.Y. Mar. 31, 2014) (*aff'd*, 605 F. App'x 27 (2d Cir. 2015) (citing *Wilson v. City of New York*, 480 F. App'x 592, 595 (2d Cir. 2012)). Moreover, courts in the Second Circuit have consistently held that a police officer's behavior does not shock the conscience when the evidence in question is not in the defendant's exclusive possession. *Nzegwu*, 2014 U.S. Dist. LEXIS 44019, at *13; *see also Cambisaca v. Ruhe*, 2019 U.S. Dist. LEXIS 111568, at *32-33 (S.D.N.Y. July 3, 2019); *Creighton v. City of New York*, 2017 U.S. Dist. LEXIS 21194 (S.D.N.Y. Feb. 14, 2017).

Plaintiffs fail to prove that Defendants knowingly withheld the phone records. Additionally, Plaintiffs also fail to prove that Defendants should have reasonably understood the import of the "ORIG" column. At best, the "ORIG" information is "arguably exculpatory", which does not establish a claim for unreasonably prolonged detention. The evidence falls far

short of the "shocking the conscious," and therefore, summary judgment should be granted as to Count Three.

### FOURTH CAUSE OF ACTION – 42 U.S.C. § 1983 – FAILURE TO INTERVENE
### (AGAINST DEFENDANTS DEASE, ADGER, AND BRELAND)

The Second Circuit has recognized that law enforcement officials "have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). To support a claim for failure to intervene, and overcome the hurdle of qualified immunity, a plaintiff must show that (1) the officer's failure "permitted fellow officers to violate [plaintiff's] clearly established statutory or constitutional rights," and (2) it was "objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." *Ricciuti*, 124 F.3d at 129 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 3040 (1987)). In addition, a plaintiff must show that the officer had "'a realistic opportunity to intervene to prevent the harm from occurring' but failed to do so." *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 619 (E.D.N.Y. 2017). "The essential inquiry is whether, under the circumstances actually presented, an officer's failure to intervene permits a reasonable conclusion that he became a 'tacit collaborator' in the unlawful conduct of another." *Figueroa v. Mazza*, 825 F.3d 89, 107-8 (2d Cir. 2016).

Plaintiffs fail to establish that Defendants failed to intervene to prevent a constitutional violation because Plaintiffs cannot prove that Defendants violated Plaintiffs' Constitutional rights. As explained, Defendants did not withhold material exculpatory evidence (Count One), fabricate and/or coerce evidence (Count Two), or subject Plaintiffs to an Unreasonably Prolonged Detention (Count Three). Thus, there is no basis to allege that Defendants failed to intervene to prevent a Constitutional deprivation that did not exist.

Where the record does not disclose an underlying constitutional violation – and does not suggest that an officer who observed the conduct could have been aware of the alleged constitution violation – summary judgment on a duty to intervene claim is appropriate. *Ferranresso v. Town of Granby*, 646 F. Supp. 2d 296, 308 (D. Conn. 2009).

**SEVENTH AND ELEVENTH CAUSES OF ACTION – NEGLIGENCE
(AGAINST DEFENDANTS DEASE, ADGER AND BRELAND)**

**I.      The Negligence Claims are Barred by the Common Law Doctrine of Governmental Immunity and the Statutory Discretionary Act Immunity.**

As a matter of law, Plaintiffs' negligence claims against the Defendants are barred by the common law doctrine of governmental immunity, and the statutory discretionary act immunity codified in Connecticut General Statutes § 52-227n(a)(2)(B) (hereafter referred to as "discretionary act immunity"). "The law of this state regarding municipalities and their agents is well established. [Our Supreme Court] has previously stated that [a] municipality itself was generally immune from liability for its tortious acts at common law." (Citations omitted; internal quotation marks omitted.)  *Texidor v. Thibedeau*, 163 Conn.App. 847, 856, 137 A.3d 765 (2016). General Statutes § 52-557n(a)(1) abrogates common law municipal immunity from tort liability, and provides that, in certain circumstances, a municipality may be held liable for damages to persons or property caused by the negligent acts or omissions of its employees or agents. "Statutes that abrogate or modify governmental immunity are to be strictly construed . . . when a statute is in derogation of common law or creates a liability where formerly none existed, it should receive a strict construction and is not to be extended, modified, repealed or enlarged in its scope by the mechanics of construction. . . ." *Rawling v. New Haven*, 206 Conn. 100, 105, 537 A.2d 439 (1988).

At common law, a municipal employee is also immune from tort liability for the performance of governmental acts but may be held liable for the misperformance of ministerial acts. *Faulkner v. Daddona*, 142 Conn. App. 113, 119, 63 A.3d 993 (2012) ("*Faulkner*") (*citing Violano v. Fernandez*, 280 Conn. 310, 317-22, 907 A.2d 1188 (2006)). An act that is supervisory or discretionary in nature is a governmental act, meaning a police officer's investigation into a criminal complaint is a matter of discretion. *See Brown v. Dooling*, J.D. of Ansonia-Milford, Docket No. CV90-0032598-S, 1998 Conn. Super. LEXIS 172 at *4 (Jan. 23, 1998, Flynn, J.) (Appendix A). "Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature. . . . The hallmark of a discretionary act is that it requires the exercise of judgment. . . . In contrast, [m]inisterial refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion." *Faulkner*; *see also Mulligan v. Rioux*, 229 Conn. 716, 727, 643 A.2d 1226 (Conn. 1994) (quoting *Gauvin v. New Haven*, 187 Conn. 180, 184, 445 A.2d 1 (1982). This discretionary act immunity applies to police officers when they are performing the typical functions of law enforcement. The policy reflected in this distinction has been stated to be:

> [B]ased on the desire to encourage police officers to use their discretion in the performance of their typical duties. Discretionary act immunity reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury . . ." (Citations omitted; internal quotation marks omitted.)

*Texidor*, 163 Conn. App. at 858-59.

The Connecticut Supreme Court notes, "the provision of police services to a city's general population is a quintessential discretionary governmental act." *Gordon v. Bridgeport Housing Authority*, 208 Conn. 161, 182 (1988). "[A]s a general rule, [p]olice officers are

protected by discretionary act immunity when they perform the typical functions of a police officer." (Citations omitted; internal quotation marks omitted.) *Ventura v. Town of E. Haven*, 330 Conn. 613, 631 (2019). "[A] plaintiff ordinarily must point to some statute, city charter provision, ordinance, regulation, rule, policy, or other directive that, by its clear language, compels a municipal employee to act in a prescribed manner, without the exercise of judgment or discretion." *Id.*; *Coley v. Hartford*, 140 Conn. App. 315, 323, 59 A.3d 811 (2013), *aff'd*, 312 Conn. 150, 95 A.3d 480 (2014). This does not mean, however, that the existence of any statute, policy or order that provides a directive to act or not to act creates a ministerial duty. "The difference between ministerial and discretionary duties though, is not whether they must be performed in the first place.  The difference is whether they can be performed in a prescribed manner without the exercise of judgment or discretion." *Violano*, 280 Conn. at 318; *see also Blake v. Mason*, 82 Conn. 324, 327, 73 A. 782, 1909 Conn. LEXIS 53 ("a ministerial act is one which a person performs in given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done"). No such allegations are made in the First Amended Complaint. *See* Am. Compl.

"Exceptions to governmental immunity will be found only if there is a duty to act that is so clear and unequivocal that the policy rationale underlying discretionary act immunity - to encourage municipal officers to exercise judgment - has no force." (Internal quotations omitted) *Ventura v. Town of E. Haven*, 170 Conn. App. 388, 402, 154 A.3d 1020, *cert granted*, *supra*, 330 Conn. 613, 199 A.3d 1, 2019 Conn. LEXIS 5. The due care standard inherent in a common law negligence claim provides no such unequivocal prescription for action or inaction, such that it creates a ministerial duty. *See Kajic v. Marquez*, Docket No. HHDCV166065320S, 2017 Conn.

Super. LEXIS 4274, *18-19 (Super. Aug. 16, 2017) (Noble, J.) (any duties or acts involving judgment as to what is reasonable care, under variable circumstances are discretionary in nature. "[T]he duty to use reasonable care imposed by our laws of negligence is a quintessentially discretionary duty because it involves the exercise of judgment in evaluating the circumstances requiring action or inaction.") Therefore, Plaintiffs' allegations under a common law negligence theory are barred by discretionary act immunity as codified in General Statutes § 52-227n(a)(2)(B).

There are three recognized exceptions to discretionary act immunity: (1) when the alleged conduct involves malice, wantonness, or intent to injure; (2) when a statute provides for a cause of action against a municipality or municipal official for failure to enforce certain laws; and (3) when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm. *Doe v. Petersen*, 279 Conn. 607, 615-16, 903 A.2d 191 (Conn. 2006).

The "identifiable person-imminent harm exception has three requirements: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm . . . . All three must be proven in order for the exception to apply.'" *Haynes v. City of Middletown*, 314 Conn. 303, 312-11, 101 A.3d 249 (2014) quoting *Edgerton v. Clinton*, 311 Conn. 217, 229, 86 A.3d 437 (2014). The Connecticut Supreme Court held that "the proper standard for determining whether a harm was imminent is whether it was apparent to the municipal defendant that the dangerous condition was so likely to cause harm that the defendant had a clear and unequivocal duty to act immediately to prevent the harm." *Haynes*, 314 Conn. at 322-23; *Ravalese v. Town of E. Hartford*, No. 3:16-cv-1642 (VAB), 2019 U.S. Dist. LEXIS 99935 at * 27-8 (D. Conn. June 14, 2019). The "discrete

person/imminent harm" exception to the general rule of governmental immunity for employees engaged in discretionary activities has received very limited recognition in this state." *Evon v. Andrews*, 211 Conn. 501, 507, 559 A.2d 1131 (1989). The *Evon* Court did not find liability when a harm might occur at some unknown time in the future, or not at all, when fire inspections did not occur as required. *Id*. at 508. Imminent harm is "harm ready to take place within the immediate future." *Tryon v. N. Branford*, 58 Conn.App. 702, 712, 755 A.2d 317 (2000). Consequently, summary judgment should enter for Defendants on Plaintiffs' common law negligence claims as there is no identifiable person-imminent harm.

At all times relevant to the events set forth in Plaintiffs' First Amended Complaint, no policy controlled whether records obtained without a warrant would be filed in the Property Room or the Records Division and detectives were free to keep records in either room. (Defs.' Rule 56a Statement ¶154 at 32). Detectives routinely made copies of records to be kept at their desks as working copies. (Defs.' Rule 56a Statement ¶178, at 36). The City of New Haven's Police Department did not have a policy or procedure prohibiting detectives from making and using working copies of records. (Defs.' Rule 56a Statement ¶179, at 36). During the course of the Deli robbery and murder investigation, Defendant Adger obtained cell phone billing records for various persons of interest, via both search warrant and informal request, and made working copies of these for herself and Defendants Dease and Breland and filed the original records in the Records Division. (Defs.' Rule 56a Statement ¶¶152-153, at 32). Defendant Adger reviewed these cell phone billing records in an attempt to connect various persons of interest to the Deli robbery and murder but was unable to do so and abandoned her efforts in that regard when Brown confessed to committing the crime with the plaintiff. (Defs.' Rule 56a Statement ¶¶173-175, at 36). Since she was unable to analyze the cell phone records and the investigation was

concluded, Defendant Adger deemed the cell phone records to be immaterial. (Defs.' Rule 56a Statement ¶176, at 36). When Defendant Adger was promoted in 2000, she cleaned out the contents of her desk in the Investigative Services Division, boxed up the contents, and brought them home for storage in her basement. (Defs.' Rule 56a Statement ¶¶180-182, at 36-37).  She was unaware that the working copies of the cell phone records obtained in the course of the Deli robbery and homicide were among the contents of the materials stored in her basement. (Defs.' Rule 56a Statement ¶¶183, 190, at 37, 38). She did not become aware of the working copy of the cell phone records until she cleaned up her basement after a flood, which was about one week prior to her receiving a call from an investigator from the Office of the Federal Public Defender. (Defs.' Rule 56a Statement ¶¶183-184, at 37). When Defendant Adger received a call from an investigator from the Office of the Federal Public Defender on January 30, 2018, she promptly turned over her working copies of the cell phone records. (Defs.' Rule 56a Statement ¶187, at 37-38). Defendant Adger's actions were appropriately within her discretion.

**SEVENTH, EIGHTH, AND ELEVENTH CAUSE OF ACTION**
**BARRED BY THE STATUE OF LIMITATIONS**
**(AGAINST DEFENDANTS DEASE, ADGER AND BRELAND)**

**I.     The Amended Complaint Alleges Wrongful Conduct Outside of the Applicable Statute of Limitations.**

In the Seventh, Eighth, and Eleventh Counts of the First Amended Complaint, Plaintiffs alleged violations of the Connecticut Constitution and common law negligence. These claims were brought on or about May 6, 2020. *See* First Amended Complaint, Seventh, Eighth, and Eleventh Counts. The remainder of the state law claims are directed at the City of New Haven. *Id*. at generally.

The Seventh Count sounds in negligence and alleges that Defendants breached their "duty to exercise reasonable care in their investigation of crimes, to pursue and disclose

exculpatory evidence and to refrain from fabricating evidence". *Id*. at Seventh Count. The Eighth Count alleges a private right of action against Defendants pursuant to Article First, §§ 7 (the right to be free from unreasonable searches and seizures), 8 (due process of law for those criminally accused), and 9 of the Connecticut Constitution (no person shall be arrested, detained, or punished except in cases clearly warranted by law). *Id*. at Eighth Count. Defendants are alleged to have violated the foregoing by causing Plaintiffs to be wrongfully arrested, charged, prosecuted, convicted, and incarcerated through coercion of witnesses, fabrication of evidence, withholding evidence, and failing to conduct an adequate investigation. *Id*. The Eleventh Count is based in negligence and claims Defendants had a continuing duty to disclose exculpatory phone records. *Id*. at Eleventh Count.

Defendants did not have a fiduciary or other special relationship with Plaintiffs. Defendants did not commit acts or fail to perform acts giving rise to a situation affecting Plaintiff, which evolved over time. Plaintiffs Horn and Jackson were arrested for the Deli robbery and homicide on March 22, 1999 and March 24, 1999, respectively. *See* Superior Ct. Record. Evidence began in Plaintiffs' trial for the Deli robbery and homicide on March 30, 2000. *See* Trial Transcript, CR6-748455 and CR6-0193254T, Mar. 30, 2000. Plaintiffs were convicted on April 19, 2000 and sentenced on June 2, 2000. *See* Trial Transcript, CR6-748455 and CR6-0193254T, Apr. 19, 2000, p. 16-22 and Trial Transcript, CR6-748455 and CR6-0193254T, June 2, 2000.

### A. Connecticut General Statutes § 52-584 Statute Of Limitations is Applicable to Negligence Based Personal Injury Claims.

Conn. Gen. Stat. § 52-584 provides, in pertinent part, that

No action to recover damages for injury . . . to real or personal property, caused by negligence . . . shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should

have been discovered, and except that no such action may be brought more than
three years from the date of the act or omission complained of . . . .

The statute, by its very language "makes it applicable to actions to recover damages to
real or personal property, caused by negligence." *Sinotte v. Waterbury*, 121 Conn. App. 420, 429,
995 A.2d 131 (2010) (internal quotations omitted).

§ 52-584 imposes two time restrictions on causes of action sounding in negligence. The
first restriction requires that a plaintiff bring an action within two years from the date on which
the injury alleged is first sustained, discovered or, in the exercise of reasonable care, should have
been discovered. *See Johnson v. N. Branford*, 64 Conn. App. 643, 648, 781 A.2d 346 (2001);
*Rosato v. Mascardo*, 82 Conn. App. 396, 401, 844 A.2d 893 (2004). The second restriction, the
statute of repose, provides an absolute bar to any cause of action brought more than three years
from the date of the act or omission complained of. *Id.*; *McDonald v. Haynes Medical Lab'y,
Inc.*, 192 Conn. 327, 334, 471 A.2d 646 (1984). The determination of whether a plaintiff's claim
is barred by the statute of limitations is a question of law. *Lindsay v. Pierre*, 90 Conn. App. 696,
699 (2005).

In ascertaining whether a cause of action has been timely commenced in accordance with
Conn. Gen. Stat. § 52-584, Connecticut appellate courts have consistently held that,

> an injury occurs when a party suffers some form of actionable harm….
> Actionable harm occurs when the plaintiff discovers … that he or she has been
> injured and that the defendant's conduct caused such injury…. The statute begins
> to run when the plaintiff discovers some form of actionable harm, not the fullest
> manifestation thereof…. The focus is on the plaintiff's knowledge of facts rather
> than on discovery of applicable legal theories.

> *Rosato*, 82 Conn. App. at 404-05 (alteration in original), *quoting Mountaindale
> Condominium Assoc. v. Zappone*, 59 Conn. App. 311, 323 (2000).

Given that accrual of a cause of action is "a singular moment in time", Connecticut
Appellate Courts have stressed that, "[a]llowing that point in time to be pushed forward so long

as it is claimed that the negligence conduct continued would eviscerate the policies underlying the statute of limitations." *Id.* Accordingly, any claim under "the continuing course of conduct doctrine has no application after a plaintiff has discovered the harm." *Rosato*, 82 Conn. App. at 405.

Under the discovery portion of Conn. Gen. Stat. § 52–584, Plaintiffs were required to bring their actions on or before March 22 and 24, 2001, two years from the date of their arrests for the Caprice Hardy homicide on March 22 and 24, 1999.[11] Plaintiffs undisputedly knew of the alleged injuries as of the date of arrest for a murder they claim they did not commit. More specifically, Plaintiffs knew of the alleged falsity of the confessions offered by Steve Brown given their contentions that they never met Brown, as well as that of Marcus Pearson given that Pearson's statements implicated them in a crime, they contend that they did not commit. Finally, Plaintiffs knew of their alleged wrongful arrests, prosecution, and convictions as of the time of their arrests in March of 1999, given that they maintain that they were and are innocent of the charges against them. The fact that Plaintiffs may not have been aware of the fullest manifestations of the harms allegedly suffered does not alter the analysis. *See Rosato*, 82 Conn. App. at 405; *Mountaindale Condominium Assoc.*, 59 Conn. App. at 323; *Lindsay*, 90 Conn. App. at 701.

Accordingly, consistent with well-established Connecticut precedent, the statute of limitations on Plaintiffs' state law negligence claims began to run on March 22 and 24, 1999. Plaintiffs were required, therefore, to bring the state law negligence claims on or before March 22 and 24, 2001, at the latest. Plaintiffs, however, did not file the instant negligence claims until September 7, 2018, over 17 years beyond the statute of limitations for bringing said claims.

---

[11] Alternatively, the claims could not be brought more than two years from the date of conviction on April 19, 2000.

Plaintiffs' state law negligence claims are, thus, barred by the two-year statute of limitations set forth in Conn. Gen. Stat. § 52-584.

Notwithstanding the foregoing, Plaintiffs' actions would, nevertheless, be barred pursuant to the statute of repose set forth in § 52-584. The three-year statute of repose set forth in § 52-584 specifies the time beyond which a cause of action under § 52-584 is *absolutely barred*. *See Rosato*, 82 Conn. App. 396; *McDonald*, 192 Conn. at 334. "The statutory clock on this three-year time limit ***begins to run when the negligent conduct*** of the defendant ***occurs***." *Johnson*, 64 Conn. App. at 648 (emphasis added). A cause of action may, therefore, be time barred even where no injury occurs within the three years following defendant's alleged negligent act or omission. *Id.*  As set forth above, Defendants' conduct underlying Plaintiffs' negligence claims occurred on or before March 22 and 24, 1999. Plaintiffs' claims are, therefore, absolutely barred by the three-year statute of repose set forth in Conn. Gen. Stat. § 52-584.

Accordingly, Defendants are entitled to summary judgment as a matter of law as Plaintiffs' state law negligence claims are expressly barred by the applicable statute of limitations set forth in Conn. Gen. Stat. § 52-584.

### B. Connecticut General Statutes § 52-577 Statute of Limitations Applicable to § 1983 and Connecticut Constitutional Claims.

Plaintiffs' federal constitutional claims brought pursuant to § 1983 and Connecticut Constitutional claims are governed by the general tort statute of limitations set forth in Conn. Gen. Stat. § 52-577. *See Harnage v. Torres*, 665 Fed. App'x 82, 83 (2d Cir. 2016); *Lounsbury v. Jeffries*, 25 F.3d 131, 132–34 (2d Cir. 1994); *Tagliaferi v. Town of Hamden*, No. 3:10cv1759 (JGM), 2014 WL 129223, at *9 n. 12 (D. Conn. Jan. 14, 2014); *Spencer v. CT*, 560 F. Supp. 2d 153, 158 (D. Conn. June 18, 2008); *In re State Police Litigation*, 888 F. Supp. 1235, 1249 (D. Conn. May 16, 1995).

The statute of repose also bars any cause of action based on negligence. The statute of limitations date for state law claims under Conn. Gen. Stat. § 52-577 is governed by the "occurrence" rule, which allows the action to be brought within three years of the date of the act complained of. Conn. Gen. Stat. § 52-577; *Weiner v. Clinton*, 106 Conn. App. 379, 386 (2008); *McDonald*, 192 Conn. at 334; *Gojcaj v. Danbury*, 2016 U.S. Dist. LEXIS 696, *15-16 (Shea, USDJ). By its very language, Conn. Gen. Stat. § 52–577 "is a statute of repose that sets a fixed limit after which the tortfeasor will not be held liable...." *Pagan v. Gonzalez*, 113 Conn. App. 135, 139, 965 A.2d 582 (2009), *quoting LaBow v. Rubin*, 95 Conn. App. 454, 468, 897 A.2d 136 (2006).

When analyzing whether a claim was timely brought under Conn. Gen. Stat. § 52-577, the "relevant date of the act or omission of . . . is the date when the negligent conduct of the defendant occurs and not the date when the plaintiffs first sustain damage. *Farnsworth v. O'Doherty*, 85 Conn. App. 145, 149, 856 A.2d 518, 2004 Conn. App. LEXIS 399; *see also Rosenfield v. Rogin, Nassau, Caplan, Lassman & Hirtle, LLC*, 69 Conn. App. 151, 158-59 (2002); *Johnson*, 64 Conn. App. at 648. "When conducting an analysis under § 52-577, the only facts material to the trial court's decision on a motion for summary judgment are the date of the wrongful conduct alleged in the complaint and the date the action was filed. . . . The three year limitation period of § 52-577 begins with the date of the act or omission complained of, not the date when the plaintiff first discovers an injury." (Citation omitted; internal quotation marks omitted.) *Collum v. Chapin*, 40 Conn. App. 449, 451, 671 A.2d. 1329, (1996).

"General Statutes § 52-577 is a statute of repose in that it sets a fixed limit after which the tortfeasor will not be held liable and in some cases will serve to bar an action before it accrues. . ." *Carson v. Allianz Life Ins. Co. of N. Am.*, 184 Conn. App. 318, 330, 194 A.3d 1214, 1223

(2018); *see also Johnson*, 64 Conn. App. at 648. "In construing our general tort statute of limitations [, General Statutes § 52-577,] . . . we have concluded that the history of that legislative choice of language precludes any construction thereof delaying the start of the limitation period until the cause of action has accrued or the injury has occurred . . . The date of the act or omission complained of is the date when the . . . conduct of the defendant occurs . . . [Section] 52-577 is an occurrence statute and . . . its limitation period does not begin when the plaintiff first discovers an injury[.]" (Citations omitted; internal quotation marks omitted.) *Certain Underwriters at Lloyd's, London v. Cooperman*, 289 Conn. 383, 408, 957 A.2d 836, 850 (2008); *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 212, 541 A.2d 472 (1988). The Connecticut Supreme Court has considered how the statute of limitations and repose might act to deprive a plaintiff of a remedy. "Unfortunately, the unavoidable result we reach in this case is harsh. The plaintiff may very well be foreclosed from any remedy for what might have been an actionable injury. But it is within the General Assembly's constitutional authority to decide when claims for injury are to be brought." *Burns v. Hartford Hosp.*, 192 Conn. 451, 460, 472 A.2d 1257, 1261 (1984).

In this case, the latest possible date in which the alleged negligent conduct or violations of the Connecticut Constitution could have occurred is the date of conviction, which was April 19, 2000. Plaintiffs were aware of the alleged wrongful arrests, prosecutions, and convictions as of this date, given that they maintain that they were and are innocent of the charges against them. The Complaint in this case was filed on March 13, 2019, nearly nineteen years after the date of conviction. *See* Complaint. The only relevant dates when analyzing this motion for summary judgment are the date of the alleged conduct and the date the action was filed. Using those dates,

the negligence and violation of the Connecticut Constitution claims are clearly well outside of the applicable three-year statute of limitations.

## II.     The Statute of Limitations Has Not Been Tolled.

In Connecticut, the statute of limitations of Conn. Gen. Stat. § 52-577 can be tolled by a continuous course of conduct. However, the statute of limitations was not tolled in this case.

The continuing course of conduct doctrine may be used to toll the statute of limitations in certain circumstances. *See Blanchette v. Barrett*, 229 Conn. 256, 275 (1994). In order for the continuing course of conduct doctrine to apply to toll the statute of limitations in a matter, "there must be evidence of the breach of a duty that remained in existence after the commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong." *Id*. A finding that a duty continued to exist after the act or omission relied upon may be made only where "there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act." *Id*. The doctrine of continuing course of conduct is best suited "to claims where the situation keeps evolving after the act complained of is complete… rather than one where the situation cannot change, such as legal malpractice arising from [allegedly] negligent drafting of the written word." *Sanborn v. Greenwald*, 39 Conn. App. 289, 2298 (1995).

Connecticut appellate courts have consistently refused to apply the continuing course of conduct doctrine after a plaintiff has discovered the harm. *See Rosato*, 82 Conn. App. at 405; *Connell v. Colwell*, 214 Conn. 242, 255 (1990). In this regard, any purported continuing duty by a defendant terminates when the plaintiff's cause of action accrues, i.e., when the plaintiff discovers that he or she has been injured and that the defendant's conduct caused such injury.

*See Id*. Consistent with the foregoing, the court in *Rosato* expressly held that "the continuing course of conduct doctrine has no application after the plaintiff has discovered the harm." *Rosato*, 82 Conn. App. at 405. In so holding, the *Rosato* court cited, with approval, the reasoning set forth in *Rivera v. Fairbank Management Properties, Inc.*, 45 Conn. Supp. 154, 160 (1997), that "[u]pon discovery of actionable harm, the policy behind the continuing course of conduct doctrine, to preserve the ongoing relationship with the hope that any potential harm from a negligent act or omission may yet be remedied, no longer has any force." *Id*.

Furthermore, Connecticut courts have recognized that equitable tolling *does not* apply to Conn. Gen. Stat. § 52-584 or 52-577. *Lopez v. Travelers Companies, Inc.*, No. AAN-CV-15-6019474S, 2016 WL 2890477, at *6 (Conn. Super. Ct. Apr. 26, 2016); *see also Saperstein v. Danbury Hosp.*, No. X06-CV-07-5007185S, 2010 WL 760402, at *13 (Conn. Super. Ct. Jan. 27, 2010) ("the law is well established that equitable tolling does not apply to statutes of repose.").

"The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied." *Sanborn v. Greenwald*, 39 Conn. App. 289, 296 (1995).  Once the conduct is performed, however, in the absence of a fiduciary relationship between the plaintiff and the alleged tortfeasor, the conduct has been completed and the limitations period begins to run.  It is undisputed that almost nineteen years lapsed since the conviction in this matter and the filing of this case, and Plaintiffs undoubtedly had knowledge of the harm at the time of their conviction. Once Plaintiffs were convicted on April 19, 2000, Defendants' conduct ended. These claims against Defendants were brought on or about May 6, 2020. *See* Am. Compl., Seventh, Eighth, and Eleventh Counts. Therefore, there was no continuing course of conduct on the part of Defendants, and there could never be any wrongful

act by Defendants after the date of conviction that would justify tolling the statute of limitations to allow claims that Defendants were negligent or violated the Connecticut Constitution.

Because the continuing course of duty doctrine also does not toll the statute of limitations for claims arising out of the 2000 conviction, those claims remain time-barred.

## **CONCLUSION**

For the foregoing reasons, Defendants Leroy Dease, Petisia Adger, and Daryle Breland respectfully request that Summary Judgment enter in their favor as to Counts One, Two, Three, Four, Seven, Eight, and Eleven of Plaintiff's Amended Complaint [Doc. 110].

Respectfully submitted

/s/Jeffrey R. Zehe
Jeffrey R. Zehe
Bradford S. Krause
NIELSEN, ZEHE & ANTAS, P.C.
55 W. Monroe, Suite 1800
Chicago, Illinois 60603
(312) 322-9900
jzehe@nzalaw.com
bkrause@nzalaw.com

/s/ Thomas E. Katon
Thomas E. Katon
Federal Bar No. ct 01565
SUSMAN, DUFFY & SEGALOFF, P.C.
55 Whitney Ave.
New Haven, CT 06510
(203) 624-9830
tkaton@susmanduffy.com
*Attorneys for Individual Defendants*