UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VERNON HORN,

      Plaintiff,

V.                       No. 3:18-cv-1502(RNC)

CITY OF NEW HAVEN, ET AL.,

      Defendants.
_____

MARQUIS JACKSON,

      Plaintiff,

V.                       No. 3:19-cv-388(RNC)

CITY OF NEW HAVEN, ET AL.,

      Defendants.


RULING AND ORDER

    Plaintiffs Vernon Horn and Marquis Jackson bring these consolidated actions under 42 U.S.C. § 1983 and state law against the City of New Haven, former New Haven Police Department Detectives Leroy Dease, Petisia Adger and Daryle Breland, and State of Connecticut firearms examiner James Stephenson.  Plaintiffs seek

1

compensation for allegedly wrongful convictions that caused them to serve lengthy terms of imprisonment. This memorandum addresses the claims against the Detectives under § 1983.

The plaintiffs advance four legal theories in suppport of these claims: suppression of material exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963); fabrication of false inculpatory evidence in violation of the Due Process Clause of the Fourteenth Amendment; mishandling of exculpatory evidence resulting in unreasonably prolonged detention in violation of the Fourth and Fourteenth Amendments; and failure to intervene to prevent others from committing the foregoing violations.  The Detectives have moved for summary judgment on all these claims and the plaintiffs have filed a cross-motion for partial summary judgment.

The parties' briefs are unusually extensive, as is the underlying record.  After careful consideration, the Detectives' motion for summary judgment on the

claims under § 1983 is denied as to the <u>Brady</u> claims,
granted as to the claims alleging fabrication of
evidence and unreasonably prolonged detention, and
denied as to the claims for failure to intervene.  The
plaintiffs' cross-motion for partial summary judgment
is denied.

I.

On January 24, 1999, at about 3:25 a.m., three
gunmen entered the Dixwell Deli in New Haven, a 24-hour
convenience store.  Two wore full-face ski masks; the
third wore a similar mask or bandana.  Immediately upon
entering, one of the three sprayed five or six bullets
from a 9-millimeter pistol in the direction of the cash
register.  A customer of the Deli, Caprice Hardy, was
standing there waiting to get change for his purchase
of a pack of cigarettes.  One of the bullets struck him
in the back, killing him.  Yousif Abbey, an employee of
the Deli, was standing at the register facing Hardy.
He was shot in the left shoulder and fell to the floor
pretending to be dead.  One of the robbers tried to

open the register but it was locked.  He called out,
"Get the n***** from the back."  Vernon Butler, an off-
duty employee of the Deli, was then brought at gunpoint
from a back room to the front of the Deli to open the
register but he did not have the key.  One of the
robbers then took $2,000 from Abbey's pocket.  Small
amounts of money were also taken from Kendall Thompson
and Howard Roberts, both of whom entered the Deli
during the robbery.  In addition, a cell phone
belonging to Butler was stolen from the back room.  At
the sound of an approaching siren, the three
perpetrators fled.  Butler called 911 and the police
arrived almost immediately.  Detective Dease was
dispatched to the scene to lead the investigation.  He
was subsequently assisted by Detectives Adger and
Breland.

Approximately, one week after the robbery, the
Detectives obtained a "call detail record" for the
stolen cell phone from Omnipoint Communications, the
service provider.  The record showed that five calls

were made from the phone before service was shut off.[1]
The first call was made approximately forty-five
minutes after the robbery to a number in Bridgeport
associated with Willie Sadler.  Through interviews of
Sadler and his friend Willie Newkirk, the Detectives
eventually learned that the first call was made by
Steven Brown, a 16-year-old resident of Bridgeport.
Brown's fingerprints matched prints found on a cigar
box in the back room of the Deli.  Detectives Dease and
Adger obtained a warrant for Brown's arrest charging
him with felony murder and other offenses.

---

[1] The record shows the following five calls:

(1) a call to a Bridgeport number on January 24, at 4:14 a.m.
(first call);

(2) a call to a Bridgeport number on January 24, at 10:48 p.m.
(second call);

(3) a call to a Bridgeport number on January 25, at 10:40 a.m.
(third call);

(4) a call to a New Haven number on January 25, at 11:07 a.m.
(fourth call); and

(5) a call to a Bridgeport number on January 25, at 2:32 p.m.
(fifth call).

Brown was arrested at his residence in Bridgeport and transported to NHPD headquarters.  Dease told Brown that they knew he used the stolen cell phone to call Sadler after the robbery and that his fingerprints were found at the Deli.  Brown agreed to waive his Miranda rights.  He was questioned by Dease and Adger during a "pre-interview" that lasted up to an hour.  The pre-interview was not recorded.

After the pre-interview, Adger took a taped statement from Brown in which he admitted his involvement in the robbery and identified the other perpetrators as Horn and Jackson, both New Haven residents, then 17 and 19.

According to Brown's statement, he met Horn and Jackson at a club in Bridgeport a few hours before the robbery.  He had met them in Bridgeport a few times before and knew them by their nicknames, "Tai" and "Son."  After the club closed, the three drove around in Jackson's car smoking marijuana and eventually stopped at the Deli.  Brown did not realize Horn and

Jackson were planning to rob it.  Horn entered first
and started firing.  At that point, it was too late for
Brown to back out.

Arrest warrants were obtained for Horn and Jackson
based principally on Brown's statement.  Horn was
charged with the murder of Caprice Hardy; Jackson was
charged with felony murder.  Brown agreed to testify
against them.  He subsequently pleaded guilty to
manslaughter in exchange for a prison sentence capped
at 25 years, suspended after 18, with a right to argue
for a lesser sentence based on his truthful trial
testimony.

In 2000, Horn and Jackson were tried together in
Connecticut Superior Court.  At the trial, the State
relied primarily on Brown's testimony, which was
generally consistent with his taped statement.  To
corroborate his testimony, the State presented the call
detail record for the stolen cell phone.  The time of
each call and the number called were plainly set forth

in the call detail record, but the site of the origin of each call was not.

Brown testified that he made the first call to Sadler, while he, Horn and Jackson were in Jackson's car driving from New Haven to Bridgeport after the robbery.  He testified that he made the second call later that day, and the third call the next morning, both to acquaintances in Bridgeport.  He testified that after making the third call, he gave the phone to Horn, who was with him in Bridgeport at the time.

Another witness for the State, Marcus Pearson, testified that he made the fourth call listed in the record.  The record showed that the call was made to a landline at a West Haven residence not long after the third call.  Pearson testified that he made the fourth call from his home in New Haven after borrowing the phone from Horn.  Pearson testified that he used the phone to call his friend, Crystal Sykes, who worked as a live-in aide at the residence in West Haven.

In addition to Brown and Pearson, the State
presented a number of other witnesses, including the
following:

Kendall Thompson testified that he entered the
Deli during the robbery and was immediately confronted
by a black male wearing a ski mask.  He was ordered to
the floor at gunpoint and robbed of his only dollar.
When the robber went to the back of the Deli, Thompson
got up and ran away.

Thompson testified that he could not say that Horn
and Jackson were in the Deli at the time of the robbery
because the robbers wore masks.  But he acknowledged
making an identification of Horn and Jackson when he
was shown a photo array two days after the robbery.
Thompson testified that he selected Horn's photo
because the yellowish eyes and mouth of the person in
the photo resembled the eyes and mouth of the person
who took his dollar.  He testified that he signed
Jackson's photo because he was familiar with Jackson's
complexion from seeing him in the neighborhood and his

complexion looked like that of the gunman who tried to
open the register.

Shaquan Pallet testified that on the day of the
robbery, he and the murder victim, Cecil Hardy, took a
taxi to the Deli after getting off work.  As he and
Hardy entered the Deli, he saw Horn and Jackson, both
of whom he knew from the neighborhood, standing outside
smoking "wet."  Hardy bought a pack of cigarettes, gave
Pallet a few from the pack and Pallet began to leave
the Deli.  As he exited, he saw Horn and Jackson
outside with masks.  Fearing he was going to be robbed,
he hurried to the taxi and was driven away, leaving
Hardy behind.

Regina Wolfson testified that she was in a car
outside the Deli at the time of the robbery when she
saw a black male run out of the Deli and get into a
car, which quickly took off.  Then, two black males,
possibly wearing hats, came out of the Deli.  She
testified that Horn looked like one of the two men she

saw outside the Deli at that time.  Her level of
certainty was 75%.

 In his closing argument, the prosecutor emphasized
the importance of the testimony of Pearson and
Thompson:

> [Counsel for Vernon Horn] will tell you, well,
> this is only a snitch case.  Mr. Pallet, he's
> getting . . . something.  Mr. Brown, he's
> getting something.  Let me ask you this, ladies
> and gentlemen.  What is Marcus Pearson getting
> out of this?  Is he a snitch?  Did he get some
> sort of consideration?  He's a friend of Mr.
> Horn's.  He is the one that puts that stolen
> cell phone in Mr. Horn's hands . . . . He
> signed those pictures three times.  Why did the
> police have him do that?  They wanted to make
> certain, one hundred percent certain, that Mr.
> Pearson was certain that he got that stolen
> cell phone from Mr. Horn.  That's why they went
> to him numerous times and had him sign those
> pictures numerous times. . . .
>
> So, the defense would have you believe . . .
> [that] [i]f you don't believe Steven Brown and
> if you don't believe Shaquan Pallet the case is
> over.  Well, how did Mr. Horn get that stolen
> cell phone a day after this murder and robbery?
> Marcus Pearson told you in his testimony and he
> told the New Haven police shortly after this
> incident happened that Mr. Horn gave him that
> phone.  What are the chances, ladies and
> gentlemen, of all of these identifications and
> Mr. Horn having a piece of incriminating

evidence that was stolen from the Deli that
night? . . .

[Kendall Thompson] looks at these pictures and
does he say that he's absolutely certain that
it's Mr. Horn and Mr. Jackson[?]  No, he
doesn't say that.  He says these are the guys I
believe were in the store.  That's what he
says.  What a coincidence.  Did Mr. Thompson
know Regina Wolfinger?  Did he know Shaquan
Pallet?  Did he know Steven Brown?  Did they
all get together and frame Mr. Horn and Mr.
Jackson? . . .  You've now got several
different people who don't even know each other
picking out the same photographs.  The same
photographs.

Kendell Thompson, how could he have possibly
known who did this robbery, they had masks on.
Kendall Thompson knew these people.  So don't
isolate each single piece of evidence.  If you
do that the State wouldn't ask you to return
verdicts of guilty on just an identification of
Kendall Thompson . . . . But when you examine
[the evidence] in its totality, when you
examine all of those identifications, when you
examine Mr. Horn's conduct and statements
following the crime, when you examine Mr.
Marquis Jackson's misstatements and the lies
about where he was, and when you consider all
of that, all of those identifications made by
independent, separate people, and when you
consider the fact that Mr. Horn, the day after
this murder had Mr. Butler's stolen cell phone,
when you examine all of that, the only
reasonable and logical conclusion that you can
come to is that both of these defendants had
been proven guilty beyond a reasonable doubt.

ECF 237-1 at 36, 53-54, 56-58.

The jury convicted Horn on ten counts and Jackson
on seven counts and they were sentenced to prison for
70 years and 45 years, respectively.

## II.

After unsuccessful appeals, Horn and Jackson
challenged their convictions through state habeas
proceedings.  Jackson's habeas petition alleged that
his counsel rendered ineffective assistance in failing
to present alibi witnesses and in failing to develop
and present a defense of third-party culpability.  In
support of the latter claim, Jackson alleged that
Brown's co-perpetrators were part of a network of
violent drug dealers in Bridgeport that included
Sadler, Newkirk and Brown's brother-in-law.  In
addition, Jackson's habeas petition included a claim of
actual innocence.

After a trial, the habeas court ruled that
Jackson's counsel's performance was not deficient: the
alibi witnesses who testified that they saw Jackson
with Horn in the hours leading up to the robbery could

13

not account for his whereabouts at the time of the
robbery; and no evidence placed any of the allegedly
culpable third parties at the scene of the robbery or
in possession of any proceeds.  Jackson's claim of
actual innocence was rejected because the evidence at
the habeas trial, although creating a reasonable doubt
as to his guilt, failed to demonstrate that he could
not have committed the crimes.  Jackson's appeal from
the denial of his habeas petition was unavailing.  See
Jackson v. Comm'r of Corr., 149 Conn. App. 681 (2014),
appeal dismissed, 321 Conn. 765 (2016).

    Like Jackson's habeas petition, Horn's included
claims of ineffective assistance of counsel and actual
innocence.  In particular, he claimed that his counsel
failed to investigate the State's theory that he was in
possession of the stolen cell phone the day after the
robbery.  At his habeas trial, Horn presented evidence
that an adequate investigation would have revealed that
Pearson's testimony concerning the fourth call was
false.  This evidence included testimony by Sadler,

14

Newkirk and Pearson.  Sadler testified that he made the
fourth call to the residence in West Haven where Sykes
worked in order to speak with Newkirk, her boyfriend at
the time.  Newkirk testified that he received the
fourth call from Sadler while visiting Sykes.  And
Pearson admitted that his criminal trial testimony
concerning his use of the phone was false.  A
representative of Omnipoint testified that information
concerning the location of the origin of the calls
could have been obtained at the time of the criminal
trial by Horn's counsel had it been requested.

    In 2013, Horn's habeas petition was granted by the
trial court.  The court found that Horn's counsel
rendered deficient performance in failing to
investigate the use of the cell phone in the days after
the robbery.  It was incumbent on Horn's counsel to
conduct an investigation in light of the implausibility
of the State's claim that Horn (1) took the phone from
Brown in Bridgeport after 10:40 a.m., (2) gave it to
Pearson in New Haven before 11:07 a.m., and (3)

returned it to Brown in Bridgeport before 2:32 p.m.

Had Horn's counsel obtained origination information

from Omnipoint, the information would have established

that all five calls were actually made in Bridgeport,

contrary to Pearson's testimony that he made the fourth

call in New Haven after borrowing the phone from Horn.

Further, an adequate investigation would have shown

that the fourth call was made by Sadler to Newkirk and

that Pearson never got the phone from Horn.  The court

ruled that Horn's counsel's deficient performance was

prejudicial under Strickland v. Washington, 466 U.S.

668, 688, 698-700 (1984).  On this basis, it ordered

that Horn's convictions be set aside.  Horn was then

released from prison pending the State's appeal. See

Horn v. Warden, No. CV010456995, 2014 WL 3397826 (Conn.

Super. Ct. June 3, 2014)(Young, J.).

In 2016, the Connecticut Supreme Court reversed

the grant of habeas relief and Horn was returned to

prison.  See Horn v. Comm'r of Corr., 321 Conn. 767

(2016).  On the appeal, the State conceded that Horn's

counsel was ineffective in failing to conduct an
adequate investigation regarding the use of the stolen
cell phone but argued that this deficiency was not
prejudicial.  The Supreme Court agreed.  Horn's
counsel's failure to investigate was not prejudicial,
the Court stated, because the evidence presented at the
habeas hearing concerning the use of the phone did not
conclusively establish that Pearson could not have made
the fourth call after borrowing the phone from Horn,
nor give rise to a reasonable probability that the
verdict would have been different if the evidence had
been presented to the jury.  321 Conn. at 791.  No such
reasonable probability had been shown because the
evidence presented at the habeas trial relating to the
use of the cell phone did not cast doubt on the
criminal trial testimony of the witnesses who placed
Horn at the Deli before, during and after the robbery.

Horn and Jackson remained incarcerated until 2018,
when the State moved to vacate their convictions.  The
State's motion was precipitated by evidence brought to

17

light by Horn's counsel in a then-pending federal habeas case.  The new evidence included F.B.I. analysis of records showing the location of the origin of the calls made from the stolen cell phone.  The analysis established that all five calls were indeed made in Bridgeport.  This evidence cast doubt on the credibility of Brown's trial testimony that Horn and Jackson were with him when he made the first call. More importantly, it refuted Pearson's trial testimony concerning the fourth call, which was the only evidence besides Brown's testimony linking Horn to the stolen phone.

The State's motion to vacate the convictions also took account of telephone records for a number of phones, including Sadler's and the phone at the West Haven residence.  These records had been obtained by Detective Adger prior to the criminal trial - Sadler's by means of a letter to his service provider, and the residence's by means of a search warrant served on Southern New England Telephone Company.  In 2018,

Horn's habeas counsel found the letter and search warrant in NHPD's files on the Dixwell Deli case but not the telephone records.  Adger, by then retired, was contacted and asked whether she had any records.  Her working copy of the telephone records was in a box in the basement of her home.  She retrieved the records so they could be turned over to Horn.

The records show that the fourth call listed in the call detail record was made in response to a call from the residence to Sadler's pager two minutes earlier.  This evidence vindicated the findings of the Superior Court in Horn's habeas trial that the fourth call was made not by Pearson to Sykes but by Sadler to Newkirk.

The State's motion to vacate the conviction was granted and the plaintiffs were released from prison. The charges against them were later dropped.  The prosecutor responsible for making the decision concluded that although the newly discovered evidence

did not exonerate the plaintiffs, it sufficiently undercut the State's case to prevent a retrial.

The plaintiffs then brought these actions.

III.

The plaintiffs make the following claims against the Detectives under § 1983:

First, they claim that the Detectives withheld from the prosecutor information favorable to the defense in violation of the Due Process Clause of the Fourteenth Amendment as construed in Brady.

Second, they claim that the Detectives fabricated evidence used to convict the plaintiffs despite knowing the plaintiffs were innocent in violation of the Due Process Clause.

Third, they claim that they were subjected to unreasonably prolonged detention due to conscience-shocking conduct on the part of the Detectives in violation of the Fourth and Fourteenth Amendments. And

Fourth, they claim that each Detective is liable for failing to intervene to prevent the others from violating the plaintiffs' constitutional rights.

A.

Under Brady, due process requires a police officer to disclose to a prosecutor evidence in the officer's possession that is favorable to an accused either because it is exculpatory or can be used to impeach a prosecution witness.  A Brady violation occurs when evidence of this nature is not disclosed and there is a reasonable probability that, had it been disclosed, the result of the proceeding would have been different. United States v. Bagley,  473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression

21

'undermines confidence in the outcome of the trial.'"
Kyles v. Whitley, 514 U.S. 419, 434 (1995)(quoting
Bagley, 473 U.S. at 678).

In support of the Brady claims, the plaintiffs
allege that the Detectives engaged in improper tactics
in witness interviews in order to obtain evidence to
sustain Dease's theory that the plaintiffs were guilty.
These tactics included coercing witnesses in off-the-
record interviews to get them to say what the
Detectives wanted them to say, then taking formal
statements omitting information that could be used to
impeach the witnesses.

The plaintiffs' primary claims are that the
Detectives failed to disclose information relating to
off-the-record interviews of Thompson and Pearson.
These claims are based principally on Thompson's and
Pearson's deposition testimony that Dease and Breland
coerced them to make false statements.[2]  In addition,

_____

[2] As pleaded and briefed, the Brady claims do not encompass
failure to disclose information relating to the post-arrest

they advance a claim based on Detective Adger's failure to disclose the telephone records showing that the fourth call was made by Sadler to Newkirk.

With regard to the Brady claims relating to Thompson and Pearson, evidence in the summary judgment record, viewed most favorably to the plaintiffs, would permit a jury to find the following.

### Kendall Thompson

Two days after the robbery, Dease and Breland interviewed Thompson.  Then 19, Thompson was on adult probation.  He did not want to speak with the Detectives about what happened at the Deli.  He was afraid he would be charged simply because he was there. But Breland threatened to tell his probation officer if he failed to cooperate.

The Detectives showed Thompson a photo array and asked if he could identify the gunman who robbed him.

---

interview of Brown.  The Brady claims do include a claim arising from Dease's interview of Pallet on March 23.  However, this claim fails as a matter of law because it is undisputed that the prosecutor was present throughout the interview.

The array included photos of Horn and Jackson because, although no physical evidence linked either of them to the robbery/murder, Dease had reason to view them as suspects.  Thompson said "about eighteen times" that it was impossible for him to provide an identification because the robbers wore masks.

Dease and Breland disputed Thompson's statements that no identification was possible.  They pointed out that the robber's eyes and mouth could have been visible through holes in the mask.

Dease kept putting Horn's picture in front of Thompson telling him to look at the eyes.  Thompson eventually gave in and provided an identification.  At Dease's request, he signed not just Horn's photo but also Jackson's.

### Marcus Pearson

After obtaining the call detail record and interviewing Sykes, Detectives Dease and Breland interviewed Pearson.  They showed him the call detail

24

record and told him it showed that the fourth call was
made from his porch to Sykes while Horn was visiting
him the day after the robbery.  He told them he had no
idea what they were talking about and denied that he
made any call using any phone.  They falsely insisted
that the call detail record proved the call was made.
They told him that either Horn let him use the phone or
he stole it himself from the Deli and kept asking
"Which one is it?"  They said they were going to charge
one of them, so unless he said he got the phone from
Horn, he would be charged with Hardy's murder.  Pearson
was afraid they would arrest him and he would lose
custody of his children, so he ultimately capitulated
and said he used the phone to call Sykes after getting
it from Horn.

     In a prior oral ruling, I addressed the Brady
claims relating to Thompson and Pearson and concluded
that they raise genuine issues for trial as to Dease
and Breland.  See Oral Ruling, Tr. 13-17 (ECF 320).  I
adhere to that ruling.

25

The defendants do not dispute (and defense experts admit) that the matters described in Thompson's and Pearson's deposition testimony concerning their interactions with Dease and Breland constitute impeachment material that must be disclosed under Brady.  And it is undisputed that these matters were not disclosed to the prosecutor.[3]  Accordingly, the issue is whether there is a reasonable probability that, had these matters been disclosed, the result of the trial would have been different.

To be clear, the undisclosed matters encompass at least the following: (1) as to Thompson, Breland's threat to call Thompson's probation officer if he failed to cooperate; Thompson's repeated statements that he could not make an identification of anyone; the Detectives' insistence that Thompson could see the robber's eyes and mouth; and Dease's persistent demands

---

[3] The defendants contend that the interactions now described by Thompson and Pearson did not happen.  However, Thompson's and Pearson's recantations are not so incredible that they can be rejected as a matter of law.

that Horn look closely at Horn's photo, especially the eyes; (2) as to Pearson, Pearson's repeated denials that he used the stolen phone to call Sykes; and the Detectives' explicit threats to charge Pearson with Hardy's murder unless he said he got the phone from Horn.

The plaintiffs contend that, considered in the aggregate, these matters "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435.  I agree.

As shown by the excerpts from the prosecutor's closing argument set forth above, the State relied heavily on the testimony of Pearson (Horn's "friend") and Thompson (who "knew" both Horn and Jackson) to dispel misgivings the jury could have about relying on the testimony of Brown and Pallet, both of whom were cooperating in exchange for leniency.  Had Thompson's and Pearson's interactions with Dease and Breland, as now described, been available for impeachment of their

trial testimony, the value of their testimony to the
prosecution would have been substantially reduced, if
not destroyed.  A reasonable juror likely would have
rejected both Thompson's identification testimony and
Pearson's testimony regarding the fourth call.
Moreover, disclosure of these matters would have
provided defense counsel with grounds to attack the
good faith of the investigation.  At a bare minimum, it
would have caused a reasonable juror to view the
testimony of Brown and Pallet with heightened
skepticism.  Accordingly, the reasonable likelihood
standard is satisfied.  See Kyles, 514 U.S. at 441-49.

The Detectives contend that they are entitled to
qualified immunity on these claims.  Accepting
Thompson's and Pearson's deposition testimony as true,
Dease and Breland are not protected by qualified
immunity on the Thompson- and Breland-related Brady
claims insofar as the claims are based on their failure
to disclose the witnesses' off-the-record statements.
Whether qualified immunity protects them against

liability for failure to disclose the methods they
allegedly used to get the witnesses to change their
statements presents a closer question.  But neither
side has grappled with this question, so I do not reach
it.

    "Qualified immunity gives government officials
breathing room to make reasonable but mistaken
judgments, and protects all but the plainly incompetent
or those who knowingly violate the law."  Messerschmidt
v. Millender, 565 U.S. 535, 546 (2012)(internals
quotations omitted).  "[W]hether an official protected
by qualified immunity may be held personally liable for
an allegedly unlawful official action generally turns
on the 'objective legal reasonableness' of the action,
assessed in light of the legal rules that were 'clearly
established' at the time the action was taken."  Id.
(quoting Anderson v. Creighton, 483 U.S. 635, 639
(1987)).

    The defendants suggest that because Thompson and
Pearson were reluctant to cooperate, just like many

witnesses in similar circumstances, their initial
denials could reasonably be considered immaterial under
Brady.  However, the witnesses' off-the-record
statements flatly contradicted the statements the
officers forwarded to the prosecutor.  Any reasonable
officer would have known that failure to reveal the
off-the-record statements to the prosecutor would
violate an officer's disclosure obligations under
Brady.

   That the officers had a similarly obvious
obligation to disclose the coercive methods they
allegedly used to get the witnesses to contradict
themselves is less clear cut.  In 1999, an officer's
obligation under Brady to disclose coercive methods
used to obtain inculpatory evidence co-existed with
widespread use of "the Reid technique," an
interrogation strategy that included outright deception
and refusal to take no for an answer.  Because the Reid
technique was widely used at the time, perhaps a
reasonable officer in the Detectives' position could

think that their alleged threats and persistent refusal

to take no for an answer did not have to be disclosed

to the prosecutor.  In that case, partial summary

judgment based on qualified immunity could be available

to the Detectives on the Thompson- and Pearson-related

Brady claims to the extent the claims go beyond

nondisclosure of the witnesses' off-the-record

statements.  But this argument has not been raised by

the defendants specifically, and I do not think it is

fairly raised by their overall reliance on qualified

immunity generally.  Accordingly, I conclude that they

are not entitled to partial summary judgment.

     With regard to the claim based on Detective

Adger's alleged concealment of the telephone records, I

previously ruled that the records are material and

adhere to that ruling.  The records show that the

fourth call was made to the West Haven residence two

minutes after a call was made from the residence to

Sadler's pager.  Disclosure of this information would

have had a significant impact on the State's case

against Horn.  In addition, it would have bolstered a third-party culpability defense by placing the phone in Sadler's possession within 36 hours of the robbery.[4]

I previously ruled that whether the records were intentionally withheld also presents a genuine issue for trial.  I adhere to this ruling as well.

The defendants contend that a jury would have to credit Detective Adger's testimony that she put the records in the records room at NHPD, where they would be available to the prosecutor.  Detective Adger's plausible testimony might well be accepted by a jury. However, whether she put the records there or decided not to presents an issue of fact that is genuinely disputed.

---

[4] The defendants contend that the records do not support a third-party culpability instruction because they disclose no direct connection between the robbery and Sadler, Newkirk or anyone else, as required to support such an instruction under State v. Sauris, 227 Conn. 389, 401 (1993).  In the context of the record developed at the criminal trial, however, Sadler's possession of the phone established a sufficiently direct connection between him and the robbery to warrant a third-party culpability instruction.

In 1999, proper handling of the records required
that they be put in the records room so they would be
available to the prosecutor.  The prosecutor had an
open file policy for discovery.  It is undisputed that
the records were not made available to the defense in
discovery.  They were not produced during the state
habeas litigation.  And when Horn's federal habeas
counsel looked for them, they could not be found.

The parties advance competing explanations for
this state of affairs.  The plaintiffs contend that a
jury could reasonably infer that Adger failed to put
the records in the records room in the first place.
The better inference in the defendants' view is that
she put them there and they were removed by third
parties.

In support of their respective positions, the
parties present detailed arguments concerning the
possible inferences that may be drawn from careful
analysis and weighing of the evidence (or lack of

evidence).  These arguments are more in keeping with closing arguments in a jury trial.

Having considered the parties' arguments, I conclude that a jury could reasonably find that the records were not placed in the records room.  Were a jury to make that finding, it would then be up to the jury to decide whether the records were intentionally withheld from the prosecutor.

In a recent submission following my oral ruling, Jackson has clarified that the Brady claim is based not only on Detective Adger's failure to disclose the original records but also her failure to disclose her working copy of the records, which she marked up and used to create a flow chart of the calls.  Adger has testified that she simply did not see the connection between the fourth call to the West Haven number and the call to Sadler's pager two minutes earlier. Construing her deposition testimony most favorably to the plaintiffs, and giving them the benefit of reasonable inferences, a jury could find that Adger and

Dease went over her working copy and flow chart of the calls, saw the connection, and decided not to disclose these materials to the prosecutor.[5]

This leaves the issue whether no <u>Brady</u> violation occurred because the plaintiffs' defense counsel could have obtained the telephone records themselves from other sources.  The plaintiffs do not dispute that their counsel could have obtained the records with minimal effort.  But they argue that this did not absolve the defendants of their obligation under <u>Brady</u> to disclose the records to the prosecutor.

The plaintiffs are correct.  In the Second Circuit, if the prosecution fails to disclose <u>Brady</u> material to the defense, due process is violated although the material was available to the defense from another source.  <u>See</u> <u>Lewis v. Conn. Comm'r of Corr.</u>, 790 F.3d 109, 121 (2d Cir. 2015) ("[<u>Brady</u>] imposes no duty upon a defendant, who was reasonably unaware of

---

[5] There is no evidence that Breland saw the records or discussed their contents with Adger or Dease.

35

exculpatory information, to take affirmative steps to
seek out and uncover such information in the possession
of the prosecution in order to prevail."); 6 Wayne R.
LaFave, et al., Criminal Procedure § 24.3(b) n.87 (4th
ed. 2023 update).  Thus, the ability of the plaintiffs'
defense counsel to obtain the records from other
sources does not necessarily preclude the Brady claim
as a matter of law.

    The defendants do not contend that the
availability of the records from other sources would
compel a jury to find that Adger lacked the state of
mind required for liability.  Even so, I have
considered whether the evidence is insufficient to
support a reasonable inference that she withheld the
records for the purpose of preventing their use at
trial.  Since Horn's counsel had not only the ability
to get the records but also a duty to investigate the
use of the stolen phone (as established in the habeas
litigation), a jury may find that Adger reasonably
expected him to get the records and thus lacked the

culpable state of mind necessary for liability.  But
the evidence is not so clear that the suppression issue
can be decided in her favor as a matter of law.[6]

B.

Turning to the fabrication claims, the plaintiffs
allege that the Detectives framed them for Hardy's
murder, knowing they were innocent, by manufacturing
the evidence that was used to convict them.  They point
to Brown's testimony identifying them as perpetrators;
Pallet's testimony that he saw them as he was leaving
the Deli; and Pearson's testimony that he borrowed the
phone from Horn and used it to call Sykes.

"To succeed on a fabricated-evidence claim, a
plaintiff must establish that 'an (1) investigating
official (2) fabricate[d] information (3) that is

_____

[6] The defendants' arguments regarding qualified immunity do not
include an argument that a reasonable officer in Adger's
position in 1999 could think that because Horn's counsel was
able to get the records himself, she did not have to disclose
them to the prosecutor.  Accordingly, I do not address the issue
here.

likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[red] [sic] a deprivation of life, liberty, or property as a result.'" Ashley v. City of New York, 992 F.3d 128, 139 (2d Cir. 2021) (quoting Garnett v. Undercover Officer C0039, 838 F.3d 265, 279 (2d Cir. 2016)); see Barnes v. City of New York, 68 Fed.4th 123, 128 (2d Cir. 2023); Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997).

 A fabrication claim against an officer differs significantly from a claim that the officer used improper methods to obtain evidence.  As the Seventh Circuit has stated:

> Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false.  Fabricated testimony is testimony that is made up; it is invariably false.  False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it.

Petty v. City of Chicago, 754 F.3d 416, 422 (7th Cir. 2014) (quoting Fields v. Wharrie, 740 F.3d 1107, 1110

(7th Cir. 2014)); see also Anderson v. City of
Rockford, 932 F.3d 494, 510-11 (7th Cir. 2019).

Stated differently, it is one thing for a
detective to use improper tactics to pressure a witness
to provide a statement that may be true and the witness
believes to be true.  It is another to use such tactics
to force a witness to provide a statement that is false
and known to be false by both the detective and the
witness.  Only the latter provides a basis for a
fabrication claim.

Second Circuit decisions in fabrication cases
reflect this distinction.  Compare Norales v. Acevedo,
No. 21-549, 2022 WL 17958450, at *4-5 (2d Cir. Dec. 27,
2022)(fabrication claim based on allegations that
officer coerced witness to make unreliable
identification through promise of leniency and threat
of prosecution properly dismissed; witness testified
that she truthfully identified the plaintiff) with
Frost v. N.Y.C. Police Dep't, 980 F.3d 231, 251 (2d
Cir. 2020)(fabrication claim sufficiently supported to

survive motion for summary judgment in view of
recanting witness's affidavit stating that he falsely
identified the plaintiff because the officer made it
clear to him that he would need to do so in order to
get a deal).

In a prior oral ruling, I concluded that the
Detectives' motion for summary judgment on the
fabrication claims must be granted because the evidence
is insufficient to raise a genuine issue on the element
of knowing falsity.  Oral Ruling, Tr. 30-41 (ECF 320).
I adhere to that ruling.[7]

With regard to Brown's testimony, the plaintiffs
allege that Dease manipulated Brown to identify the
plaintiffs as perpetrators and that Brown went along
with the fraud to protect his friends in Bridgeport.  A

---

[7] The plaintiffs claim that Dease and Breland fabricated Sykes's
statement that Pearson made the fourth call then used it to
pressure Pearson to falsely confirm that in fact he did make the
call.  In my prior ruling, I agreed that the evidence permits a
reasonable finding that Dease and Breland manufactured Sykes's
statement but not the further finding required for a fabrication
claim that they knew her statement was false.  I adhere to that
conclusion.

reasonable jury could credit the plaintiffs' testimony that they are innocent and therefore find that Brown's identification of them was false.  But Brown has never recanted, and his testimony against them may be true.  Moreover, even assuming the plaintiffs are actually innocent, they offer no evidence to support their assertion that Dease knew they were innocent when he interviewed Brown.  The claim that Dease used Brown to frame them thus fails to raise a genuine issue for trial.

Pallet's testimony that he saw the plaintiffs as he exited the Deli after getting cigarettes from Hardy may be false.  The taxi driver does not recall Pallet getting out of the taxi and accompanying Hardy into the Deli; and a crime scene photo shows an unopened pack of cigarettes on the counter where Hardy was standing when he was shot.  In addition, were Pallet to testify at a trial in these cases, he could be impeached based on out-of-court statements he has allegedly made admitting that he falsely implicated the plaintiffs.  The issue,

however, is not whether a jury could reasonably reject Pallet's testimony that he saw the plaintiffs at the Deli but whether a jury could reasonably find that Dease manufactured Pallet's testimony knowing the plaintiffs were not there.  The record evidence, viewed most favorably to the plaintiffs, is insufficient to make this a genuine issue for trial.

The evidence supporting the Pearson-related fabrication claim is also insufficient.  The Detectives interviewed Pearson about the fourth call because Sykes, after saying she knew him, agreed there was a good possibility he made the call.  Pearson had previously admitted that he and Horn were together on his porch the morning the call was made.  In the circumstances, the Detectives could credit Pearson's statement that he did make the call to Sykes, notwithstanding his previous denials.  In any event, there is no evidence they knew the call was made by someone else.

C.

Plaintiffs' unreasonably prolonged detention claims seek damages for the Detectives' failure to investigate the numbers in the "ORIG" column of the call detail record, which show that all the calls originated in Bridgeport, and the telephone records, which show that the fourth call was made by Sadler to Newkirk.  Plaintiffs contend that these claims fit within the scope of the cause of action for unreasonably prolonged detention recognized by the Second Circuit in Russo v. City of Bridgeport, 479 F.3d 196, 205 (2d Cir. 2007).  The defendants move for summary judgment arguing that Russo cannot be extended to apply to the facts presented here.  I agree.

It is well-established that an arrest based on probable cause prevents recovery of damages against an arresting officer for pretrial detention caused by the officer's failure to conduct an inadequate investigation.  See Curley v. Vill. of Suffern, 268 F.3d 65, 70 (2d Cir. 2001) ("Once a police officer has a reasonable basis for believing there is probable

43

cause, he is not required to explore and eliminate
every theoretically plausible claim of innocence before
making an arrest.") (alteration omitted) (citation
omitted); Krause v. Bennett, 887 F.2d 362, 372 (2d Cir.
1989)("[An officer's] function is to apprehend those
suspected of wrongdoing, and not to finally determine
guilt through a weighing of the evidence.").  The
decision in Russo does not disturb this rule.  Rather,
it speaks to the availability of a damages remedy when
a person arrested on probable cause suffers prolonged
detention due to the arresting officer's conscience-
shocking failure to promptly disclose to the prosecutor
exculpatory evidence of great significance in the
officer's exclusive possession.

In Russo, the plaintiff was arrested for armed
robbery of a convenience store.  The arresting officers
told him they had a surveillance camera videotape of
the crime.  The plaintiff, who had prominent body
tattoos covering his neck and arms, insisted he was
innocent and asked the officers to check the video for

tattoos.  They later told him that they checked the
video, and it showed tattoos.  In fact, the video
showed that the perpetrator had no tattoos on his
forearms.  The plaintiff remained in pretrial detention
for months until the prosecutor looked at the videotape
and realized the plaintiff was innocent.

 The plaintiff sued the officers claiming that
their conduct violated his right to due process.  The
District Court ruled that the officers had no due
process duty to investigate the plaintiff's assertion
of innocence.  The Second Circuit reversed.  The Court
held that in the circumstances, the officers had a duty
to check the videotape for tattoos.  The plaintiff's
continued detention caused by the officers' conscience-
shocking failure to disclose the video to the
prosecutor within a reasonable time violated the
plaintiff's Fourth Amendment right to be free from an
unreasonable seizure.[8]

---

[8] Since Russo, the Second Circuit has considered the legal
sufficiency of claims for unreasonably prolonged pretrial

In accordance with the holding in Russo, district courts in the Second Circuit have recognized that to recover damages for unreasonably prolonged detention, the plaintiff must prove that he would have been released were it not for the defendant's conscience-shocking mishandling of highly significant evidence of the plaintiffs' actual innocence.  See Connelly v. Komm, 20-cv-1060, 2022 WL 13679562, at *6 n.9 (D. Conn. Oct. 21, 2022); Cafasso v. Nappe, 15-cv-920, 2017 WL 4167746, at *7 (D. Conn. Sept. 20, 2017); Jackson v. City of New York, 29 F. Supp. 3d 161, 179 (E.D.N.Y. 2014); Creighton v. City of New York, 12-cv-7454, 2017

---

detention in six cases.  In all six, the claim failed.  In Waldron v. Milana, 541 Fed. Appx. 5, 8-9 (2d Cir. 2013), the claim failed because the evidence was not "plainly exculpatory." See Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006).  In Wilson v. City of New York, 480 Fed. Appx. 592, 595 (2d Cir. 2012), the claim failed because some of the evidence at issue actually supported the charge against the detainee.  In Nzegwu v. Friedman, 605 Fed. Appx. 27, 32 (2d Cir. 2015), there was no proof the officer "tampered with, lost, tainted or concealed" exculpatory evidence.  In Virgil v. Town of Gates, 455 Fed. Appx. 36, 40 (2d Cir. 2012), the pleadings did not "support an inference that [the] defendants 'actively hid . . . exculpatory evidence.'"  See Russo, 479 F.3d at 210.  In two other cases, the period of pretrial detention was not sufficiently prolonged to support a claim.  See Husbands ex rel. Forde v. City of New York, 335 Fed. Appx. 124, 129 (2d Cir. 2009); Marchand v. Hartman, 395 F. Supp. 3d 202, 224-25 (D. Conn. 2019).

WL 636415, at *46 (S.D.N.Y. Feb. 14, 2017); <u>Pierre v.
City of Rochester</u>, 16-CV-6428, 2018 WL 10072453, at *14
(W.D.N.Y. Sept. 7, 2018); <u>Vazquez-Mentado v. Buitron</u>,
12-CV-0797, 2014 WL 12894096, at *3 (N.D.N.Y. July 9,
2014).[9]

    Plaintiffs allege that it would have been obvious
to anyone looking at the call detail record in 1999
that "ORIG" was an abbreviation for "origination."
They further allege that, in view of the potential
significance of the calls listed in the "ORIG" column,
the Detectives' failure to investigate what the numbers
meant may reasonably be viewed as conscience-shocking.

---

[9] The parties appear to assume that a <u>Russo</u> claim can be brought
to recover for unreasonably prolonged imprisonment following a
conviction.  Whether a <u>Russo</u> claim is available in the post-
conviction context is questionable.  However, since an officer's
disclosure obligations under <u>Brady</u> continue after conviction,
the duty recognized in <u>Russo</u> may logically continue as well
(predicated on the Due Process Clause of the Fourteenth
Amendment rather than the Fourth Amendment).  In any event, I
assume without deciding that a claim can be brought under § 1983
to obtain redress for a sentenced prisoner's unreasonably
prolonged imprisonment caused by conscience-shocking conduct
that would support a <u>Russo</u> claim based on unreasonably prolonged
pretrial detention.

But the numbers in the "ORIG" column are readily distinguishable from the videotape in Russo.

In Russo, the videotape itself exonerated the plaintiff, just as he said it would.  No investigation was required to verify the plaintiff's actual innocence beyond simply examining the videotape, as he requested. Anyone looking at the tape for evidence of the plaintiff's tattoos would have realized that his assertion of innocence was true.  Yet the officers either failed to look at the tape or, if they did look, they lied to the plaintiff about what it showed. Either way, their conduct was conscience-shocking.

Unlike the videotape in Russo, the numbers in the "ORIG" column were not in the Detectives' exclusive possession and they did not have obvious significance as evidence of the plaintiffs' actual innocence. Plaintiffs' assertion that they did is belied by the history of the proceedings arising from the robbery/murder.  As far as the record shows, at no point prior to 2018 did any lawyer, investigator,

48

witness, or judge recognize the potential significance of the numbers in the "ORIG" column.  Moreover, unlike the videotape in Russo, the F.B.I.'s analysis in 2018 falls well short of establishing that the plaintiffs are actually innocent.  In these circumstances, the Detectives' failure to look into the meaning of the numbers in the "ORIG" column cannot reasonably be considered conscience-shocking.

Nor are the telephone records comparable to the videotape in Russo.  The plaintiffs allege that Detective Adger should have used the records to develop a case against Brown's associates in Bridgeport.  For reasons discussed above, the records' value as exculpatory evidence is sufficient to satisfy the materiality standard applicable to a Brady claim.  But the standard applicable to a Russo claim is more demanding.  The exculpatory evidence must be highly significant if not dispositive.  Because the plaintiffs cannot satisfy this requirement, the Russo claims fail as a matter of law.

D.

To prevail on a § 1983 claim against a police officer for failure to intervene, a plaintiff must prove that (1) a violation of his constitutional rights was ongoing or about to occur, (2) the defendant knew this at the time, (3) the defendant had a reasonable opportunity to intervene to prevent harm to the plaintiff, and (4) the defendant failed to take reasonable steps to intervene. Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988)).

Consistent with the foregoing discussion, Dease and Breland are each potentially liable for failing to intervene to prevent the other from withholding Thompson- and Pearson-related Brady material. And Dease is potentially liable for failing to intervene to prevent Adger from withholding the telephone records,

50

if not the originals, then her working copy and flow chart of the calls.[10]

V.

Plaintiffs contend that they are entitled to summary judgment on the Pearson- and Thompson-related Brady claims because Dease and Breland do not dispute that they failed to disclose the following: Pearson's denial that he called Sykes, Thompson's statement that he could not identify the robbers, and Breland's statement to Thompson that unless he cooperated they would call his probation officer.  Defendants contend that their admitted failure to disclose this information does not automatically entitle the plaintiffs to summary judgment.  I agree.

---

[10] District courts in other circuits have ruled that qualified immunity applied to similar failure-to-intervene Brady claims because it was not clearly established at the pertinent time that an officer had a duty to prevent another from withholding Brady material.  See Virgil v. City of Newport, 545 F.Supp.3d 444, 488 (E.D. Ky. 2021); Elkins v. Summit County, No. 5:06-cv-3004, 2009 WL 1150114, at *9 (N.D. Ohio Apr. 28, 2009).  However, the defendants have not pressed this argument, so I do not address it here.

51

Plaintiffs' motion is based on the standards that govern a criminal defendant's ability to obtain relief from a conviction based on a <u>Brady</u> violation.  A prosecutor's failure to disclose information favorable to the defense, whether intentional or inadvertent, provides a basis for setting aside a conviction, and a conviction will be vacated if the undisclosed information undermines confidence in the verdict. <u>Brady</u>, 373 U.S. at 87.  However, in a suit for damages against a police officer under § 1983, the plaintiff must prove that the officer concealed the information from the prosecutor with a sufficiently culpable state of mind and that but for the officer's wrongful conduct the outcome would have been different.

The plaintiffs contend that, even assuming these standards apply, they are still entitled to summary judgment.  But the evidence regarding the Detectives' state of mind, viewed fully and most favorably to the Detectives, does not permit me to find as a matter of law that they concealed the information in bad faith to

prevent its use at trial.  Nor can I find as a matter
of law that but for the Detectives' concealment of the
information, the plaintiffs would not have been
convicted.


                              VI.

     Accordingly, the Detectives' motion for summary
judgment is denied as to the Brady claims, granted as
to the claims for fabrication of evidence and
unreasonably prolonged detention, and denied as to the
claims for failure to intervene, and the plaintiffs'
cross-motion for partial summary judgment is denied.

     So ordered this 19th day of March 2024.


                         _____
                              /s/ RNC
                         Robert N. Chatigny
                         United States District Judge


                              53